1
                UNITED STATES DISTRICT COURT
2
          FOR THE NORTHERN DISTRICT OF CALIFORNIA
                  SAN JOSE DIVISION
3

GILEAD SCIENCES, INC.,
4
        PLAINTIFF,          CASE NO.  CV-13-4057-BLF
5
   VS.                SAN JOSE, CALIFORNIA
6
MERCK & CO., INC., ET AL.,   MARCH 10, 2016
7
        DEFENDANTS.       VOLUME 5
8
                 PAGES 637 - 762
9
         TRANSCRIPT OF TRIAL PROCEEDINGS
10
      BEFORE THE HONORABLE BETH LABSON FREEMAN
         UNITED STATES DISTRICT JUDGE
11
          A-P-P-E-A-R-A-N-C-E-S
12
FOR THE PLAINTIFF:   FISH & RICHARDSON PC
                BY:  JUANITA R. BROOKS
13
                     JONATHAN SINGER
                     DOUGLAS MCCANN
14
                     MICHAEL FLOREY
           222 DELAWARE AVENUE, 17TH FLOOR
15
           P.O. BOX 1114
           WILMINGTON, DELAWARE 19801
16

FOR THE DEFENDANTS:  WILLIAMS & CONNOLLY, LLP
17
                BY:  BRUCE R. GENDERSON
                     JESSAMYN BERNIKER
18
                     STANLEY FISHER
                     SANJIV LAUD
19
                     JESSICA RYEN
                     STANLEY FISHER
20
           725 TWELFTH STREET, N.W.
           WASHINGTON, DC 20005
21

   (APPEARANCES CONTINUED ON THE NEXT PAGE.)
22

OFFICIAL COURT REPORTERS:  IRENE L. RODRIGUEZ, CSR, CRR
23
                      CERTIFICATE NUMBER 8074
                      LEE-ANNE SHORTRIDGE, CSR, CRR
24
                      CERTIFICATE NUMBER 9595

25
    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
TRANSCRIPT PRODUCED WITH COMPUTER.

```
 1        A P P E A R A N C E S:  (CONT'D)

 2
          FOR THE DEFENDANTS:     HUGHES, HUBBARD & REED
 3                                BY:  STEPHEN S. RABINOWITZ
                                       DAVID LANSKY
 4                                     MITCHELL E. EPNER
                                       PATRICE JEAN
 5                                ONE BATTERY PARK PLAZA
                                  NEW YORK, NEW YORK 10004
 6

 7


 8        ALSO PRESENT

 9

10        FOR THE PLAINTIFF:      GILEAD
                                  BY:  LORIE ANN MORGAN
11                                     ANDREA HUTCHISON
                                       JAMISON LYNCH
12                                333 LAKESIDE DRIVE
                                  FOSTER CITY, CALIFORNIA  94404
13

14        FOR THE DEFENDANTS:     MERCK
                                  BY:  MICHAEL HOLSTON
15                                     WILLIAM KROVATIN
                                  126 EAST LINCOLN AVENUE
16                                P.O. BOX 2000
                                  RAHWAY, NEW JERSEY  07065
17
                                  IONIS
18                                BY:  CLIFF FORD
                                       JASON D. FERRONE
19                                2855 GAZELLE COURT
                                  CARLSBAD, CALIFORNIA  92010
20

21

22

23

24

25
```

1

2                        INDEX OF PROCEEDINGS

3

4       FOR THE PLAINTIFF:

5       **VALENTINO STELLA**

                DIRECT EXAM BY MR. SINGER (RESUMED)      P. 642
6               CROSS-EXAM BY BY MR. RABINOWITZ          P. 687
                REDIRECT EXAM BY MR. SINGER              P. 708
7
        **JOHN (JACK) SECRIST**
8              DIRECT EXAM BY MS. BROOKS                P. 710

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                      INDEX OF EXHIBITS

3                              IDENT.          EVIDENCE
         PLAINTIFF'S:
4

5          24                                   674

6

7

8

9

10

11       DEFENDANTS':

12       2644                                   695
         2649                                   697
13       2648                                   698
         802                                    702
14       742                                    705

15

16

17

18

19

20

21

22

23

24

25

```
 1    SAN JOSE, CALIFORNIA                    MARCH 10, 2016

 2                    P R O C E E D I N G S

 3        (JURY IN AT 9:03 A.M.)

 4            THE COURT:  GOOD MORNING EVERYONE.  PLEASE BE

 5    SEATED.

 6        WE'RE ON THE RECORD.  ALL OF OUR JURORS ARE HERE.

 7            MR. RABINOWITZ:  YOUR HONOR, SINCE BOTH OF THE

 8    PATENTS ARE IN EVIDENCE, I WAS WONDERING WHETHER THE JURY

 9    MEMBERS COULD BE PROVIDED WITH THE HIGHLIGHTED COPIES.

10            THE COURT:  I THOUGHT THEY WERE GIVEN THAT ON THE

11    FIRST DAY OF THE TRIAL.

12            MR. RABINOWITZ:  I DON'T BELIEVE THAT HAPPENED.

13            THE COURT:  THAT'S WHAT I THOUGHT.  BUT IT'S BETTER

14    LATE THAN NEVER.

15        LADIES AND GENTLEMEN, YOU'VE HEARD ABOUT THESE PATENTS AND

16    IT'S MY PRACTICE TO GIVE YOU A COPY OF IT AND HIGHLIGHT THE

17    CLAIMS THAT ARE AT ISSUE.  IT'S ONLY BECAUSE THE PRINTS ARE A

18    LITTLE SMALL AND I WANT YOU TO BE ABLE TO SEE THOSE PORTIONS.

19        OBVIOUSLY THE ENTIRE EXHIBIT IS IMPORTANT, LIKE ALL OTHER

20    EXHIBITS, AND YOU'RE TO USE IT AS YOU DEEM APPROPRIATE.

21        ALL RIGHT.  WE ARE BACK ON THE RECORD AND DR. STELLA HAS

22    RETURNED.

23        I'M GOING TO HAVE YOU STAND AND BE SWORN FOR A NEW COURT

24    DAY.

25        **(PLAINTIFF'S WITNESS, VALENTINO STELLA, WAS SWORN.)**
```

1          THE WITNESS:  YES.

2          THE CLERK:  THANK YOU.

3          THE COURT:  MR. SINGER, GO AHEAD.

4          MR. SINGER:  THANK YOU, YOUR HONOR.

5               **DIRECT EXAMINATION (RESUMED)**

6    BY MR. SINGER:

7    Q.   GOOD MORNING.

8         GOOD MORNING TO EVERYONE.

9         DR. STELLA, WE BROKE AFTER YOU DESCRIBED YOUR BACKGROUND

10   TO THE JURY AND WE QUALIFIED YOU AS AN EXPERT.  LET'S GET RIGHT

11   TO THE OPINIONS YOU'VE REACHED.

12        DR. STELLA, HAVE YOU REACHED ANY OPINIONS ON THE VALIDITY

13   OF THE '499 PATENT IN THIS CASE?

14   A.   YES, I HAVE.

15   Q.   AND HAVE YOU WORKED WITH OUR ART DEPARTMENT TO CREATE A

16   SLIDE PRESENTATION EXPLAINING THOSE OPINIONS SO THAT MAYBE WE

17   CAN GO THROUGH THIS A LITTLE MORE EFFICIENTLY AND SPEEDILY?

18   A.   YES.

19   Q.   ALL RIGHT.  LET'S, IF WE COULD, HAVE UP THE FIRST SLIDE OF

20   DR. STELLA.

21        YOU'VE CHARACTERIZED THIS AS A SUMMARY OF YOUR OPINIONS.

22   IF YOU COULD, FOR THE JURY, DESCRIBE YOUR FIRST BULLET IN THE

23   OPINION.

24   A.   BASICALLY THAT THE CLAIMS COVER A NUMBER OF POTENTIAL

25   PRODRUGS, AND THAT THE COMPOUNDS WITH NO SUPPORTIVE DISCLOSURE,

1    MEANING THAT THERE'S NO DATA, AND NO PRODRUG EXAMPLES THAT ARE

2    WITHIN THE SCOPE OF THE CLAIMS, THAT MEANS THAT IN THE CLAIM,

3    NONE OF THE COMPOUNDS IN THE CLAIMS OR PRODRUGS IN THE CLAIMS

4    APPEAR IN THE SPECIFICATION.

5    Q.   AND WHAT IS THE CONSEQUENCE OF THAT, IN YOUR OPINION, AS

6    TO THE VALIDITY OF THE ASSERTED CLAIMS OF THE '499 PATENT?

7    A.   WELL, BECAUSE OF THAT I THINK THE CLAIMS ARE NOT -- THEY

8    LACK ENABLEMENT AND IT DOES NOT TEACH ONE HOW TO MAKE AND USE A

9    PRODRUG CLAIMED FOR THE TREATMENT OF HCV.

10        IT ALSO DOESN'T MEET THE CRITERIA OF WHAT WE CALL WRITTEN

11   DESCRIPTION.  IT DOES NOT SHOW THAT THE INVENTORS ACTUALLY

12   INVENTED ANY OF THE PRODRUGS OR THE CLAIMED CLASS OF COMPOUNDS.

13   Q.   OKAY.  THE FIRST THING YOU SAY HERE -- AND I'M GOING TO

14   UNDERLINE IT AND WE'LL WIPE IT AWAY -- YOU SAY THAT THE CLAIMS

15   COVER UNLIMITED POTENTIAL PRODRUG COMPOUNDS.

16        IF WE CAN GO TO THE NEXT SLIDE.  THIS IS CLAIM 1 AND WE

17   HAVE ALL SEEN IT BEFORE WITH OTHER WITNESSES.

18        AND IT'S CALLED A METHOD OF TREATING HEPATITIS C VIRUS

19   INFECTION COMPRISING ADMINISTERING TO A MAMMAL IN NEED OF SUCH

20   TREATMENT A THERAPEUTICALLY EFFECTIVE AMOUNT OF A COMPOUND OF

21   THE MARKUSH STRUCTURE.

22        DID I READ THAT CORRECTLY?

23   A.   YES.

24   Q.   NOW, DR. STELLA, I DON'T SEE THE WORD "PRODRUG" THERE.  I

25   DON'T SEE IT.  WHY DO YOU SAY THAT THE CLAIM COVERS UNLIMITED

1   POTENTIAL PRODRUGS?

2   A.   WELL, THE -- I'VE HIGHLIGHTED THE WORD "ADMINISTERING"

3   HERE.  THE COURT HAS CONSTRUED, IN WHAT WE CALL CLAIM

4   CONSTRUCTION, THAT ADMINISTERING MEANS PROVIDING A COMPOUND OF

5   THE INVENTION OR A PRODRUG OF THE COMPOUND OF THE INVENTION TO

6   AN INDIVIDUAL IN NEED.

7        SO IT'S IN THAT CONSTRUCTION THAT THE WORD PRODRUG --

8   ADMINISTERING IS WHAT INCLUDES THE PRODRUGS.

9   Q.   SO IF I UNDERSTAND, AND THIS IS NEW FOR THE JURY AND THEY

10  HAVE NOT HEARD THIS BEFORE, THE WORD "ADMINISTERING" HAS A

11  SEPARATE MEANING THAT THE PARTIES ARE TO APPLY IN THIS CASE; IS

12  THAT CORRECT?

13  A.   THAT'S CORRECT.

14  Q.   AND THAT MEANING YOU'VE LISTED ON YOUR PDX-604 AS

15  PROVIDING A COMPOUND OF THE INVENTION OR A PRODRUG OF THE

16  COMPOUND OF THE INVENTION TO THE INDIVIDUAL IN NEED.

17       WHY DO YOU SAY THAT DEFINITION MEANS THAT THE CLAIM COVERS

18  UNLIMITED POTENTIAL PRODRUGS?

19  A.   BECAUSE IT SAYS ANY PRODRUG.  A PRODRUG OF ANY COMPOUND

20  WITHIN THE CLAIM, RIGHT?

21  Q.   IS THE CLAIM LIMITED TO ANY PARTICULAR TYPE OF PRODRUG?

22  A.   NO, NOT AT ALL.

23  Q.   OKAY.  IT SIMPLY HAS TO BE A PRODRUG OF ONE OF THE

24  COMPOUNDS COVERED BY THE CLAIMS; IS THAT CORRECT?

25  A.   THAT'S MY UNDERSTANDING, YES.

1    Q.   OKAY.  NOW, LET'S STEP BACK -- NOW THAT WE HAVE THE CLAIM

2    AND WHAT IT COVERS, LET'S STEP BACK TO THE REASONS FOR YOUR

3    OPINIONS.  ALL RIGHT?  CAN WE DO THAT?

4    A.   YES.

5    Q.   FIRST OFF, A LITTLE FORMALITY.  WE WENT THROUGH THIS WITH

6    DR. SEEGER.  DID YOU, DR. STELLA, ANALYZE THE CLAIMS FROM THE

7    REQUIRED PERSPECTIVE, REQUIRED UNDER PATENT LAW, OF THIS

8    HYPOTHETICAL, MADE UP PERSON OF ORDINARY SKILL IN THE ART,

9    WHICH WE LEARNED IS ACTUALLY KIND OF A TEAM OF PEOPLE, DID YOU

10   DO THAT?

11   A.   THAT'S CORRECT.  THAT'S CORRECT.

12   Q.   AND WE HAVE THE DEFINITION IN THE NEXT SLIDE, PDX-605.

13        THANK YOU, MR. ANG.

14        FIRST OFF, JUST REAL QUICK, DO YOU QUALIFY AS A -- AS ONE

15   OF THE TEAM MEMBERS OF A PERSON OF ORDINARY SKILL IN THE ART?

16   A.   YES, I THINK I DO.

17   Q.   AND, IN FACT, YOU EXCEED THAT, DON'T YOU?

18   A.   I BELIEVE I DO, YES.

19   Q.   OKAY.  NO TIME TO BE HUMBLE HERE TODAY.

20        SAME QUESTION WE ASKED DR. SEEGER.  HOW DO YOU DO THAT?

21   HOW DO YOU, WITH 40 YEARS OF EXPERIENCE IN THIS, PUT YOURSELF

22   IN THE SHOES OF THIS HYPOTHETICAL PERSON OF ORDINARY SKILL IN

23   THE ART?

24   A.   WELL, I DO THAT EVERY DAY, RIGHT?  I HAVE GRADUATE

25   STUDENTS AND POST-DOCS -- I WORK WITH STUDENTS, BOTH

DIRECT STELLA BY MR. SINGER

1    UNDERGRADUATE AS WELL AS GRADUATE STUDENTS, AND SO I'M ALWAYS

2    AROUND PEOPLE LIKE THAT AND SO I UNDERSTAND THEM.

3        HOPEFULLY SOME OF THEM RAISE UP TO THE LEVEL THAT THEY

4    BECOME EXPERTS AT SOME TIME IN THE FUTURE, BUT AT THIS POINT IN

5    THEIR CAREER, THESE PEOPLE THAT WOULD REPRESENT SOMEONE SKILLED

6    IN THE ART.

7        I ALSO CONSULT FOR MANY DRUG COMPANIES AND I'M

8    CONTINUOUSLY IN CONTACT WITH PEOPLE AT COMPANIES THAT WOULD

9    MEET THE LEVEL OF A PERSON OF SKILL IN THE ART.

10       SO I THINK I UNDERSTAND AND APPRECIATE A PERSON WITH THAT

11   SKILL SET.

12   Q.   OKAY.  NOW, THIS PERSON OF ORDINARY SKILL IN THE ART,

13   THAT'S SOMEONE WHO HAS GOT SOME SKILL, BUT IS NOT AN EXPERT OR

14   INVENTOR; IS THAT CORRECT?

15   A.   THAT'S CORRECT.

16   Q.   OKAY.  FAIR ENOUGH.

17       NOW, I KNOW THE MERCK EXPERT HAD A SLIGHTLY DIFFERENT

18   DEFINITION.  HAVE YOU LOOKED AT THAT DEFINITION?

19   A.   YES, I HAVE.

20   Q.   DO YOU ALSO MEET THEIR DEFINITION?

21   A.   YEAH, I MEET THEIR DEFINITION, YES.

22   Q.   AND DO YOUR OPINIONS CHANGE USING THE DEFINITION THAT

23   YOU'VE PROVIDED, OR THE MERCK DEFINITION WHICH I ASSUME THAT

24   WE'LL SEE LATER IN THE TRIAL?

25   A.   IT'S -- IT'S -- TO ME IT'S A VERY SIMILAR -- IT REALLY

1    DOESN'T CHANGE MY OPINION AT ALL.

2    Q.   OKAY.  ALL RIGHT.  WITH THAT FORMALITY OUT OF THE WAY,

3    LET'S TALK ABOUT PRODRUGS.

4         THE JURY HAS HEARD FROM DR. SOFIA ABOUT PRODRUGS, BUT FOR

5    MOST OF THEM IT'S A NEW CONCEPT.

6         YOU WEREN'T HERE WHEN DR. SOFIA TESTIFIED, BUT HAVE YOU

7    HAD A CHANCE TO REVIEW HIS TESTIMONY?

8    A.   YES, I HAVE.  I HAVE READ HIS TRANSCRIPTS.

9    Q.   OKAY.  NOW, YOU'RE AN EXPERT IN THE AREA.  CAN YOU JUST,

10   FOR THE LADIES AND GENTLEMEN OF THE JURY, AND ALL OF OUR

11   BENEFITS, EXPLAIN AGAIN WHAT A PRODRUG IS IN YOUR EXPERT

12   OPINION?

13   A.   WELL, A PRODRUG IS A MATERIAL -- SO WHEN DRUGS ARE

14   DISCOVERED, EITHER FROM NATURAL SOURCES OR THROUGH MEDICINAL

15   CHEMISTRY PROGRAMS, AND YOU HAVE A DRUG THAT YOU NEED TO

16   DELIVER TO A PATIENT TO AFFECT A DISEASE, SOMETIMES THE

17   PROPERTIES OF THAT DRUG ARE SUCH THAT IT'S REALLY NOT

18   DELIVERABLE OR FORMULATABLE OR DELIVERABLE TO A PATIENT.  IT

19   HAS SOME WARTS.

20        AND AS A RESULT OF THAT, WHAT YOU WANT TO BE ABLE TO DO,

21   AND ONE OF THE WAYS WE ATTACK THAT, IS TO SAY CAN I CHANGE THE

22   STRUCTURE OF THE MOLECULE SO THAT IT OVERCOMES THAT WART.

23        AND THEN WE DESIGN IT IN SUCH A WAY THAT WHATEVER YOU DO

24   TO CHANGE IT IS CLIPPED OFF AND RELEASES THE DRUG.

25        SO THE WORD "PRODRUG" IS, IS A GOOD EXAMPLE, THE WORD

1    "PRODRUG."  ACTUALLY THE INVENTOR OF THAT NAME WAS AN

2    AUSTRALIAN, SO I THOUGHT THAT WAS PRETTY COOL.

3    Q.   AND SO YOU HAVE A DEPICTION HERE OF PDX-606.  WHAT ARE WE

4    LOOKING AT?  WE HAVE PRODRUG AND PROMOIETY.  WHAT ARE WE

5    LOOKING AT?

6    A.   THIS IS AN ILLUSTRATION THAT I'VE USED IN A LOT OF MY

7    PAPERS AND SO I REPRODUCED IT HERE FOR THE JURY AND THE TRIAL.

8         SO IF WE HAVE A DRUG, THAT'S WHAT WE'RE TALKING ABOUT,

9    IT'S A MATERIAL THAT HAS SOME LIMITATION, SOME BARRIER TO ITS

10   UTILITY.

11        NOW, THAT BARRIER COULD BE SOMETHING AS COMPLEX AS

12   TARGETING THE LIVER TO TREAT HCV.

13        THAT COULD BE SOMETHING ALSO WHERE, FOR EXAMPLE, THE DRUG

14   MAY TASTE HORRIBLE AND YOU WANT A MASK THE TASTE SO IT CAN BE

15   GIVEN TO CHILDREN.

16        OR IT MIGHT BE THAT YOU HAVE A DRUG THAT CAN'T BE GIVEN BY

17   INJECTION BECAUSE YOU CAN'T DISSOLVE IT AND BE ABLE TO INJECT

18   IT SAFELY INTO A PATIENT.

19        SO A PRODRUG IS WHERE YOU TAKE THAT MOLECULE AND YOU

20   IDENTIFY WHAT THE BARRIER OR HURDLE TO THE USE OF THAT DRUG IS

21   AND WE CHEMICALLY CHANGE IT BY PUTTING ON ONE OR MORE

22   PROMOIETIES.  I'VE USED THAT TERMINOLOGY AND I'M JUST

23   REPRODUCING IT HERE FOR YOU GUYS, BUT A PROMOIETY IS WHERE WE

24   WOULD ALTER THE CHEMICAL STRUCTURE OF THE MATERIAL TEMPORARILY

25   SO IT CAN OVERCOME THE BARRIER, AND ONCE IT GETS INTO THE BODY

1    OR PAST THAT BARRIER, WE DESIGN IT SUCH THAT WE HAVE A

2    TRANSFORMATION THAT ESSENTIALLY CUTS OFF, DELETES THE

3    ADDITIONAL PART OF THE MOLECULE AND RELEASES THE DRUG.

4        SO THIS IS A TECHNOLOGY THAT HAS BEEN FOUND TO BE

5    EFFECTIVE.

6    Q.   JUST GENERALLY SPEAKING, DR. STELLA, DO PEOPLE OF SKILL IN

7    THE ART REGARD THIS AS A SIMPLE TASK OR A CHALLENGING TASK?

8    A.   IT'S A VERY, VERY DIFFICULT TASK AND VERY CHALLENGING AND

9    IT TAKES A LOT OF CREATIVITY TO COME UP WITH PRODRUGS.

10       AS I SAID YESTERDAY, WHEN I WORKED ON MY PH.D.

11   DISSERTATION, AT THE TIME THAT I WAS WORKING ON PHENYTOIN, FOR

12   EXAMPLE, AND I WAS ONE SKILLED IN THE ART AS A GRADUATE STUDENT

13   TO WHERE I WAS ABLE TO STEP OVER THE LINE AND BECOME THAT

14   CREATIVE INDIVIDUAL THAT LED TO FOSPHENYTOIN, THE DRUG THAT WE

15   TALKED ABOUT YESTERDAY.  IT TOOK ME ABOUT TEN YEARS IN THAT

16   CASE.

17   Q.   OKAY.  I HAVE A QUESTION KIND OF OUT OF LEFT FIELD HERE,

18   AND IT WILL MAKE SENSE IN A MINUTE.  DID YOU RUN TRACK IN HIGH

19   SCHOOL?

20   A.   YES, I DID.

21   Q.   OKAY.  DO YOU HAVE AN ANALOGY THAT YOU WOULD LIKE TO SHARE

22   WITH THE JURY ABOUT THE PROCESS OF CREATING A PRODRUG?

23   A.   I WOULD.

24       AND COULD I HAVE THE NEXT TRANSPARENCY, PLEASE?

25   Q.   IF WE CAN GO TO THE NEXT SLIDE.

1    A.   SO MY UNFAVORITE RACE, BUT ONE I HAD TO RUN BECAUSE I WAS

2    THE ONLY ONE THAT WAS GAME ENOUGH TO DO IT, WAS TO RUN THE 400

3    METER HURDLE, AND THAT'S A TOUGH RACE.  THERE ARE ONLY TWO

4    TOUGHER RACES, WHICH MAY BE THE MARATHON AND STEEPLECHASE.

5         AND I RAN THE 400 METERS, SO I ALWAYS USED THIS ANALOGY OF

6    HURDLES IN DEVELOPING A DRUG BECAUSE I COULD RELATE TO THE FACT

7    THAT I HAVE TRIPPED OVER A NUMBER OF THESE ALONG THE WAY, BOTH

8    FIGURATIVELY AND ACTUALLY.

9         SO CAN I GO AHEAD AND, AND EXPLAIN?

10   Q.   CAN I ASK YOU ONE QUESTION BEFORE YOU DO?

11   A.   RIGHT.

12   Q.   IS THIS HURDLE CONCEPT SOMETHING THAT YOU USE IN YOUR

13   TALKS AROUND THE COUNTRY AND AT OTHER COMPANIES?

14   A.   RIGHT.  I USUALLY GIVE SHORT COURSES ON PRODRUGS AND

15   SEMINARS AND I DO IT ALL OVER THE COUNTRY.

16        IN FACT, LAST -- THE MIDDLE OF LAST YEAR I GAVE A ONE DAY

17   SHORT COURSE TO A MEDICINAL CHEMISTRY GROUP AT MERCK.

18   Q.   OKAY. NOW, LET'S TALK ABOUT YOUR DEMONSTRATIVE.  YOU

19   START HERE AT THE BEGINNING WITH THE STARTING LINE WITH THE

20   ACTIVE DRUG, WHICH WE SAW, I THINK YOU JUST CALLED IT A DRUG ON

21   YOUR OTHER DEMONSTRATIVE.

22        WHAT IS IMPORTANT ABOUT THAT STARTING LINE?

23   A.   WELL, I LIKE TO USE THE ANALOGY OF THE 400 METER RACE AT

24   THE OLYMPICS.  NOT EVERYBODY GETS TO GET IN THE STARTING BLOCK,

25   RIGHT?  YOU HAVE TO BE GOOD TO GET TO THE STARTING BLOCK.

1    AND SO IN THE ANALOGY TO PRODRUG DEVELOPMENT, YOU HAVE TO

2    HAVE SOMEWHERE -- YOU'VE GOT TO BE ABLE TO STEP INTO THE

3    STARTING BLOCK, AND THAT MEANS THAT YOU HAVE TO IDENTIFY A

4    COMPOUND THAT YOU'RE GOING TO START WITH TO MAKE A PRODRUG OFF

5    TO MAKE IT BETTER, RIGHT?  YOU HAVE TO IDENTIFY WHY THERE'S A

6    PROBLEM.

7    AND SO GETTING TO THE STARTING BLOCK TO ME IS -- YOU CAN'T

8    WIN THE RACE IF YOU CAN'T FIND THE STARTING BLOCKS.

9    Q.   I'M GOING TO ASK YOU A QUESTION ABOUT THAT.  IS THERE EVEN

10   A STARTING BLOCK THAT'S WITHIN THE SCOPE OF THE CLAIMS IN THE

11   '499 PATENT?

