John M. Farrell (CA Bar No. #99649)
farrell@fr.com
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5070
Facsimile: (650) 839-5071

Jonathan E. Singer (CA Bar No. #187908)
singer@fr.com
FISH & RICHARDSON P.C.
3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402
Telephone: (612) 335-5070
Facsimile: (612) 288-9696

Juanita R. Brooks (CA Bar No. #75934)
brooks@fr.com
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA 92130
Telephone: (858) 678-5070
Facsimile: (858) 678-5099

Attorneys for Plaintiff
GILEAD SCIENCES, INC.

*Additional counsel listed on signature page*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**(SAN JOSE DIVISION)**

| | |
|---|---|
| GILEAD SCIENCES, INC., <br><br> Plaintiff and Counterdefendant, <br><br> v. <br><br> MERCK & CO, INC. (Defendant only), MERCK SHARP & DOHME CORP. and ISIS PHARMACEUTICALS, INC., <br><br> Defendants and Counterclaimants. | Case No. 5:13-cv-04057-BLF/PSG <br><br> **GILEAD'S BRIEF REGARDING PRESENTATION OF EVIDENCE ON A LUMP SUM ROYALTY** |

Gilead has not introduced any new damages theory. As the accused-infringer, Gilead has no burden-of-proof with respect to damages and therefor need not, and has not, asserted *any* damages theory. Rather, Gilead, and its damages expert, Dr. O'Brien have criticized and rebutted the damages evidence put forth by Merck and its expert, Dr. Carter. At trial, Gilead will do no more than that.

Dr. Carter expressly recognizes that one type of potential royalty is "a lump sum royalty," which he describes as "a fixed single payment royalty that provides a fully-paid license to use the Patents-in-Suit."[1]  (ECF No. 230-12 Ex. 3A at 23.)  Dr. Carter opines, however, that "based on the facts of this case, I believe a running royalty as a percentage of sales applied to each infringing sale of an accused product represents the proper royalty type." *Id.*  Gilead intends only to show that the *very license agreement* Dr. Carter relies on to support his conclusion that a running royalty is appropriate—as well as other evidence specifically disclosed and discussed in the expert report of Dr. O'Brien—actually supports a lump sum over the life of the patents as the appropriate form of damages in this case.

## I. GILEAD RELIES ONLY ON ISSUES RAISED BY DR. CARTER OR DISCLOSED BY DR. O'BRIEN

Dr. Carter has pointed to the Merck-Roche license agreement for the '499 patent as a key piece of evidence supporting his opinion that the parties would have agreed to a 10% running royalty. At his deposition, Dr. Carter stated that the Merck-Roche license is an "amazing comparable license agreement, and I have been in this business a long time, and you don't get many agreement as comparable as that one." (Carter Depo. Tr. at 157:22-25.)  He relies on that agreement to conclude that the parties would have agreed to a 10% royalty rate, resulting in billions in past-damages covering a period of only slightly more than two years. (ECF No. 230-12 at 70; ECF No. 230-16.)  Gilead intends to point to evidence showing that Merck internally valued *that very license* as being worth far less than what Dr. Carter has

---

[1] Although Merck initially took the position that a jury was not empowered to award a lump sum royalty covering the life of the patents, Merck has now conceded that such an award is legally permissible. *See* ECF 316 at 3.

1  suggested.  Specifically, in a February 2, 2011 internal Merck presentation, Merck considered
2  the comparative value of taking a license from Pharmasset for PSI-7977 versus entering into a
3  licensing and collaboration agreement with Roche for RG-7128, which Merck ultimately
4  elected to do.  (*See* EX-99).  In that presentation, Merck concluded that the value of the Roche
5  license had a net present value of $73 million running through to the expiration of Merck's
6  patents.  (*Id.* at 18 "Assumes royalty stream ends in December 2022 (Merck/Isis method of use
7  patent expiry."))  By pointing out that the very license agreement relied on by Merck actually
8  suggests damages of $73 million over the life of the patent, rather than damages of billions over
9  a period of just two years, Gilead is not introducing a new damages theory.  Gilead is merely
10 challenging the theory and the evidence offered by Merck, and presenting the jury with
11 evidence from which it could reach a different, legally permissible conclusion.

12         Gilead likewise intends to point to a second internal Merck presentation—already
13 introduced into evidence during the liability phase of the case—showing that Merck calculated
14 the value of a potential "unblocking license" to Pharmasset ***for sofosbovir*** as being worth $347
15 million over the entire life of the patent.  (EX-77 at 44.)  Any suggestion that Gilead's reliance
16 on that evidence is "undisclosed" is wrong.  The *very first criticism* made in Dr. O'Brien's
17 expert report is that "Merck's own documents indicate that in a situation where Merck was
18 unable to purchase Pharmasset, the expected value of a royalty was $346[2] million for a license
19 that would last many years longer than Mr. Carter's 'compensation period.'"  (ECF No. 230-10
20 at ¶ 12.)  Dr. O'Brien then specifically cites to the Merck internal presentation cited above.
21 (*Id.*)  Likewise, Dr. O'Brien cites and discusses the internal Merck valuation of $73 million for
22 the Roche license at paragraphs 145-146 of his expert report.  (*Id.* at ¶¶ 145-146.)  Although
23 Dr. O'Brien did not affirmatively opine that Merck's $73 million valuation or its $347 million
24 valuation supported a lump sum as the appropriate form of damages award, that is only because

25 ───────────────
26 [2] Although Dr. O'Brien's report says "$346 million" instead of "$347 million," his report cites specifically to the page on which Merck's $347 million valuation is disclosed.  Thus, it appears
27 that Dr. O'Brien's reference to $346 million instead of $347 million is merely a typo.