12   A.   ABSOLUTELY NOT.

13   Q.   ALL RIGHT.  LET'S PUT THAT TO ONE SIDE, THAT THERE'S NO

14   STARTING BLOCK.

15   AND IF YOU CAN TALK ABOUT THE FIRST FEW HURDLES AND

16   EXPLAIN THEM TO THE JURY?

17   A.   RIGHT.  WELL, I'VE IDENTIFIED THESE 8 HURDLES, AND BY THE

18   WAY, IT'S NOT LIMITED TO THE 8 HURDLES.  THAT'S THE ONLY 8 THAT

19   I COULD FIT ON A PAGE.  AND IF YOU'VE EVER RUN THE 400 METER,

20   IT'S ACTUALLY 12 HURDLES TO PUT IT IN PERSPECTIVE.

21   BUT WHAT I'D LIKE TO DO IS WALK YOU THROUGH KIND OF THE

22   CRITICAL HURDLES IN DEVELOPING A DRUG THAT CAN BE GIVEN ORALLY,

23   OKAY?

24   SO LET'S ASSUME THAT WE HAVE AN ACTIVE DRUG AND WE'VE

25   IDENTIFIED AN ACTIVE DRUG WHICH IN THE CASE OF THE '499 PATENT

1      IS NOT THE CASE.

2          BUT ASSUMING WE HAVE THAT, I'D LIKE TO WALK YOU THROUGH,

3      ESSENTIALLY, THE THOUGHT PROCESS OF HOW YOU WOULD DEVELOP A

4      DRUG THAT EVENTUALLY IS GOING TO BE TARGETED PASSED TO THE

5      LIVER FOR THE TREATMENT OF HEPATITIS C.

6          SO, FIRST OF ALL, ASSUMING THAT YOU'VE GOT A STARTING A

7      STARTING BLOCK, A BIG ASSUMPTION IN MY MIND, THE FIRST STEP IS

8      THAT YOU'VE GOT TO SYNTHESIZE A PRODRUG.  THAT MEANS THAT YOU

9      HAVE TO IDENTIFY A PRODRUG APPROACH OR A SERIES OF PRODRUG

10     APPROACHES THAT YOU FEEL COULD GET YOU TO THE FINISH LINE.

11         THE FIRST STEP IS CAN I MAKE THE MATERIAL, RIGHT?

12     SYNTHESIS IS NOT A TRIVIAL PROCESS.  I THINK YOU'VE PROBABLY

13     ALREADY GOT A SENSE OF THAT FROM OTHER SPEAKERS, BUT THE

14     SYNTHESIS OF COMPOUNDS, THESE COMPLEX CHEMICALS, IS NOT A

15     TRIVIAL TASK.  IT'S USUALLY THE PURVIEW OF THE MEDICINAL

16     CHEMIST.

17         I CAN TELL YOU FROM MY OWN EXPERIENCE THAT I'M A CARD

18     CARRYING CHEMIST, BUT OFTEN COMING UP WITH WHAT WE EVEN

19     CONSIDER MINOR CHANGES CHEMICALLY CAN BE A SIGNIFICANT

20     CHALLENGE.

21         SO ASSUMING I MAKE IT OVER THE FIRST STEP, WHAT HAPPENS

22     WHEN YOU TAKE A DRUG?  WHEN YOU SWALLOW A DRUG?  WHEN YOU

23     SWALLOW YOUR TYLENOL OR IBUPROFEN, ONE OF THE FIRST STEPS THAT

24     HAS GOT TO HAPPEN IS THAT THE DRUG HAS GOT TO DISSOLVE IN THE

25     INTESTINAL TRACT.  YOU DON'T ABSORB THE SOLID PARTICLES.  THE

DIRECT STELLA BY MR. SINGER

1    DRUG HAS GOT TO DISSOLVE.  THAT'S CALLED DISSOLUTION, OKAY.

2         NOW, THINK ABOUT WHAT HAPPENS WHEN YOU SWALLOW A TABLET,

3    THE FIRST ORGAN OTHER THAN THE SALIVA THAT YOU SEE IS INTO THE

4    STOMACH.  THE STOMACH HAS A PH OF ABOUT 1.  SO LET ME EXPLAIN

5    WHAT PH IS.

6         PH IS THE MEASURE OF THE ACIDITY.  AND YOU ALL HEARD ABOUT

7    ACID REFLUX, RIGHT?  ACID REFLUX IS YOUR STOMACH HAS A VERY,

8    VERY STRONG -- IT'S DESIGNED TO BREAK UP FOOD PRODUCTS AND

9    BREAK UP THINGS THAT ARE PART OF YOUR NUTRITION SYSTEM, OKAY.

10        SO YOUR DRUG HAS GOT TO DISSOLVE AND BE CHEMICALLY STABLE

11   IN A VERY HOSTILE ENVIRONMENT, OKAY?

12        AND AFTER IT LEAVES THE STOMACH, IT'S GOING TO BE EXPOSED

13   TO PH VALUES AND THAT IS MEASURED AS ACIDITY, AND IT'S GOT TO

14   BE -- AND IT CAN BE QUITE BASIC, PH OF WHAT IS CALLED 8.5.

15   THAT NUMBER DOESN'T HAVE TO BE MEANINGFUL TO YOU.

16        BUT -- SO THE NEXT STEP IS, CAN THE DRUG DISSOLVE?  AND

17   THAT'S NOT PREDICTABLE BECAUSE WHEN YOU SYNTHESIZE ANY ONE

18   COMPOUND, ITS PROPERTIES WILL BE DEPENDENT ON THAT MOLECULE,

19   OKAY?

20        AND IS IT CHEMICALLY STABLE IN THE GASTROINTESTINAL TRACT?

21   THAT'S THE NEXT BARRIER.

22        THE THIRD BARRIER I'VE GOT LABELLED HERE IS STABILITY TO

23   SURVIVE THE ENZYME ATTACK IN THE GI TRACT.  GI TRACT HERE

24   STANDS FOR GASTROINTESTINAL TRACT.

25        WHY DO WE HAVE ENZYMES THAT CHEW THINGS UP?  WHEN YOU HAD

1    BREAKFAST THIS MORNING OR SALAD LAST NIGHT, YOU HAD OILS, YOU

2    HAD WHEATS, YOU HAVE WHEAT AND SEEDS AND EVERYTHING ELSE.

3         SO WHAT THE BODY DOES IS TAKE YOUR FOOD PRODUCTS, DIGEST

4    THEM, AND IN DIGESTING THEM, THEY BREAK IT UP INTO THE AMINO

5    ACIDS, ALL OF THE MINOR COMPONENTS, ALL OF THE, LIKE, THE BALLS

6    THAT MAKE UP THESE COMPLEX MOLECULES, YOU ABSORB THOSE

7    MOLECULES, GET INTO THE BODY AND YOUR BODY REASSEMBLES THEM AND

8    CREATES PROTEINS AND THINGS THAT YOUR BODY NEEDS.

9         IT'S ALSO A DEFENSE MECHANISM.  IF YOU SWALLOW SOMETHING

10   THAT THE BODY RECOGNIZES AS BEING BAD FOR YOU, HOPEFULLY IT

11   CHEWS IT UP SO THAT YOU DON'T GET BAD EFFECTS FROM THE FOOD.

12   ALL RIGHT.

13        AND WE'VE EVOLVED ENZYMES IN THE GASTROINTESTINAL TRACT TO

14   BREAK UP PRODUCTS BOTH FOR THE SAFETY REASONS, AS WELL AS FOR

15   FOOD AND NUTRITIONAL REASONS.

16        SO IF YOU HAVE A PRODRUG AND YOU WANT IT TO EVENTUALLY GET

17   ACROSS THE FINISH LINE AND IF IT GETS CHEWED UP BY THOSE

18   ENZYMES THAT ARE IN THE INTESTINAL TRACT, YOU'VE LOST ALREADY.

19   YOU'VE TRIPPED OVER THE HURDLE.

20        IF YOUR PRODRUG HAS TO BE INTACT TO GET TO THE TARGET SITE

21   AND IT GETS CHEWED UP IN A GASTROINTESTINAL TRACT, DESIGNING

22   THAT TO HIT THAT BALANCE OF ENOUGH STABILITY IN THE GI TRACT

23   AND YET GET TO SOME TARGET TISSUE AND WORK IS A REALLY, REALLY,

24   REALLY MAJOR, MAJOR CHALLENGE AND IT'S PROBABLY ONE OF THE

25   TOUGHEST THINGS WE HAVE TO DO.

1       THE FOURTH THING WE HAVE TO DO IS LET'S ASSUME THE DRUG

2   DOES SURVIVE AND YOU'VE DONE THE GREAT JOB OF DESIGNING YOUR

3   MOLECULE TO DO THAT.

4       IT THEN HAS TO BE ABSORBED INTO THE BODY.  NOW, THE CELLS

5   THAT LINE THE SMALL INTESTINE ARE CALLED ENTEROCYTES.  THESE

6   ARE ONE LAYER CELLS THAT ARE ON THE SURFACE OF YOUR INTESTINE

7   AND TO GO ACROSS AND INTO THOSE CELLS TO BE ABLE TO GET INTO

8   THE BLOODSTREAM REQUIRES THE DRUG TO HAVE WHAT WE CALL

9   PERMEABILITY CHARACTERISTICS.

10      PERMEABILITY IS A FANCY NAME OF BEING ABLE TO CROSS A

11  MEMBRANE, OKAY.

12      TO CROSS THAT MEMBRANE, IT REQUIRES THE DRUG TO HAVE A

13  BALANCE OF PROPERTIES, AND THAT'S A VERY COMPLEX PROCESS AND I

14  DON'T WANT TO GO INTO A LOT OF DETAILS BECAUSE WE CAN SPEND TOO

15  MUCH TIME ON THAT.

16      BUT THE BODY HAS WAYS OF PROTECTING ITSELF, AND IT

17  PROTECTS ITSELF BY HAVING IMBEDDED IN THOSE MEMBRANES MOLECULES

18  CALLED E-FLEX PUMPS.  THESE ARE THINGS THAT TEND TO PUMP CRAP

19  OUT, OKAY?

20      IN OTHER WORDS, THE REASON YOU DON'T GET SICK ON SOME

21  OCCASIONS IS BECAUSE THE DRUG YOU TAKE IS AN E-FLEX CANDIDATE

22  AND IT DOESN'T GET INTO THE CELLS.

23      SO A GOOD EXAMPLE OF THAT, I THINK YOU MAY HAVE HEARD OF

24  THE DRUG IMODIUM, IT IS A DRUG TO TREAT DIARRHEA, RIGHT.

25  IMODIUM WORKS IN THE INTESTINE TO STOP DIARRHEA BECAUSE IT

1      CAN'T GET INTO THE CELLS IN THE BODY.

2          IF YOU CAN ACTUALLY GET IMODIUM INTO THE BODY AND INTO THE

3      BRAIN.  IT'S ACTUALLY A VERY, VERY STRONG NARCOTIC.  BUT IT

4      DOESN'T HAVE NARCOTIC PROPERTIES BECAUSE IT GETS PUMPED OUT,

5      IT'S RECOGNIZED BY THIS E-FLEX AND PUMPS IT OUT.

6          OKAY.  THAT'S WHY IT'S EFFECTIVE TO TREAT DIARRHEA AND IT

7      DOESN'T GIVE YOU HALLUCINATIONS.

8      Q.  DR. STELLA, IF YOU COULD TELL US, WHERE ARE WE ON YOUR

9      HURDLES TO THE FINISH LINE AT THIS POINT?

10     A.  AT 5.  SO THAT WAS 4.

11         AT 5 IT WAS ENZYMES INTO THE ENTEROCYTES THAT ARE

12     RESPONSIBLE FOR FURTHER DESTROYING MATERIALS THAT SURVIVE THE

13     GASTROINTESTINAL TRACT.  THE ENTEROCYTES ARE VERY RICH IN

14     ENZYMES FOR DESTROYING MOLECULES, BOTH FOOD PRODUCTS AS WELL AS

15     DRUG MOLECULES.

16         THE NEXT STEP IS PASSAGE THROUGH THE ENTEROCYTES OF THE

17     OTHER SIDE, IF YOU WOULD LIKE, IT'S CALLED THE BASEMENT

18     MEMBRANE, AND THAT PROCESS HAS MANY OF THE SAME COMPLEXITIES AS

19     BEING TAKEN OUT INTO THE CELLS.

20         FINALLY, WHEN YOU ABSORB FOOD AND A DRUG PRODUCT AND TAKE

21     YOUR TYLENOL, IT GETS INTO WHAT IS CALLED A PORTAL DRUG SUPPLY

22     SO ALL OF THE BLOOD THAT FEEDS INTO THE INTESTINAL TRACT PICKS

23     UP THE ALL OF THE BLOOD SUPPLY AND GOES TO THE LIVER.

24         THE LIVER IS YOUR ORGAN -- THE INTESTINAL TRACT IS YOUR

25     OTHER BIG ORGAN THAT SAVES YOU FROM BEING EXPOSED TO THINGS

1    THAT YOU SHOULDN'T GET EXPOSED TO.  BASICALLY IT'S THERE TO

2    CLEAR OUT UNDESIRABLE MOLECULES THAT YOU HAVE EATEN AS PART OF

3    YOUR FOOD DIGESTION PROCESS.  SO IT PICKS UP THE BLOOD AND

4    TAKES IT TO THE LIVER.

5         SO IN THIS PARTICULAR CASE, WE HAVE AN INTERESTING ASPECT

6    OF THIS CASE, OF THIS TYPE OF DRUG.  YOU WANT THE DRUG TO ACT

7    IN THE LIVER, OKAY?

8         SO LET'S TALK A LITTLE BIT ABOUT WHAT THE LIVER IS.  THE

9    LIVER CONTAINS MANY CELLS AND YOU CAN THINK OF IT AS A CHEMICAL

10   REACTOR, OKAY?

11        AND SO IF YOU HAVE A MOLECULE GOING INTO THE LIVER ON ONE

12   SIDE AND YOU WANT IT TO ACT IN THE LIVER, IT ACTUALLY HAS TO BE

13   PICKED UP IN THE LIVER FASTER THAN IT GOES THROUGH THE LIVER.

14        SO IF IT ACTUALLY GOES THROUGH THE LIVER UNTOUCHED AND

15   ENDS UP ON THE OTHER SIDE OF THE LIVER AND IT GETS DILUTED OUT,

16   THEN YOU HAVE A LESS EFFECTIVE DRUG.

17        SO IN THIS CASE YOU ALSO HAVE TO DESIGN INTO THE MOLECULE

18   THOSE PROPERTIES THAT ALLOW IT TO BE TAKEN UP BY THE LIVER

19   CELLS.

20        AND THEN THE REALLY, THE REALLY BIG TASK IN THIS

21   PARTICULAR CASE IS IF YOU'RE TARGETING THE LIVER AND YOU'RE

22   TARGETING A VIRUS IN THE LIVER, YOU HAVE TO DESIGN THAT

23   MOLECULE SUCH THAT IT WILL BREAK DOWN IN THE LIVER INFECTED

24   CELLS, OKAY?

25        AND THAT -- BOY, SO THAT'S WHAT WE CALL TARGETING OR AN

1    ASPECT OF TARGETING AND THAT'S A TRULY MAJOR CHALLENGE.  YOU

2    CAN PROBABLY COUNT ON A COUPLE OF HANDS THOSE SUCCESSFUL DRUGS

3    THAT HAVE ACTUALLY ACHIEVED SOME GOALS LIKE THAT.

4         THAT IS THE SORT OF, IN A NUTSHELL, EIGHT BARRIERS.  AS I

5    SAID, THERE'S A LOT OF OTHERS.

6         BUT I LIKE TO -- ONE OF THE WORST RACES I EVER RAN WAS I

7    MANAGED TO GET OVER THE 12TH HURDLE AND PULL THE HAMSTRING ON

8    THE STRAIGHT.  SO I DIDN'T MAKE IT.

9         I MADE IT TO THE FINISH LINE, BUT LET'S SAY I WASN'T

10   HEALTHY WHEN I CROSSED THE FINISHED LINE.

11        SO YOU CAN DO ALL OF THESE DESIGN ASPECTS, BUT AT THE END

12   OF THE DAY YOU CAN GET TRIPPED UP, RIGHT?

13   Q.   DR. STELLA, THESE HURDLES THAT YOU HAVE JUST DESCRIBED,

14   ARE THOSE SOMETHING THAT A PERSON OF ORDINARY SKILL IN THE ART

15   WOULD HAVE UNDERSTOOD EXISTED BACK IN OUR HYPOTHETICAL

16   TIMEFRAME OF 2002 WHEN THE APPLICANTS FOR PATENT AT MERCK

17   APPLIED FOR THE '499 PATENT?

18   A.   I THINK A PERSON OF SKILL IN THE ART, READING THE

19   LITERATURE, WOULD UNDERSTAND THAT THE DESIGN OF ORAL PRODRUGS

20   IS EXTREMELY CHALLENGING AND THAT THESE BARRIERS CAN CREATE

21   PROBLEMS WITH DESIGN AND IMPLEMENTATION.

22   Q.   NOW, IT'S 2016.  WE ALL KNOW THAT.

23        DO WE KNOW MORE TODAY OR DID WE KNOW LESS BACK IN 2002?

24   A.   WE KNEW A LOT LESS.

25   Q.   OKAY.

1    A.   WE'VE BEEN MORE APPRECIATIVE TODAY AND WE CAN UNDERSTAND

2    THIS A LITTLE BIT BETTER TODAY.

3    Q.   OKAY.  NOW, YOUR SLIDE TALKS ABOUT ORAL PRODRUGS.  ARE

4    THERE OTHER TYPES OF DELIVERY POSSIBLE AS WELL?

5    A.   YES.  I DID ORAL PRODRUGS BECAUSE THAT IS THE PRINCIPAL

6    ROUTE THAT WE PREFER BECAUSE IT'S CONVENIENT FOR THE PATIENT TO

7    TAKE ONE TABLET ONCE A DAY OR ONE TABLET A COUPLE TIMES A DAY.

8    THAT'S A CONVENIENT METHOD FOR TREATMENT.

9         THERE ARE OTHER ROUTES OF ADMINISTRATION, SUCH AS

10   INJECTIONS OR NASAL SPRAYS AND THINGS LIKE THAT, YES.

11   Q.   OKAY.  AND ARE THERE THE SAME HURDLES, DIFFERENT HURDLES,

12   MORE OR LESS?

13   A.   THE HURDLES -- MANY HURDLES ARE VERY SIMILAR, BUT THERE

14   ARE OTHERS AS WELL.  SO, FOR EXAMPLE, IN AN INTRAVENOUS

15   INJECTION, NUMBER ONE, YOU'RE PUNCHING THE SKIN AND POTENTIALLY

16   CAUSING A PROBLEM WITH INFECTIONS.  EVERY TIME YOU PUNCH THE

17   SKIN YOU HAVE THAT CAPABILITY.  SO IT'S NOT THE MOST SAFEST

18   ROUTE OF ADMINISTRATION.

19        PLUS, IF YOU HAVE TO GIVE AN INJECTION ONCE A DAY FOR EVEN

20   12 WEEKS, THAT'S NOT SOMETHING THAT IS OBVIOUSLY ENCOURAGED TO

21   DO.  BUT IN SOME CASES WE MAY HAVE TO, BUT THAT'S NOT SOMETHING

22   THAT WE TRY TO DO.

23        PLUS THE PROPERTIES THAT YOU WOULD HAVE TO BUILD INTO YOUR

24   PRODRUG TO BE ABLE TO GIVE A DRUG BY INJECTION, FOR EXAMPLE,

25   REQUIRES A DRUG TO BE IN SOLUTION.  DIFFERENT PROPERTY THAN

1    WHAT YOU'RE TRYING TO DO WITH ORAL.

2         YOU ALSO HAVE TO DO IT IN A WAY THAT YOU CAN STERILIZE THE

3    PRODUCT.  YOU CAN'T INJECT INTO THE PATIENT NONSTERILE PRODUCT.

4    THAT REQUIRES EXPOSING THE DRUG TO SOME STERILIZATION.  AND SO

5    THERE NEEDS TO BE PRODUCT DESIGN PROGRAMS THAT ARE TAILORED TO

6    THAT PARTICULAR ROUTE OF ADMINISTRATION.

7         SO IN TERMS OF THE COMPLEXITY OF THE PRODRUGS, IT'S A

8    DIFFERENT TYPE OF COMPLEXITY.  BUT AT THE END OF THE DAY, ALL

9    OF THEM REQUIRE OVERCOMING MAJOR HURDLES.

10   Q.   THANK YOU, DR. STELLA.

11        ONE MORE QUESTION ABOUT THIS.  IF YOU ARE LUCKY ENOUGH TO

12   FIGURE OUT A PRODRUG STRATEGY FOR ONE ACTIVE, WILL THAT SAME

13   STRATEGY WORK FOR A DIFFERENT ACTIVE, EVEN ONE IN THE SAME

14   CLASS?

15   A.   NO, NOT NECESSARILY.

16        AND I LIKE TO USE AN ANALOGY, IF YOU DON'T MIND.  EXCUSE

17   ME.

18        I'VE GOT TWO KEYS HERE, RIGHT?  ONE OF THEM OPENS -- THIS

19   ONE OPENS MY OFFICE DOOR, THIS ONE OPENS THE FRONT DOOR OF MY

20   BUILDING (INDICATING).

21        IF I MATCH THEM UP TOGETHER, IF YOU LOOK AT THIS -- AND I

22   CAN'T SHOW YOU PERSONALLY HERE -- BUT ALL THE TEETH MATCH UP

23   EXCEPT FOR ONE, ONE LITTLE TOOTH.

24        THAT'S THE ANALOGY OF A SMALL DIFFERENCE IN A DRUG

25   MOLECULE.

1       ONE OPENS MY FRONT DOOR AND ONE OPENS MY OFFICE DOOR, BUT

2    THEY DON'T WORK ON THE OTHERS.

3       SO VERY SMALL DIFFERENCES CAN MAKE VERY SMALL DIFFERENCES

4    IN DRUG MOLECULES, JUST AS THERE ARE SMALL DIFFERENCES IN KEYS,

5    CAN HAVE A TREMENDOUS EFFECT ON DRUG DEVELOPMENT.

6       I ALSO LIKE THE ANALOGY, THOSE TEETH ARE USELESS.  THOSE

7    TEETH ARE USELESS BECAUSE IF I JUST HAD THE TEETH AND THREW IT

8    IN THERE, GUESS WHAT HAPPENS?  I CAN'T TURN THE LOCK.  RIGHT?

9       IT'S THE REST OF THE MOLECULES, THE HANDLE IF YOU WOULD

10   LIKE.  IT MAY SEEM TO BE IRRELEVANT, BUT THAT KEY DOESN'T WORK

11   WITHOUT THE HANDLE.

12      SO IF YOU THINK ABOUT THIS PROCESS, IT'S A VERY

13   SIGNIFICANT CHALLENGE.

14   Q.   AND WAS THAT TRUE FOR NUCLEOTIDES AND NUCLEOSIDES BACK IN

15   2002?

16   A.   YES.

17   Q.   AND LET'S GO BACK TO YOUR OPINIONS, AND IF WE GO TO THE

18   NEXT SLIDE WITH THAT CLAIM, THE WORD "ADMINISTERING" IS

19   HIGHLIGHTED THAT WAS CONSTRUED TO COVER ANY PRODRUG.

20      FIRST OFF, WE HAVE THIS PENTAGON, THE FIVE-SIDED FIGURE,

21   AND WE HEARD THAT'S CALLED A MARKUSH STRUCTURE.  DO YOU AGREE

22   THAT THIS IS A MARKUSH STRUCTURE?

23   A.   THAT'S MY UNDERSTANDING.

24   Q.   SO THAT MEANS, IF I'VE GOT IT RIGHT, THAT YOU CAN

25   SUBSTITUTE AT THESE VARIOUS POINTS R2, R3, R1, R5, R6 DIFFERENT

DIRECT STELLA BY MR. SINGER

1    THINGS THAT ARE LISTED IN THE CLAIMS; IS THAT CORRECT?

2    A.   AND Y.

3    Q.   OH, THERE'S ANOTHER ONE.  SORRY.

4         THAT THE CLAIM THEN DEFINES THESE WITH DIFFERENT POSSIBLE

5    SUBSTITUENTS; IS THAT CORRECT?

6    A.   THAT'S CORRECT.

7    Q.   NOW, IF IT GOES -- AS FAR AS PRODRUGS ARE CONCERNED, DOES

8    THE PRODRUG APPROACH, I TAKE IT, THEN DEPENDS ON WHAT

9    SUBSTITUENT THERE IS; IS THAT RIGHT?

10   A.   THAT'S CORRECT.

11   Q.   NOW, LOOKING AT THE MARKUSH STRUCTURE AND THE BASE, AND

12   THE BASE IS DOWN HERE, WHERE WOULD A PERSON OF SKILL IN THE ART

13   THINK OF POSSIBLY PUTTING A PRODRUG MOIETY THAT, THAT LITTLE --

14   NOT LITTLE -- BUT THE MOIETY YOU DESCRIBED, WHERE COULD A

15   PERSON OF SKILL IN THE ART PUT A PRODRUG MOIETY ON THE MARKUSH

16   STRUCTURE AND/OR THE BASE?

17   A.   WELL, IN THE WAY -- WELL, IN COMING TO THAT ANALYSIS, A

18   PERSON OF SKILL IN THE ART WOULD LOOK AT NOT ONLY THE MARKUSH

19   STRUCTURE, BUT ALSO LOOK AT WHAT ARE THE LIMITS WITHIN THAT

20   MARKUSH STRUCTURE.

21        SO, FOR EXAMPLE, R3 HERE, IF I CAN FIND IT.

22   Q.   IT'S RIGHT HERE (INDICATING).

23   A.   R3 IS A HYDROXYL ALKOXY OR A FLUID, RIGHT?

24        SO, FOR EXAMPLE, IN THE CASE OF A HYDROXYL COMPOUND, WHICH

25   WOULD BE R3, THAT MEANS YOU COULD PUT A LOT, HUNDREDS IF NOT

1    THOUSANDS, OF POSSIBLE SUBSTITUENTS ON THERE THAT COULD BE USED

2    TO AFFECT DELIVERY OF THE DRUG.

3    Q.   AND THAT WOULD BE A PRODRUG?

4    A.   THAT WOULD BE A PRODRUG.

5    Q.   ARE THERE OTHER SPOTS THAT YOU COULD PUT THE PRODRUG?

6    A.   R1 IS -- CAN ALSO BE -- NO.

7         ACTUALLY, R1 IS PROBABLY -- THE WAY IT'S DEFINED HERE IS

8    PROBABLY NOT A FUNCTION OR AN AREA THAT COULD BE DERIVED,

9    ALTHOUGH IT'S POSSIBLE, OKAY.

10        R3 IS AGAIN A HYDROXYL -- I'M SORRY.  I SAID R3.

11        R2 CAN BE A HYDROXYL, AND SO THAT'S ANOTHER SIDE IN WHICH

12   THERE COULD BE, IN FACT, PRODRUGS ATTACHED.

13        Y, THAT'S VERY, VERY COMPLEX AREA.  IF YOU KNOW Y HERE CAN

14   BE A HYDROXYL AND IT CAN BE AN ALKOXY, IT CAN BE A PHOSPHATE,

15   TRIPHOSPHATE, MONOPHOSPHATE.

16        AND THEN WITHIN THE PHOSPHATE YOU'VE GOT R9 AND R10 WHICH

17   ARE ALSO MULTIPLE SUBSTITUENTS.

18        SO THESE WOULD BE THREE AREAS IN WHICH YOU COULD GET

19   ADDITIONS, AND THEN YOU'VE GOT THE BASE.

20        IN THE CASE OF THE BASE, THE WAY THIS IS WRITTEN --

21        CAN I CLEAR THIS?

22   Q.   I WILL CLEAR IT FOR YOU.

23   A.   OKAY.  AND IT SAYS UNDO UP HERE.  WOULD THAT WORK FOR ME?

24   Q.   CLEAR ALL IS IN THE BOTTOM LEFT.

25   A.   OKAY.  GREAT.  THANK YOU.

1    Q.   THE BOTTOM LEFT.

2    A.   AND IF I LOOK AT THE BASE, W HERE COULD BE AN OXYGEN OR

3    SULPHUR.  THAT'S THE O AND THE S.

4         AND BECAUSE OF THAT O AND THE S, IT CAN ENOLIZE.

5    E-N-O-L-I-Z-E.

6    Q.   THE O OR THE S CAN.

7    A.   AND THAT ALLOWS YOU TO ACTUALLY PUT PRODRUGS ON THAT

8    PARTICULAR GROUP.

9         YOU ALSO HAVE R6, AND R6 CAN BE A FUNCTIONAL GROUP.  MANY

10   OF THESE WOULD BE IN THE SUBCATEGORY AND DIRECTLY DERIVATIZABLE

11   FROM A PRODRUG POINT OF VIEW.

12        THE ONLY FUNCTIONAL GROUP THAT I SAW THAT I THOUGHT YOU

13   COULD -- COULD YOU CLEAR THAT, JON, MR. SINGER?  IT SHOULDN'T

14   BE FAMILIARITY, RIGHT.

15   Q.   THAT'S OKAY.

16   A.   AND R5, AND THE WAY R5 IS DESIGNED, I DON'T THINK THAT

17   WOULD BE A FUNCTIONAL GROUP THAT YOU COULD DERIVATIZE, AND SO I

18   DON'T SEE ANY PRODRUGS THAT YOU COULD PROBABLY DO OFF THAT.  AT

19   LEAST A PERSON OF SKILL IN THE ART WOULD QUESTION WHETHER YOU

20   COULD DO SOMETHING ON THE R5.

21        SO, IN OTHER WORDS, THERE'S MULTIPLE SITES, AND MULTIPLE

22   SITES IN THE MOLECULE AND A COMPLEXITY AND PLETHORA OF PRODRUGS

23   THAT ARE POSSIBLE.

24   Q.   AND COULD YOU EVEN GIVE -- COULD YOU EVEN GIVE TO THE

25   LADIES AND GENTLEMEN OF THE JURY A BALLPARK ESTIMATE ABOUT HOW

```
1    MANY POTENTIAL PRODRUGS THIS, THIS MEANS THE CLAIM COVERS?

2    A.   WELL, I THINK I USED THE WORD "UNLIMITED" IN MY EXPERT

3    REPORT AND I THINK I WOULD STICK WITH THAT.  I DON'T KNOW THAT

4    I COULD PUT A NUMBER, BUT IT WOULD BE IN EXCESS OF A MILLION.

5    Q.   ALL RIGHT.  DOES THIS -- DOES THIS RAISE AN ENABLEMENT

6    PROBLEM IN YOUR EXPERT OPINION?

7    A.   I THINK THEY HAVE AN ENABLEMENT PROBLEM, YES.

8    Q.   AND DOES IT RAISE A WRITTEN DESCRIPTION PROBLEM IN YOUR

9    OPINION?

10   A.   ABSOLUTELY.

11   Q.   AND LET'S TURN TO YOUR ENABLEMENT OPINION AND WALK THROUGH

12   THAT.

13       WE HAVE ON THE NEXT SLIDE A SUMMARY OF A BELIEVABLE

14   STANDARD FOR ENABLEMENT.  AND IT SAYS THAT THE PATENT

15   DISCLOSURE MUST ALLOW A PERSON OF SKILL IN THE ART TO PRACTICE

16   THE FULL SCOPE OF THE CLAIMED INVENTION WITHOUT UNDUE

17   EXPERIMENTATION.

18       WE HEARD ABOUT THIS CONCEPT OF UNDUE EXPERIMENTATION

19   YESTERDAY.  WHAT FACTORS DID YOU CONSIDER, DR. STELLA, IN

20   TRYING TO DECIDE WHETHER THE CLAIM REQUIRED UNDUE

21   EXPERIMENTATION AND THUS VIOLATED THE ENABLEMENT STANDARD?

22   A.   WELL, I'VE LISTED EIGHT STANDARDS THERE, THE EIGHT THINGS

23   THAT WE COULD EVALUATE TO SEE WHETHER, IN FACT, THEY MEET THE

24   ENABLEMENT STANDARD.

25   Q.   AND DID YOU CONSIDER ALL EIGHT OF THOSE FACTORS?
```