28

Dr. O'Brien did not opine on *any* appropriate form of damages award.[3] Dr. O'Brien limited his report to criticizing the flaws in Dr. Carter's report. Critically, however, Gilead need not rely exclusively on expert testimony to rebut Merc's damages position. *Dow Chemical Co. v. Mee Industries, Inc.*, 341 F.3d 1370 (Fed. Cir. 2003) ("Further, section 284 is clear that expert testimony is not necessary to the award of damages, but rather 'may [be] receive[d] ... as an aid.'")

Gilead's response to Merck's Interrogatory No. 19 is consistent; that response explained that the interrogatory "call[ed] for information that is properly disclosed during expert discovery, and Gilead will disclose information according to the schedule entered by the Court." Then, as described above, the $73 million valuation evidence and the $347 million valuation evidence were specifically discussed in Dr. O'Brien's report. Simply put, nothing prohibits Gilead from pointing to (a) Merck's ***own internal valuation*** of the Merck-Roche license agreement relied on by Dr. Carter, and (b) Merck's $347 million valuation of a potential lifetime "unblocking" license for sofosbovir, to allow the jury to conclude that the evidence supports a form of damages that Dr. Carter expressly acknowledges as a possibility, and that Merck has conceded is legally permissible.

The two decisions relied on by Merck are inapt. In both cases, a patent holder changed the theory on which it was seeking damages shortly before trial. *See Apple., Inc. v. Samsung Electronis Co.*, 2013 WL 6001902 (N.D. Cal. 2013) (foreclosing patent holder from proceeding on lost profits theory); *Radward, Ltd. v. F5 Networks, Inc.*, Case No. 5:13-cv-02024-RMW (N.D. Cal. March 10, 2016) (preventing patent holder from seeking damages twice what its expert computed). Gilead is not the patent holder and has not presented any affirmative theory on damages. Thus, Gilead has not changed its theory on damages. Gilead is only responding

---

[3] Merck's assertion that Gilead has "at the 11th hour . . . switch[ed] its damages theory from a running royalty" is, thus, false. Gilead has never offered a running royalty damages theory. Merck fully understands that fact, having specifically confirmed it with Dr. O'Brien during his deposition: "[Q.] And you also do not provide your own opinion, separate and apart from your criticism of Mr. Carter's number, of what the appropriate number is in this case; correct? [A.] That's correct." (O'Brien Depo. at 29:25-30:4.)

to and rebutting the evidence that Merck has put forth on damages, and arguing that that evidence actually supports a different result that both Merck and its expert acknowledge is legally permissible.  Merck cannot genuinely be surprised about the facts Gilead intends to rely on to respond to and rebut Merck's theory, as the Merck-Roche agreement is the very agreement relied on by Dr. Carter, and both the $73 million valuation of the Roche license and the potential $347 million license to Pharmasset were specifically discussed in Dr. O'Brien's report.

### II. GILEAD MUST BE ABLE TO ARGUE FOR A ROYALTY COVERING THE LIFE OF THE PATENTS BECAUSE MERCK HAS REPRESENTED TO THE JURY THAT IT IS ONLY SEEKING TO GIVE GILEAD AN "UNBLOCKING LICENSE"

The testimony of Merck's witnesses, and the argument of Merck's attorneys, during the liability phase of the case also support instructing the jury that it may award a lump sum royalty covering the life of the patents.  Specifically, Ms. Demain asserted that Merck sought to offer parties, including Gilead, "unblocking licenses."  (Trial Tr. at 1413:18-21; 1416:9-17; 1424:1-5.)  Similarly, the potential $347 million license contemplated for Pharmasset was described as an "unblocking license."  (Ex. 77.)  Likewise, in closing argument, Merck's attorney responded to the e-mail from Dr. Cook regarding "block[ing] as many routes as possible to effective therapies," by assuring the jury that "that's not Isis's philosophy, and that's certainly not Merck's philosophy."  (Trial Tr. 1722:2-6.)  Thus, the very strong impression that Merck has given to the jury is that, if the jury finds the patents valid, any damages award it makes will be for an "unblocking license" running into the future.  At a minimum, Merck's liability presentation will cause massive confusion as to this point in the minds of the jurors.  Merck should not be permitted to tell the jury that it is only trying to give Gilead an "unblocking license"—as is its philosophy to do—and then seek to prevent the jury from even having the *option* of awarding one.

| | |
|---|---|
| Dated: March 17, 2016 | FISH & RICHARDSON P.C. |
| | By: */s/ Joseph B. Warden* |
| | Joseph B. Warden |
| | Attorneys for Plaintiff |
| | GILEAD SCIENCES, INC. |