1    A.   YES, I DID.

2    Q.   ALL RIGHT.  I'M GOING TO GO THROUGH THEM NOW.  THAT'S WHAT

3    THE LAW REQUIRES WE DO.  I DON'T MEAN TO BORE YOU, BUT THAT'S

4    WHAT WE'VE GOT TO DO.

5         I'M GOING TO GO THROUGH THEM A LITTLE BIT OUT OF ORDER AND

6    SAVE A FEW FOR THE END.

7         BUT LET'S START, THOUGH, WHERE WE SHOULD, WITH NUMBER 1,

8    THE QUANTITY OF EXPERIMENTATION.

9         DR. STELLA, HOW MUCH EXPERIMENTATION, IN YOUR OPINION,

10   WOULD A PERSON OF SKILL IN THE ART NEED TO PRACTICE THESE

11   CLAIMS IN RELATION TO THE PRODRUG ASPECT OF THEM?

12   A.   WELL, AS I TALKED ABOUT IN MY 400 METER HURDLE RACE, IT

13   WOULD BE INCREDIBLE.  I MEAN, I DON'T EVEN KNOW.  WE CAN'T EVEN

14   GET INTO THE BLOCKS, INTO THE STARTING BLOCK.

15        SO TO BEGIN WITH, THAT BY ITSELF WOULD TAKE AN INCREDIBLE

16   AMOUNT OF EXPERIMENTATION TO EVEN KNOW WHERE TO START.

17        NOW, ASSUMING THAT YOU DO FIND THE STARTING SPOT, THE

18   OPTIONS, THEN, ON A STARTING BLOCK, OR A GROUP OF STARTING

19   BLOCKS, YOU NEED EIGHT PEOPLE IN THE RACE, RIGHT, BUT THE

20   AMOUNT OF EXPERIMENTATION WOULD THEN WILL BE TO REQUIRE YOU TO

21   IDENTIFY A PRODRUG THAT ACHIEVES THE GOALS THAT YOU WANT TO

22   ACHIEVE IS INCREDIBLY HIGH, I MEAN, AN INCREDIBLE AMOUNT OF

23   WORK WITHOUT THAT STARTING BLOCK.

24   Q.   NOW, TO BE FAIR, THERE WERE TYPES OF PRODRUGS KNOWN IN THE

25   PRIOR ART; CORRECT?

1    A.    THERE WAS.

2    Q.    AND AREN'T THERE TESTS THAT A PERSON OF SKILL CAN RUN TO

3    TRY TO FIGURE OUT WHICH PRODRUG THEY MIGHT TRY TO USE?

4    A.    THERE ARE TESTS.  THAT'S NOT UNUSUAL.  BUT THE TYPE OF

5    TEST, WHAT YOU'RE TRYING TO ACHIEVE, WHERE YOU'RE GOING WOULD

6    REQUIRE YOU TO HAVE, ONE, THE STARTING BLOCK, AND THEN COME UP

7    WITH THE PRODRUGS; AND THEN ESSENTIALLY TRY TO DEFINE HOW YOU

8    GAIN SUCCESS IN THAT.

9        SO DEFINE THE APPROPRIATE TESTS AND PERFORMING THOSE

10   APPROPRIATE TESTS IS JUST MIND BOGGLING AS TO WHAT WOULD BE

11   REQUIRED.

12   Q.    AND IS THAT UNDUE EXPERIMENTATION?

13   A.    I THINK THAT EXCEEDS THE DEFINITION OF UNDUE

14   EXPERIMENTATION.

15   Q.    OKAY.  LET'S GO TO FACTOR 2, THE AMOUNT OF DIRECTION OR

16   GUIDANCE NEEDED.

17       HOW MUCH AMOUNT OF DIRECTION WOULD THIS HYPOTHETICAL

18   PERSON OR TEAM NEED TO COME UP WITH A PRODRUG APPROACH FOR THE

19   CLAIMS?

20   A.    WELL, THERE IS SOME GUIDANCE.  I MEAN, THERE'S HISTORY OF

21   PRODRUGS, RIGHT?  SO THERE IS SOME GUIDANCE OUT THERE.

22       BUT THERE'S NOTHING FROM WHAT I COULD TELL FROM 2000, IN

23   THE TIME PERIOD OF THIS PATENT, THAT WOULD GIVE WHAT I WOULD

24   CALL ADEQUATE DIRECTION AND GUIDANCE, AND THE PATENT SURE AS

25   HECK DOESN'T PROVIDE ANY BECAUSE THERE'S NOTHING IN THERE TO

 1    PROVIDE ANY GUIDANCE.

 2    Q.   DOES THAT MEAN A LOT OF GUIDANCE WOULD BE NEEDED OR ONLY A

 3    LITTLE?

 4    A.   A HUGE AMOUNT OF GUIDANCE.  WELL, NOT HUGE.  YOU NEED

 5    ENOUGH TO BE COMFORTABLE THAT YOU KNOW WHERE YOU'RE GOING WITH

 6    THIS.

 7    Q.   ALL RIGHT.  LET'S SKIP FACTOR 3 AND COME BACK TO THAT.

 8    ALL RIGHT?  IS THAT OKAY?

 9    A.   YES.

10    Q.   AND LET'S GO TO FACTOR 4.  THE NATURE OF THE INVENTION

11    HERE IS A METHOD OF TREATMENT FOR HEPATITIS C WITH NUCLEOSIDE

12    AND NUCLEOTIDE COMPOUNDS, INCLUDING PRODRUGS.  WE SAW THAT IN

13    THE CLAIM.

14        HOW DOES THE NATURE OF THIS CLAIMED INVENTION IMPACT THE

15    ANALYSIS?

16    A.   WELL, I THINK IT HAS A VERY BIG EFFECT.

17    Q.   WHY IS THAT?

18    A.   NUMBER ONE, YOU'RE TREATING HEPATITIS C.  THERE WERE VERY

19    FEW THINGS OUT THERE.  THERE WERE A COUPLE OF DRUGS THAT HAD

20    SOME EFFECT.  THEY ALL HAD THEIR OWN TOXICITY AND THEIR OWN

21    LIMITATIONS.

22        BUT JUST TREATMENT OF HEPATITIS C IN GENERAL, IT SEEMS TO

23    ME THAT AT THE TIME OF THIS PATENT THERE WAS EFFECTIVELY --

24    THAT IN ITSELF WAS A HIGH HURDLE.  WE DIDN'T HAVE ESSENTIALLY

25    EFFECTIVE TREATMENT TO BEGIN WITH.

1      COMBINING THAT WITH ALL OF THE OTHER COMPLEXITY MAKES THE

2   DESIGN OF A PRODRUG TO BE EFFECTIVE VERY, VERY CHALLENGING.

3   Q.   OKAY.  AND LET'S SKIP NUMBER 5 AND COME BACK TO THAT.

4      NUMBER 6, RELATIVE SKILL OF THOSE IN THE ART.  WE ALREADY

5   TALKED ABOUT THAT?

6   A.   RIGHT, RIGHT.

7   Q.   THAT WAS THE HYPOTHETICAL TEAM WE TALKED ABOUT?

8   A.   RIGHT.

9   Q.   AND THAT'S A HIGH LEVEL OF SKILL.

10      HOW DOES THAT IMPACT YOUR ANALYSIS?

11   A.   WELL, TO QUOTE THE AFRICAN PROVERB, IT TAKES A VILLAGE TO

12   RAISE A CHILD.  IT TAKES AN EXTREMELY GOOD TEAM TO DEVELOP A

13   DRUG.

14      SO THAT PERSON OF SKILL IN THE ART WOULD REQUIRE -- BE

15   REQUIRED, IF YOU WOULD LIKE, TO REALLY PUT TOGETHER A VERY

16   EFFECTIVE TEAM TO ATTACK A PROBLEM LIKE THIS, AND I THINK THAT

17   WOULD REQUIRE A HIGH DEGREE OF SKILL SET THAT I THINK IS NOT

18   MET IN THIS CASE.

19   Q.   ALL RIGHT.  AND LET'S SKIP NUMBER 7 AND GO TO 8.

20      HOW DOES THE BREADTH OF THE CLAIMS AFFECT YOUR ANALYSIS,

21   DR. STELLA?

22   A.   OH, THE CLAIM.  HUGE, RIGHT?  AND SO FROM THE PRODRUG'S

23   RESPECT, YOU HAVE THE CLAIMS OF THE ACTIVE MATERIAL, AND ON TOP

24   OF THAT, IF ALL PRODRUGS ARE INCLUDED, SO A MILLION TIMES A

25   MILLION, IT DOESN'T TAKE A LOT OF HIGH LEVEL MATH TO REALIZE

1    THAT THE BREADTH OF THE CLAIMS MAKE THIS AN EXTREMELY --

2    THERE'S NO GUIDANCE HERE AT ALL --

3    Q.   OKAY.

4    A.   -- IN THE PATENT.

5    Q.   OKAY.  LET'S JUMP BACK TO FACTOR 3 AND THEN WE'LL GO TO

6    SOME THINGS THAT WE CAN SHOW THE JURORS.

7         PRESENCE OR ABSENCE OF WORKING EXAMPLE.  FIRST, JUST ONE

8    QUESTION.  DOES THE PATENT SHOW ANY WORKING EXAMPLES OF

9    PRODRUGS THAT FALL WITHIN THE SCOPE OF THE CLAIMS?

10   A.   ABSOLUTELY NOT.

11   Q.   NOW, TO BE FAIR, THERE ARE EXAMPLES OF PRODRUGS IN THE

12   PATENTS.  SOME OF THE EXAMPLES DEPICT PRODRUGS?

13   A.   YES.

14   Q.   DO ANY OF THOSE FALL WITHIN THE CLAIMS?

15   A.   THEY DO NOT.

16   Q.   LET'S SHOW THE LADIES AND GENTLEMEN OF THE JURY THAT.  IF

17   WE GO TO THE NEXT SLIDE.

18        YOU'VE LISTED HERE, AND WE'LL HIGHLIGHT AS WE GO THROUGH

19   THEM, THE DIFFERENT TYPES OF PRODRUGS THAT ARE EXEMPLIFIED IN

20   THE PATENT.

21        AND THE FIRST ONE YOU'VE CALLED ACYL DERIVATIVE PRODRUGS,

22   EXAMPLES 59, 60, 120.  ARE ANY OF THOSE EXAMPLES WITHIN THE

23   SCOPE OF THE CLAIMS?

24   A.   NO.

25   Q.   NOW WE HAVE ANOTHER COLUMN THAT SAYS DATA.  ALL RIGHT?

1    NOW, PUT THAT ASIDE.  LET'S PUT ASIDE THAT THESE ARE NOT EVEN

2    WITHIN THE SCOPE OF THE CLAIMS.  CAN YOU DO THAT FOR ME?

3    A.   YES.

4    Q.   IS THERE ANY DATA IN THE PATENT THAT IS EVEN SPECIFIC TO

5    THESE PRODRUGS THAT AREN'T IN THE SCOPE OF THE CLAIMS?

6    A.   THERE IS NO DATA.

7    Q.   AND WE SAW YESTERDAY, I THINK, A LINE FROM THE PATENT

8    REPRESENTATIVE COMPOUNDS OF THE INVENTION TESTED AT IC50 OR

9    EC50 LESS THAN 100 MICROMOLAR.

10   A.   YES.

11   Q.   AND YOU'VE READ THAT IN THE PATENT; IS THAT CORRECT?

12   A.   YES.

13   Q.   AND DOES THAT TELL A PERSON OF SKILL IN THE ART WHAT THOSE

14   REPRESENTATIVE COMPOUNDS EVEN ARE?

15   A.   NO.

16   Q.   OKAY.  ANY WAY TO FIGURE OUT FROM THE PATENT WHAT

17   COMPOUNDS THAT LINE IS TALKING ABOUT IN YOUR EXPERT OPINION?

18   A.   I -- I COULDN'T FIGURE IT OUT.

19   Q.   OKAY.

20   A.   AND I'M AN EXPERT.

21   Q.   ALL RIGHT.

22   A.   A PERSON OF SKILL IN THE ART IS NOT GOING TO BE ABLE TO DO

23   IT.

24   Q.   NEXT GROUP OF DRUGS ARE THE SATE PRODRUGS, EXAMPLES 72 TO

25   81.  ANY OF THOSE FALLS WITHIN THE SCOPE OF THE ACTUAL CLAIMS

1    THAT WE'RE TALKING ABOUT IN THIS CASE?

2    A.   NOT AT ALL.

3    Q.   ANY DATA SPECIFIC TO THOSE THAT YOU COULD FIND?

4    A.   NO, NOT AT ALL.

5    Q.   BY THE WAY, ARE SATE PRODRUGS KNOWN TO HAVE PROBLEMS WITH

6    TOXICITY, DR. STELLA?

7    A.   YES.  I'VE WRITTEN ON THAT A LITTLE BIT, AND THE SATE

8    PRODRUGS, SATE IS A TYPE OF TECHNOLOGY TO DERIVATIZE OR TO MAKE

9    PRODRUGS.

10        THE -- IN THE PROCESS OF RELEASING THE DRUG THAT IS

11   BREAKING DOWN TO RELEASE THE ACTIVE INGREDIENT, IT PRODUCES A

12   MATERIAL CALLED EPISULFIDE, E-P-I-S-U-L-F-I-D-E, AND THERE'S

13   ALWAYS BEEN CONCERNS ABOUT THAT MATERIAL BEING TERATOGENIC AND

14   CARCINOGENIC, AND THAT'S EQUIVALENT TO -- YOU MAY HAVE HEARD

15   ABOUT STERILIZATION BY ETHYLENE OXIDE, AND IT'S VERY ANALOGOUS

16   TO THAT AND I FEEL, AND THE DATA HAS BORNE THIS OUT, THAT THESE

17   TYPE OF PRODRUGS ARE LIKELY TO BE TOXIC AND WILL NEVER MAKE IT

18   TO THE MARKETPLACE.

19   Q.   ALL RIGHT.  THE NEXT TYPE OF PRODRUG IS CALLED POC

20   PRODRUGS, OR P-O-C, EXAMPLE 83.  IS EXAMPLE 83 WITHIN THE SCOPE

21   OF THE CLAIMS?

22   A.   NO.

23   Q.   IS THERE ANY DATA SPECIFIC TO THE PRODRUG DEPICTED, EVEN

24   THOUGH IT'S NOT IN THE CLAIMS, SPECIFIC TO EXAMPLE 83?

25   A.   NO.

1    Q.   AND THEN THE LAST TYPE OF PRODRUG THAT IS EXEMPLIFIED,

2    LONG CHAIN MONOPHOSPHATE ESTER PRODRUGS, EXAMPLES 84 AND 85.

3         ARE ANY OF THOSE DEPICTED -- ARE EITHER OF THOSE EXAMPLES

4    DEPICTED, DO THEY ACTUALLY FALL WITHIN THE SCOPE OF THE CLAIMS

5    THAT WE'RE TALKING ABOUT IN THIS CASE?

6    A.   NO, THEY DO NOT.

7    Q.   AND IS THERE ANY DATA SPECIFIC TO THEM?

8    A.   NO.

9    Q.   ALL RIGHT.  NOW, DR. STELLA, THE BOTTOM LINE -- YOU KNOW

10   WHAT?  LET'S GO.  LET ME ASK YOU A DIFFERENT QUESTION.

11        ARE THERE EVEN OTHER POTENTIAL PRODRUGS NOT DISCUSSED IN

12   THE SPECIFICATION?

13   A.   OH, ABSOLUTELY, YEAH.

14   Q.   NOW, WE'VE HEARD DR. SOFIA TALK ABOUT SOFOSBUVIR BEING A

15   PHOSPHORAMIDATE.

16        YOU DON'T NEED TO APOLOGIZE.

17   A.   SORRY.  THAT'S A TOUGH ONE.

18   Q.   DO YOU AGREE WITH THAT CHARACTERIZATION OF SOFOSBUVIR AS A

19   PHOSPHORAMIDATE PRODRUG?

20   A.   THAT'S A TERM THAT'S BEEN ATTRIBUTED TO THAT, YES.

21   Q.   AND DOES THE SPECIFICATION SHOW ANY EXAMPLES OF

22   PHOSPHORAMIDATE PRODRUGS?

23   A.   IT DOESN'T.

24   Q.   AND, BOTTOM LINE, ARE ANY EXAMPLES COVERED BY THE CLAIMS?

25   A.   NO.

1    Q.   ANY DATA ABOUT THEM?

2    A.   NO.

3    Q.   LET'S TALK MORE ABOUT FACTORS 5 AND 7, AND WE JUST DID THE

4    ABSENCE OF WORKING EXAMPLES.

5         FACTORS 5 AND 7, JUST TO REMIND EVERYONE, ARE THE STATE OF

6    THE ART AND THE UNPREDICTABILITY OF THE ART.

7         DR. STELLA, DOES THE SPECIFICATION TALK ABOUT AN ARTICLE

8    ABOUT PRODRUGS?

9    A.   YES, IT DOES.

10   Q.   AND IS THIS A PAPER WRITTEN BY WAGNER?

11   A.   YES.

12   Q.   AND ARE YOU FAMILIAR WITH THAT PAPER?

13   A.   YES, I AM FAMILIAR.

14   Q.   AND DID YOU USE IT IN FORMING YOUR OPINIONS?

15   A.   YES, I DID.

16   Q.   AND I THINK IT'S IN YOUR BINDER AS EXHIBIT 24.

17        I DON'T BELIEVE THERE'S ANY OBJECTION TO THIS.

18        PLAINTIFFS MOVE EXHIBIT 24 INTO EVIDENCE.

19            MR. RABINOWITZ:  NO OBJECTION.

20            THE COURT:  IT WILL BE ADMITTED.

21        (PLAINTIFF'S EXHIBIT 24 WAS RECEIVED IN EVIDENCE.)

22   BY MR. SINGER:

23   Q.   BEFORE WE LOOK AT WAGNER, LET'S LOOK AT WHAT THE PATENT

24   SAYS ABOUT WAGNER.  I THINK THAT WOULD BE HELPFUL TO EVERYONE.

25        IF WE GO TO THE NEXT SLIDE, WE'VE DEPICTED HERE VERBATIM

1      EXAMPLE 72.  THIS IS ONE OF THESE SATE PRODRUGS THAT YOU TALKED

2      ABOUT, THE TOXIC ONE, GENERAL PROCESS TO SATE PRODRUG MOIETY.

3            I'M JUST GOING TO SAY SATE.  SATE PRONUCLEOTIDES ARE

4      DISCUSSED IN C.R. WAGNER, ET AL, PRONUCLEOTIDES TOWARD THE

5      IN VIVO DELIVERY OF ANTI-VIRAL AND ANTI-CANCER NUCLEOTIDES.

6            DO YOU SEE THAT?

7      A.   YES.

8      Q.   AND THEN IT SAYS, WHICH IS INCORPORATED BY REFERENCE

9      HEREIN IN ITS ENTIRETY.

10           FIRST OFF, HOW WOULD A PERSON OF SKILL IN THE ART ACTUALLY

11     READ WHAT IS BEING TALKED ABOUT HERE AS TO WAGNER?  HOW DO YOU

12     BELIEVE A PERSON OF SKILL WOULD READ THIS?

13     A.   WELL, I BELIEVE, BASED ON THE TITLE, GENERAL PROCESS TO

14     SATE PRODRUG MOIETY, AND THEN THE SUBSEQUENT REFERENCE TO

15     WAGNER, TO ME, WAGNER BY BEING, QUOTE-UNQUOTE, "INCORPORATED BY

16     REFERENCE," REFERS TO, IN FACT, WAGNER AS IT RELATES TO SATE

17     PRODRUGS.

18     Q.   OKAY.  SO IN YOUR OPINION, WE SHOULD ONLY BE LOOKING AT

19     THE WAGNER PAPER AS IT RELATES TO SATE?

20     A.   THAT'S CORRECT.

21     Q.   AND YOU ALREADY TALKED ABOUT SATE PRODRUGS EARLIER;

22     CORRECT?

23     A.   THAT'S CORRECT.

24     Q.   AND I KNOW THERE'S A DISAGREEMENT ABOUT THIS BETWEEN THE

25     TWO SIDES.

1    A.   RIGHT.

2    Q.   LET'S PUT ASIDE -- LET'S PUT ASIDE THAT IT TALKS ABOUT

3    WAGNER UNDER A HEADER TALKING ABOUT SATE IN AN EXAMPLE.

4    A.   YES.

5    Q.   AND CAN WE PUT THAT ASIDE?  CAN YOU DO THAT?

6    A.   YES.

7    Q.   AND CAN WE CONSIDER IT IN ITS ENTIRETY?  AND DID YOU?

8    A.   I DID.

9    Q.   ALL RIGHT.  DOES WAGNER, JUST THIS PUBLICATION THAT'S

10   REFERRED TO IN ONE LINE IN THIS PATENT, ENABLE A PERSON OF

11   SKILL IN THE ART TO PRACTICE THE CLAIMED INVENTION AS FAR AS

12   THE USE OF ALL OF THESE PRODRUGS?

13   A.   ABSOLUTELY NOT.

14   Q.   AND LET'S TAKE A LOOK AT THE ARTICLE.  ALL RIGHT?

15        IF WE GO TO THE NEXT SLIDE, WE SEE THE TITLE JUST AS IT

16   WAS IN THE PATENT, "PRONUCLEOTIDES:  TOWARD THE IN VIVO

17   DELIVERY OF ANTI-VIRAL AND ANTI-CANCER NUCLEOTIDES?"

18        FIRST OFF, I KNOW YOU TOLD US TO PUT THE TITLE ON THERE.

19   WHY DID YOU TELL US TO PUT THE TITLE ON THERE IN YOUR

20   PRESENTATION?

21   A.   WELL, FIRST OF ALL, THE COMPOUNDS THAT ARE BROADLY CLAIMED

22   COVER NUCLEOSIDES AND NUCLEOTIDES, S-I-D-E-S VERSUS T-I-D-E-S,

23   OKAY?

24        AND JUST TO REFRESH, IF YOU DON'T REMEMBER THAT, YOU

25   REMEMBER THAT THE NUCLEOSIDE IS ONE OF THESE SORT OF BASE

1    MOLECULES WHICH DOESN'T HAVE IN THE Y POSITION, LEFT-HAND SIDE

2    IN ALL OF THE DIAGRAMS, THAT Y IS NOT A PHOSPHATE.  IT'S WHAT

3    IS CALLED OH OR HYDROXYL GROUP, OKAY.

4        THE NUCLEOTIDE IS WHERE THAT Y IS AN O PHOSPHATE.  THAT'S

5    THE NUCLEOTIDE, OKAY?

6        WAGNER, IN HIS ANALYSIS OF THE STATE OF THE ART OF

7    DELIVERING -- THE STATE OF THE ART OF DELIVERING POTENTIALLY

8    EXAMPLES OR PROCESSES, EXAMPLES OF NUCLEOTIDES AND NOT

9    NUCLEOSIDES.

10       SO WAGNER BY ITSELF DOESN'T ADDRESS NUCLEOSIDE PRODRUGS AT

11   ALL.  SO IF YOU LIKE, A SMALL SUBSET OF A MUCH BIGGER SUBSET.

12       SO WAGNER ONLY TALKS ABOUT ONE LITTLE GROUP IN ONE CORNER

13   OF A VERY BIG SET OF MOLECULES.  SO WAGNER ONLY FOCUSES ON

14   NUCLEOTIDES.

15   Q.  ALL RIGHT.  LET'S GO TO THE NEXT SLIDE, WHICH IS THE

16   ABSTRACT.  I'M SURE MANY MEMBERS OF THE JURY KNOW WHAT AN

17   ABSTRACT IS, BUT SOME WAY NOT.  WHAT IS AN ABSTRACT IN A

18   SCIENTIFIC PAPER?

19   A.  WELL, IT'S REALLY SORT OF THE SUMMARY, IF YOU LIKE, OF

20   WHAT THE AUTHORS FOUND.

21       SO, FOR EXAMPLE, WHEN YOU GO INTO A BOOK STORE -- AND WE

22   STILL HAVE BOOK STORES, RIGHT? -- AND IF YOU GO INTO THE BOOK

23   STORE AND YOU PULL IT UP ON THE KINDLE AND YOU'RE LOOKING FOR A

24   BOOK BY GIANNI DE LEON BENEDETTI, "DETECTIVE IN VENICE" AND YOU

25   WANT TO READ THAT BOOK, WHAT COMES UP?

1          YOU GET AN ABSTRACT AND A SMALL SUMMARY THAT SAYS, HEY,

2     THAT'S COOL, AND THAT MAY BE A PAPER OR A BOOK I'D LIKE TO

3     READ.

4          OR YOU PICK UP THE BOOK AT THE BOOKSTORE AND YOU LOOK AT

5     THE BACK COVER AND THE BACK COVER HAS AN IDEA OF WHAT THE BOOK

6     IS ABOUT.  IT DOESN'T GIVE YOU THE SECRETS, BUT IT GIVES YOU AN

7     IDEA OF WHAT THE BOOK IS ABOUT AND IT TELLS YOU ABOUT THE

8     AUTHOR.

9          SO THE ABSTRACT HAS THE SAME ELEMENT.

10          AND THIS IS SAYING, OKAY, ALL OF THIS ANALYSIS OF PRODRUGS

11     AND NUCLEOTIDES, THIS IS WHAT WE FOUND, AND SO IF YOU LIKE IT,

12     IT HELPS YOU UNDERSTAND, IS THIS A PAPER I REALLY WANT TO READ

13     OR IS THIS SOMETHING, NO, THIS DOESN'T INTEREST ME?

14          SO AN ABSTRACT HELPS YOU KNOW WHAT THEY CONCLUDED WITHOUT

15     HAVING TO READ THE WHOLE PAPER.

16     Q.   ALL RIGHT.  DR. STELLA, WHAT HAVE YOU CHOSEN TO HIGHLIGHT

17     FOR THE JURY IN THE ABSTRACT OF WAGNER?

18     A.   WELL, CAN I READ OUT THE --

19     Q.   ABSOLUTELY.

20     A.   THE FIRST SECTION?

21          "TO OVERCOME THE MANY HURDLES PREVENTING THE USE OF

22     ANTI-VIRAL AND ANTI-CANCER NUCLEOSIDES AS THERAPEUTICS, THE

23     DEVELOPMENT OF A PRODRUG METHODOLOGY (I.E., NUCLEOTIDE) FOR THE

24     IN VIVO DELIVERY OF NUCLEOTIDES HAS BEEN PROPOSED AS A

25     SOLUTION."

1    Q.   STOP RIGHT THERE.  IT'S TALKING ABOUT THESE HURDLES.

2    THAT'S THE SAME CONCEPT THAT YOU USED; RIGHT?

3    A.   RIGHT.

4    Q.   AND THEN THE ABSTRACT GOES ON TO TALK ABOUT THE IDEAL

5    NUCLEOSIDE -- OR NUCLEOTIDE, MY BAD -- AND THEN YOU'VE

6    HIGHLIGHTED ANOTHER LINE.  AND WHAT DOES THAT SAY?

7    A.   "ALTHOUGH THIS GOAL HAS YET TO BE ACHIEVED."

8    Q.   OKAY.  WHAT DOES THAT SAY?  EVEN THOUGH IT SAYS MANY

9    CLEVER AND IMAGINATIVE APPROACHES HAVE BEEN DEVELOPED, WHAT

10   DOES THAT TELL A PERSON OF SKILL IN THE ART ABOUT WHERE THINGS

11   STOOD, WHERE THINGS STOOD AT THE TIME OF THIS ARTICLE IN 2000

12   JUST SHORTLY BEFORE THE PATENTS AT ISSUE IN THIS CASE WERE

13   APPLIED FOR?

14   A.   WELL, TO ME WHAT WAGNER WAS SAYING IS, HEY, WE'VE TRIED A

15   LOT OF THINGS AND THERE ARE SOME THINGS LOOK LIKE -- SOME

16   EXAMPLES SHOW SOME PROMISE, BUT THERE'S REALLY -- WE'RE NOT

17   THERE YET.

18   Q.   NOW, IN THE BODY OF WAGNER, DOES IT LIST EVEN MORE

19   POSSIBLE APPROACHES A PERSON OF SKILL IN THE ART MIGHT TRY?

20   A.   YES, IT DOES.

21   Q.   ALL RIGHT.  IF WE GO TO THE NEXT SLIDE.  THIS IS A

22   DEMONSTRATIVE THAT YOU HELPED PREPARE OF WHAT YOU CALLED A

23   LAUNDRY LIST OF POSSIBLE PRODRUG GROUPS THAT MIGHT BE TRIED.

24        WHY DID YOU CALL IT A LAUNDRY LIST?

25   A.   WELL, WAGNER'S PAPER IS A REVIEW.  IT'S BASICALLY AN

1    ANALYSIS THAT SOMEONE THAT HAS CONSIDERED A GROUP, THAT IS

2    OFTEN HIGHLY SKILLED IN THE ART, HAS DONE A LITERATURE SURVEY

3    AND THEY HAVE GONE OUT AND BASICALLY DONE A SURVEY AND SAID,

4    WHAT ARE THE SORT OF APPROACHES THAT PEOPLE HAVE TRIED?  WHAT

5    ARE THE THINGS THAT PERHAPS HAVE BEEN TRIED TO DATE,

6    UNDERSTANDING THAT ANY REVIEW ARTICLE, THE DAY YOU PUBLISH IT,

7    IT'S PROBABLY OUT OF DATE, RIGHT?  BECAUSE SOMEBODY ELSE HAS

8    PROBABLY COME UP WITH SOME OTHER WORK.

9        SO THIS IS A LAUNDRY LIST OF COMPOUNDS OR APPROACHES, IF

10   YOU LIKE, OR HEADINGS WHERE PEOPLE HAVE LOOKED AT VARIOUS

11   APPROACHES FOR THE DELIVERING OF NUCLEOTIDES.

12   Q.   OKAY.  NOW, IN LISTING -- WE'RE NOT GOING TO READ THESE.

13   I PROMISED THE REPORTER I WOULDN'T DO THAT.

14       IN LISTING ALL OF THESE POSSIBILITIES THAT WE SEE HERE IN

15   PDX-616, IS THERE A SINGLE EXAMPLE IN THIS ARTICLE IN WAGNER OF

16   A PRODRUG OF A 2' METHYL, 2' FLUORO NUCLEOTIDE OR NUCLEOSIDE?

17   A.   ABSOLUTELY NOT.

18   Q.   ALL RIGHT.  DOES THIS ARTICLE EVEN TELL, EVEN TELL A

19   PERSON OF SKILL IN THE ART HOW TO SELECT ONE OF THESE MANY

20   APPROACHES FOR ANY PARTICULAR NUCLEOTIDE OR NUCLEOSIDE?

21   A.   NO, IT DOESN'T.

22       AND LET ME JUST REITERATE.  WHAT I HAVE DONE HERE WITH

23   THESE FIVE HEADINGS IS SORT OF CATEGORIES.  WITHIN EACH ONE OF

24   THOSE CATEGORIES YOU SEE ME LISTING A WHOLE BUNCH OF THINGS

25   WITHIN THOSE CATEGORIES.

1        AND WITHIN THOSE SUBCATEGORIES THERE ARE MULTIPLE POSSIBLE

2    DERIVATIVES, OKAY.  SO WHEN I CAME UP EARLIER AND I SAID THERE

3    WAS AN UNLIMITED NUMBER, JUST ON A NUCLEOTIDE SIDE -- FORGET

4    ABOUT THE NUCLEOSIDE SIDE -- ON THE NUCLEOTIDE SIDE, YOU CAN

5    COUNT LITERALLY MILLIONS OF COMPOUNDS.

6    Q.   AND DOES THE ARTICLE THEN HAVE A CONCLUSION WHERE THE

7    AUTHORS MAKE A CONCLUSION AFTER SURVEYING THE LITERATURE?

8    A.   THEY DO, YES.

9    Q.   AND IF WE GO TO THE NEXT SLIDE, PDX-627, SUMMARY AND

10   CHALLENGES.  AND YOU'VE HIGHLIGHTED HALF OF THE SENTENCE IN THE

11   SECOND PARAGRAPH THERE, AND THE FIRST PARAGRAPH TALKS ABOUT THE

12   IMAGINATIVE AND CLEVER APPROACHES AS WE SAW IN THE ABSTRACT.

13       IT SAYS, "DESPITE THE SUCCESS OF PRONUCLEOTIDES, MANY

14   QUESTIONS AND ISSUES REMAIN TO BE ADDRESSED.  NO SINGLE METHOD

15   HAS PROVED TO BE GENERALLY USEFUL FOR ALL NUCLEOTIDES."

16       WHAT DOES THAT TELL A PERSON OF SKILL IN THE ART?

17   A.   SOMEONE READING THIS WOULD SAY, GOOD LUCK.  THERE'S A LOT

18   OF THINGS THAT YOU COULD TRY IN THIS NOT BEING OUT THERE THAT

19   STAND AND SAYS THIS IS WHERE WE NEED TO GO.

20   Q.   AND IF WE GO TO THE NEXT SLIDE, DO THEY SAY EVEN MORE IN

21   THE NEXT PARAGRAPH?

22   A.   YES.  I'D JUST LIKE TO READ THE AREA I HIGHLIGHTED.

23   "UNFORTUNATELY, THE EFFECTS OF PRONUCLEOTIDE DESIGN ON THE

24   MECHANISM OF NUCLEOTIDE RELEASE HAVE ONLY BEEN SYSTEMATICALLY

25   STUDIED IN A FEW CASES.  FURTHERMORE, IN VIVO --" IN VIVO MEANS

1    IN LIVE ANIMALS -- "IN VIVO POTENCY, LONG-TERM TOXICITY,

2    BIOAVAILABILITY" -- BIOAVAILABILITY IS THE ABILITY TO ABSORB A

3    DRUG -- "PLASMA PHARMACOKINETICS" -- THAT IS THE TIME PROFILE

4    OF A DRUG IN THE BODY, PROFILE OF DRUGS IN THE BODY TO LEAD TO

5    EFFECTIVE THERAPY -- "AND TISSUE DISTRIBUTION HAVE BEEN

6    DETERMINED ONLY IN A FEW PRONUCLEOTIDES."

7    Q.   DR. STELLA, DOES THIS MEAN THAT A PERSON OF SKILL IN THE

8    ART, READING WAGNER, THEY WOULD CONCLUDE THAT THE ART IS

9    PREDICTABLE OR UNPREDICTABLE?

10   A.   WELL, AS I SAID, GOOD LUCK.  IT'S HIGHLY UNPREDICTABLE.

11   Q.   ALL RIGHT.  DR. STELLA, HAVE WE NOW WALKED THROUGH ALL OF

12   THE FACTORS THAT YOU HAVE STUDIED?

13   A.   WE DID.

14   Q.   AND CAN WE SUMMARIZE YOUR OPINION ON THE NEXT SLIDE?

15   A.   YES.

16   Q.   AND THERE'S THE STANDARD AGAIN.  OKAY.  AND THOSE ARE THE

17   EIGHT FACTORS.  AND IF WE CAN GO TO PDX 620.  AND IF YOU CAN

18   EXPLAIN TO THE JURY IN SUMMARY FORM WHY YOU BELIEVE THE PATENT

19   IS NOT ENABLED?

20   A.   WELL, IT'S NOT ENABLED BECAUSE IT'S GOING TO TAKE A HIGH

21   AMOUNT OF EXPERIMENTAL -- EXPERIMENTATION TO IDENTIFY A WORKING

22   COMPOUND; THERE'S SUBSTANTIAL GUIDANCE THAT IS NEEDED AND VERY

23   LITTLE IS GIVEN; THERE ARE NO WORKING EXAMPLES AND NO DATA; THE

24   FIELD ITSELF IS COMPLEX AND UNPREDICTABLE; THERE'S A LIMITED

25   GUIDANCE IN THE PRIOR ART; AND THE VERY BROAD CLAIMS COVERING

1      THE USE OF ANY POSSIBLE PRODRUGS TO TREAT IS VERY, VERY BROAD.

2          SO IN MY EYES THIS PATENT TOTALLY LACKS ENABLEMENT.

3      Q.   DR. STELLA, ARE THE INVENTORS BASICALLY SAYING TO PERSONS

4      OF SKILL IN THE ART WHO READ THIS, YOU GO FIGURE IT OUT?

5      A.   ABSOLUTELY.

6      Q.   ALL RIGHT.  LET'S TALK BRIEFLY ABOUT YOUR OPINION ON

7      WRITTEN DESCRIPTION.  YOU ALSO REACHED AN OPINION ON WHETHER OR

8      NOT CLAIMS, YOU KNOW, 1 AND 2 ARE VALID UNDER THE WRITTEN

9      DESCRIPTION; IS THAT CORRECT?

10     A.   YES.

11     Q.   AND, YOU KNOW, DR. STELLA, WE NEVER TALKED ABOUT CLAIM 2,

12     ACTUALLY.  WE SKIPPED THAT, AND THAT'S MY FAULT.

13         IF WE COULD GO BRIEFLY, MR. ANG, IF WE COULD GO TO PDX

14     604, PLEASE.  603.  603.

15         WE TALKED ABOUT CLAIM 1 IN THE MARKUSH STRUCTURE, AND WE

16     ACTUALLY DIDN'T TALK ABOUT CLAIM 2.

17     A.   RIGHT.

18     Q.   AND IS YOUR OPINION THE SAME FOR CLAIMS 1 AND 2?

19     A.   ABSOLUTELY.

20     Q.   AND WHAT IS THE DIFFERENCE BETWEEN CLAIMS 1 AND 2?

21     A.   CLAIM 1, I THINK, WE TALKED ABOUT ADEQUATELY.

22         CLAIM 2, AND I'D LIKE TO READ THIS OUT BECAUSE THERE'S A

23     LEGAL ASPECT OF THIS, THE METHOD OF CLAIM 1 WHEREIN.

24         AND WHAT THAT MEANS IS THAT CLAIM 1 IS ACTUALLY BUILT INTO

25     CLAIM 2.  SO CLAIM 2 IS WHAT IS CALLED, I BELIEVE, A DEPENDENT

1    CLAIM, THAT IT DEPENDS ON CLAIM 1.

2         AND EFFECTIVELY WHAT THIS CLAIM IS SAYING IS THAT YOU CAN

3    TAKE THE COMPOUNDS OF CLAIM 1 AND TREAT HCV BY GIVING A SECOND

4    DRUG WITH THAT.

5         SO THIS CLAIM, I ASSUME, WAS DESIGNED TO COVER THE FACT

6    THAT A COMPOUND FROM CLAIM 1 WOULD THEN BE GIVEN TO TREAT HCV

7    IN COMBINATION WITH A SECOND DRUG.

8    Q.   BY BEING A DEPENDENT CLAIM, DOES THAT MEAN THAT ALL OF

9    CLAIM 1 IS INCORPORATED INTO CLAIM 2?

10   A.   THAT'S CORRECT.

11   Q.   AND IS YOUR OPINION -- THE BASIS FOR YOUR OPINION ON

12   ENABLEMENT THE SAME FOR CLAIM 2 AS IT IS FOR CLAIM 1?

13   A.   YES.

14   Q.   AND LET'S GO AND TALK ABOUT WRITTEN DESCRIPTION BRIEFLY.

15        IF WE COULD, MR. ANG, GO TO PDX 621.

16        ALL RIGHT.  THIS IS THE WRITTEN DESCRIPTION STANDARD THAT

17   YOU -- THAT IS IN SUMMARY.  THE JURY WILL GET MUCH LONGER

18   INSTRUCTIONS.

19        THAT THE PATENT'S DISCLOSURE MUST CONVEY TO A PERSON OF

20   SKILL IN THE ART THAT THE INVENTORS HAD POSSESSION OF THE

21   CLAIMED SUBJECT MATTER?

22        IS THAT THE STANDARD YOU APPLIED?

23   A.   YES.

24   Q.   AND WHAT IS YOUR OPINION AS TO WHETHER OR NOT THE PATENT

25   SHOWS THAT THE INVENTORS POSSESSED THE SCOPE OF THEIR CLAIMS AS

1    IT RELATES TO THE PRODRUG ASPECT OF THINGS?

2    A.   I'VE GOT THAT SUMMARIZED.

3    Q.   IF WE CAN GO TO THE NEXT SLIDE.

4    A.   SO THE CLAIMS COVER TREATING HCV WITH AN EXTREMELY LARGE

5    GENUS OF COMPOUNDS AND ANY PRODRUG OF THOSE COMPOUNDS.

6        SO TO BEGIN WITH AND TO QUOTE THE DEFINITION THAT THE

7    INVENTORS HAD POSSESSION OF THE CLAIMED COMPOUNDS, THAT COVERS

8    A VERY BROAD RANGE OF COMPOUNDS, AND THERE ARE NO EXAMPLES OF

9    PRODRUGS THAT FALL WITHIN THE SCOPE OF THE CLAIMS, AND THERE'S

10   NO DATA OR ANY PRODRUG, PERIOD, LET ALONE THOSE THAT FALL

11   WITHIN THE CLAIMS SINCE THERE ARE NONE.  AND SO IN MY

12   ESTIMATION, THE NAMED INVENTORS HERE WERE NOT IN POSSESSION OF

13   THE INVENTION.

14   Q.   OKAY.

15   A.   AND, THEREFORE, THEY DID NOT MEET THE WRITTEN DESCRIPTION

16   CRITERIA.

17   Q.   SO THIS WAS SOMETHING THAT THEY DIDN'T INVENT, DID THEY?

18   A.   THAT'S RIGHT.

19   Q.   AND, DR. STELLA, A COUPLE OF FINAL QUESTIONS.  IN SIMPLE

20   TERMS, DOES THE '499 PATENT SOLVE THE PROBLEM OF HOW TO TREAT

21   HEPATITIS C WITH A PRODRUG OF A NUCLEOTIDE OR A NUCLEOSIDE?

22   A.   ABSOLUTELY NOT.

23   Q.   WHO SOLVED THAT PROBLEM?

24   A.   I BELIEVE PHARMASSET IN THEIR PRODUCT SOFOSBUVIR DID THAT.

25   Q.   AND WHAT DO YOU THINK OF SOFOSBUVIR AS AN EXPERT WHO HAS

1    WORKED IN THIS FIELD NOW FOR OVER 40 YEARS?

2    A.   I'M A PRODRUG GUY.

3    Q.   I THINK YOU SAID I'M A PRODRUG GUY.

4    A.   I'M A PRODRUG GUY.  SOFOSBUVIR IS ONE COOL DRUG.  I MEAN,

5    IT KNOCKED IT OUT OF THE BALLPARK.  IT'S SAVING JUST AN

6    INCREDIBLE NUMBER OF LIVES AND THE TECHNOLOGY AND HOW THEY GOT

7    THERE, I THINK, IS ONE OF THE COOLEST STORIES THAT I HAVE EVER

8    SEEN AS A SCIENTIST IN MY 40 YEARS.

9    Q.   THANK YOU.

10        I HAVE NO FURTHER QUESTIONS AT THIS TIME.

11             THE WITNESS:  IS IT POSSIBLE TO TAKE A SHORT BREAK?

12             THE COURT:  ABSOLUTELY.

13             THE WITNESS:  I'M GETTING REALLY -- I'M THIRSTY.  IF

14    I CAN SORT OF DRINK SOME WATER.

15             THE COURT:  LET'S TAKE A 10 MINUTE BREAK.  YOU'RE

16    THE ONE DOING ALL OF THE TALKING AND WE'RE JUST LISTENING.  ALL

17    RIGHT.  WE'LL COME BACK IN 10 MINUTES.

18        (RECESS FROM 10:05 A.M. UNTIL 10:17 A.M.)

19             THE COURT:  PLEASE BE SEATED.  ALL OF OUR JURORS ARE

20    BACK.  ALL RIGHT.  I BELIEVE WE CONCLUDED THE DIRECT

21    EXAMINATION OF DR. STELLA.

22        AND, MR. RABINOWITZ, ARE YOU TAKING THE LEAD ON THIS ONE?

23             MR. RABINOWITZ:  YES, YOUR HONOR.

24             THE COURT:  ALL RIGHT.  WOULD YOU LIKE TO

25    CROSS-EXAMINE THE WITNESS?

1          MR. RABINOWITZ:  THANK YOU, YOUR HONOR.

2      YOUR HONOR, MAY I APPROACH?

3          THE COURT:  YES.

4                    **CROSS-EXAMINATION**

5  BY MR. RABINOWITZ:

6  Q.  GOOD MORNING, DR. STELLA.

7  A.  GOOD MORNING.

8  Q.  WE'VE MET BEFORE.  WE'VE, IN FACT, WORKED ON SEVERAL CASES

9  TOGETHER?

10  A.  YES.

11  Q.  AND JUST SO THE JURY KNOWS WHO I AM, I AM

12  STEPHEN RABINOWITZ, AND I REPRESENT MERCK IN THIS MATTER.

13      DR. STELLA, YOU ARE AWARE THAT THERE ARE TWO PATENTS AT

14  ISSUE IN THIS LITIGATION?

15  A.  THAT'S WHAT I'M TOLD, YES.

16  Q.  AND ONE IS THE '499 PATENT?

17  A.  YES.

18  Q.  AND THAT'S IDENTIFIED BY THE THREE DIGITS ON THE TOP ON

19  THE RIGHT, THE '499 PATENT?

20  A.  YES.

21  Q.  AND THE OTHER IS THE '712 PATENT?

22  A.  YES.

23  Q.  WE CAN AGREE YOUR TESTIMONY AND OPINIONS THAT YOU GAVE

24  THIS MORNING CONCERN THE '499 PATENT?

25  A.  YES.

1    Q.   NOT THE '712 PATENT?

2    A.   THAT'S CORRECT.

3    Q.   CAN I ASK YOU TO TURN TO THE '499 PATENT THAT IS IN

4    EVIDENCE AS EXHIBIT 1.  IT'S THE TOP EXHIBIT IN THE BINDER I'VE

5    JUST GIVEN YOU.

6         AND CAN I ASK YOU TO TURN TO CLAIM 1, AND THAT'S TOWARDS

7    THE BACK IN COLUMN 137.

8         CAN YOU GO TO COLUMN 137.  AND THAT'S ON YOUR SCREEN.  DO

9    YOU SEE THAT?

10   A.   CAN YOU BLOW THAT UP A LITTLE BIT MORE.  IT'S A LITTLE BIT

11   FUZZY.  OKAY.

12   Q.   AND THAT'S THE WORD THAT YOU FOCUSSED ON IN YOUR TESTIMONY

13   THIS MORNING "ADMINISTERING;" CORRECT?

14   A.   CORRECT.  THAT'S ONE OF THE THINGS I CONCENTRATED ON.

15   Q.   AND, NOW, CAN WE GO TO COLUMN 37 OF THE '499 PATENT?

16   A.   COLUMN 37.

17   Q.   COLUMN 37.  SORRY.  COLUMN 32.  I BEG YOUR PARDON.  THE

18   PARAGRAPH BEGINNING AT LINE 5 OF COLUMN 32.

19   A.   LINE 5?

20   Q.   AND IT'S ON THE SCREEN IN FRONT OF YOU, AND WE'VE BLOWN UP

21   THE FIRST SENTENCE OF THAT PARAGRAPH.

22        DO YOU SEE THAT?

23   A.   YES.

24   Q.   AND WE CAN AGREE THAT IT SAYS, "THE TERMS OF

25   'ADMINISTRATION OF' AND 'ADMINISTERING' A COMPOUND SHOULD BE

1    UNDERSTOOD TO MEAN PROVIDING A COMPOUND OF THE INVENTION OR A

2    PRODRUG OF A COMPOUND OF THE INVENTION TO THE INDIVIDUAL IN

3    NEED."

4        THAT'S WHAT THE PATENT SAYS; RIGHT?

5    A.   YES.

6    Q.   CAN WE AGREE THAT THIS COMPOUND ALLOWS IT DIRECTLY TO BE

7    ADMINISTERED AS THE COMPOUND?

8    A.   YES.

9    Q.   AND IT ALSO ALTERNATIVELY ALLOWS FOR THE COMPOUND TO BE

10   DELIVERED BY MEANS OF A PRODRUG?

11   A.   THAT IS A WAY THAT I THINK THAT IT'S CORRECT.

12   Q.   AND LET'S GO TO COLUMN 34 OF THE '499 PATENT THE PARAGRAPH

13   BEGINNING AT LINE 31 AND I'D LIKE YOU TO TAKE A LOOK AT THE

14   SENTENCE BEGINNING "THE COMPOSITIONS INCLUDE."

15       AND THAT'S ON YOUR SCREEN AS WELL.

16   A.   ARE YOU ASKING ME TO JUST READ THE FIRST SENTENCE?

17   Q.   I'M JUST DIRECTING YOUR ATTENTION.  DO YOU HAVE THAT?

18   A.   YES.

19   Q.   AND IT'S ON THE SCREEN AS WELL IF YOU WANT TO LOOK THERE.

20   A.   ALL RIGHT.

21   Q.   AND WE CAN AGREE THAT THIS ALLOWS FOR THE COMPOSITION TO

22   BE ADMINISTERED ORALLY; RIGHT?

23   A.   YES.

24   Q.   AND IT ALLOWS FOR THE COMPOSITION TO BE ADMINISTERED BY A

25   RECTAL ROUTE?

CROSS STELLA BY MR. RABINOWITZ

1    A.   THAT'S WHAT IT SAYS.  I WOULD NOT RECOMMEND IT, BUT THAT'S

2    OKAY.

3    Q.   IT ALLOWS THE COMPOSITION TO BE ADMINISTERED BY A TOPICAL

4    ROUTE?

5    A.   AGAIN, IT STATES THAT, BUT I WOULDN'T RECOMMEND THAT.

6    Q.   AND TOPICAL MEANS SPREADING IT ON THE SKIN?

7    A.   THAT'S CORRECT.

8    Q.   AND IT ALLOWS FOR PARENTERAL?

9    A.   YES.  AND FOR THE JURY, PARENTERAL MEANS AN INJECTABLE

10   FORM.

11   Q.   ALL RIGHT.  AND WITH PARENTERAL IT ALLOWS FOR IT TO BE

12   ADMINISTERED SUBCUTANEOUSLY?

13   A.   YES, UNDER THE SKIN.

14   Q.   AND IT ALLOWS FOR IT INTRAMUSCULARLY?

15   A.   YES, THAT'S INJECTION INTO THE MUSCLE AND USUALLY THE

16   GLUTEUS MAXIMUS.

17   Q.   AND IT ALLOWS FOR INTRAVENOUSLY?

18   A.   THAT'S WHAT IT SAYS.

19   Q.   AND INTRAVENOUS MEANS DIRECTLY INTO A VEIN?

20   A.   THAT'S CORRECT.

21   Q.   AND SOMETIMES CALLED AN IV?

22   A.   YES.

23   Q.   AND WE CAN AGREE THIS ALLOWS FOR PULMONARY ADMINISTRATION?

24   A.   I'M SORRY?

25   Q.   THIS ALLOWS FOR PULMONARY ADMINISTRATION?

1    A.    OPHTHALMIC AND PULMONARY.

2    Q.    AND PULMONARY ADMINISTRATION MEANS THROUGH THE LUNGS?

3    A.    YES.  AGAIN, I WOULDN'T RECOMMEND THAT.

4    Q.    AND IT ALLOWS FOR ADMINISTRATION BY AN OCULAR ROUTE?

5    A.    YES.

6    Q.    AND THAT MEANS ADMINISTRATION THROUGH THE EYE?

7    A.    TO THE EYE.

8    Q.    AND WE CAN AGREE THAT IT ALLOWS FOR ADMINISTRATION BY A

9    NASAL ROUTE?

10    A.    THAT'S WHAT IT STATES.

11    Q.    AND THAT MEANS BREATHING IT IN THROUGH THE NOSE?

12    A.    YES.

13    Q.    WE CAN AGREE THAT ALL OF THESE ARE WAYS IN WHICH THE

14    PATENT PERMITS THE COMPOSITION TO BE ADMINISTERED ACCORDING TO

15    THIS LANGUAGE?

16    A.    COULD YOU RESTATE THAT, PLEASE.  I JUST WANT TO MAKE SURE.

17    Q.    WE CAN AGREE THAT THIS LANGUAGE PERMITS THE COMPOSITION TO

18    BE ADMINISTERED BY ANY OF THESE ROUTES?

19    A.    THE PATENT STATES THAT, YES.

20    Q.    NOW, IN YOUR TESTIMONY YOU IDENTIFIED SEVERAL HURDLES THAT

21    YOU SPOKE ABOUT AND YOU USED A DIAGRAM.  COULD I ASK YOU TO

22    TAKE A LOOK AT THAT HURDLE DIAGRAM, PDX 607.  AND COULD WE HAVE

23    IT UP ON THE SCREEN, PLEASE.  AND YOU SAID THESE ARE HURDLES IN

24    DEVELOPING ORAL PRODRUGS?

25    A.    YES.

CROSS STELLA BY MR. RABINOWITZ

1    Q.  CAN WE AGREE THAT THE FIRST HURDLE SYNTHESIS OF THE

2    PRODRUG COMPOUND DOESN'T APPLY TO A DRUG THAT IS GIVEN AS AN

3    ACTIVE COMPOUND AND NOT AS A PRODRUG?

4    A.  WELL, YOU HAVE THE SYNTHESIS OF THE DRUG BUT, YES, WHEN IT

5    RELATES TO PRODRUG BUT THAT ALSO REQUIRES YOU HAVE A STARTING

6    POINT.

7    Q.  AND IF YOU'RE GIVING IT AS THE COMPOUND AND NOT AS THE

8    PRODRUG, YOU DON'T NEED TO SYNTHESIZE THE PRODRUG?

9    A.  THAT'S CORRECT.

10   Q.  AND THEN HURDLE NUMBER 2 IS DISSOLUTION AND CHEMICAL

11   STABILITY IN THE GI TRACT.  CAN WE AGREE THAT GI MEANS

12   GASTROINTESTINAL TRACT?

13   A.  YES, I DID DEFINE THAT FOR THE JURY.

14   Q.  AND WE CAN AGREE FOR A DRUG THAT IS NOT GIVEN ORALLY, IT

15   DOESN'T NEED TO DISSOLVE AND BE STABLE IN THE GASTROINTESTINAL

16   TRACT, THAT HURDLE DOESN'T APPLY?

17   A.  NO, FOR THE -- SORRY.  COULD YOU REDO THE QUESTION BECAUSE

18   I GET CONFUSED.

19   Q.  LET ME RESTATE IT, AND IT MAY BE EASIER THAT WAY.

20       CAN WE AGREE THAT IF A DRUG IS GIVEN BY A PARENTERAL OR

21   NOT ORALLY, IT DOES NOT HAVE TO PASS HURDLE 2 DISSOLUTION AND

22   CHEMICAL STABILITY IN THE GI TRACT?

23   A.  IT DOESN'T HAVE TO PASS THAT, BUT IT DOES HAVE TO PASS

24   ANOTHER SET OF HURDLES IN THAT CASE.

25   Q.  AND HURDLE 3 YOU IDENTIFIED WAS STABILITY TO SURVIVE

1       ENZYME ATTACK IN THE GI TRACT; CORRECT?

2       A.   CORRECT.

3       Q.   AND WE CAN AGREE THAT HURDLE 3 DOESN'T APPLY IF THE

4       PRODRUG IS NOT GIVEN ORALLY?

5       A.   NOT IN A GI TRACT BUT IT ALSO -- WITH ALL OF THE OTHER

6       ROUTES IT WOULD BE A COMPARABLE POTENTIAL SET OF HURDLES THAT

7       WOULD HAVE TO BE TAKEN CARE OF, YES.

8       Q.   AND WE CAN AGREE THAT THIS PARTICULAR HURDLE DOESN'T APPLY

9       TO A PRODRUG THAT IS NOT GIVEN ORALLY?

10      A.   THAT'S CORRECT.

11      Q.   AND HURDLE 4 WAS PERMEABILITY THROUGH MEMBRANES AND

12      ENTEROCYTE CELLS LINING THE GI TRACT; CORRECT?

13      A.   YES.

14      Q.   AND WE CAN AGREE THAT THIS PARTICULAR HURDLE DOESN'T APPLY

15      IF THE DRUG WAS NOT GIVEN ORALLY?

16      A.   NO, BUT THERE WOULD BE A COMPARABLE SET OF HURDLES FOR A

17      DRUG GIVEN BY SOME OTHER ROUTE.  FOR EXAMPLE, IN THE NASAL

18      CAVITY YOU WOULD HAVE THE PERMEABILITY THROUGH THE NASAL

19      PASSAGE INTO THE BLOOD SUPPLY OR THROUGH THE CELLS THAT LINE IN

20      THE NASAL PASSAGE.

21      Q.   LET'S LOOK AT NUMBER 5, STABILITY TO SURVIVE THE ENZYMES

22      IN ENTEROCYTE CELLS.  WE CAN AGREE THAT ENTEROCYTE CELLS ARE

23      CELLS THAT LINE THE GUT?

24      A.   YES.

25      Q.   AND WE CAN AGREE THAT THIS PARTICULAR HURDLE DOESN'T APPLY

1    TO A DRUG IF IT'S NOT GIVEN ORALLY?

2    A.   IF IT'S NOT GIVEN ORALLY, YOU'RE RIGHT, BUT THERE WOULD BE

3    ANOTHER SET OF CELLS.  FOR EXAMPLE, IN INTRAVENOUS INJECTION,

4    THE FIRST ORGAN YOU SEE IS THE LUNG, AND THE LUNG HAS SOME OF

5    THE SAME PROCESSES.

6         IF YOU TAKE THE DRUG BY A NASAL ADMINISTRATION, YOU'VE GOT

7    PERMEABILITY, ENZYMES THAT ARE PRESENT IN THOSE CELLS, RIGHT.

8    Q.   AND WE CAN AGREE THAT THERE ARE NO ENTEROCYTES?

9    A.   NOT ON INTRAVENOUS INJECTION, RIGHT.

10   Q.   AND HURDLE NUMBER 6 IS PASSING THROUGH ENTEROCYTES INTO

11   BLOOD THAT FLOWS INTO LIVER.  WE CAN AGREE THAT THAT HURDLE

12   CONTAINING ENTEROCYTES DOESN'T APPLY TO A PRODRUG THAT IS NOT

13   GIVEN ORALLY?

14   A.   CORRECT.  BUT, AGAIN, IT'S A COMPARABLE HURDLE.

15   Q.   AND THEN HURDLE NUMBER 8 YOU SAID AT THE ACTIVE SITE NEED

16   CORRECT ENZYMES TO CLEAVE THE PRODRUG MOIETY AND RELEASE THE

17   ACTIVE DRUG.

18        WE CAN AGREE THAT IF IT'S NOT GIVEN BY MEANS OF THE

19   PRODRUG DELIVERY STRATEGY, THAT HURDLE DOESN'T APPLY?

20   A.   YES, IF YOU IDENTIFY A DRUG THAT DOESN'T REQUIRE THAT,

21   THAT'S FINE.

22   Q.   I'D LIKE TO CULL UP EXHIBIT 2644.  IT'S NOT YET BEEN

23   ADMITTED INTO EVIDENCE.

24             THE COURT:  OKAY.

25             THE WITNESS:  I'M SORRY, WHICH?

1    BY MR. RABINOWITZ:

2    Q.   EXHIBIT 2644.  THEY'RE TABBED IN EXHIBIT NUMBER ORDER IN

3    YOUR BINDER.

4    A.   OKAY.

5    Q.   AND THIS IS AN ARTICLE THAT YOU WROTE?

6    A.   IT'S A REVIEW ARTICLE THAT I WROTE, YES.

7         MR. RABINOWITZ:  YOUR HONOR, I MOVE THAT

8    EXHIBIT 2644 BE ADMITTED.

9         MR. SINGER:  NO OBJECTION, YOUR HONOR.

10        THE COURT:  IT WILL BE ADMITTED.

11        (DEFENDANTS' EXHIBIT 2644 WAS RECEIVED IN EVIDENCE.)

12   BY MR. RABINOWITZ:

13   Q.   THIS ARTICLE DISCUSSES FOSPHENYTOIN?

14   A.   YES.

15   Q.   AND THIS IS THE DRUG THAT YOU DISCUSSED YESTERDAY THAT WAS

16   ADMINISTERED TO YOUR FORMER COLLEAGUE?

17   A.   YES, YES.  HIS DAUGHTER.

18   Q.   A FORMER COLLEAGUE'S DAUGHTER.  AND THAT WAS A GREAT

19   MOMENT FOR YOU?

20   A.   YES, IT WAS.

21   Q.   NOW, IN THE ABSTRACT, IN THE SECOND LINE OF THE ABSTRACT

22   YOU SAID FOSPHENYTOIN IS A PARENTERALLY USEFUL PRODRUG FORM OF

23   PHENYTOIN?  IS THAT CORRECT?

24   A.   THAT'S THE FIRST SENTENCE, RIGHT.

25   Q.   THE SECOND LINE.  FOSPHENYTOIN IS A PARENTERALLY USEFUL

1       PRODRUG FORM OF PHENYTOIN.  DID I READ THAT CORRECTLY?

2       A.   YES.  YES.

3       Q.   AND WE CAN AGREED THAT FOSPHENYTOIN IS A PRODRUG OF

4       PHENYTOIN?

5       A.   YES.

6       Q.   COULD I ASK YOU TO TURN TO PAGE 317 OF YOUR ARTICLE THAT'S

7       MARKED IN THE EXHIBIT AS WITH THE LAST NUMBERS .0007 AT THE

8       BOTTOM.

9            AND THERE'S A DIAGRAM AT THE BOTTOM THAT YOU DREW SHOWING

10      HOW FOSPHENYTOIN WORKS TO DELIVER PHENYTOIN; IS THAT RIGHT?

11      A.   YES.  IT'S THE ETYMOLOGY OF THAT REACTION, YES.

12      Q.   AND WE CAN AGREE IN YOUR DRAWING YOU SHOW HOW THE PRODRUG

13      FOSPHENYTOIN GOES THROUGH AN INTERMEDIATE TO BECOME THE ACTIVE

14      COMPOUND PHENYTOIN?

15      A.   YES.

16      Q.   AND THAT'S WHY WE KNOW THAT FOSPHENYTOIN IS A PRODRUG OF

17      THE ACTIVE COMPOUND PHENYTOIN; CORRECT?

18      A.   YES.

19      Q.   CAN I ASK YOU TO LOOK AT EXHIBIT 2694.  THIS IS NOT YET IN

20      EVIDENCE.  AND THAT'S ALSO IN YOUR BINDER.

21           DO YOU HAVE THAT, DR. STELLA?

22      A.   YES.

23      Q.   AND THIS IS A DRAWING THAT YOU PROVIDED IN YOUR EXPERT

24      REPORT?

25      A.   I BELIEVE SO, YES.

1                MR. RABINOWITZ:  YOUR HONOR, WE MOVE THAT

2        EXHIBIT 2694 BE ADMITTED IN EVIDENCE.

3                MR. SINGER:  THERE IS NO OBJECTION, YOUR HONOR.

4                THE COURT:  IT WILL BE ADMITTED.

5            (DEFENDANTS' EXHIBIT 2694 WAS RECEIVED IN EVIDENCE.)

6        BY MR. RABINOWITZ:

7        Q.   DR. STELLA, WE CAN AGREE THIS SHOWS WHAT HAPPENS TO

8        SOFOSBUVIR AFTER IT ENTERS THE BODY?

9        A.   YES, THIS IS WHAT HAS BEEN, DR. SOFIA AND HIS COLLEAGUES,

10       ET CETERA, HAS PROPOSED THIS IS WHAT GOES ON AND OTHERS.

11       Q.   AND THIS IS HOW YOU ILLUSTRATE IT IN YOUR EXPERT REPORT?

12       A.   YES.

13       Q.   AND WE CAN AGREE THAT THE PRODRUG SOFOSBUVIR GOES THROUGH

14       A NUMBER OF INTERMEDIATES TO BECOME THE ACTIVE COMPOUND WHICH

15       IS DEPICTED AT THE BOTTOM LEFT?

16       A.   YES.

17       Q.   AND THAT'S CALLED GS-461203?

18       A.   YES.

19       Q.   AND IT'S ALSO CALLED PSI-7409?

20       A.   THAT'S MY UNDERSTANDING.

21       Q.   CAN I ASK YOU TO LOOK AT EXHIBIT 2648.  THIS IS ANOTHER

22       DRAWING THAT YOU PROVIDED IN YOUR EXPERT REPORT?

23       A.   YES.

24       Q.   AND WITH THE ASSOCIATED TEXT?

25       A.   RIGHT.

1           MR. RABINOWITZ:  YOUR HONOR, I MOVE THAT

2     EXHIBIT 2648 BE ADMITTED INTO EVIDENCE.

3           MR. SINGER:  THERE'S NO OBJECTION, YOUR HONOR.

4           THE COURT:  IT WILL BE ADMITTED.

5           (DEFENDANTS' EXHIBIT 2648 WAS RECEIVED IN EVIDENCE.)

6     BY MR. RABINOWITZ:

7     Q.   WE CAN AGREE GS-461203 IS THE TRIPHOSPHATE THAT IS THE

8     ACTIVE FORM OF SOFOSBUVIR?

9     A.   YES, THAT'S MY UNDERSTANDING.

10    Q.   AND THIS TRIPHOSPHATE IS THE VIRUS STOPPER?

11    A.   THAT IS MY UNDERSTANDING.

12    Q.   DR. STELLA, I'D LIKE TO SHOW YOU A DEMONSTRATIVE THAT

13    DR. SOFIA USED IN HIS TESTIMONY.  CAN WE SHOW PDX-310?

14    A.   IS THIS IN MY --

15    Q.   IT IS NOT.  WE'LL SHOW THAT TO YOU ON THE SCREEN.

16    A.   OKAY.

17    Q.   WE CAN AGREE THAT THIS IS THE STRUCTURE OF SOFOSBUVIR?

18    A.   I BELIEVE THAT'S TRUE.  I AGREE.

19    Q.   WELL, IF YOU WOULD LIKE TO TAKE A LOOK.  WE CAN LOOK AT

20    WHAT IS ALREADY IN EVIDENCE IS 2602 IS THE SOFOSBUVIR LABEL

21    THAT IS IN YOUR BINDER.

22    A.   2?

23    Q.   26 -- 2062, THE SOVALDI LABEL?

24          MR. SINGER:  COUNSEL, WHAT PAGE?

25          MR. RABINOWITZ:  2062?

1              THE WITNESS:  2062.  I THOUGHT YOU SAID 22.  OKAY.

2     GO AHEAD.

3     BY MR. RABINOWITZ:

4     Q.   AND WOULD YOU LIKE TO TURN TO THE PAGE THAT ENDS AT THE

5     BOTTOM OF 310.  CAN YOU SHOW THE DEMONSTRATIVE, PLEASE.  NOT

6     THE LABEL, THE DEMONSTRATIVE FROM DR. SOFIA'S PDX-310?

7     A.   YES.

8     Q.   AND CAN YOU SATISFY YOURSELF NOW THAT THAT IS THE

9     STRUCTURE OF SOFOSBUVIR?

10    A.   YES.

11    Q.   AND THIS DRUG CONSISTS OF A STRUCTURE PRODRUG MOIETY ON

12    THE LEFT?

13    A.   MULTIPLE PROMOIETIES ON THE LEFT.

14    Q.   AND THE PRODRUG PART IS THE PART IN YELLOW THERE; CORRECT?

15    A.   NO.

16    Q.   AND WHERE IS THE PRODRUG PART?  WOULD YOU DRAW IT, PLEASE.

17    A.   CAN I DRAW ON THIS?

18    Q.   YES, PLEASE DO.  OKAY.  SO LET'S GO BACK TO THE

19    UNHIGHLIGHTED VERSION.  SO THAT'S THE PRODRUG PART ON THE LEFT

20    AND THERE'S A NUCLEOSIDE ON THE RIGHT?

21    A.   SORRY.  I DIDN'T REALIZE I DROPPED MY VOICE.  THE

22    PROMOIETY IS THE TWO AREAS THAT I'VE COVERED.  WHAT IS LEFT IS

23    THE NUCLEOTIDE.

24    Q.   SO THE NUCLEOTIDE ANALOG IS IN RED AND THE PRODRUG PART IS

25    IN YELLOW?

1    A.   WRONG.

2    Q.   WHICH IS THE NUCLEOTIDE PART?

3    A.   IT INCLUDES THE PHOSPHATE.

4    Q.   OKAY.  THAT'S THE NUCLEOTIDE?

5    A.   AND IT WOULD HAVE TO HAVE TWO OXYGENS ON THE PHOSPHOROUS.

6    Q.   AND IN THE NUCLEOTIDE PORTION OF SOFOSBUVIR, THE SUGAR HAS

7    A 2' METHYL IN THE UP POSITION AND A 2' FLUORO IN THE DOWN

8    POSITION; CORRECT?

9    A.   YES, YES, IT DOES.

10   Q.   CAN YOU CALL UP EXHIBIT 1542 ON THE SCREEN.

11        AND IT'S IN YOUR BINDER, DR. STELLA, 1542.  1-5-4-2?

12        THIS IS THE MERCK/ISIS JOINT RESEARCH COMMITTEE REPORT

13   DATED 18TH OF APRIL 2001.  DO YOU HAVE THAT EXHIBIT?

14   A.   YEP.

15   Q.   AND PLEASE REFER TO THE PAGE MARKED AT THE BOTTOM AS PAGE

16   0056.  DO YOU SEE THE STRUCTURE ON THE TOP LEFT?

17   A.   HOLD ON.  OKAY.

18   Q.   DO YOU SEE THE STRUCTURE ON THE TOP LEFT?

19   A.   YES.

20   Q.   AND THE SUGAR IN THAT STRUCTURE HAS A 2' METHYL UP AND A

21   2' FLUORO DOWN?

22   A.   YES.

23   Q.   AND CAN WE AGREE -- WE CAN AGREE THAT THE SUGAR RING

24   DEPICTED IN THIS STRUCTURE IS THE SAME AS THE SUGAR IN

25   SOFOSBUVIR?

1    A.   I DON'T KNOW WHETHER THESE WERE ACTUALLY MADE OR JUST

2    PROPOSED COMPOUNDS.  I DON'T KNOW ENOUGH ABOUT WHAT IS ON HERE.

3    AND AS I SAID, THE BASE IS DIFFERENT, BUT I DON'T KNOW WHAT THE

4    HISTORY OF THESE COMPOUNDS ARE, WHETHER THESE WERE ACTUALLY

5    MADE, PROPOSED OR WHATEVER.

6    Q.   AND COMPARING THE SUGAR RING THAT IS DEPICTED IN THIS

7    STRUCTURE DRAWN HERE WITH THE SUGAR RING IN SOFOSBUVIR, THEY

8    BOTH HAVE A METHYL UP AND A FLUORO DOWN; CORRECT?

9    A.   ONLY CONSIDERING THE SUGAR, THAT IS CORRECT.  I DON'T KNOW

10   WHAT THE STEREOCHEMISTRY IS ON THE OTHER HYDROXYL BUT THE ONE

11   ON THE 3 POSITION.

12   Q.   AND YOU AGREE THAT SOFOSBUVIR IS A PHOSPHORAMIDATE

13   PRODRUG?

14   A.   AS THAT TERM IS USED, YES.

15   Q.   AND THAT IS ALSO KNOWN AS MCGUIGAN PRODRUGS?

16   A.   MCGUIGAN DID A LOT OF DIFFERENT PRODRUGS BUT THAT TERM HAS

17   BEEN USED, YES.

18   Q.   AND PROFESSOR MCGUIGAN HAS BEEN CREDITED WITH INVENTING

19   PHOSPHORAMIDATE PRODRUGS?

20   A.   YEAH, MCGUIGAN, I THINK HE'S THE ONE THAT IT'S BEEN

21   ATTRIBUTED TO HIM.

22   Q.   WOULD YOU PLEASE TURN TO EXHIBIT 0802.

23   A.   0?

24   Q.   0802.  THIS IS AN INTERNATIONAL PATENT APPLICATION

25   PUBLISHED AS WO 00/47591?

1    A.    YES.

2    Q.    AND ONE OF THE INVENTORS IS CHRISTOPHER MCGUIGAN?

3    A.    YES.

4    Q.    AND YOU KNOW WHO CHRISTOPHER MCGUIGAN IS?

5    A.    I KNOW OF HIM.  I DON'T KNOW HIM.

6    Q.    HE'S ONE OF THE LEADERS IN THE AREA OF PRODRUGS?

7    A.    NOT GENERALLY RECOGNIZED AS THAT, BUT HE'S RECOGNIZED AS

8    MADE A MAJOR CONTRIBUTION TO PRODRUGS THROUGH HIS WORK, YES.

9              MR. RABINOWITZ:  YOUR HONOR, I WOULD MOVE THAT THIS

10   EXHIBIT BE ADMITTED INTO EVIDENCE.

11             MR. SINGER:  THERE'S NO OBJECTION, YOUR HONOR.

12             THE COURT:  IT WILL BE ADMITTED.

13        (DEFENDANTS' EXHIBIT 802 WAS RECEIVED IN EVIDENCE.)

14   BY MR. RABINOWITZ:

15   Q.    WOULD YOU PLEASE TURN TO PAGE 9, NUMBER 9 AT THE TOP AND

16   THE NUMBER AT THE TOP IS .0011?

17        DO YOU SEE THERE'S A STRUCTURAL FORMULA?

18   A.    YES.

19   Q.    AND WE CAN AGREE THAT THE STRUCTURAL FORMULA HAS A

20   NUCLEOSIDE ON THE LEFT?

21   A.    ARE YOU GOING TO HIGHLIGHT THE NUCLEOSIDE?

22   Q.    WELL, JUST LET'S ESTABLISH THAT THERE'S -- THE LEFT PART

23   IS THE NUCLEOSIDE?

24   A.    FOR THE JURY, THIS IS THE NUCLEOSIDE HERE (INDICATING).

25   Q.    AND THE STRUCTURAL FORM HAS A PRODRUG ON THE RIGHT?

1      A.   WELL, ACTUALLY, THIS IS THE PRODRUG PART HERE, AND IT ALSO

2   HAS A PHOSPHATE WHICH IS TO PRODUCE THE NUCLEOTIDE.

3      Q.   AND THE TABLE BELOW GIVES A NUMBER OF EXAMPLES WITH

4   DIFFERENT CHOICES THAT R1, R2, R3, R4, AND R5; CORRECT?

5      A.   YES.

6      Q.   AND I'D LIKE YOU TO COMPARE THE PRODRUG MOIETY IN

7   MCGUIGAN'S EXAMPLE NUMBER 11 WITH THE PROMOIETY IN SOFOSBUVIR.

8           R1 IN THE MCGUIGAN EXAMPLE 11 IS PHENYL; CORRECT?

9      A.   YES.

10     Q.   AND WE CAN AGREE THAT'S THE SAME AS IN SOFOSBUVIR?

11     A.   NUMBER 11 DID YOU SAY?

12     Q.   NUMBER 11?

13     A.   YES.

14     Q.   R2 IN THE MCGUIGAN EXAMPLE NUMBER 11 IS HYDROGEN?

15     A.   YES.

16     Q.   AND THAT'S THE SAME AS IN SOFOSBUVIR?

17     A.   YES.

18     Q.   AND R3 IN MCGUIGAN EXAMPLE 11 IS METHYL?

19     A.   I CAN GIVE AN ANSWER HERE THAT IS BOTH YES AND NO.

20          YES, IT'S A METHYL GROUP THAT IS IN BOTH OF THEM.

21          AS FAR AS I CAN TELL FROM THIS TABLE, IT DOESN'T DESIGNATE

22   THE STEREOCHEMISTRY WHICH IS -- WHICH IN THE SOFOSBUVIR IS A

23   SPECIFIC STEREOCHEMISTRY, UNLESS THERE'S SOMETHING ELSE IN THIS

24   PATENT THAT SAYS THIS I DON'T -- THERE IS A METHYL GROUP THAT

25   IS R3, BUT IT DOESN'T DESIGNATE THE STEREOCHEMISTRY.

1    Q.   AND R3 IN SOFOSBUVIR IS METHYL AS WELL?

2    A.   YES, BUT IT'S THE PARTICULAR STEREOCHEMISTRY OF THAT

3    MATTER.

4    Q.   ONE OF THE TWO PARTICULAR STEREOCHEMISTRY THAT ARE

5    CONVEYED BY THIS DIAGRAM?

6    A.   I DON'T KNOW IF THEY CONVEY THEM OR NOT, I DON'T KNOW.

7    Q.   R4 IN THE MCGUIGAN EXAMPLE 11 IS O ISOPROPYL, O,

8    I-S-O-P-R-O-P-Y-L?

9    A.   THAT IS CORRECT.

10   Q.   AND THE SAME IN SOFOSBUVIR?

11   A.   YES, THERE'S ISOPROPYL.

12   Q.   R5 IN MCGUIGAN EXAMPLE 11 IS HYDROGEN?

13   A.   YES.

14   Q.   AND SAME AS IN SOFOSBUVIR?

15   A.   CORRECT.

16   Q.   WOULD YOU AGREE THAT SOFOSBUVIR HAS THE SAME PRODRUG

17   MOIETY THAT DR. MCGUIGAN DISCLOSED IN EXAMPLE 11?

18   A.   IT DOES NOT.

19   Q.   AND IF YOU LOOK AT THE TWO ALTERNATIVES STEREOCHEMISTRIES

20   THAT FIT WITH EXAMPLE 11 IN MCGUIGAN, ONE OF THOSE TWO IS THE

21   PRODRUG MOIETY IN SOFOSBUVIR?

22   A.   IT DOES NOT.

23   Q.   DR. STELLA, WOULD YOU TURN TO EXHIBIT 742.  EXHIBIT 742, I

24   BEG YOUR PARDON, EXHIBIT 742.

25        ARE YOU FAMILIAR WITH THIS DOCUMENT?

1    A.    YEAH.

2    Q.    AND THIS IS A PATENT THAT YOU OBTAINED FROM THE U.S.

3    PATENT AND TRADEMARK OFFICE?

4    A.    YES.

5    Q.    AND YOU'RE THE FIRST NAMED INVENTOR?

6    A.    YES.

7              MR. RABINOWITZ:  YOUR HONOR, I WOULD MOVE THAT

8    EXHIBIT 742 BE ADMITTED IN EVIDENCE.

9              MR. SINGER:  THERE'S NO OBJECTION, YOUR HONOR.

10             THE COURT:  IT WILL BE ADMITTED.

11         (DEFENDANTS' EXHIBIT 742 WAS RECEIVED IN EVIDENCE.)

12   BY MR. RABINOWITZ:

13   Q.    THIS IS U.S. PATENT NUMBER 4,163,058; CORRECT?

14   A.    YES.

15   Q.    AND YOU ARE THE VALENTINO J. STELLA THAT IS LISTED AS THE

16   FIRST NAMED INVENTOR?

17   A.    YEAH.  THERE ARE VERY FEW OF US AROUND, SO --

18   Q.    AND SO I'D LIKE YOU TO TURN TO THE CLAIMS IN COLUMN 14,

19   CLAIM 9.

20         CAN WE BLOW UP CLAIM 9, PLEASE.

21         CLAIM 9 IS A METHOD FOR ALLEVIATING CARDIAC ARRHYTHMIAS OR

22   CONVULSIONS?

23   A.    I'M SORRY.  WHAT CLAIM IS IT?

24   Q.    CLAIM 9.

25   A.    9.  I THOUGHT YOU WERE ON CLAIM 1.

1    Q.   AND CLAIM 9 IS DIRECTED TO A METHOD FOR TREATMENTS;

2    CORRECT?

3    A.   GIVE ME A MINUTE TO READ IT.  I WANT TO MAKE SURE I GET IT

4    RIGHT.

5         (PAUSE IN PROCEEDINGS.)

6              THE WITNESS:  OKAY.

7    BY MR. RABINOWITZ:

8    Q.   CLAIM 9 IS DIRECTED TO A METHOD FOR TREATMENT?

9    A.   THAT'S WHAT IT APPEARS TO SAY, YES.

10   Q.   AND TREATING CARDIAC ARRYTHMIA OR CONVULSIONS; CORRECT?

11   A.   YES.

12   Q.   BY ADMINISTERING ONE OF A CLASS OF COMPOUNDS DEFINED BY

13   STRUCTURAL FORMULA?

14   A.   THAT'S CORRECT.

15   Q.   AND WE CAN AGREE THAT THIS PATENT CONTAINS NO DATA?

16   A.   IT DOES NOT CONTAIN ANY DATA.

17   Q.   YOU KNEW THIS PATENT HAD NO DATA WHEN YOU APPLIED FOR IT?

18   A.   YES.  WELL, WE HAD DATA, BUT IT JUST WASN'T INCLUDED -- I

19   DIDN'T WRITE THE PATENT, SO I DID THE WORK AND A LAWYER PUT

20   THIS TOGETHER AND WROTE THE PATENT.

21   Q.   SO YOU HAD DATA WHEN YOU APPLIED FOR THIS PATENT, ALTHOUGH

22   THE DATA DIDN'T APPEAR IN THE PATENT?

23   A.   YEAH.  I WAS NOT FAMILIAR WITH THE PATENTING PROCESS AT

24   THAT TIME, SO I WAS PRETTY NAIVE AND THAT'S WHAT ENDED UP IN

25   THE PATENT.

1    Q.   AND THIS PATENT REPRESENTS THE FRUITS OF YOUR WORK THAT

2    RESULTED IN THE DATA?

3    A.   YES.

4    Q.   AND YOU KNEW THE PATENT DIDN'T DISCLOSE THE DATA WHEN YOU

5    OBTAIN IT?

6    A.   I DIDN'T REALIZE THAT AT THAT TIME.  I REALIZE IT NOW.

7    Q.   AND YOU LICENSED THIS PATENT; CORRECT?

8    A.   YES, IT WAS LICENSED TO MERCK.

9    Q.   AND YOU MADE A MILLION DOLLARS OFF OF THIS PATENT?

10   A.   I MADE A MILLION DOLLARS OFF OF THAT PATENT.

11   Q.   AND YOU DIDN'T BELIEVE THIS PATENT WAS WORTHLESS WHEN YOU

12   ACCEPTED A MILLION DOLLARS?

13   A.   I'M SORRY?

14   Q.   YOU DIDN'T BELIEVE THIS PATENT WAS WORTHLESS WHEN YOU

15   ACCEPTED A MILLION DOLLARS FOR IT?

16   A.   NO, I DID NOT.  WE CAME OUT WITH A GREAT DRUG.

17   Q.   AND YOU NEVER RETURNED THE MILLION DOLLARS TO MERCK THAT

18   YOU OBTAINED FOR THIS PATENT?

19   A.   WHY WOULD I?

20         MR. RABINOWITZ:  NO FURTHER QUESTIONS.

21         THE COURT:  REDIRECT FOR THIS WITNESS?

22         MR. SINGER:  VERY BRIEFLY, YOUR HONOR.

23   /  /  /

24   /  /  /

25   /  /  /

1                          **REDIRECT EXAMINATION**

2       BY MR. SINGER:

3       Q.   MR. ANG, IF WE CAN HAVE EXHIBIT 1542 AT PAGE 56.

4            DR. STELLA, YOU WERE POINTING TO THIS COMPOUND THAT I

5       CIRCLED IN RED, AND I'LL CLEAR IT SO MR. ANG CAN HIGHLIGHT A

6       LITTLE BIT BETTER THAN MY SCROLL.

7            YOU SAID THERE WAS A DIFFERENT BASE, BUT YOU DIDN'T SAY

8       WHAT BASE WAS THERE.  DOES THE A STAND FOR ADENOSINE?  IS THAT

9       CORRECT.

10      A.   I BELIEVE SO.

11      Q.   AND IS THAT A DOUBLE RING OR A SINGLE RING?

12      A.   I BELIEVE IT'S A DOUBLE RING.

13      Q.   THANK YOU.  OKAY.

14           AND THE CLAIMS AT ISSUE HERE, THEY COVER DOUBLE RINGS OR

15      SINGLE RINGS?

16      A.   SINGLE RINGS.

17      Q.   OKAY.  AND WE CAN TAKE THAT DOWN.  THANK YOU.

18           MR. RABINOWITZ WAS ASKING YOU SOME QUESTIONS ABOUT -- I

19      REALLY ONLY HAVE ONE OTHER SET OF QUESTIONS FOR YOU -- ABOUT

20      THE COLUMN 34, LINES 31 TO 37 IN THE PATENT.

21      A.   IS THIS IN THE PATENT?

22      Q.   YES, IN THE '499 PATENT.

23           AND, MR. ANG, IT WAS THE PART, YEAH, ABOUT THE RECTAL,

24      TOPICAL, PARENTERAL, OCULAR, PULMONARY.  DO YOU REMEMBER THOSE

25      QUESTIONS?

1    A.   YEAH.

2    Q.   AND, DR. STELLA, FIRST OFF, ARE THERE ANY EXAMPLES IN THE

3    PATENT OF PRODRUGS THAT ARE DELIVERED -- IF YOU CAN HIGHLIGHT

4    THERE -- RECTALLY, TOPICALLY, PARENTERALLY, OCULARLY,

5    PULMONARILY OR NASALLY, ARE THERE ANY EXAMPLES OF THAT IN THE

6    PATENT?

7    A.   NO, THERE'S NOT.

8    Q.   AND IS THIS A LAUNDRY LIST OF POSSIBILITIES?

9    A.   THAT'S A LAUNDRY LIST OF POSSIBILITIES.

10   Q.   ARE THESE THINGS ENABLED BY THE PATENT-IN-SUIT?

11   A.   ABSOLUTELY NOT.

12   Q.   OKAY.  YOU WENT THROUGH YOUR LITTLE HURDLE DIAGRAM, AND WE

13   TALKED ABOUT ORAL, HOW IT WASN'T ENABLED FOR ORAL, SO I'M NOT

14   GOING TO GO THROUGH THAT AGAIN.

15        COULD YOU HAVE LISTED A SIMILAR SET OF HURDLES FOR RECTAL

16   DELIVERY, TOPICAL DELIVERY, PARENTERALLY DELIVERY, OCULAR

17   DELIVERY, NASAL DELIVERY, AND PULMONARY HERE?

18   A.   YES.

19   Q.   WOULD WE HAVE BEEN ALL DAY HERE TODAY AND TOMORROW IF YOU

20   HAD TO EXPLAIN THE HURDLES FOR THOSE?

21   A.   WE WOULD TAKE AT LEAST ANOTHER TWO OR THREE OR FOUR HOURS.

22   Q.   THANK YOU.  I HAVE NO FURTHER QUESTIONS.

23             THE COURT:  ANYTHING ELSE FOR THIS WITNESS,

24   MR. RABINOWITZ?

25             MR. RABINOWITZ:  NO, YOUR HONOR.

DIRECT SECRIST BY MS. BROOKS

```
 1                 THE COURT:  MAY DR. STELLA BE EXCUSED?

 2                 MR. RABINOWITZ:  YES, YOUR HONOR.

 3                 THE COURT:  THANK YOU, DR. STELLA.  YOU ARE FREE TO

 4      STEP DOWN.

 5                 THE WITNESS:  THANK YOU, YOUR HONOR.

 6                 THE COURT:  YOU'RE ALSO FREE TO GO.

 7           MS. BROOKS, YOUR NEXT WITNESS?

 8                 MS. BROOKS:  YES, YOUR HONOR.

 9           OUR NEXT WITNESS IS DR. JOHN SECRIST, AND IF WE CAN HAVE A

10      MOMENT TO GET OUR BINDERS TO DISTRIBUTE?

11                 THE COURT:  OF COURSE.

12                 THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

13           (PLAINTIFF'S WITNESS, JOHN SECRIST, WAS SWORN.)

14                 THE WITNESS:  YES.

15                 THE CLERK:  THANK YOU, SIR.  PLEASE BE SEATED.

16           AND IF YOU WOULD STATE YOUR NAME AND SPELL YOUR LAST NAME

17      FOR THE RECORD.

18                 THE WITNESS:

19                 MS. BROOKS:  YOUR HONOR, MAY I APPROACH WITH A

20      BINDER FOR BOTH THE COURT AND DR. SECRIST.

21                 THE WITNESS:  JOHN S. SECRIST, III, S-E-C-R-I-S-T.

22                           DIRECT EXAMINATION

23      BY MS. BROOKS:

24      Q.   GOOD MORNING, DR. SECRIST.

25      A.   GOOD MORNING.
```

1    Q.   DR. SECRIST, ARE YOU HERE TO GIVE YOUR EXPERT OPINION AS A

2    CHEMIST, AND SPECIFICALLY A MEDICINAL CHEMIST, ON WHETHER OR

3    NOT THE ASSERTED CLAIMS IN THE '499 PATENT AND THE '712 PATENT

4    ARE INVALID FOR LACK OF WRITTEN DESCRIPTION AND ENABLEMENT?

5    A.   YES, I AM.

6    Q.   SO BEFORE WE DO THAT, WE NEED TO QUALIFY YOU AS AN EXPERT

7    TO MAKE SURE THAT YOU INDEED HAVE THE APPROPRIATE CREDENTIALS

8    TO RENDER SUCH AN OPINION.

9    A.   I UNDERSTAND.

10   Q.   LET'S START, DR. SECRIST, WITH CAN YOU TELL THE LADIES AND

11   GENTLEMEN OF THE JURY WHAT YOU ARE CURRENTLY DOING?

12   A.   YES.  I AM RETIRED.  I'VE BEEN RETIRED OVER TWO YEARS NOW.

13   I RETIRED FROM THE SOUTHERN RESEARCH INSTITUTE, WHICH WAS

14   LOCATED IN BIRMINGHAM, ALABAMA.

15       SINCE BEING RETIRED, I'VE BEEN INVOLVED IN A NUMBER OF

16   THINGS, AND I'LL CONTINUE TO BE INVOLVED IN A NUMBER OF THINGS.

17   I HAVE DONE SOME CONSULTING WORK SINCE RETIRING.  I CONTINUE TO

18   EDIT A JOURNAL IN THE FIELD SINCE RETIRING, AND I'M STILL

19   INVOLVED WITH SOUTHERN RESEARCH INSTITUTE IN SEVERAL WAYS.

20       ONE OF THOSE WAYS, WHICH IS REALLY EXCITING TO ME, IS WE

21   ARE PUTTING TOGETHER A BOOK THAT I'LL SAY HIGHLIGHTS THE

22   ACCOMPLISHMENTS OF SOUTHERN RESEARCH INSTITUTE OVER THE YEARS.

23       AND SO I GET TO WORK WITH A NUMBER OF COLLEAGUES WHO HAVE

24   BEEN INVOLVED IN SOME REALLY EXCITING THINGS PUTTING TOGETHER

25   INFORMATION FOR A LAY AUDIENCE DESCRIBING WHAT SOUTHERN

1    RESEARCH INSTITUTE HAS BEEN DOING, AND IT'S BEEN WORTHWHILE AND

2    IT'S BEEN A SPECTACULAR AMOUNT OF STUFF, ALTHOUGH I IMAGINE

3    NONE OF YOU HAVE NEVER HEARD OF SOUTHERN RESEARCH INSTITUTE.

4         THE SECOND THING I'M DOING FOR SOUTHERN RESEARCH INSTITUTE

5    AFTER RETIRING IS HELPING THEM IN FUND RAISING.

6    Q.   SO DOING FUND RAISING, IS SOUTHERN RESEARCH INSTITUTE A

7    FOR PROFIT OR A NONPROFIT RESEARCH INSTITUTE?

8    A.   IT'S A 5103, SO A NOT FOR PROFIT RESEARCH INSTITUTE THAT

9    ENGAGED IN A VARIETY OF DIFFERENT KINDS OF RESEARCH.

10   Q.   AND CAN YOU DESCRIBE FOR THE LADIES AND GENTLEMEN OF THE

11   JURY WHAT SOUTHERN RESEARCH INSTITUTE DOES?

12   A.   SURE.  IT'S AN INDEPENDENT RESEARCH ORGANIZATION.  WE HAVE

13   THREE AREAS.

14        ONE OF THEM IS ONE THAT CONCERNS THESE PROCEEDINGS, THAT

15   IS, LIFE SCIENCES.  WE DO A LOT OF WORK WITH DRUG DISCOVERY, A

16   LOT OF WORK WITH DRUG DEVELOPMENT, AND WE'VE BEEN DOING THAT

17   FOR OVER 50 YEARS.

18        WE HAVE A SECOND ENTITY RELATED TO ENGINEERING.  AND THOSE

19   FOLKS DO A LOT OF THINGS.

20        AND BY THE WAY, THE WORK IN LIFE SCIENCES.  THE VAST

21   MAJORITY OF THEM HAVE BEEN FUNDED BY THE NATIONAL INSTITUTE OF

22   HEALTH THROUGH GRANTS AND CONTRACTS.

23        IN THE ENGINEERING AREA, OUR WORK HAS COME MAINLY FROM

24   NASA AND D.O.D.  WE HAVE BEEN INSTRUMENTAL IN THE MAN SPACE

25   PROGRAM SINCE ITS BEGINNING, AND WE HAVE DONE A LARGE AMOUNT OF

DIRECT SECRIST BY MS. BROOKS

1    WORK ON MATERIALS THAT ARE USED FOR A VARIETY OF PURPOSES FOR

2    NOT ONLY NASA, BUT D.O.D.

3         THE THIRD PIECE OF WHAT SOUTHERN RESEARCH INSTITUTE HAS

4    DONE OVER THE YEARS IS IN THE ENVIRONMENTAL AREA.  WE HAVE DONE

5    A LOT OF WORK FOR EPA, FOR POWER COMPANIES RELATING TO AIR

6    QUALITY.

7         AND IN THE LAST, I'LL SAY, FIVE YEARS -- TIME FLIES -- THE

8    LAST FIVE YEARS WE'VE GOTTEN INVOLVED IN WATER QUALITY AS WELL.

9         SO THAT GIVES YOU, I THINK, A QUICK VIEW OF WHAT WE DO AND

10   WHERE OUR MONEY COMES FROM.  ALL OF THE MONEY COMES FROM

11   OUTSIDE, SO WE HAVE TO ATTRACT MONEY BY PROPOSING TO DO

12   WORTHWHILE THINGS FOR PEOPLE.

13   Q.   AND HOW LONG WERE YOU WITH SOUTHERN RESEARCH INSTITUTE

14   BEFORE YOU RETIRED?

15   A.   I JOINED SOUTHERN RESEARCH INSTITUTE IN LATE 1979.  SO I

16   WAS THERE OVER 34 YEARS, I GUESS.

17   Q.   AND WHERE IS IT LOCATED?

18   A.   IT'S LOCATED IN BIRMINGHAM, ALABAMA.  AND I HAD NEVER --

19   I'LL SAY I HAD NEVER BEEN IN ALABAMA BEFORE, AND VISITING THERE

20   THE FIRST TIME -- I GUESS I COULD TALK ABOUT THAT IF YOU WISH.

21   Q.   WELL, WHERE WERE YOU BEFORE YOU JOINED SOUTHERN RESEARCH

22   INSTITUTE?

23   A.   WELL, MAYBE I'LL JUST DESCRIBE SORT OF MY CHRONOLOGY

24   LEADING UP TO THAT.  IS THAT ALL RIGHT?

25   Q.   PLEASE, YES.

1    A.   SO I GOT A BACHELORS IN CHEMISTRY AT THE UNIVERSITY OF

2    MICHIGAN MANY YEARS AGO.

3         THEN I WENT TO THE UNIVERSITY OF ILLINOIS FOR A PH.D. IN

4    ORGANIC CHEMISTRY, AND YOU'LL RECALL THAT DR. SOFIA DID EXACTLY

5    THE SAME THING.  HE'S TEN YEARS YOUNGER THAN ME, SO WE DIDN'T

6    OVERLAP.

7         BUT I WENT TO THE UNIVERSITY OF ILLINOIS FOR THE SAME

8    REASON.  IT WAS ONE OF THE TOP CHEMISTRY PROGRAMS IN THE

9    COUNTRY AND I WANTED TO GO WHERE I COULD DO THE BEST.  SO I GOT

10   A PH.D. FROM THE UNIVERSITY OF ILLINOIS.

11        THEN I WAS LUCKY ENOUGH TO GET A POST-DOCTORAL

12   FELLOWSHIP -- ACTUALLY I HAVE POST-DOCTORAL FELLOWSHIPS DOING

13   MY PH.D. WORK, AND IN MY POST-DOC FROM THE NATIONAL INSTITUTE

14   OF HEALTH, BOTH PLACES.

15        ANYHOW, I WENT TO HARVARD FOR A POST-DOCTORAL STAY WITH

16   PROFESSOR E.J. COREY, ELIAS J. COREY.  HE HAS A NOBEL PRIZE IN

17   CHEMISTRY, AN OUTSTANDING GENTLEMAN AND AN OUTSTANDING

18   SCIENTIST.

19        THEN I MOVED TO THE OHIO STATE UNIVERSITY.  I WAS A

20   FACULTY MEMBER THERE FOR SOME YEARS IN THE CHEMISTRY

21   DEPARTMENT, AND I GUESS I WOULD SAY THAT AT THAT TIME FOR A

22   YOUNG PERSON WHAT I WANTED TO DO WAS TO FOCUS ON DRUG

23   DISCOVERY.

24        AND IT'S VERY HARD TO DO THAT, OR IT WAS AT THAT TIME AT

25   THE UNIVERSITY, AND ESPECIALLY FOR A YOUNGER PERSON.  SO I

DIRECT SECRIST BY MS. BROOKS

```
 1        WANTED TO MAKE A TRANSITION TO AN ORGANIZATION THAT WOULD ALLOW

 2        ME TO REALLY GET MEANINGFULLY INVOLVED IN DRUG DISCOVERY.

 3             AND WHILE I WAS AT OHIO STATE, I HAD WON A RESEARCH

 4        CONTRACT WITH THE UNITED STATES ARMY, AND THE PURPOSE OF THIS

 5        CONTRACT WAS ACTUALLY TO MAKE NUCLEOSIDES -- BY THE WAY, MY

 6        PH.D. WAS IN NUCLEOSIDES AS WELL.  SO I HAD BEEN WORKING WITH

 7        THE NUCLEOSIDE AREA SINCE 1968.

 8             SO I HAD THIS SIGNIFICANT SIZE CONTRACT WITH THE ARMY TO

 9        MAKE ANTI-PARASITIC COMPOUNDS THAT WERE NUCLEOSIDES.

10             THE ARMY WOULD HAVE, ONCE A YEAR, A MEETING WITH ALL OF

11        THE PEOPLE THEY HAD WORKING WITH MALARIA AND VARIOUS OTHER

12        PARASITES AND EVERYBODY GOT TOGETHER AND TALKED ABOUT THEIR

13        RESULTS.

14             I WENT TO THIS MEETING LESS THAN A YEAR AFTER I WAS

15        AWARDED THIS CONTRACT AND MET ALL OF THE PEOPLE THERE.

16             AMONG THE FOLKS THERE WERE SOME PEOPLE FROM SOUTHERN

17        RESEARCH INSTITUTE BECAUSE THEY WERE DOING A LOT OF THIS WORK

18        IN THIS AREA AT THE TIME.

19             SO I MET ALL OF THEM.  WE MADE PRESENTATIONS.

20             AND THE LEADER OF THAT GROUP AT SOUTHERN RESEARCH WAS ALSO

21        SECOND IN COMMAND AT SOUTHERN RESEARCH, HE WAS VERY INTERESTED

22        IN ME AND WONDERED IF I MIGHT WANT TO WORK AT THE SOUTHERN

23        RESEARCH INSTITUTE IN BIRMINGHAM, ALABAMA.

24             AND I SAID, WELL, WHY DON'T I COME DOWN AND VISIT?

25             I DID THAT AND I VISITED ALABAMA AND I DISCOVERED THAT
```

1    THESE FOLKS HAVE -- HAD AT THE TIME, AND STILL HAVE, A

2    SPECTACULAR DRUG DISCOVERY OPERATION.  THEY DO WHAT YOU NEED TO

3    DO TO ACTUALLY DISCOVER AND DEVELOP NEW DRUGS.  THEY HAD A

4    TEAM -- AND WE'VE TALKED ABOUT A TEAM ALL WEEK -- THEY HAD A

5    TEAM TO DO IT AND YOU COULD SEE IT.

6        SO I WENT HOME, AND MY WIFE HAD ALSO NEVER BEEN TO ALABAMA

7    AND I SAID, SAY, THIS LOOKS VERY GOOD.  AND I REMEMBER HER

8    RESPONSE FAIRLY CLEARLY.  SHE SAID, ALABAMA?

9        AND SO WE TOOK HER DOWN TO ALABAMA ALSO AND SHE WAS

10   TREATED I'LL SAY VERY NICELY.  WE HAD YOUNG CHILDREN AT THE

11   TIME.  THEY WERE ALSO TREATED NICELY.

12       ANYHOW, WE CAME BACK AND SHE SAID WELL, OKAY, IT LOOKS

13   LIKE A NICE PLACE AND THE SCHOOL SYSTEMS ARE REASONABLE.  IF

14   YOU WANT TO DO THAT, IT'S FINE WITH ME.

15       SO I SAID, WHY DON'T WE TRY IT FOR A FEW YEARS AND SEE IF

16   I LIKE THE PLACE AND IF I CAN DO WHAT I WANT TO DO?  BECAUSE

17   IT'S A PLACE WHERE YOU HAVE TO USE YOUR OWN IDEAS AND THEY

18   DON'T TELL YOU WHAT TO DO.  YOU USE YOUR OWN IDEAS AND YOU GET

19   MONEY TO DO IT AND THEN YOU DO IT.

20       SO WE MOVED TO ALABAMA THINKING WE'LL BE HERE FOR A FEW

21   YEARS AND SEE WHERE WE GO, AND AS YOU'VE HEARD, I'VE STAYED

22   THERE OVER 34 YEARS.

23   Q.   AND WHAT PERCENTAGE OF YOUR CAREER HAS BEEN FOCUSSED

24   SPECIFICALLY ON DRUG DISCOVERY IN THE AREA OF NUCLEOTIDES AND

25   NUCLEOSIDES?

1      A.   WELL, MY PH.D. WORK WAS IN THE AREA OF NUCLEOSIDES.

2           I WOULD SAY ONLY, ONLY PARTIALLY FOCUSSED IN DRUG

3      DISCOVERY.  WITH PROFESSOR COREY AT HARVARD, I WAS NOT INVOLVED

4      IN NUCLEOSIDES AT ALL.

5           WHEN I JOINED OHIO STATE, FROM THAT POINT UNTIL NOW I'VE

6      BEEN INVOLVED IN NUCLEOSIDE DRUG DISCOVERY.  SO I WOULD SAY, I

7      DON'T KNOW, 95 PERCENT OR SOMETHING LIKE THAT.

8      Q.   HAVE YOU EVER BEEN INVOLVED IN ANY TYPE OF DRUG DISCOVERY

9      WORK WHERE YOU SCREENED NUCLEOSIDES AND OTHER COMPOUNDS FOR

10     BIOLOGICAL ACTIVITY?

11     A.   OH, YES, OF COURSE.

12          WELL, ALL OF OUR GRANTS OVER THE YEARS THAT CAME FROM,

13     MOSTLY FROM NIH, BUT ALSO FROM OTHER ORGANIZATIONS, ALL OF THEM

14     INVOLVED MAKING NUCLEOSIDES AND EVALUATING THEM FOR WHATEVER

15     PURPOSE IT MIGHT HAVE BEEN.  IT COULD HAVE BEEN AN ANTI-VIRAL

16     PURPOSE.  IT COULD HAVE BEEN AN ANTI-CANCER PURPOSE.  IT COULD

17     HAVE BEEN OTHER THINGS.

18          WE HAD, HOWEVER, ONE INTERESTING PROJECT.  THAT WAS AN NIH

19     CONTRACT WHEREBY I WAS THE PRINCIPAL INVESTIGATOR OF THIS

20     CONTRACT AND THERE WERE -- I THINK I HAD FOUR OTHER PH.D.

21     CHEMISTS THAT WERE INVOLVED WITH ME.

22          OUR JOB WAS TO GO OUT ACROSS THE WORLD TO VARIOUS

23     CHEMISTRY LABS AND TRY TO CONVINCE CHEMISTS TO SEND IN

24     COMPOUNDS TO NIH.

25          THESE COMPOUNDS THEN WOULD BE EVALUATED FOR THEIR

1      ANTI-VIRAL ACTIVITY AGAINST UP TO ABOUT 27 DIFFERENT VIRUSES.

2      ANY GIVEN COMPOUND MIGHT NOT HAVE BEEN DONE AGAINST ALL 27, BUT

3      ALL 27 WERE POSSIBLE.

4          AND WE PLAYED A ROLE IN DECIDING, WELL, WHICH COMPOUNDS

5      MIGHT BE GOOD FOR WHICH VIRUSES AND HAVE THEM EVALUATED.

6          SO NIH WAS WILLING TO EVALUATE THESE COMPOUNDS AT NO COST

7      TO ANY OF THE CHEMISTS ACROSS THE WORLD, WHICH THEY DID.

8          THE WAY THEY DID THAT WAS THROUGH A SERIES OF, I DON'T

9      KNOW, SEVEN OR EIGHT OTHER CONTRACTS WITH BIOLOGICAL LABS.

10         DR. SEEGER, WHO YOU MET YESTERDAY, HE'S AN EXAMPLE OF A

11     LAB WHO WOULD DO ANTI-VIRAL TESTING.  HE'S NOT INVOLVED IN THIS

12     PARTICULAR PROGRAM, BUT THERE ARE LABS THAT DO THAT AND THEY

13     HAVE SPECIALTY, AND HIS SPECIALTY WAS HBV AND HCV.  THOSE WERE

14     TWO OF THE 27 VIRUSES.

15         AND THERE WERE TWO LABS AROUND THE COUNTRY THAT ACTUALLY

16     LOOKED AT THOSE COMPOUNDS.  ONE OF THEM TURNED OUT TO BE

17     SOUTHERN RESEARCH INSTITUTE.  SORRY.

18         OTHERS DID HERPES VIRUSES OR DID INFLUENZA OR, AS YOU

19     MIGHT IMAGINE WITH 27 DIFFERENT VIRUSES, OR THEREABOUTS, YOU

20     NEEDED A LOT OF DIFFERENT EXPERTISE TO DO THAT, SO A NUMBER OF

21     LABS WERE INVOLVED.

22         OKAY.  THE COMPOUNDS -- AND WE BROUGHT IN THOUSANDS AND

23     THOUSANDS OF COMPOUNDS FROM ALL AROUND THE WORLD.

24         AND WE HELPED FOLKS GET THROUGH THE PROCESS, GET THE

25     COMPOUNDS TO THE LAB AND SELECT THE VIRUSES TO BE SCREENED, AND

DIRECT SECRIST BY MS. BROOKS

```
 1        THEN THE LABS WOULD SEND US BACK THE BIOLOGICAL ACTIVITY.

 2             SO WE WOULD, AS A MEDICINAL CHEMIST, ALL OF THE MEDICINAL

 3        CHEMISTS, WE WOULD EVALUATE THE BIOLOGICAL ACTIVITY, TRANSMIT

 4        IT TO THE CHEMISTS AROUND THE WORLD, AND THEN WORK WITH THEM TO

 5        DECIDE WHAT MIGHT BE DONE NEXT, IF ANYTHING.

 6             SO A LOT OF CHOICES, SOMETIMES NOBODY HAD -- SOMEBODY

 7        WOULD HAVE NO COMPOUNDS IN INTEREST AND WE WOULD SAY, SORRY.

 8             SOMETIMES THERE WERE COMPOUNDS OF INTEREST AND WE WOULD

 9        SAY, OKAY, YOU HAVE SOMETHING THAT MIGHT BE OF INTEREST HERE.

10        DO YOU HAVE ANY OTHER COMPOUNDS LIKE THIS IN YOUR COLLECTION

11        THAT WE CAN TEST?  OR IF YOU DON'T, WOULD YOU BE INTERESTED IN

12        MAKING SOME MORE OR COULD YOU MAKE SOME MORE COMPOUNDS SO THAT

13        WE COULD TEST THOSE?

14             SO WE, WE WOULD HAVE A DIALOGUE WITH THE CHEMISTS FROM

15        AROUND THE WORLD THAT MIGHT HELP THEM DECIDE WHAT THEY COULD DO

16        NEXT.  THAT COULD BE DONE THROUGH NIH AS WELL OR BY SOME OTHER

17        MEANS IF THEY WISH, AND IT WAS ENTIRELY THEIR CHOICE.

18             AND WE WOULD ALSO HELP THEM -- IF THEY DECIDED THEY WANTED

19        TO PUBLISH SOMETHING THAT CAME OUT OF THIS PROGRAM, WE WOULD

20        MAKE SURE THAT THEY GOT THE DATA RIGHT AND EVERYTHING WAS SET.

21             BECAUSE A LOT OF CHEMISTS ARE NOT EXPERTS AT PUTTING

22        BIOLOGICAL PROPERTY INTO A MANUSCRIPT FOR PUBLICATION AND WE

23        DID ALL PHASES OF THIS, AND AS I SAID, WE EVALUATED, THROUGH

24        THIS PROGRAM, THOUSANDS, TENS OF THOUSANDS OF COMPOUNDS AT A

25        TIME WHEN IT WAS NOT DONE BY HIGH FREQUENCY SCREENING, WHICH
```

DIRECT SECRIST BY MS. BROOKS

1    YOU HEARD ABOUT A LITTLE BIT EARLIER IN THE YEAR, OR EARLIER IN

2    THE WEEK I MEAN, AND BY SORT OF NORMAL MEANS.

3        SO IT WAS A WAY THAT NIH WAS LOOKING FOR NEW ANTI-VIRAL

4    DRUGS AGAINST A WIDE VARIETY OF VIRUSES.  IT WAS A VERY

5    WORTHWHILE PROGRAM.

6    Q.   DR. SECRIST, COULD YOU HAVE MOVED FORWARD ON ANY OF THESE

7    COMPOUNDS WITHOUT KNOWING IF THOSE COMPOUNDS HAD BIOLOGICAL

8    ACTIVITY?

9    A.   OH, OF COURSE NOT.  OF COURSE NOT.

10   Q.   THE PROJECT WOULD HAVE COME TO A SCREECHING HALT?

11   A.   WELL, ONCE AGAIN, THERE WAS NO ACTIVITY.  WE TOLD THE

12   CHEMIST THERE WAS NO ACTIVITY AND WE MOVED ON.

13   Q.   AND WHAT ROLE DID YOU PLAY, IF YOU COULD BRIEFLY TELL THE

14   JURY, WHAT ROLE DID YOU PLAY IN THIS MASSIVE SCREENING PROJECT?

15   A.   YEAH, I MENTIONED EARLIER I WAS THE PRINCIPAL

16   INVESTIGATOR, SO I WAS THE PERSON THAT WAS OVERSEEING

17   EVERYTHING THAT WENT ON IN THIS PROGRAM, AIL CONNECTION WITH

18   THE CHEMIST, THE CONNECTION WITH THE BIOLOGICAL LABS, AND THE

19   CONNECTION WITH THE GOVERNMENT BECAUSE THE GOVERNMENT WAS ALSO

20   VERY INTERESTED IN THIS.

21   Q.   DO YOU BELONG TO ANY PROFESSIONAL SOCIETIES IN THE FIELD

22   OF NUCLEOSIDE DRUG DISCOVERY?

23   A.   YES, I DO.  THESE ARE GOING TO BE LONG NAMES.

24       THE PRINCIPAL SOCIETY THAT I'LL SAY NUCLEOSIDE AND

25   NUCLEOTIDE CHEMISTS BELONG TO IS CALLED THE INTERNATIONAL

1      SOCIETY FOR NUCLEOSIDES, NUCLEOTIDES, AND NUCLEIC ACIDS.

2          THAT IS A SOCIETY THAT WAS FORMED, I'M NOT SURE, I'M GOING

3      TO SAY 1990.  I WAS ONE OF THE FIVE FOUNDERS OF THAT SOCIETY

4      BACK IN WHATEVER YEAR THAT WAS.

5      Q.  AND -- I'M SORRY, DR. SECRIST.  AND DO THEY ACTUALLY --

6      ARE THERE ACTUALLY MEETINGS OF THIS INTERNATIONAL SOCIETY FOR

7      NUCLEOTIDES AND NUCLEOSIDES AND NUCLEIC ACIDS?

8      A.  OH, YES, THERE'S A MEETING EVERY YEAR.  THIS YEAR IT'S IN

9      PARIS.  IT'S BEEN IN FRANCE BEFORE.

10         BUT, YES, IT'S EVERY OTHER YEAR.  AND IT'S A GREAT WAY TO

11     GET TOGETHER WITH PEOPLE WHO ARE DOING ALL KINDS OF NEAT THINGS

12     IN THE NUCLEOTIDE AND NUCLEOSIDE AREA TO TALK ABOUT WHAT IS

13     GOING ON AND PRESENT YOUR RESULTS AND SO FORTH.

14         SO IT'S A WONDERFUL SOCIETY THAT HAS PROSPERED OVER THE

15     YEARS BECAUSE IT'S USEFUL.

16     Q.  DO THEY GET PRETTY WILD AND CRAZY?

17     A.  NO, OF COURSE NOT.  ABSOLUTELY NOT.

18     Q.  AND WHAT IS -- WHAT IS YOUR ROLE IN THAT SOCIETY?

19     A.  WELL, OF COURSE, I WAS A FOUNDER AS I SAID, AND I WAS

20     ELECTED THE PRESIDENT OF THAT SOCIETY FAIRLY EARLY ON.  SO I

21     SPENT TWO YEARS BEING THE PRESIDENT OF THE SOCIETY, AND I WAS

22     INVOLVED AND ACTUALLY I CONTINUE TO BE INVOLVED IN THE AFFAIRS

23     OF THE SOCIETY FROM ITS INCEPTION UNTIL NOW STILL.

24     Q.  IS THERE A SECOND SOCIETY THAT YOU'RE INVOLVED IN THAT

25     FOCUSES PRIMARILY ON NUCLEOSIDES AND NUCLEOTIDES?

1    A.   WELL, THE OTHER ONE I WOULD MENTION IS THE INTERNATIONAL

2    SOCIETY FOR ANTI-VIRAL RESEARCH.

3         THAT FOCUSES ON -- IT WAS A SOCIETY FORMED BY A SMALL

4    GROUP OF VIROLOGISTS TO FOCUSES ON ANTI-VIRAL DRUG DISCOVERY

5    AND DEVELOPMENT AND THAT'S REALLY WHAT IT WAS ABOUT.

6         AND CHEMISTS BEGAN GOING TO THE MEETINGS EARLY ON AND ALL

7    OF A SUDDEN THERE WERE A LOT OF CHEMISTS AT THIS MEETING AND

8    LOTS OF VIROLOGISTS.

9         SO IT WAS A GREAT WAY TO INTERFACE WITH PEOPLE IN THE

10   ANTI-VIRAL DRUG DISCOVERY DEVELOPMENT ARENA, AND SO I PRETTY

11   MUCH ATTENDED EVERY MEETING UNTIL MY RESPONSIBILITIES AT

12   SOUTHERN RESEARCH CHANGED.

13        AND I WAS ALSO ELECTED PRESIDENT OF THAT INTERNATIONAL

14   SOCIETY, AND IN THAT CASE I SPENT TWO YEARS AS THE INCOMING

15   PRESIDENT AND TWO YEARS AS PRESIDENT AND TWO YEARS AS A PAST

16   PRESIDENT.  SO IT'S A SIX YEAR COMMITMENT.

17        BEFORE THAT I WAS ACTUALLY ELECTED TO BE THE TREASURER OF

18   THAT SOCIETY, SO I SPENT SIX OR EIGHT YEARS OF THAT SOCIETY AS

19   THE TREASURER.

20        SO, AGAIN, I'M STILL INVOLVED IN THE GOVERNANCE OF THAT

21   SOCIETY NOW ALSO.

22   Q.   HAVE YOU EVER EDITED ANY JOURNALS IN THE FIELD OF

23   NUCLEOTIDES RESEARCH?

24   A.   YES.  I'M STILL CONTINUING WITH EDITING RESPONSIBILITIES.

25   THE JOURNAL NUCLEOTIDES, NUCLEOSIDES, AND NUCLEIC ACIDS WAS

1    ESTABLISHED IN 1982 AND I WAS THE EXECUTIVE EDITOR AT THE TIME

2    OF ITS IN EXCEPTION IN 1982, AND I'M STILL THE EXECUTIVE EDITOR

3    OF IT TODAY.

4    Q.   HAVE YOU PUBLISHED IN THE AREA OF NUCLEOSIDE COMPOUNDS AS

5    DRUGS?

6    A.   YES.  OH, YES.  AND I HAVE, I DON'T KNOW, 170, 180

7    PUBLICATIONS, SOMEWHERE IN THERE.  MOST OF THOSE RELATE TO

8    NUCLEOSIDES, NUCLEOTIDES, THOSE SORTS OF COMPOUNDS.

9    Q.   HAVE YOU APPLIED FOR AND RECEIVED ANY UNITED STATES

10   PATENTS?

11   A.   YES, I HAVE.  I THINK SOMEWHERE AROUND 40.  I DON'T KNOW

12   THE EXACT NUMBER.  MAYBE CLOSE TO 40, MAYBE A LITTLE MORE.

13        SO, YES, I HAVE A NUMBER OF PATENTS THAT HAVE MY NAME ON

14   THEM.

15   Q.   AND DO ANY OF THEM RELATE TO NUCLEOSIDES?

16   A.   I WOULD SAY MANY OF THEM DO.  I DON'T KNOW THE NUMBER, BUT

17   CERTAINLY WELL OVER HALF.  MAYBE, MAYBE THREE-QUARTERS, MAYBE

18   MORE.  I'M NOT SURE.  YES, THEY DO.

19   Q.   HAVE YOU EVER INVENTED ANY DRUGS THAT HAVE BEEN APPROVED

20   BY THE FOOD AND DRUG ADMINISTRATION?

21   A.   YES, I HAVE.  I GUESS AS A, AS A MEDICINAL CHEMIST -- AND

22   WE HEARD THIS FROM DR. SOFIA -- THAT'S WHY YOU BECAME A

23   MEDICINAL CHEMIST IS TO HELP WITH SOMETHING THAT MIGHT ACTUALLY

24   MAKE A DIFFERENCE IN HUMAN HEALTH.

25        SO I'VE BEEN WORKING ALL OF THESE YEARS IN THE NUCLEOSIDE

1      FIELD LOOKING FOR DRUGS.

2          A LOT OF IT WAS ANTI-CANCER DRUGS AND WE CO -- ANOTHER

3      SENIOR PERSON THAT DID RESEARCH ON IT CO-AMENDED A DRUG THAT

4      DID BECOME FDA APPROVED CALLED CLOFARABINE.

5      Q.   CLOFARABINE, C-L-O -- YOU DO IT.  IT'S YOUR DRUG.

6      A.   I KNOW HOW TO SPELL THIS DRUG.  C-L-O-F-A-R-A-B-I-N-E.

7      Q.   SO, DR. SECRIST, WE HEARD FROM DR. SOFIA A MOMENT THAT HE

8      HAD IN TIME AT THE -- WHEN SOFOSBUVIR WAS APPROVED, AND WE

9      HEARD FROM DR. STELLA A COUPLE OF STORIES ABOUT WHAT HAPPENED

10     WITH HIM WHEN HIS DRUG WAS APPROVED.

11         CAN YOU TELL THE LADIES AND GENTLEMEN OF THE JURY WHAT

12     HAPPENED WITH YOU WHEN YOUR DRUG WAS AT THE FDA APPROVAL

13     HEARING, WHAT HAPPENED?

14     A.   I'LL TRY.  OKAY.  FIRST OF ALL, CLOFARABINE IS A

15     NUCLEOSIDE DRUG.  IT HAS A DOUBLE RING BASE ON IT, AN ADENINE.

16     IT'S A SUBSTITUTED ADENINE BASE -- SORRY -- IT HAS A

17     SUBSTITUENT ON IT IN ADDITION TO THE NORMAL SUBSTITUENT.

18         THE SUGAR RING DOES HAVE A FLUORINE AT THE 2' POSITION AS

19     WELL.

20         SO IT WAS A DRUG THAT WE PUSHED AS FAR AS WE COULD AT

21     SOUTHERN RESEARCH, AND THEN WE LICENSED IT TO AN ORGANIZATION

22     TO CARRY IT FURTHER, A SMALL COMPANY.  LARGE COMPANIES WERE NOT

23     INTERESTED IN THE DRUG.  THEY DIDN'T THINK IT WOULD ACTUALLY BE

24     WORTH ANYTHING.

25         SO WE LICENSED IT TO A SMALL COMPANY THAT WAS COMMITTED TO

1     IT, AND WE GOT SOME CLINICIANS WHO WERE VERY INTERESTED IN

2     TESTING IT IN PATIENTS.

3          SO THE GROUP THAT WE WORKED WITH DURING THOSE YEARS AND

4     REALLY HAD A WONDERFUL RELATIONSHIP WITH WAS AT M.D. ANDERSON

5     CANCER CENTER IN HOUSTON, WHICH IS WORLD RENOWNED, AND PEOPLE

6     COME THERE FOR CANCER TREATMENT FROM ALL OVER THE WORLD.

7          THE PEOPLE THAT WE WORKED WITH WERE EXPERIMENTS IN

8     LEUKEMIA MAINLY, AND THIS DRUG WAS GOING TO BE LOOKED AT AS A

9     POTENTIAL LEUKEMIA DRUG.  AND THERE'S NO WAY TO KNOW WHEN YOU

10    START CLINICAL TRIALS IN THE CANCER ARENA, WHAT CANCERS YOU

11    MIGHT ACTUALLY BE ABLE TO HELP PEOPLE WITH, YOU CAN'T KNOW.

12    YOU HAVE TO TRY TO FIND OUT.

13         SO YOU SAW FROM DR. MCHUTCHISON EARLIER IN THE WEEK THIS

14    SLIDE WHERE HE TALKED ABOUT, WELL, YOU MAKE A POTENTIAL DRUG

15    AND IT GOES INTO A PHASE 1 TRIAL AND PHASE 2 AND SO FORTH AND

16    YOU SAW THAT.

17         WELL, WHAT WE COULD AFFORD, WHAT M.D. ANDERSON COULD DO TO

18    HELP US OUT WITH WAS THE PHASE 1 TRIAL ON THIS DRUG.  AND THEY

19    DID THE PHASE 1 TRIAL, AND IT IS A SAFETY TRIAL.  WILL THIS

20    DRUG BE SAFE FOR PEOPLE TO TAKE?

21         SOMETIMES IN A SAFETY TRIAL YOU DO SEE SOME PEOPLE WHO

22    WILL BE HELPED BY A DRUG.  BUT YOU START OF COURSE WITH A VERY

23    LOW DOSE AS WAS MENTIONED EARLIER AND YOU CAN MOVE UP.

24         ANYHOW, THE TRIAL WAS STARTED AT M.D. ANDERSON WITH

25    CLOFARABINE IN ADULTS WITH LEUKEMIA.  IT COULD BE WHATEVER

1    KIND.  AND THAT WAS ONGOING WHEN ONE OF THE -- ACTUALLY A

2    PARENT OF A PATIENT AT M.D. ANDERSON.

3         BY THE WAY, I DIDN'T MENTION THIS, CLOFARABINE WAS

4    APPROVED BY FDA FOR CHILDHOOD LEUKEMIA.  IT WAS ACTUALLY USED

5    ROUTINELY IN ADULT LEUKEMIA AND IT WORKS BEAUTIFULLY THERE.

6    BUT IT WAS INITIALLY APPROVED BY THE FDA FOR CHILDHOOD

7    LEUKEMIA.

8         HOW DID THAT COME ABOUT?  THERE WAS A COUPLE OF FOLKS,

9    PARENTS WERE THERE WITH THEIR SON AT M.D. ANDERSON AND THEIR

10   SON HAD GONE THROUGH ALL OF THE TREATMENTS THAT THEY HAD AND

11   THERE WAS NOTHING LEFT AND IT DIDN'T WORK.

12        SO YOU CAN PUT YOURSELF --

13   Q.   SORRY, DR. SECRIST.  WAS HE CURED?

14   A.   YES.

15   Q.   FIVE YEARS OLD?

16   A.   OR LESS.

17   Q.   THANKS TO YOUR WORK.

18   A.   I'M SORRY.

19   Q.   AND --

20   A.   ANYHOW, THE BOY CAME -- THE YOUNG LAD AND HIS DAD CAME TO

21   THE APPROVAL HEARING FOR FDA.  SO HE -- I GOT TO SEE HIM AT

22   THIS APPROVAL HEARING.

23        THAT'S WHY YOU'RE A MEDICINAL CHEMIST.

24   Q.   THANK YOU, DR. SECRIST.

25        YOUR HONOR, WE WOULD TENDER DR. SECRIST AS AN EXPERT IN

DIRECT SECRIST BY MS. BROOKS

1    THE FIELD OF MEDICINAL CHEMISTRY, NUCLEOSIDE CHEMISTRY, AND

2    NUCLEOSIDE DRUG DISCOVERY.

3              THE COURT:  ANY OBJECTION?

4              MR. GENDERSON:  NO OBJECTION, YOUR HONOR.

5              THE COURT:  THE DOCTOR MAY SO TESTIFY.

6    BY MS. BROOKS:

7    Q.   AND DO YOU HAVE SOME WATER UP THERE?

8    A.   I DO.

9         AND I HAVE TO SAY, I DON'T THINK I MENTIONED THAT -- AT

10   SOUTHERN RESEARCH I SAID I GOT A LITTLE BIT AWAY FROM RESEARCH

11   BECAUSE THE LAST SEVEN YEARS I WAS THERE I WAS THE CEO AND

12   PRESIDENT OF SOUTHERN RESEARCH, SO WHEN I RETIRED I WAS IN

13   CHARGE OF THE ORGANIZATION.

14        SORRY, I LEFT THAT OUT.

15   Q.   LET'S TURN NOW TO THE ANALYSIS THAT YOU DID IN THIS CASE

16   OF THE '499 AND THE '712 PATENTS TO DETERMINE WHETHER OR NOT,

17   IN YOUR EXPERT OPINION, THE ASSERTED CLAIMS ARE VALID OR

18   INVALID.

19        NOW, FIRST, WHEN YOU FORMED YOUR OPINIONS, ARE YOU

20   REQUIRED TO DO YOUR ANALYSIS FROM THE PERSPECTIVE OF WHAT IS

21   CALLED A PERSON OF ORDINARY SKILL IN THE ART?

22   A.   YES.

23   Q.   AND, MR. ANG, IF WE CAN PULL UP PDX 702.

24        WE SAW A SIMILAR SLIDE TO THIS WITH DR. SEEGER AND AGAIN

25   WITH DR. STELLA, AND WE WON'T READ THE ENTIRE SLIDE, BUT JUST

1    SO IT'S CLEAR FOR THE RECORD -- AND THIS IS PDX-702 -- THIS IS

2    THE DEFINITION, OR AT LEAST GILEAD'S DEFINITION, OF WHAT ONE OF

3    ORDINARY SKILL IN THE ART WOULD BE.

4        DID YOU KEEP THIS IN MIND AS YOU DID YOUR ANALYSIS?

5    A.   YES, I DID.

6    Q.   NOW, YOU YOURSELF ARE ONE OF EXTRAORDINARY SKILL IN THE

7    ART I ASSUME?

8    A.   I'LL GO ALONG WITH DR. STELLA'S STATEMENT IN THAT REGARD.

9    Q.   SO HOW IS IT THAT YOU KNOW SO MUCH MORE THAN ONE OF

10   ORDINARY SKILL IN THE ART, WHICH, BY THE WAY, IS IMPRESSIVE AS

11   IT IS?  HOW DO YOU DO YOUR ANALYSIS AND HOW DO YOU SET ASIDE

12   THAT EXTRA LEARNING THAT YOU HAVE TO PUT YOURSELF IN THE SHOES

13   OF ONE OF ORDINARY SKILL IN THE ART?

14   A.   WELL, IN MY CASE, AS I SAID, I DID SPEND TIME AT OHIO

15   STATE AND I DID HAVE A NUMBER OF PH.D. STUDENTS THERE.  SO A

16   NUMBER HAD PH.D. DEGREES OR MASTERS DEGREES WHILE I WAS THERE,

17   SO I WAS WITH THEM IN THE LAB EVERY DAY AS THEY LEARNED

18   CHEMISTRY AND BECAME, I WOULD SAY, GRADUATE PERSONS OF ORDINARY

19   SKILL IN THE ART AND THEN BEYOND THAT.

20       IN ADDITION, MY MANY YEARS AT SOUTHERN RESEARCH, IT'S BEEN

21   THE SAME.  I'VE HAD MANY POST-DOCTORAL PEOPLE AT SOUTHERN

22   RESEARCH WHO WORKED ON GRANTS, WE'VE HAD BACHELORS DEGREE

23   CHEMISTS, MASTERS CHEMISTS AND PERMANENT STAFF THAT WORKED AT

24   SOUTHERN RESEARCH THAT ALSO WORKED FOR ME.

25       SO IT'S -- I THINK IT'S EASY FOR ME TO PUT MYSELF IN THE

1    SHOES OF A PERSON OF ORDINARY SKILL.

2    Q.   NOW, DOES MERCK HAVE A SLIGHTLY DIFFERENT DEFINITION OF

3    THE QUALIFICATIONS OF A PERSON OF ORDINARY SKILL IN THE ORDER?

4    A.   I READ THE MERCK DEFINITION AS WELL AS THIS ONE AND, YES,

5    IT'S SLIGHTLY DIFFERENT.

6    Q.   AND WOULD YOUR OPINIONS BE THE SAME WHETHER YOU DID YOUR

7    ANALYSIS USING GILEAD'S DEFINITION OF ONE OF ORDINARY SKILL OR

8    MERCK'S DEFINITION?

9    A.   THEY WERE SUBSTANTIALLY THE SAME AND IT WOULDN'T MATTER

10   RELATIVE TO MY OPINIONS.

11   Q.   ALL RIGHT.   LET'S NOW START BY SUMMARIZING YOUR OPINIONS

12   AND THEN WE'LL GO BACKWARD AND SEE WHAT THE BASIS OF THOSE

13   OPINIONS ARE.

14       MR. ANG, IF WE CAN GO TO PDX 701.

15       AND, DR. SECRIST, IF YOU COULD JUST WALK THE JURY THROUGH

16   WHAT YOUR OPINIONS, YOUR ULTIMATE OPINIONS ARE IN THIS CASE?

17   A.   YES.

18       ON THE LEFT YOU SEE THE SHORTENED SUMMARY.   ON THE RIGHT

19   YOU SEE A LITTLE MORE DETAIL.

20       AND WE HAVE BROKEN THEM OUT IN SEVERAL DIFFERENT WAYS.

21       BUT BASICALLY CLAIMS 1 AND 2 OF THE '499 PATENT, IN MY

22   JUDGMENT THERE'S NO WRITTEN DESCRIPTION SUPPORT FOR THOSE

23   CLAIMED METHODS AND THERE'S NO DISCLOSURE OF HOW TO MAKE AND

24   USE THE METHODS WITHIN THE '499 PATENT.

25       IN THE '712 PATENT, CLAIMS 1 THROUGH 3, 5 AND 7, THE SAME

1    IS TRUE.  THERE'S NO WRITTEN DESCRIPTION SUPPORT FOR ANY OF

2    THOSE CLAIMED COMPOUNDS.  AND THERE'S NO DISCLOSURE OF HOW TO

3    MAKE AND USE THE CLAIMED COMPOUNDS.

4        IN FOR CLAIMS 9 THROUGH 11, IT'S SIMILARLY TRUE.  THERE'S

5    NO WRITTEN DESCRIPTION SUPPORT FOR THOSE CLAIMED COMPOUNDS, AND

6    CERTAINLY NO DISCLOSURE OF HOW TO MAKE AND USE THOSE CLAIMED

7    COMPOUNDS.

8        SO THE SUMMARY OVERALL IS ALL OF THESE CLAIMS ARE INVALID

9    BASED OF LACK OF WRITTEN DESCRIPTION AND LACK OF ENABLEMENT.

10   Q.   NOW, DR. SECRIST, YOU BROKE OUT SOME OF THE CLAIMS IN THE

11   '712 PATENT.  IN THE SECOND BULLET POINT YOU HAVE CLAIMS 1

12   THROUGH 3, 5 AND 7, AND IN THE THIRD BULLET POINT YOU HAVE

13   CLAIMS 9 THROUGH 11.

14       WHY DID YOU BREAK THOSE OUT?

15   A.   WELL, THE CLAIMS 9 THROUGH 11 ARE MUCH NARROWER IN SCOPE

16   THAN THE VERY, VERY BROAD CLAIMS 1 THROUGH 3 AND THE VERY BROAD

17   CLAIMS 5 THROUGH 7.

18       SO TO DISTINGUISH BETWEEN THE CLAIMS THAT WERE ABSOLUTELY

19   MASSIVE AND CLAIMS THAT WERE MUCH NARROWER, I BROKE THEM OUT.

20       BUT THE INVALIDITY REASONS REMAIN THE SAME.

21   Q.   ALL RIGHT.  THEN LET'S TURN TO THE TWO PATENTS AT ISSUE.

22   I'M GOING TO GET MY COPY HERE THAT I THINK MR. SINGER HAD

23   BORROWED.

24       OH, IT'S RIGHT UP HERE.  I BROUGHT IT WITH ME.  OR I

25   THOUGHT I DID.

1          IT'S IN YOUR BINDER FOR SURE.

2          SO IF WE LOOK AT EXHIBIT 1 IN YOUR BINDER, DR. SECRIST,

3     IT'S ALREADY IN EVIDENCE.

4     A.   YES.

5     Q.   THAT'S THE '499 PATENT; IS THAT RIGHT?

6     A.   YES, IT IS.

7     Q.   AND THEN EXHIBIT 2 THAT IS ALREADY IN EVIDENCE, THAT'S THE

8     '712 PATENT; IS THAT RIGHT?

9     A.   YES.

10    Q.   OKAY.  NOW, WE'RE GOING TO TALK ABOUT THE CLAIMS IN A

11    MINUTE WHICH ARE FOUND -- SINCE THE LADIES AND GENTLEMEN OF THE

12    JURY NOW HAVE THEIR OWN COPIES, THE CLAIMS ARE FOUND AT THE END

13    OF THE PATENT; IS THAT RIGHT?

14    A.   THAT'S RIGHT.

15    Q.   BUT IN BETWEEN THAT WE HAVE SOMETHING CALLED THE

16    SPECIFICATION; IS THAT CORRECT?

17    A.   YES.

18    Q.   OKAY.  SO THE SPECIFICATION OF THE '499 PATENT, EVEN

19    THOUGH THE CLAIMS MAY BE DIFFERENT, ARE THE SPECIFICATIONS OF

20    THE '499 PATENT AND THE '712 PATENT THE SAME?

21    A.   YES, THEY ARE.

22    Q.   SO WE DON'T NEED TO GO BACK AND FORTH BETWEEN THE TWO

23    SPECIFICATIONS WHEN LOOKING FOR THINGS?  WE CAN JUST USE ONE

24    SPECIFICATION?

25    A.   THAT'S CORRECT.

1    Q.   ALL RIGHT.  LET'S START NOW WITH THE CLAIMS OF THE '499

2    PATENT.

3         AND JUST TO ORIENT THE JURY, MR. ANG, COULD YOU PLEASE PUT

4    UP PDX-703.

5         SO THE '499 -- THE CLAIMS OF THE '499 PATENT, THOSE CAME

6    TO BE IN -- ON FEBRUARY 1ST, 2005, WHEN PHIL DURETTE FILED --

7    WELL, LET ME BACK UP -- WHEN PHIL DURETTE CANCELLED, IT LOOKS

8    LIKE, TEN CLAIMS THAT WERE PENDING.

9         IS THAT CORRECT, DR. SECRIST?  IS THAT YOUR UNDERSTANDING?

10   A.   YES, IT IS.

11   Q.   AND THEN HE FILED TWO NEW CLAIMS, CLAIMS 53 AND 54?

12   A.   YES.

13   Q.   AND DID THOSE CLAIMS TURN INTO CLAIMS 1 AND 2 OF THE '499

14   PATENT?

15   A.   YES, THEY DID.

16   Q.   NOW, MR. DURETTE -- OR DR. DURETTE TOLD THE PATENT OFFICE

17   THAT THESE NEW CLAIMS THAT WOULD BECOME CLAIMS 1 AND 2 OF THE

18   '499 PATENT DO NOT -- DID NOT INTRODUCE ANY NEW MATTER INTO THE

19   APPLICATION SINCE, QUOTE, "THEY ARE FULLY SUPPORTED BY

20   APPLICANTS' SPECIFICATION."

21        BASED ON YOUR EXPERT ANALYSIS, IS THAT STATEMENT TRUE?

22   ARE THEY FULLY SUPPORTED BY THE SPECIFICATION?

23   A.   ABSOLUTELY NOT.

24   Q.   ALL RIGHT.  WE WILL GO THROUGH AND WE WILL SEE HOW THEY

25   ARE NOT.

1          NOW, LET'S GO TO THE '499 PATENT.  AND WE'LL GET TO THE

2     '712 IN A MOMENT.

3          LET'S TURN TO EXHIBIT 1 AND LET'S PUT UP, IF WE COULD,

4     MR. ANG, PDX 704.

5          SO THIS IS -- AND IF THE LADIES AND GENTLEMEN OF THE JURY

6     WANT TO FIND IT, THEY CAN TURN TO COLUMN 137 OF THE '499

7     PATENT, AND WE'RE LOOKING HERE AT CLAIM 1; IS THAT RIGHT,

8     DR. SECRIST?

9     A.   YES, IT IS.

10    Q.   NOW, IN READING THIS CLAIM, DID YOU GIVE ANY SPECIAL

11    MEANING TO ANY OF THE TERMS IN THE CLAIM?

12    A.   WELL, BY AND LARGE THE TERMS EXPLAIN THEMSELVES.

13         THE ONLY ADDITIONS TO THAT WOULD BE THE TWO THAT ARE --

14    THAT THE COURT HAS GIVEN US CONSTRUCTIONS FOR.

15    Q.   ALL RIGHT.  SO LET'S LOOK AT THOSE.  DR. STELLA HAD THEM,

16    AT LEAST THE ADMINISTERED PART UP.  LET'S GO TO 705.

17         SO THE COURT, IS IT YOUR UNDERSTANDING, DR. SECRIST, THAT

18    HER HONOR CONSTRUED TWO OF THEM IN A PARTICULAR WAY, COMPOUND

19    AND ADMINISTERING?

20    A.   YES, IT IS MY.

21    Q.   AND WHAT IS THE DEFINITION OF A COMPOUND?

22    A.   A COMPOUND IS A SUBSTANCE THAT CONSISTS OF TWO OR MORE

23    CHEMICAL ELEMENTS IN UNION.

24    Q.   AND WHAT IS THE COURT'S CONSTRUCTION OF THE TERM

25    ADMINISTERING?

1      A.   WE HEARD THIS FROM DR. STELLA, PROVIDING A COMPOUND OF THE

2      INVENTION OR A PRODRUG OF A COMPOUND OF THE INVENTION TO THE

3      INDIVIDUAL IN NEED.

4      Q.   WHEN YOU DID YOUR ANALYSIS IN THIS CASE, DID YOU APPLY THE

5      COURT'S CONSTRUCTION TO THESE TERMS IN THE CLAIMS?

6      A.   YES, I DID.

7      Q.   NOW, DOES THE CONSTRUCTION OF ADMINISTERING IMPACT THE

8      SCOPE OF CLAIM 1?

9      A.   VERY DRAMATICALLY.

10     Q.   IN WHAT WAY?

11     A.   WELL, AGAIN, AS DR. STELLA MENTIONED, IT TAKES A CLAIM

12     THAT ALREADY HAS WELL OVER A MILLION COMPOUNDS AND JUST

13     DRAMATICALLY EXPANDS IT BY ADDING ALL OF THE MULTIPLE OF

14     PRODRUGS THAT HE TALKED ABOUT AS BEING POSSIBLE.

15          SO IT CONVERTS IT INTO -- I WOULD SAY HE USED THE TERM

16     UNLIMITED MAYBE, OR SOMETHING LIKE THAT.

17          SO I HAVE TO AGREE WITH HIM.  THAT'S WHERE WE ARE ONCE YOU

18     ADD THE PRODRUGS IN TO CLAIM 1.

19     Q.   NOW, LET'S FOCUS ON THE CHEMICAL STRUCTURE OF CLAIM 1.  SO

20     IF WE COULD BRING UP PDX 706.

21          SO WE'RE GOING BACK TO CLAIM 1.  NOW, WE'RE GOING TO COME

22     BACK TO THE -- CLAIM 1 IS ACTUALLY A METHOD OF TREATING

23     HEPATITIS C; IS THAT RIGHT?

24     A.   THAT'S CORRECT.

25     Q.   AND WE ALREADY HEARD DR. SEEGER TALKING ABOUT THIS CLAIM

1    FROM A PERSPECTIVE OF A VIROLOGIST.  WERE YOU HERE TO HEAR

2    THAT?

3    A.   YES.

4    Q.   ARE YOU HERE TO TALK ABOUT THE CLAIM AS A MEDICINAL

5    CHEMIST?

6    A.   YES.

7    Q.   AND SO LET'S LEAVE ASIDE FOR A MOMENT THAT IT'S A METHOD

8    OF TREATING HCV AND LET'S JUST LOOK AT THE COMPOUNDS.

9         SO WE'RE LOOKING AT -- THERE'S TWO STRUCTURAL DRAWINGS

10   HERE.  WHAT IS THE TOP ONE?

11   A.   THE -- EXCUSE ME.  THE TOP ONE, IF Y, H IS A NUCLEOSIDE, B

12   WOULD BE THE BASE AND Y WOULD BE H, AND THEN THE OTHERS WOULD

13   BE AS DESCRIBED TO THE RIGHT.

14        THE BOTTOM IS JUST AN EXPANDED DEFINITION OF WHAT B IS

15   GIVEN PICTORIALLY.  IT IS A SINGLE RING BASE, A PYRIMIDINE BASE

16   AS DEPICTED WITH R5 AND R6.

17        SO THERE ARE ONE, TWO, THREE, FOUR, FIVE, SIX, SEVEN --

18   EIGHT PLACES IN THIS STRUCTURE WHERE YOU COULD PUT IN DIFFERENT

19   SUBSTITUENT GROUPS.

20   Q.   SO IF A COMPOUND -- WELL, LET ME ASK YOU THIS:  HOW BROAD

21   IS THIS CLAIM?  EVEN THOUGH IT HAS CERTAIN LIMITATIONS, AND

22   WE'RE GOING TO TALK ABOUT THEM IN A MOMENT, HOW MANY COMPOUNDS

23   COULD THIS CLAIM POTENTIALLY COVER?

24   A.   WELL, IF YOU ONLY INCLUDE WHAT IS LISTED ON THIS PAGE, IT

25   IS CERTAINLY WELL OVER A MILLION, AND PROBABLY MILLIONS OF

1    COMPOUNDS.

2         IF YOU ADD IN THE COURT'S CONSTRUCTION ON ADMINISTERING,

3    WHICH IS APPROPRIATE FOR THE '499 PATENT, IT BECOMES TENS OF

4    MILLIONS, HUNDREDS OF MILLIONS OF COMPOUNDS BECAUSE YOU COULD

5    DO THIS MASSIVE NUMBER OF PRODRUGS ON THIS SINGLE COMPOUND THAT

6    IS IN HERE, AND AS DR. STELLA SAID, YOU MULTIPLY A MILLION BY A

7    MILLION, WE'RE TALKING ABOUT A LOT OF COMPOUNDS.

8    Q.   AND SO EVEN THOUGH IT COVERS POTENTIALLY MILLIONS OF

9    COMPOUNDS, IF A COMPOUND HAD A DOUBLE RING BASE LIKE MERCK'S

10   MK-608 COMPOUND HAD, DOES THIS CLAIM, EVEN THOUGH IT COVERS

11   MILLIONS OF COMPOUNDS, WOULD THAT COVER A COMPOUND THAT HAD A

12   DOUBLE RING BASE?

13   A.   NO, IT WOULD NOT.

14   Q.   AND WHY IS THAT?

15   A.   WELL, IT ONLY COVERS SINGLE RING BASES, PYRIMIDINE.  SO

16   ANYTHING THAT IS A PURINE BASE, A DOUBLE RING BASE, IS NOT

17   GOING TO BE INCLUDED IN THESE CLAIMS.

18   Q.   AND SO LET'S WALK THROUGH SOME OF THE OTHER REQUIREMENTS

19   HERE.

20   A.   OKAY.

21   Q.   AND WHAT WE HAVE A POSITION HERE CALLED R1.  SO CAN WE

22   HAVE -- DO WE HAVE ANY GUIDANCE IN THE CLAIM AS TO WHAT ONE CAN

23   PLACE AT R1?

24   A.   YES.  R1 IS AT THE C 2' POSITION, IN THE UP POSITION OF

25   C 2', AND IT SHOWS IT AS BEING TRY FLUOROMETHYL C1-4 ALKYL.

1          SO THE C1-4 ALKYL DESIGNATION, IF YOU TAKE THE TIME TO

2     WRITE UP ALL OF THE POSSIBILITIES, THERE ARE EIGHT

3     POSSIBILITIES.

4          SO THERE ARE BASICALLY NINE POSSIBILITIES FOR R1.

5     Q.   AND, AGAIN, EVEN THOUGH THERE'S A VAST AMOUNT OF

6     POSSIBILITIES, IF A COMPOUND HAD A HYDROGEN AT THE R1 POSITION,

7     WOULD IT BE COVERED BY THIS CLAIM?

8     A.   DEFINITELY NOT.

9     Q.   NOW, LET'S LOOK AT THE R2 AND R3 POSITIONS.  WHAT CAN ONE

10    ATTACH, ACCORDING TO THIS CLAIM, TO THE R2 AND R3?  AND YOU CAN

11    BREAK THEM DOWN ANY WAY YOU WOULD LIKE, DOCTOR.

12    A.   OKAY.  THANK YOU.

13         SO I'LL READ WHAT IT SAYS HERE.  IT SAYS IN ONE OF R2 AND

14    R3 IS OH OR C1-4 ALKOXY, AND THE OTHER OF R2 AND R3 IS FLUORO.

15         OKAY.  SO THAT MEANS THAT, FOR EXAMPLE, IF R2 IS OH, THEN

16    R3 MUST BE FLUORO.

17         OR IF R3 IS OH, R2 MUST BE FLUORO.

18         AND, OF COURSE, YOU CAN DO ALKOXY THE SAME WAY.

19         THE OTHER THING I WOULD POINT OUT ABOUT THIS STRUCTURE IS

20    THAT YOU CAN SEE THE LINE LEADING TO R3 IS A WAVY LINE.  IT'S

21    NOT THE DASHED LINE READING TO R2.  IT'S A WAVY LINE.

22         OKAY.  THE WAVY LINE MEANS THAT R3 CAN EITHER BE UP OR

23    DOWN.  IT'S DRAWN HERE IN THE DOWN POSITION, BUT IT COULD BE

24    EITHER UP OR DOWN IN THIS STRUCTURE.

25         SO THAT, AGAIN, ADDS A LOT MORE COMPOUNDS TO THE SCOPE OF

1       THIS CLAIM BY ADDING IN BOTH OF THOSE.

2           SO IN THIS -- LOOKING AT R2 AND R3, ONE OF THEM HAS TO BE

3       FLUORO, R2 OR R3, ONE OF THEM HAS TO BE FLUORO.

4       Q.  SO LET'S GO 707, AND WE TRIED TO COLOR CODE WHAT YOU JUST

5       SAID.  SO WHAT ARE WE LOOKING AT HERE?  WHAT IS THE BLUE AND

6       WHAT IS THE ORANGE AND WHAT IS THE GREEN?

7       A.  SO THE BLUE, R1, THAT WOULD BE ONE OF THE NINE OPTIONS

8       THAT I MENTIONED THAT COULD BE R1.

9           THE GREEN AND -- I DON'T KNOW WHAT THE COLOR TO CALL THAT.

10      BROWN?  ORANGE?

11      Q.  ORANGE I THINK MAYBE.

12      A.  OKAY.  ALL RIGHT.  GREEN AND ORANGE.

13          THEN ONE IS OH, ALKOXY, AND THE OTHER IS FLUORO.  SO THIS

14      WAY AND THIS WAY, IT HAS TO BE ONE OF THOSE (INDICATING).

15          SO THOSE ARE THE CHOICES FOR R1, R2, AND R3.

16      Q.  SO WITH THESE LIMITATIONS IN MIND, AGAIN, EVEN THOUGH IT

17      COVERS MILLIONS OF CLAIMS, LET'S SEE IF WE COULD FIND OUR WAY

18      TO THE CLAIMED INVENTION.  YOU'RE GOING TO DO A MORE DETAILED

19      DESCRIPTION IN A MOMENT ABOUT THE WRITTEN DESCRIPTION

20      REQUIREMENTS?

21      A.  YES.

22      Q.  BUT IS IT YOUR UNDERSTANDING THAT ONE NEEDS TO LOOK AT THE

23      SPECIFICATION AND SEE IF THE SPECIFICATION KIND OF GUIDES

24      THE -- ONE OF SKILL IN THE ART TO THE CLAIMED INVENTION?

25      A.  IT'S MY UNDERSTANDING THAT THAT MUST BE THE CASE.

DIRECT SECRIST BY MS. BROOKS

1   Q.   AND IN THAT WAY, ONE CAN KNOW WHETHER OR NOT THE INVENTORS

2   WERE ACTUALLY IN POSSESSION OF THE CLAIMED INVENTION BACK WHEN

3   THEY FIRST FILED THE SPECIFICATION IN 2002?

4   A.   THAT'S CORRECT.

5   Q.   OKAY.  SO LET'S LOOK --

6        AND, YOUR HONOR, MAY I APPROACH THE BUTCHER PAPER UP HERE

7   (INDICATING)?

8             THE COURT:  YES.

9             MS. BROOKS:  THANK YOU.

10  Q.   SO WE'LL START WITH THE REQUIREMENTS OF THE ASSERTED

11  CLAIMS.  SO WE'RE LOOKING AT THE '499, CLAIM 1.  SO I'LL JUST

12  CALL THIS -- SO THESE ARE THE ASSERTED CLAIMS, WHICH IS ALSO

13  THEN KNOWN AS THE CLAIMED INVENTION.  IS THAT RIGHT,

14  DR. SECRIST?

15  A.   YES.

16  Q.   OKAY.  SO AT THE R1 POSITION, AM I CORRECT THAT BASED ON

17  WHAT WE'RE LOOKING AT HERE, R1 CANNOT -- MUST NOT EQUAL

18  HYDROGEN?

19  A.   THAT'S CORRECT.

20  Q.   AND AT THE BASE IT MUST EQUAL A SINGLE RING?

21  A.   THAT'S CORRECT.

22  Q.   AND I'LL JUST PUT S.R. FOR SINGLE RING.

23       AND THEN AT THE R2 OR R3 POSITION, YOU MUST HAVE -- AT ONE

24  OF THOSE TWO, YOU MUST HAVE A FLUORO?  IS THAT RIGHT,

25  DR. SECRIST?

1    A.   THAT'S CORRECT.

2    Q.   ALL RIGHT.  SO THAT IS WHAT IS REQUIRED BY THE ASSERTED

3    CLAIM.

4         NOW, LET'S GO DOWN HERE AND LET'S LOOK AT THE EXAMPLES

5    THAT ARE IN THE SPECIFICATION.

6    A.   OKAY.

7    Q.   I BELIEVE FROM COLUMNS 40 TO COLUMN 131, THERE ARE 154

8    EXAMPLES LAID OUT IN THE SPECIFICATION; IS THAT RIGHT?

9    A.   THAT'S CORRECT.  THEY'RE NOT ALL CHEMICAL STRUCTURES, BUT,

10   YES, 154 TOTAL EXAMPLES.

11   Q.   OKAY.  AND YOU SAID THAT THEY'RE NOT ALL CHEMICAL

12   STRUCTURES.  ARE 149 OF THEM CHEMICAL STRUCTURES?

13   A.   YES, 149 ARE CHEMICAL STRUCTURES.

14   Q.   OKAY.  SO WE'VE GOT 149 STRUCTURES, AND OF THOSE 149 --

15   LET'S START WITH THE R1 -- AM I CORRECT -- I'M NOT -- I DIDN'T

16   DO THIS MYSELF.  DID YOU DO THIS ANALYSIS, DR. SECRIST?

17   A.   YES, I DID.  YES, I DID.

18   Q.   ALL RIGHT.  AND OF THE 149 STRUCTURES, ACTUAL STRUCTURES

19   IN THE CLAIM, DO 101 OF THEM, AT THE R1 POSITION, ACTUALLY HAVE

20   A HYDROGEN?

21   A.   THAT'S CORRECT.

22        MR. GENDERSON:  OBJECTION, YOUR HONOR.  I HAVEN'T

23   OBJECTED TO LEADING, BUT --

24        THE COURT:  SUSTAINED.

25   BY MS. BROOKS:

1    Q.   DR. SECRIST, HAVE YOU DONE YOUR OWN ANALYSIS?

2    A.   I DID.

3    Q.   HOW MANY OF THE STRUCTURES IN THE SPECIFICATION HAVE

4    HYDROGEN AT THE R1 SPECIFICATION?

5    A.   101 OF 149.

6    Q.   AND HOPEFULLY YOU HAVE THIS MEMORIZED, BUT HOW MANY

7    STRUCTURES -- LET'S NOW LOOK AT THE BASE.

8    A.   YES.

9    Q.   HOW MANY STRUCTURES DO NOT HAVE A SINGLE RING AS REQUIRED

10   BY THE CLAIMS, DO NOT HAVE A SINGLE RING AS THE BASE?

11   A.   OUT OF 149 STRUCTURES, 127 OF THEM DO NOT.  THEY HAVE A

12   DOUBLE RING.

13   Q.   AND GOING TO THE R2 OR R3 POSITION, HOW MANY OF THOSE

14   STRUCTURES DO NOT HAVE, RATHER THAN HAVE, HOW MANY DO NOT HAVE

15   A FLUORO AT THE R2 OR R3 POSITION?

16   A.   I BELIEVE THE NUMBER IS 135.

17   Q.   SO, DR. SINGER -- SEEGER -- SECRIST.

18        (LAUGHTER.)

19            MS. BROOKS:  I TRIED THE WHOLE COURTROOM.

20            THE WITNESS:  YOU DIDN'T SAY STELLA.  YOU ONLY GOT

21   THREE OF THOSE.

22   BY MS. BROOKS:

23   Q.   I DID NOT.

24        DR. SECRIST, LOOKING AT THIS, IF ONE OF SKILL IN THE ART

25   WERE TO FOLLOW THE TEACHINGS IN THE SPECIFICATION, WOULD ONE BE

1    LED TOWARD THE CLAIMED INVENTION OR WOULD ONE BE LED SOMEWHERE

2    ELSE?

3    A.   WELL, ONE WOULD BE LED CLEARLY AWAY FROM THE INVENTION.

4    Q.   WHY IS THAT?

5    A.   WELL, THE OVERWHELMING MAJORITY OF THE COMPOUNDS HAVE A

6    DOUBLE RING BASE AND NOT A SINGLE RING.

7         TWO-THIRDS OF THEM, MORE THAN TWO-THIRDS I GUESS HAVE A

8    HYDROGEN UP INSTEAD OF ONE OF THE GROUPS THAT IS WITHIN THE

9    CLAIMS.

10        AND OVERWHELMINGLY THE COMPOUNDS SIMPLY DO NOT HAVE

11   FLUORINE IN THEM, SO YOU CERTAINLY WOULD BE LED AWAY FROM THE

12   ASSERTED CLAIMS BY THE EXAMPLES.

13        AND, IN ADDITION, OF COURSE, AS WE KNOW, THE EXAMPLE, THE

14   CLAIMS HAVE -- THE EXAMPLES DO NOT REPRESENT ANY COMPOUNDS THAT

15   ARE WITHIN THE CLAIMS.

16   Q.   NONE WHATSOEVER?

17   A.   NONE.  WE'VE HEARD IT BEFORE.  I'VE CONFIRMED THAT NONE OF

18   THE EXAMPLES ARE IN THE CLAIMED COMPOUNDS.

19   Q.   HAVE YOU SEEN AN EXAMPLE OF AN ASSERTED CLAIM THAT ONE --

20   IF ONE FOLLOWED THESE EXAMPLES, THAT ONE WOULD BE LED TOWARD?

21   A.   WELL, WE SAW ONE EARLIER IN THE WEEK FROM DR. SOFIA.

22        THE PHARMASSET PATENT DOES THAT CERTAINLY.

23   Q.   OH, I -- OKAY.  SO YOU'VE SEEN A PATENT --

24   A.   YES.

25   Q.   -- WHERE -- AS AN EXAMPLE OF WHERE ONE WOULD BE LED TO A

1    PARTICULAR CLAIM?

2    A.    YES, UH-HUH.

3    Q.    WHAT ABOUT -- I'M TALKING ABOUT THIS SPECIFICATION THOUGH.

4    A.    OKAY.

5    Q.    AND WHERE WOULD ONE BE LED IF YOU FOLLOW THE EXAMPLES OF

6    THE SPECIFICATION?  WHAT TYPE OF A CLAIM WOULD YOU END UP WITH?

7    A.    WELL, YOU WOULD END UP WITH A DOUBLE RING, A DOUBLE RING

8    BASE THAT DID NOT HAVE A FLUORINE IN IT AND WOULD HAVE OTHER

9    POSSIBLE GROUPS AT 2' OR 3'.

10        SO IT WOULD -- I GUESS IT WOULD LEAD YOU MAINLY TO THE

11   PREVIOUS PATENT OR THE '395 PATENT.  AND, OF COURSE, IN THAT

12   PATENT THESE EXAMPLES, MANY OF THEM, ARE IN THOSE CLAIMS.

13   Q.    LET'S TURN TO CLAIM 2 OF THE '499 PATENT, PDX-708.

14        NOW, WHAT IS YOUR UNDERSTANDING OF WHAT CLAIM 2

15   REPRESENTS?

16   A.    WELL, WE HEARD IT EARLIER TODAY, BUT BASICALLY IT

17   ENCOMPASSES EVERYTHING THAT IS IN CLAIM 1.  ALL OF THE

18   COMPOUNDS, ALL OF THE PRODRUGS FROM CLAIM 1 CARRY OVER TO

19   CLAIM 2, AND AS WAS SAID EARLIER, IT IS A CLAIM THAT

20   ENCOMPASSES A COMBINATION TREATMENT OF A COMPOUND FROM CLAIM 1

21   WITH ANOTHER DRUG THAT MIGHT BE OF USE FOR TREATING HCV.

22        AS WE HEARD FROM DR. MCHUTCHISON AND OTHERS, IT'S -- IN

23   THE ANTI-VIRAL AREA, IT'S OFTEN CRITICAL TO HAVE A COMBINATION

24   OF DRUGS THAT YOU GIVE AS IS THE CASE WITH HIV.

25        AND THIS CLAIM RELATES TO MAKING SURE THAT THAT IS

DIRECT SECRIST BY MS. BROOKS

1    COVERED.

2    Q.   NOW, LET'S GO TO THE '712, WHICH IS IN YOUR BINDER AT

3    EXHIBIT 7.  THE ASSERTED CLAIMS THAT MERCK IS ASSERTING AGAINST

4    GILEAD ARE CLAIMS 1 THROUGH 3, 5, 7, AND 9 THROUGH 11.

5         AND JUST TO ORIENT THE JURY, THESE WERE CLAIMS THAT WERE

6    FILED BY A MR. BERGMAN IN 2011 AND 2012?  IS THAT YOUR

7    UNDERSTANDING?

8    A.   THAT IS MY UNDERSTANDING.  IT'S, IT'S EXHIBIT 2.  I THINK

9    YOU SAID 7.

10   Q.   I'M SORRY.  EXHIBIT 2.  IT SHOULD BE HOPEFULLY IN YOUR

11   BINDER, THE EXHIBIT '712 PATENT?

12   A.   UH-HUH.

13   Q.   AND LET'S PULL UP EXHIBIT 709.

14        NOW, THESE CLAIMS ARE SLIGHTLY DIFFERENT THAN THE '499

15   CLAIMS; IS THAT RIGHT?

16   A.   THEY ARE.

17   Q.   AND SPECIFICALLY ARE THEY METHOD OF TREATMENT CLAIMS?

18   A.   NO.  THESE ARE COMPOUND CLAIMS, NOT METHOD OF TREATMENT

19   CLAIMS.

20   Q.   BUT IN LOOKING AT THE PATENT, WE'VE SEEN THE ABSTRACT THAT

21   TALKS ABOUT HCV.

22        SO IS IT -- WHAT IS YOUR UNDERSTANDING OF, EVEN THOUGH

23   THESE ARE METHOD OF TREATMENT CLAIMS, WHAT THE COMPOUNDS ARE

24   SUPPOSED TO BE USEFUL FOR?

25   A.   YES.  IN THIS SITUATION WITH A COMPOUND CLAIM, YOU

1       INDICATE THE COMPOUNDS THAT YOU'RE HOPING TO CLAIM AND A

2       SPECIFIC USE FOR THOSE COMPOUNDS.

3           SO YOU NEED TO HAVE SOME DATA DEMONSTRATING THE USE OF

4       THOSE COMPOUNDS.

5       Q.   AND WHAT IS THE USE THAT IS DEMONSTRATED, OR AT LEAST

6       CLAIMED TO BE DEMONSTRATED IN THE PATENT?

7       A.   IN THIS CASE IT WOULD BE TO TREAT THE HCV INFECTION.

8       Q.   LET'S GO TO -- OKAY.  WE HAVE PDX-709 UP THERE.

9           WE'RE LOOKING AT CLAIMS 1, 2, AND 3, AND WE SORT OF

10      GROUPED THEM TOGETHER.  ARE THERE SIMILARITIES IN THESE CLAIMS?

11      A.   YES.  THESE THREE CLAIMS, FIRST OF ALL, ARE VAST NUMBERS

12      OF COMPOUNDS AND I'LL GET TO THAT.

13          THE ONLY DIFFERENCE BETWEEN THEM IS THE GROUP AT THE 5'

14      POSITION.  WE'VE SEEN THIS BEFORE.  CLAIM 1 HAS A

15      MONOPHOSPHATE; CLAIM 2 HAS A DIPHOSPHATE; CLAIM 3 HAS A

16      TRIPHOSPHATE.

17          EVERYTHING ELSE IS IDENTICAL IN THOSE THREE CLAIMS.

18      Q.   AND IS THAT, JUST SO -- I'M GOING TO SEE IF I CAN TAP INTO

19      THIS.  SO CLAIM 1, DID I JUST TAP WHERE THE MONOPHOSPHATE IS?

20      A.   CAN I DO THIS?

21      Q.   OH, THAT WOULD BE EVEN BETTER.  THANK YOU.

22      A.   ALL RIGHT.  SO THERE'S THE MONOPHOSPHATE; THERE'S THE

23      DIPHOSPHATE; AND THERE'S THE TRIPHOSPHATE (INDICATING).

24          AND I'M DOING THAT WITH MY LEFT FINGER AND I'M RIGHT

25      FINGERED, SO --

1    Q.   THANK YOU, DR. SECRIST.

2    A.   YES.

3    Q.   AND FROM NOW ON I'M GOING TO DEFINITELY LET YOU HAVE

4    CONTROL OF THE MONITOR.  AND YOU KNOW YOU CAN CLEAR IT BY JUST

5    CLICKING ON THE BOTTOM LEFT-HAND CORNER WHENEVER YOU WANT TO

6    CLEAR IT.

7    A.   DO YOU WANT ME TO DO THAT?

8    Q.   WHENEVER YOU'RE READY.

9    A.   BOTTOM LEFT-HAND CORNER.

10   Q.   SO BESIDE THOSE THREE DIFFERENCES --

11   A.   YES.

12   Q.   -- MONO, DI, AND TRIPHOSPHATE, OTHER THAN THAT, ARE THE

13   STRUCTURES THE SAME?

14   A.   YES, THEY ARE.

15   Q.   AND CAN YOU DESCRIBE, LOOKING AT THIS, WHAT TYPE OF

16   COMPOUNDS THEY COVER?  HOW BROAD OR NARROW ARE THESE CLAIMS?

17   A.   THESE CLAIMS ARE EXTREMELY BROAD.  THEY'RE MUCH BROADER

18   THAN THE CLAIMS IN THE '499 PATENT.

19        AND DO YOU WANT ME TO TALK A LITTLE BIT ABOUT THAT OR --

20   Q.   YES, PLEASE.

21   A.   OKAY.  JUST TO POINT OUT SOME DIFFERENCES, IN THE '499

22   PATENT, THE BASE WAS STILL A SINGLE RING BASE, JUST AS IS THE

23   CASE HERE.  BUT IT'S A PYRIMIDINE BASE.  BUT YOU CAN SEE HERE

24   IN THE PYRIMIDINE BASE AN E AND AN L THERE.

25        SO THAT THERE ARE VARIATIONS POSSIBLE ON THE LEFT-HAND

1    SIDE OF THIS PYRIMIDINE BASES THAT IS PRESENTED THAT WEREN'T

2    INCLUDED IN THE '499 PATENT.  SO THAT STILL HAS THE W THAT WE

3    SAW.

4         AND, OF COURSE, IT IS R6 THERE.  AND SO E PRESUMABLY WOULD

5    BE AN R5 AMONG ITS OTHER POSSIBILITIES.

6         OKAY.  SO THAT'S ONE THING.

7         NOW, IF YOU GO UP TO THE FULL NUCLEOSIDE ON TOP, WE SEE IF

8    YOU REMEMBER THE '499 THERE, R1, R2, R3 ATTACHED TO THE SUGAR

9    RING.  THIS HAS THREE MORE THINGS ATTACHED TO THE SUGAR RING.

10   IT HAS AN R4 UP AT WHAT IS THE C 3' POSITION, AND IT HAS AN R12

11   1 CARBON OVER IT, THE 4' CARBON, AND IT HAS AN R13 AT CARBON

12   1', WHICH IS THE SAME CARBON THAT HAS THE SINGLE RING BASE

13   ATTACHED TO IT.

14        SO IT HAS THREE MORE SUBSTITUENTS, EACH OF WHICH CAN BE A

15   VARIETY OF THINGS.

16        SO IT'S -- IT'S DRAMATICALLY MORE BROAD THAN CLAIM 1 OF

17   THE '499, ALL THREE OF THESE ARE.

18   Q.   HOW MANY COMPOUNDS, IF YOU MADE ALL OF THE VARIOUS

19   SUBSTITUTIONS THAT YOU'RE ALLOWED TO IN THE CLAIM, HOW MANY

20   COMPOUNDS ARE WITHIN THE SCOPE OF CLAIM 1 THROUGH 3 OF THE '712

21   COMPOUND?

22   A.   EACH OF THEM HAS BILLIONS OF COMPOUNDS AND -- WELL, I'LL

23   JUST LEAVE IT AT THAT.  EACH OF THEM HAS BILLIONS OF COMPOUNDS.

24   I WORKED ON THE CALCULATIONS ON MY CALCULATOR UNTIL MY

25   CALCULATOR RAN OUT OF DIGITS.

1    Q.   NOW, DESPITE THE FACT THAT THESE CLAIMS CONTAIN BILLIONS

2    OF COMPOUNDS, IF THE COMPOUND HAD A DOUBLE RING, AS MERCK'S

3    MK-608 DID, IS IT COVERED BY THIS CLAIM?

4    A.   IT IS NOT COVERED BY ANY OF THESE CLAIMS.

5    Q.   LET'S TURN TO CLAIMS 5 AND 7, PDX-710.

6         SO THIS CLAIM NOW SAID CLAIM 5, THE COMPOUND OF CLAIM 1,

7    WHEREIN B IS, AND IT GOES ON.

8         AND CLAIM 7 SAYS, THE COMPOUND OF CLAIM 2, WHEREIN B IS.

9         SO DO YOU HAVE AN UNDERSTANDING OF WHAT THAT MEANS WHEN IT

10   REFERS TO A PREVIOUS CLAIM?

11   A.   YES.  IT'S -- IT REFERS YOU BACK TO THE STRUCTURES FROM

12   CLAIM 1 AND CLAIM 2 RESPECTIVELY, BUT IT PINS DOWN THE B TO BE

13   JUST ONE SPECIFIC BASE AND NOT THE GROUP OF BASES THAT WERE

14   INCLUDED IN CLAIMS 1 TO 3.

15   Q.   AND WHAT IS CLAIM 5?  WHAT IS THE B?

16   A.   B IN CLAIM 5 IS URACIL.  URACIL IS THE BASE THAT IS PART

17   OF URACIL AND SO IT'S CLAIM 5 IS THE BASE.

18   Q.   AND WHAT ABOUT CLAIM 7?

19   A.   CLAIM 7 IS THE IDENTICAL URACIL BASE.

20   Q.   AND NOW LET'S TURN TO PDX-711.  THAT'S GOING TO BE CLAIMS

21   9 THROUGH 11 OF THE '712 PATENT.

22        AND CAN YOU EXPLAIN TO THE JURY NOW THE DIFFERENCE IN

23   THESE CLAIMS FROM WHAT WE JUST SAW FROM CLAIMS 1 THROUGH 3?

24   A.   YES.  THESE THREE CLAIMS ARE DRAMATICALLY NARROW IN FOCUS,

25   DRAMATICALLY NARROW IN FOCUS.

1          SO YOU CAN SEE NOW WE'RE BACK TO HAVING R1, R2, AND R3 AND

2     B AND Y.

3          B IS FIXED AS A URACIL RING, AGAIN, IN ALL THREE OF THESE

4     CLAIMS.

5          AND THEN Y IN ONE CLAIM IS -- IN CLAIM 9 IT'S EITHER A

6     DIPHOSPHATE OR TRIPHOSPHATE, AND IN CLAIM 10 IT SPECIFICALLY

7     CLAIMS THE TRIPHOSPHATE, AND IN CLAIM 11 IT SPECIFICALLY CLAIMS

8     THE DIPHOSPHATE.

9          NOW, RELATIVE TO R1, R2, AND R3, WHICH WOULD BE IMPORTANT

10    OTHER PLACES FOR THE NARROWING OF THE CLAIMS, IT REDUCES R1 TO

11    JUST BEING C1-4 ALKYL.

12         SO AS YOU REMEMBER, I TOLD YOU THAT MEANS THAT THERE ARE

13    EIGHT POSSIBILITIES.  R2 IS NOW SPECIFICALLY AND ONLY FLUORO.

14         IF YOU REFER BACK TO CLAIMS 1 THROUGH 3, R2 CAN BE

15    DRAMATICALLY LARGE MATERIALS AND THIS NARROWS IT DOWN TO JUST

16    FLUORO, AND R3 IS EITHER AN OH GROUP OR A HYDROXYL GROUP OR A

17    C1-4 ALKOXY.  SO THERE ARE EIGHT OF THOSE.

18         SO R3 CAN BE NINE DIFFERENT POSSIBILITIES DOWN.  AND YOU

19    NOTICE IT'S A WAVY LINE AGAIN, AND SO ALSO THERE ARE NINE

20    POSSIBILITIES UP AT C 3' FOR R3.

21         BUT THERE ARE NINE POSSIBILITIES WHEREVER R3 GOES.

22    THERE'S ONE POSSIBILITY FOR R2 AND THERE ARE EIGHT

23    POSSIBILITIES FOR R1 NOW.

24         SO IT'S REALLY DRAMATIC AND NARROW IN ALL THREE OF THESE

25    CLAIMS.

DIRECT SECRIST BY MS. BROOKS

1    Q.   WAS THERE ANYTHING THAT YOU FOUND IN THE SPECIFICATION

2    THAT WOULD HAVE LED YOU TO THIS CLAIMED INVENTION WHERE THERE'S

3    A 2 ALKYL UP AND A 2 FLUORO DOWN, AND AT 3' POSITION AN OH OR

4    AN ALKOXY WITH A NATURAL URACIL BASE, AND AT THE 5' POSITION

5    WITH THE DI OR TRIPHOSPHATE?

6    A.   NO, THERE ISN'T, ABSOLUTELY NOTHING.  AND I'VE LOOKED IN

7    GREAT DETAIL THROUGH THE SPECIFICATION MULTIPLE TIMES.

8    Q.   NOW LET'S NOW TURN TO YOUR WRITTEN DESCRIPTION OPINION,

9    DR. SECRIST.

10   A.   YES.

11   Q.   AT PDX-712.  WHAT WE HAVE UP HERE IS A DESCRIPTION OF WHAT

12   IT NEEDS, THE PURPOSE OF WRITTEN DESCRIPTION.

13        WHAT IS YOUR UNDERSTANDING OF WHAT THE WRITTEN DESCRIPTION

14   REQUIREMENT ENTAILS?

15   A.   YES.  AT THE TIME THE PATENT IS FILED, THAT WOULD BE IN

16   EARLY 2002, THE INVENTOR MUST BE IN POSSESSION OF THE CLAIMED

17   SUBJECT MATTER.  THEY MUST BE IN POSSESSION OF THE CLAIMED

18   SUBJECT MATTER AT THAT TIME IN EARLY 2002.

19   Q.   SO EVEN THOUGH THE CLAIMS WERE NOT FILED UNTIL 2005 AND

20   2012, THE INVENTORS NEED TO BE IN POSSESSION OF THE CLAIMED

21   INVENTION IN '02?

22   A.   YES, THAT'S MY UNDERSTANDING.

23   Q.   SO DID YOU DO YOUR ANALYSIS THEN FOCUSSING ON 2002?

24   A.   I DID.

25   Q.   AND SO LET'S TURN NOW TO THE '499 PATENT.

DIRECT SECRIST BY MS. BROOKS                                    751

1    A.   YES.

2    Q.   LOOKING AT THE CLAIMS OF THE '499 PATENT, AND LOOKING AT

3    THE SPECIFICATION, IN YOUR EXPERT OPINION, WOULD ONE OF SKILL

4    IN THE ART HAVE RECOGNIZED THAT THE PATENT APPLICATION

5    DESCRIBED THE INVENTION AS CLAIMED IN THE '499 PATENT?

6    A.   NO.

7    Q.   WHAT PARTS OF THE PATENT DID YOU LOOK AT TO TRY TO SEE IF

8    YOU WOULD BE GUIDED TO THE CLAIMS OF THE '499?

9    A.   YES.  THE SPECIFICATION OF THIS PATENT, IT HAS, I DON'T

10   KNOW HOW MANY, BUT LET'S SAY A DOZEN DIFFERENT STRUCTURES LIKE

11   THE ONE WE HAVE SEEN IN THE CLAIMS.

12        AND YOU CAN GO THROUGH ALL OF THOSE AND SEE WHAT THEY'RE

13   TALKING ABOUT, BUT IF YOU LOOK AT THE CLAIMS, THEN MAYBE

14   THERE'S SOMETHING TO GUIDE YOU THERE AND THERE'S A ROMAN

15   NUMERAL III BESIDE THE STRUCTURE IN CLAIM 1.

16        THEN ONE HAS TO PRESUME THEN THAT ONE WOULD NEED TO GO

17   BACK TO FORMULA 3 IN THE SPECIFICATIONS TO SEE IF THERE WAS ANY

18   GUIDANCE TO GET TO FORMULA 3 IN THE CLAIMS.

19   Q.   SO LET'S LOOK AT PDX-713.  IS THIS FORMULA 3, SINCE THE

20   CLAIM TALKS ABOUT FORMULA 3, CAN YOU FIND A FORMULA 3 IN THE

21   SPECIFICATION?

22   A.   YES, YES, THERE IS ONE, AND IT'S SHOWN HERE.

23   Q.   AND WHAT KIND OF GUIDANCE, IF ANY, DOES THIS GIVE YOU?

24   A.   WELL, THE FORMULA 3 IN THE SPECIFICATION IS MUCH BIGGER

25   THAN THE FORMULA 3 IN THE CLAIMS.

1          SO WHAT I WOULD EXPECT AS A PERSON OF ORDINARY SKILL IN

2     THE ART WAS THAT THIS PERSON WOULD GUIDE ME FROM THIS BIGGER

3     GROUP OF COMPOUNDS THAT IS IN FORMULA 3 IN THE SPECIFICATIONS

4     TO STILL A VERY BIG, BUT REDUCED GROUP OF COMPOUNDS WITHIN

5     CLAIM 1.

6          NOW, IF YOU LOOK FOR THAT GUIDANCE, YOU DON'T FIND IT.  SO

7     YOU'RE LOOKING FOR SOME KIND OF A DIRECTION.  YOU'RE OUT IN THE

8     FOREST AND YOU'RE LOOKING FOR THE PATH TO GO FROM WHERE YOU ARE

9     TO WHERE YOU NEED TO BE AND THERE'S NO TRAIL THAT GETS YOU FROM

10    ONE SPOT TO ANOTHER HERE AT ALL.  THERE ARE NO WORDS THAT HELP

11    YOU IN ANY WAY TO GO FROM FORMULA 3 IN THE SPECIFICATIONS TO

12    FORMULA 3.

13    Q.   NOW, SOME OF THE OTHER CLAIMS REFER TO FORMULAS 7, 8, AND

14    9.  SO LET'S GO TO PDX-714.

15         AND, FIRST OF ALL, DID YOU FIND THESE FORMULAS IN THE

16    SPECIFICATION?

17    A.   WELL, YOU'RE NOW TALKING ABOUT THE '712 PATENT.

18    Q.   YES, NOW WE'RE GOING TO THE '712.

19    A.   YES, YES.  WELL, I LOOKED FOR THESE.  AND I THINK WE HAVE

20    SOMETHING TO TALK ABOUT THIS.  DON'T WE HAVE DEMONSTRATIVES?

21    Q.   AND SO, IF WE LOOK, THESE REFER US BACK TO FORMULA 1?

22    A.   YEAH, 7, 8 AND 9 HERE SEND US BACK TO FORMULA 1.

23    Q.   ALL RIGHT.  LET'S GO TO FORMULA 1 THEN.

24         SO WE WERE TALKING ABOUT FORMULA 3 IN RELATION TO THE

25    '499?

1    A.    YES.

2    Q.    AND FORMULA 1 NOW IN RELATION TO THE '712.  DO WE FIND

3    SOME HELP IN FORMULA 1 IN GETTING TO THE ASSERTED CLAIMS?

4    A.    THE ANSWER IS THE SAME.  NO, THERE'S NOT ANY HELP.

5    THERE'S NO GUIDANCE AND NO DIRECTION AND NO PATH TO WALK TO TO

6    GET TO THE ASSERTED CLAIMS FROM THE FORMULA 1 COMPOUNDS IN THE

7    SPECIFICATION.

8    Q.    NOW, MR. GENDERSON IN HIS OPENING STATEMENT REFERRED TO

9    THE SPECIFICATION AS SORT OF LIKE A COOKBOOK, THAT WHILE --

10    THAT YOU COULD FIND I GUESS THE ULTIMATE RECIPE IN THE

11    COOKBOOK.

12          DID YOU SEE THAT?

13                MR. GENDERSON:  OBJECTION, YOUR HONOR.  I WAS

14    TALKING ABOUT ENABLEMENT, NOT WRITTEN DESCRIPTION.

15                MS. BROOKS:  OH, I APOLOGIZE.  I'M SORRY,

16    MR. GENDERSON.

17    Q.    HOLD THAT THOUGHT AND WE'LL GET TO THAT WHEN WE TALK ABOUT

18    ENABLEMENT, DR. SECRIST.

19    A.    OF COURSE.

20    Q.    AND SO LET'S GO BACK AND TALK ABOUT WRITTEN DESCRIPTION.

21    SO YOU FOUND NOTHING IN THE FORMULAS.

22          WHAT ABOUT THE EXAMPLES?  YOU MENTIONED TO THE JURY THAT

23    THERE ARE ACTUAL COMPOUNDS IN THE PATENTS AND, AS I SAID, I

24    THINK THEY START AT COLUMN 30 WITH EXAMPLE 1 AND THEY RUN ALL

25    OF THE WAY THROUGH TO COLUMN 131.

DIRECT SECRIST BY MS. BROOKS

```
1          SO DID YOU LOOK AT THE EXAMPLES TO SEE IF THERE WAS ANY

2     GUIDANCE IN THE EXAMPLES THAT WOULD LEAD YOU TO THE CLAIMED

3     INVENTION IN EITHER THE '499 OR THE '712?

4     A.   YES.  ACTUALLY, I LOOKED AT THE EXAMPLES FIRST.  THEY'RE A

5     MORE FOCUSSED THING TO LOOK AT.  ONE WOULD EXPECT THE EXAMPLES

6     TO HAVE SOME EXAMPLES FROM THE CLAIMS THAT ONE COULD LEARN

7     SOMETHING FROM.

8          SO I LOOKED AT THE EXAMPLES FIRST BEFORE I WENT TO THE

9     MASS OF STRUCTURES WITHIN THE OTHER FORMULAS.

10         AND, OF COURSE, THERE IS NOTHING IN THOSE STRUCTURES THAT

11    GUIDES ONE TO ANY OF THE ASSERTED CLAIMS IN EITHER PATENT.

12    Q.   IN LOOKING AT THE EXAMPLES, CAN YOU TELL WHETHER OR NOT

13    THE INVENTORS WERE IN POSSESSION OF THE CLAIMED INVENTIONS IN

14    2002?

15    A.   NO, CERTAINLY YOU CAN'T.

16    Q.   CAN YOU TELL WHETHER -- THIS IS A DOUBLE NEGATIVE --

17    WHETHER THEY WERE NOT IN POSSESSION?

18    A.   WELL, LOOKING AT THE PATENT, I WOULD SAY THAT THEY WERE

19    NOT IN POSSESSION OF THE COMPOUNDS.

20    Q.   WHY DO YOU SAY THAT?

21    A.   THERE'S NOTHING, ABSOLUTELY NOTHING THAT GUIDES YOU FROM

22    THE SPECIFICATION TO THE ASSERTED CLAIMS, NOTHING, IN EITHER

23    CASE.

24    Q.   AND WERE YOU HERE WHEN A STIPULATION WAS READ TO THE JURY

25    HERE YESTERDAY?
```

1    A.   I WAS.

2    Q.   AND WHAT IS YOUR UNDERSTANDING OF WHAT THAT STIPULATION

3    MEANS?

4    A.   WELL, I BELIEVED -- DO WE HAVE IT WRITTEN DOWN?  OR NO?

5         THE COURT:  WE DO.  I CAN SHOW IT TO HIM.

6         MS. BROOKS:  THANK YOU, YOUR HONOR.

7    Q.   SORRY.  I SHOULD HAVE HAD THAT FOR YOU, DR. SECRIST.

8    A.   THANK YOU.  I WANTED TO GET IT RIGHT.

9         THIS IS STIPULATION FACT NUMBER 1.  NONE OF THE COMPOUNDS

10   DESCRIBED BY STRUCTURE IN THE 154 EXAMPLES IN THE SHARED

11   SPECIFICATION OF THE '499 AND THE '712 PATENTS-IN-SUIT ARE

12   RECITED WITHIN THE ASSERTED CLAIM.

13        SO THAT'S WHAT I WAS JUST SAYING.  THIS STIPULATION MEANS

14   THAT BOTH SIDES AGREE TO THAT FACT.

15   Q.   AND DID YOU DO YOUR OWN INDIVIDUAL ANALYSIS TO CONFIRM

16   THAT WE'RE RIGHT WHEN WE STIPULATED, BOTH MERCK AND GILEAD

17   AGREE THAT THAT'S THE CASE, DID YOU IN YOUR EXPERT OPINION DO A

18   DOUBLE-CHECK?

19   A.   I DID.

20   Q.   AND?

21   A.   AND IT'S CORRECT.

22   Q.   THANK YOU.

23        YOUR HONOR, I'M ABOUT TO MOVE ON TO ANOTHER SUBJECT

24   MATTER.

25        THE COURT:  THIS IS A GOOD TIME.

1          ALL RIGHT.  LADIES AND GENTLEMEN, WE ARE ENDING EARLY

2     TODAY, SO WE'VE COME TO THE END OF OUR SESSION THIS MORNING.

3          TOMORROW I'M GOING TO HAVE YOU RETURN AT 9:00 O'CLOCK AND

4     WE WILL AGAIN BE IN SESSION UNTIL NOON.

5          TOMORROW WHEN YOU LEAVE, I WILL HAVE YOUR SCHEDULE FOR THE

6     FOLLOWING WEEK AND DR. SECRIST WILL JOIN US TOMORROW AT 9:00

7     O'CLOCK.

8          SO THANK YOU ALL.  LEAVE THOSE BADGES AND ALL OF THE

9     MATERIALS, YOUR NOTES, THE PATENTS, LEAVE ALL OF THAT ON YOUR

10    CHAIRS THERE.

11         LET ME REMIND YOU YOU'RE NOT TO FORM OR EXPRESS ANY

12    OPINION IN THE CASE OR DO ANY RESEARCH OR INVESTIGATION OR TALK

13    TO ANYONE IN REGARD TO ANYTHING IN THE CASE.

14         HAVE A GOOD AFTERNOON, AND I'LL SEE YOU TOMORROW MORNING.

15         (JURY OUT AT 12:03 P.M.)

16              THE COURT:  DR. SECRIST, YOU'RE WELCOME TO GO BACK

17    TO YOUR SEAT.

18              THE WITNESS:  THANK YOU.

19              THE COURT:  ALL RIGHT.  WE WILL BREAK FOR THE DAY.

20         LET ME ASK, AS ALWAYS, ARE THERE ANY HOUSEKEEPING ISSUES

21    FROM EITHER OF THE PARTIES?

22              MR. GENDERSON:  NO, YOUR HONOR.

23              THE COURT:  THANK YOU.

24              MS. BROOKS:  NO, YOUR HONOR.

25              THE COURT:  GOOD.  LET ME MENTION A FEW THINGS.

```
 1              MS. BROOKS:  I'M SORRY.  APPARENTLY SOMEONE RAISED

 2    THEIR HAND AND I DIDN'T SEE THEM.

 3         YOUR HONOR, MAY MR. WARDEN DRESS THE COURT?

 4              THE COURT:  YES, OF COURSE.

 5              MR. WARDEN:  YOUR HONOR, WE'RE STILL TRYING TO WORK

 6    THIS OUT WITH MERCK, BUT WE MAY HAVE AN OBJECTION TO EXHIBITS

 7    THAT ARE BEING USED IN THE EXAMINATION OF DR. OLSEN TOMORROW,

 8    AND WE'LL BE PREPARED TO PUT THAT IN WRITING BY 5:00 TODAY IF

 9    WE CAN'T WORK THAT OUT.

10              THE COURT:  I APPRECIATE THAT.  I'LL BE HERE BY 8:30

11    AND I'LL CHECK MY E-MAIL.

12         FROM MY PERSPECTIVE -- FIRST OF ALL, MS. BROOKS, DO YOU

13    HAVE AN ESTIMATE WHEN YOU WILL CONCLUDE YOUR CASE IN CHIEF?

14              MS. BROOKS:  WE DO, YOUR HONOR, AND WE ALREADY TOLD

15    MERCK THAT AFTER DR. SECRIST, WE REST.

16              THE COURT:  ALL RIGHT.

17         SO, MR. GENDERSON, YOU WILL HAVE WITNESSES HERE TOMORROW?

18              MR. GENDERSON:  WE WILL, YOUR HONOR.

19              THE COURT:  EXCELLENT.  AND I KNOW IT'S HARD TO

20    PROJECT, BUT DO YOU HAVE -- YOU HAVE THE HOURS YOU HAVE, SO I'M

21    NOT HOLDING YOU TO THIS.

22         DO YOU HAVE A PROJECTION OF HOW LONG YOUR CASE IN CHIEF

23    WILL TAKE?

24              MR. GENDERSON:  YOUR HONOR, WE WERE HOPING THAT WE

25    WOULD BE ABLE TO, SINCE WE NARROWED OUR CASE, WE WOULD BE ABLE
```

DIRECT SEGRIST BY MS. BROOKS

1    TO FINISH BY TUESDAY -- WEDNESDAY IN TIME TO DO CLOSINGS

2    WEDNESDAY AFTERNOON.

3         GIVEN THAT THIS CASE IS GOING ON -- I THOUGHT THIS WAS --

4    THAT WE WERE GOING TO BE DONE YESTERDAY OR TODAY WITH THEIR

5    CASE.  I DON'T, FRANKLY, THINK THAT'S GOING TO BE POSSIBLE.

6         WE'LL TRY, BUT WE HAVEN'T PUT ON OUR FIRST WITNESS YET AND

7    WE HAVE A NUMBER OF EXPERTS TO RESPOND TO EACH OF THEIR

8    EXPERTS.

9         AND, FRANKLY, I THINK IT'S PROBABLY GOING TO BE IMPOSSIBLE

10   TO FINISH UNTIL THE END -- BEFORE THE END OF THE DAY WEDNESDAY.

11            THE COURT:  THE END OF THE DAY WEDNESDAY.

12            MR. GENDERSON:  OR EVEN THEN.  I CAN'T PROMISE THAT.

13            THE COURT:  AS I SAID, YOU HAVE THE HOURS YOU HAVE.

14        THEN LET ME JUST SAY, SO THAT YOU CAN HAVE YOUR WITNESSES

15   AVAILABLE, THERE ARE TWO THINGS THAT WE NEED TO DO.

16        FIRST OF ALL, WE WILL NOT BE IN SESSION ON THE 17TH, NEXT

17   THURSDAY.  I'VE SAID THAT BEFORE.  YOU SHOULD EXPECT TO BE IN

18   SESSION ALL DAY ON FRIDAY.

19        I'VE CLEARED -- I'M GOING TO CLEAR AND I'M GOING TO

20   DISAPPOINT THE PARTIES IN ANOTHER CASE THAT WERE HOPING TO DO

21   THEIR CLAIMS CONSTRUCTION HEARING, BUT THEY'LL JUST HAVE TO

22   STEP ASIDE BECAUSE I'M CONCERNED ABOUT FINISHING.

23        YOU SHOULD ALSO EXPECT THAT WE WILL MOVE DIRECTLY INTO

24   CLOSING ARGUMENT AND SO HAVE THINGS READY.

25        YOU KNOW, I WOULD LOVE FOR YOU TO REST ON WEDNESDAY SO YOU

1     HAVE THURSDAY TO COLLECT, BUT I -- YOU KNOW, REALLY THE CLOCK

2     IS RUNNING AND YOU ALL ARE MANAGING YOUR TIME.

3          AND THE OTHER THING IS THAT I NEED TO HAVE SOME TIME FOR

4     US TO FINISH THE JURY INSTRUCTION DISCUSSION AND LOOK AT THE

5     VERDICT FORM, WHICH WE HAVEN'T DONE.

6          AND ALTHOUGH I CAN DO THAT ON THURSDAY, THAT -- I THINK

7     THAT WOULD NOT BE WISE BECAUSE YOU MIGHT FINISH SOONER.  SO WE

8     WILL NEED TO DO THAT ON MONDAY OR TUESDAY, AND I GUESS WE CAN'T

9     DO IT UNTIL 5:00 O'CLOCK, WHICH DOESN'T MAKE ME TERRIFICALLY

10    HAPPY.  I'D RATHER TUESDAY.  I HAVE SOMETHING AT 5:00 O'CLOCK

11    ON MONDAY THAT I WOULD LIKE NOT TO HAVE TO MISS.

12         SO DOES THAT WORK FOR YOU?

13              MR. GENDERSON:  YES, YOUR HONOR.

14              MS. BROOKS:  YES, YOUR HONOR.

15              THE COURT:  AND SO, OF COURSE, I HAVE NOT SEEN THE

16    REVISED SECOND PORTION OF THE JURY INSTRUCTIONS.  I DON'T KNOW

17    THAT THERE REMAIN OBJECTIONS, AND OF COURSE I WANT TO GIVE YOU

18    TIME TO MAKE A RECORD AS WE TALKED ABOUT.

19         BUT IF I COULD KNOW BY MONDAY MORNING FIRST THING WHETHER

20    THERE REMAIN OBJECTIONS ON THE REMAINDER OF THE JURY

21    INSTRUCTIONS, THAT WOULD BE HELPFUL.

22         AND AS I HAD SAID TO YOU, I WAS INCLINED TO FOLLOW A

23    VERDICT FORM MORE SIMILAR TO WHAT MERCK HAD PROPOSED, AND SO

24    I'D LIKE YOU TO SHIFT TO THAT AND BE PREPARED TO RESPOND AND

25    PERHAPS TO WORK OUT AN AGREED VERDICT FORM.

```
 1          BUT I AM LOOKING FOR THE JURY TO MAKE DETERMINATIONS CLAIM

 2    BY CLAIM, ISSUE BY ISSUE, AND I'M ACTUALLY -- AND SO WE'RE NOT

 3    EVEN DEALING WITH DAMAGES, SO YOU WILL DON'T NEED TO GET TO

 4    THAT PART, AND WE DON'T NEED TO LOOK AT JURY INSTRUCTIONS ON

 5    DAMAGES EITHER.  SO THAT REDUCES THINGS A BIT, I THINK.

 6          SO MONDAY I WILL ASK YOU ABOUT ALL OF THIS PROGRESS AGAIN,

 7    BUT I -- I WILL BE ABLE TO PUBLISH TO THE JURY -- I MAY PUBLISH

 8    TO THEM THAT THEY WILL BE HERE THURSDAY IN CASE THERE'S SOME

 9    SWITCH AND THEY'RE ACTUALLY DELIBERATING SO WE DON'T LOSE THE

10    DAY, AND I'LL TELL THEM IT'S A FULL WEEK.

11          BUT YOU KNOW THAT I'LL LET THEM DELIBERATE, BUT YOU WILL

12    NOT BE PUTTING WITNESSES ON ON THURSDAY NEXT WEEK.

13          ALL RIGHT.  THAT'S EVERYTHING I HAVE.  THANK YOU.

14          YES, MR. GENDERSON.

15               MR. GENDERSON:  YOUR HONOR, ONE OTHER QUESTION.

16               THE COURT:  YES.

17               MR. GENDERSON:  TOMORROW AFTER THE PLAINTIFF'S REST,

18    WE'LL HAVE A MOTION.  I ASSUME WE CAN DO THAT ORALLY, BUT

19    OBVIOUSLY WE DON'T WANT TO DO IT IN FRONT OF THE JURY.

20               THE COURT:  WE WILL DEFINITELY DO IT ORALLY, AND

21    USUALLY WHAT WE DO IS THAT YOU SIMPLY MAKE A MOTION AS A PLACE

22    HOLDER, AND THEN AT THE END OF THE DAY YOU ACTUALLY ARGUE IT SO

23    THAT WE CAN GO ON.

24          AND, YES, ORALLY IS ACCEPTABLE.  AND IT MAY TAKE YOU A

25    NUMBER OF MINUTES TO ACTUALLY PUT EVERYTHING ON THE RECORD.
```

1        SO I DON'T LIKE TO DO IT WITH THE JURY WAITING, BUT I

2    THINK THE TIMELY PLACEMENT OF THE MOTION, ASSERTION OF THE

3    MOTION IS ALL THAT YOU NEED, AND THEN WE CAN DO IT AT NOON WHEN

4    THE JURY GOES HOME.

5            MR. GENDERSON:  THAT'S FINE.

6        YOUR HONOR, MAYBE SO WE WON'T DISTURB THE JURY, WE CAN

7    JUST HAND YOU AND I WILL JUST SAY WE MOVE UNDER RULE SUCH AND

8    SUCH AND UNDERSTAND THAT WE WILL ARGUE IT IN THE AFTERNOON.

9            THE COURT:  THAT'S ALL YOU NEED TO DO.

10           MR. GENDERSON:  THAT MIGHT BE EASIER AND THAT WAY WE

11   WON'T HAVE TO DISTURB THE JURY.

12           THE COURT:  THANK YOU.  I APPRECIATE THAT.  YES.

13       ALL RIGHT.  ANYTHING ELSE?

14           MR. GENDERSON:  I'M SORRY.  ONE MORE SECOND, YOUR

15   HONOR.

16       (DISCUSSION OFF THE RECORD.)

17           MR. GENDERSON:  YOUR HONOR, WE HAD UNDERSTOOD

18   BRIEFING ON DAMAGES AT 5:00 O'CLOCK TOMORROW.  DO YOU STILL

19   WANT THAT?  OR CAN WE HAVE A LITTLE MORE TIME ON THAT?

20           THE COURT:  I THINK YOU CERTAINLY CAN HAVE SOME TIME

21   ON IT, AND AT THIS MOMENT I DON'T REMEMBER WHAT THE ISSUE WAS.

22   I THINK IT HAD TO DO WITH THE LUMP SUM ISSUE; IS THAT CORRECT?

23           MS. BROOKS:  YES, YES.

24           THE COURT:  ALL RIGHT.  YES.  YOU KNOW, WE'RE JUST

25   NOT THERE.

1              AND SO --

2                    MR. GENDERSON:  COULD WE HAVE UNTIL MONDAY?

3                    THE COURT:  AND, MS. BROOKS, THAT WORKS?

4                    MS. BROOKS:  ABSOLUTELY, YOUR HONOR.

5                    THE COURT:  ALL RIGHT.  MONDAY IS FINE.

6              ALL RIGHT.  GOOD.  THANK YOU ALL.  I WILL SEE YOU TOMORROW

7        MORNING.

8                    MR. GENDERSON:  THANK YOU, YOUR HONOR.

9                    THE CLERK:  COURT IS ADJOURNED.

10             (COURT CONCLUDED AT 12:11 P.M.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                        CERTIFICATE OF REPORTERS

4

5

6

7        WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16        _____
          IRENE RODRIGUEZ, CSR, CRR
          CERTIFICATE NUMBER 8076
17

18        _____

19        LEE-ANNE SHORTRIDGE, CSR, CRR
          CERTIFICATE NUMBER 9595
20

21        DATED:  MARCH 10, 2016

22

23

24

25