1

UNITED STATES DISTRICT COURT

2
FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

3

GILEAD SCIENCES, INC.,

4

PLAINTIFF,                    CASE NO.  CV-13-4057-BLF

5

VS.                           SAN JOSE, CALIFORNIA

6

MERCK & CO., INC., ET AL.,    MARCH 30, 2016

7

DEFENDANTS.              VOLUME 16

8

PAGES 2413 - 2645

9

TRANSCRIPT OF TRIAL PROCEEDINGS

10
BEFORE THE HONORABLE BETH LABSON FREEMAN

UNITED STATES DISTRICT JUDGE

11
A-P-P-E-A-R-A-N-C-E-S

12
FOR THE PLAINTIFF:   FISH & RICHARDSON PC

BY:   JUANITA R. BROOKS

13
JONATHAN SINGER

GREGORY BOOKER

14
MICHAEL FLOREY

222 DELAWARE AVENUE, 17TH FLOOR

15
P.O. BOX 1114

WILMINGTON, DELAWARE 19801

16

FOR THE DEFENDANTS:   WILLIAMS & CONNOLLY, LLP

17
BY:   BRUCE R. GENDERSON

JESSAMYN BERNIKER

18
STANLEY FISHER

SANJIV LAUD

19
JESSICA RYEN

STANLEY FISHER

20
725 TWELFTH STREET, N.W.

WASHINGTON, DC 20005

21

(APPEARANCES CONTINUED ON THE NEXT PAGE.)

22

OFFICIAL COURT REPORTERS:   IRENE L. RODRIGUEZ, CSR, CRR

23
CERTIFICATE NUMBER 8074

24

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,

25
TRANSCRIPT PRODUCED WITH COMPUTER.

A P P E A R A N C E S: (CONT'D)

FOR THE DEFENDANTS:     HUGHES, HUBBARD & REED
                        BY:  STEPHEN S. RABINOWITZ
                             DAVID LANSKY
                             MITCHELL E. EPNER
                             PATRICE JEAN
                        ONE BATTERY PARK PLAZA
                        NEW YORK, NEW YORK 10004


**ALSO PRESENT**


FOR THE PLAINTIFF:      GILEAD
                        BY:  LORIE ANN MORGAN
                             ANDREA HUTCHISON
                        JAMISON LYNCH
                        333 LAKESIDE DRIVE
                        FOSTER CITY, CALIFORNIA  94404


FOR THE DEFENDANTS:     MERCK
                        BY:  MICHAEL HOLSTON
                             WILLIAM KROVATIN
                        126 EAST LINCOLN AVENUE
                        P.O. BOX 2000
                        RAHWAY, NEW JERSEY  07065

                        IONIS
                        BY:  CLIFF FORD
                             JASON D. FERRONE
                        2855 GAZELLE COURT
                        CARLSBAD, CALIFORNIA  92010

1

INDEX OF PROCEEDINGS

2

3      PLAINTIFF'S OPENING STATEMENT
       BY MR. SINGER                        P. 2460
4
       DEFENDANTS' OPENING STATEMENT
5      BY MS. BERNIKER                      P. 2465

6

7
       FOR THE PLAINTIFF:
8

9      **VIDEOTAPED DEPOSITIONS OF MALCOLM MACCOSS**
       **WALLACE ASHTON AND PHILIPPE DURETTE**   P. 2480
10

11     **VIDEOTAPED DEPOSITION OF JEFFREY BERGMAN**  P. 2523

12     **VIDEOTAPED DEPOSITION**
       **OF KSZYSZTOF PANKIEWICZ**              P. 2524
13

14     FOR THE DEFENDANTS':

15     **PAMELA DEMAIN**
       DIRECT EXAM BY MR. FISHER            P. 2481
16     CROSS-EXAM BY MR. BOOKER             P. 2496
       REDIRECT EXAM BY MR. FISHER          P. 2520
17

18     PLAINTIFF'S CLOSING ARGUMENT
       BY MR. SINGER                        P. 2537
19
       BY MR. BOOKER                        P. 2563
20
       DEFENDANTS' CLOSING ARGUMENT
21     BY MR. RABINOWITZ                    P. 2570

22     BY MS. BERNIKER                      P. 2576

23     PLAINTIFF'S REBUTTAL ARGUMENT
       BY MR. SINGER                        P. 2613
24

25

INDEX OF EXHIBITS

|  | IDENT. | EVIDENCE |
|---|---|---|
| **PLAINTIFF'S:** | | |
| 2400 | 2477 | |
| 2397 | 2478 | |
| 2399 | 2478 | |
| 2398 | 2478 | |
| 158 & 183 | | 2479 |
| | | |
| **DEFENDANTS':** | | |
| 2791 | 2524 | |

```
1    SAN JOSE, CALIFORNIA                    MARCH 30, 2016

2                       P R O C E E D I N G S

3         (COURT CONVENED AT 9:02 A.M.)

4              THE COURT:  I HOPE EVERYONE IS RESTED AND READY TO

5    GO BACK TO WORK.  I KNOW THAT YOU WERE HERE YESTERDAY WITH

6    JUDGE GREWAL, AND I WAS PLEASED THAT HE REPORTED TO ME THAT IT

7    WAS A PRODUCTIVE SESSION BUT, OF COURSE, YOU'RE HERE TODAY AND

8    SO WE WILL JUST CONTINUE.

9              BUT I DO APPRECIATE THE SERIOUSNESS WITH WHICH YOU TOOK

10   THE SESSION WITH JUDGE GREWAL AND I'M -- THAT IS BETWEEN YOU

11   AND HIM, OF COURSE, AND THAT PROCESS IS NOT SOMETHING THAT I

12   ENGAGE IN, BUT I KNOW THAT YOU ALL DID MAKE THAT A VERY SERIOUS

13   EFFORT.

14             WE HAVE A DIFFERENT JOB TODAY.

15             MR. GENDERSON.

16             MR. GENDERSON:  JUST AS A HOUSEKEEPING MATTER.  FOR

17   THAT MEDIATION, WE HAVE EACH SELECTED THREE INDEPENDENT

18   MEDIATORS.  I THINK BOTH SIDES WOULD PREFER THAT IF WE HAVE

19   FURTHER DISCUSSIONS, WE DO IT WITH JUDGE GREWAL.  HE KNOWS THE

20   CASE.

21             AND SO CAN WE DISMISS THOSE MEDIATORS AND --

22             THE COURT:  THANK YOU, YES.  AND I DID ASK

23   JUDGE GREWAL IF HE WOULD HAVE THE TIME AVAILABLE, AND HE DOES.

24   AND SO THANK YOU FOR DOING YOUR OWN RESEARCH.  YOU NOW CAN PUT

25   THAT ASIDE.
```

1      IF THE PARTIES FEEL THAT PRIVATE MEDIATION IS IN YOUR BEST

2      INTEREST, OF COURSE, YOU'LL JUST PROCEED AND THERE'S NO -- I

3      DON'T NEED TO MONITOR THAT AT ALL.  JUDGE GREWAL IS AVAILABLE,

4      AND I WILL LET YOU BE IN TOUCH WITH HIM.

5          AT THIS POINT I SEE NO REASON TO ORDER FURTHER SESSIONS

6      WITH JUDGE GREWAL BECAUSE I -- YOU'VE NOW COMPLIED WITH MY

7      REQUEST.  I WOULD URGE YOU TO ENGAGE WITH JUDGE GREWAL WHEN YOU

8      FEEL IT WOULD BE PRODUCTIVE, BUT YOU DON'T NEED TO DO THAT

9      THROUGH MY COURT.  YOU CAN DO IT -- YOU CAN WORK DIRECTLY WITH,

10     WITH JUDGE GREWAL AND SET THAT UP AS WOULD BE BENEFICIAL

11     THROUGHOUT THE REMAINDER OF THIS CASE WHICH COULD BE QUITE SOME

12     TIME.

13          ALL RIGHT.  SO THANK YOU FOR THAT.

14              MR. GENDERSON:  THANK YOU, YOUR HONOR.

15              THE COURT:  ALL RIGHT.  SO THIS MORNING WE HAVE A

16     NUMBER OF THINGS TO GO THROUGH, AND ULTIMATELY THERE'S GOING TO

17     BE SOME EVIDENTIARY PRESENTATION, I UNDERSTAND.

18          BUT I THINK THE HARDEST TASK FOR ME WAS TO DETERMINE WHAT

19     THE PRELIMINARY ISSUES WERE GOING TO BE SO THAT WE COULD GET

20     STARTED.  AND THERE ARE SOME EVIDENTIARY OBJECTIONS THAT YOU

21     DID FILE, AND I MUST SAY THAT I'D LIKE TO START WITH THE ISSUES

22     OF THE REMAINING DEFENSES THAT GILEAD IS OFFERING IN THE

23     EQUITABLE PHASE OF THE CASE AND THAT WOULD BE THE UNCLEAN HANDS

24     AND WAIVER DEFENSES.

25          THERE ARE SOME PRELIMINARY ISSUES THAT I'D LIKE TO DISCUSS

1    WITH YOU BEFORE THE PRESENTATION OF THE EVIDENCE.  WE HAVE A

2    DISPUTE OVER THE BURDEN OF PROOF FOR WAIVER, AND WE HAVE AN

3    EVIDENTIARY OBJECTION THAT I AM CONCERNED ABOUT ON THE ISSUE OF

4    THE PRESENTATION OF THE UNCLEAN HANDS DEFENSE.

5         AND AS A SHORTHAND, IT APPEARS TO ME THAT MERCK'S POSITION

6    IS THAT IT REALLY IS AN INEQUITABLE CONDUCT DEFENSE WHICH WAS

7    NEITHER PLED NOR DISCLOSED THROUGHOUT THE CASE.

8         SO I HAVE SOME QUESTIONS ABOUT THAT.  UNCLEAN HANDS WAS

9    CLEARLY PLED, AND THERE ARE NO PLEADING REQUIREMENTS OTHER THAN

10   THE STATEMENT OF DEFENSE.

11        HOWEVER, I THINK IT IS WELL-KNOWN THAT INEQUITABLE CONDUCT

12   DOES REQUIRE PLEADING WITH PARTICULARITY AND IT'S NOT PLED AT

13   ALL.  SO I WANT TO TALK ABOUT THAT AS WELL.

14        LET ME START ON THE WAIVER ISSUE.  MERCK ARGUES OR STATES

15   IN ITS EITHER BRIEFING OR CONCLUSION OF LAW THAT THE BURDEN OF

16   PROOF IS CLEAR AND CONVINCING EVIDENCE.

17        I HAVE LOOKED AT A NUMBER OF CASES, AND IT'S A LITTLE BIT

18   ELUSIVE, I MUST SAY.  BUT ACTUALLY, I THINK AUCKERMAN IS THE

19   BEST CASE THAT I WAS ABLE TO COME UP WITH ON THIS ISSUE WHICH

20   WOULD SUGGEST TO ME THAT IT IS A PREPONDERANCE OF THE EVIDENCE

21   STANDARD.

22        I KNOW THAT GILEAD CITED A JUDGE ALSUP CASE.  HOWEVER, IN

23   TRYING TO WORK MY WAY BACKWARDS TO WHAT JUDGE ALSUP RELIED UPON

24   DIDN'T QUITE PAN OUT.  I THINK HE'S RIGHT, BUT I DIDN'T FIND

25   THE UNDERPINNINGS FOR IT SO I LOOKED A LITTLE BIT FURTHER.

1    AND ON THE CASES THAT MERCK RELIES, IT APPEARS THAT THOSE

2    ARE LIMITED TO THE STANDARD SETTING SITUATION, AND THAT'S NOT

3    WHAT WE HAVE HERE.

4    MS. BERNIKER, YOU'RE SMILING BECAUSE YOU KNOW THAT'S

5    EXACTLY WHAT THE CASES SAY.

6    AND THIS IS OBVIOUSLY AN IMPORTANT ISSUE.  I HAVEN'T HEARD

7    THE EVIDENCE ON IT, SO IT MAY NOT MAKE A DIFFERENCE ULTIMATELY,

8    BUT I WANTED TO HEAR A LITTLE BIT MORE FROM YOU ON THE BURDEN

9    OF PROOF FOR WAIVER.

10   SO I DON'T KNOW WHO THE LEADS ARE ON THESE REALLY NITTY

11   GRITTY ISSUES THAT YOU EACH DEVOTED A LINE TO.

12   MR. SINGER.

13   MR. SINGER:  YOUR HONOR, WE HAVE NO ISSUE WITH THAT.

14   JUST SO YOU'RE NOT LOST AS TO WHO IS GOING TO BE PRESENTING

15   TODAY.

16   I'M GOING TO BE HANDLING THE UNCLEAN HANDS ARGUMENT TODAY

17   AND THE PRESENTATION ON THAT.  MY COLLEAGUE WHO YOU HAVE NOT

18   MET YET -- STAND UP -- GREG BOOKER.

19   THE COURT:  HELLO, MR. BOOKER.  I SAW YOUR NAMES ON

20   THE PAPERS BUT I DIDN'T HAVE A FACE TO GO WITH IT.

21   MR. SINGER:  AND CONSISTENT WITH MAGISTRATE

22   JUDGE GREWAL'S INITIATIVE TO GIVE YOUNGER ATTORNEYS A CHANCE TO

23   ARGUE THINGS, MR. BOOKER IS GOING TO HANDLE ANY WITNESSES ON

24   WAIVER, THE ARGUMENT YOU JUST ASKED FOR --

25   THE COURT:  GREAT.

1          MR. BOOKER:  -- AS WELL AS A SMALL CLOSING ON WAIVER

2     AS WELL TODAY.

3          THE COURT:  I THINK THAT'S GREAT, AND I DO

4     APPRECIATE THAT.

5          MR. SINGER:  AND MS. BROOKS IS GOING TO HANDLE THE

6     ISSUES TODAY ON STANDING AND SO YOU KNOW WHO TO TURN TO.

7          THE COURT:  THANK YOU.  THAT'S HELPFUL.

8     MR. BOOKER, I'M SURE YOU'VE BEEN HERE EVERY STEP OF THE

9     WAY.

10          MR. BOOKER:  I HAVE.

11          THE COURT:  AND MS. BERNIKER.

12          MS. BERNIKER:  YES.  I'LL BE ADDRESSING THE WAIVER

13     AND UNCLEAN HANDS ISSUE, AND I'M HAPPY TO ADDRESS THE BURDEN OF

14     PROOF ISSUE AT THE MOMENT.

15          THE COURT:  OKAY.

16          MS. BERNIKER:  SO I'LL CERTAINLY ACKNOWLEDGE THAT

17     THE LAW APPEARS TO BE INCONSISTENT ON THIS POINT.  THERE'S NO

18     QUESTION ABOUT THAT.

19     JUST BEFORE WE CAN GET TO THE BURDEN OF PROOF, WE THINK

20     THAT INDEPENDENT OF THE BURDEN OF PROOF THERE'S ABSOLUTELY NO

21     WAY TO FIND WAIVER IN THIS CASE, AND WE'LL GET TO THAT ARGUMENT

22     WHEN WE --

23          THE COURT:  WELL, THAT'S FINE.  AS I SAY, IT MAY BE

24     BEYOND A REASONABLE DOUBT ULTIMATELY BUT WE KNOW THAT'S NOT THE

25     STANDARD SO --

1          MS. BERNIKER:  SURE.

2          THE COURT:  -- BUT IT IS A PREDICATE TO MY

3  EVALUATION.  I DO NEED TO KNOW WHAT THE STANDARD IS.

4          MS. BERNIKER:  CERTAINLY, YOUR HONOR.  AND THE CASE

5  THAT WE HAVE CITED IN SUPPORT OF THE CLEAR AND CONVINCING

6  EVIDENCE STANDARD, THE QUALCOMM CASE, IS, IN FACT, A CASE THAT

7  RELATES TO THE STANDARD SETTING TYPE OF WAIVER AND WE HAVE

8  EXPRESSLY EXPLAINED THAT WE DON'T THINK THE STANDARD SETTING

9  TYPE OF WAIVER IS APPLICABLE TO THIS, AND I AGREE WITH THAT.

10         BUT WITH ALL DUE RESPECT, THE PARAGRAPH THAT DISCUSSES THE

11  BURDEN OF PROOF ON THAT ISSUE, WHICH IS AT STAR 9 OF THE

12  OPINION.  IT'S A 2007 WESTLAW OPINION FROM THE CENTRAL DISTRICT

13  OF CALIFORNIA -- SOUTHERN DISTRICT OF CALIFORNIA.

14         THE PARAGRAPH SAYS, "ACCORDING TO THE FEDERAL CIRCUIT, THE

15  BURDEN OF ESTABLISHING AN AFFIRMATIVE DEFENSE IS ON THE PARTY

16  RAISING THE DEFENSE," CITING JAZZ PHOTO FROM THE FEDERAL

17  CIRCUIT.

18         AND THEN IT GOES ON TO SAY, "THAT CONSTITUTIONAL RIGHTS

19  CAN ONLY BE WAIVED IF IT CAN BE ESTABLISHED BY CLEAR AND

20  CONVINCING EVIDENCE THAT THE WAIVER IS VOLUNTARY, KNOWING, AND

21  INTELLIGENT."

22         AND THEN IT GOES ON TO CITE NINTH CIRCUIT CASE LAW SAYING

23  THAT, "THE NINTH CIRCUIT HAS ALSO HELD THAT CALIFORNIA LAW

24  DEMANDS A CLEAR AND CONVINCING EVIDENCE STANDARD IN THE WAIVER

25  OF INSURANCE COVERAGE RIGHTS."

1        SO OUR UNDERSTANDING WAS THAT THEY WERE APPLYING A CLEAR

2    AND CONVINCING EVIDENCE STANDARD UNDER FEDERAL CIRCUIT AND

3    NINTH CIRCUIT LAW TO THE WAIVER QUESTION THAT WAS ADDRESSED

4    THERE WHICH WAS A WAIVER OF PATENT RIGHTS.

5        NOW, I UNDERSTAND THAT THAT'S DIFFERENT FROM WHAT

6    JUDGE ALSUP DID IN THE OTHER CASE WHERE HE APPLIED A

7    PREPONDERANCE STANDARD.

8        WE BELIEVE THE CLEAR AND CONVINCING EVIDENCE STANDARD --

9            THE COURT:  SO WHAT AUCKERMAN, THOUGH -- NO ONE HAS

10   CITED IT, BUT EVERYONE KNOWS THE CASE, OF COURSE.  AND IT WAS

11   THE SUBJECT OF A VERY SIGNIFICANT DISCUSSION BY THE FEDERAL

12   CIRCUIT ON LACHES LAST YEAR, BUT I BELIEVE EVERYTHING IN THIS

13   CASE CONTINUES TO BE GOOD LAW.

14       AND THERE THE FEDERAL CIRCUIT TALKS ABOUT THE DISTINCTION

15   BETWEEN THE HIGHER STANDARD AND CLEAR AND CONVINCING EMPLOYED

16   WHERE THERE'S A DANGER -- WHERE THE DANGER OF DECEPTION IS

17   PRESENT SUCH AS ESTABLISHING THE TERMS OF LOSS WHERE A

18   PARTICULAR CLAIM IS DISFAVORED ON POLICY GROUNDS SUCH AS

19   REFORMATION OR MODIFICATION OF A WRITTEN CONTRACT OR WHERE A

20   PARTICULARLY IMPORTANT INDIVIDUAL INTEREST IS AT STAKE SUCH AS

21   ONE'S REPUTATION SUCH AS FRAUD OR UNDUE INFLUENCE.

22       THE CLEAR AND CONVINCING STANDARD HAS ALSO BEEN IMPOSED IN

23   SOME ASPECTS OF PATENT LITIGATION BY REASON OF THE SPECIFIC

24   STATUTORY PROVISION THAT A PATENT IS PRESUMED VALID.  HOWEVER,

25   NEITHER LACHES NOR ESTOPPEL ATTACKS A PATENT'S VALIDITY.

```
1            AND IN MY VIEW WAIVER IS PART OF ESTOPPEL AND THAT'S WHY

2      I'M CITING -- I'M ASKING YOU ABOUT AUCKERMAN.

3                 MS. BERNIKER:  SO, FIRST OF ALL, I'M NOT SURE THAT

4      THE PARTIES HAVE TREATED WAIVER AS PART OF ESTOPPEL.

5      OBVIOUSLY GILEAD HAS WITHDRAWN --

6                 THE COURT:  I DON'T CARE WHAT THE PARTIES HAVE DONE.

7      I'M ASKING WHAT THE LAW DOES.

8                 MS. BERNIKER:  CERTAINLY.  WELL, MY UNDERSTANDING OF

9      THE LAW IS THAT THE FEDERAL CIRCUIT HAS NOT SPECIFICALLY MADE A

10     RULING ON THE BURDEN --

11                THE COURT:  I THINK THAT'S CORRECT.  I AGREE WITH

12     YOU.

13                MS. BERNIKER:  SO OUR POSITION WOULD BE THAT WHEN

14     YOU'RE -- WHEN THE OTHER SIDE, IN THIS CASE GILEAD, WAS ASKING

15     TO FIND A THAT PARTY INTENTIONALLY RELINQUISHED ITS RIGHTS,

16     THAT SHOULD BE PROVED BY CLEAR AND CONVINCING EVIDENCE BECAUSE

17     ACCORDING TO THE CASE, THE AUCKERMAN CASE AND THE OTHER

18     CATEGORIES THAT YOU IDENTIFIED, ONE OF THOSE WAS THE IDEA THAT

19     SOMEBODY WOULD BE DEPRIVED OF THEIR PATENT RIGHTS THAT WERE

20     VALIDLY GRANTED BY THE PATENT OFFICE.

21            I DON'T HAVE THE LANGUAGE IN FRONT OF ME.  I APOLOGIZE,

22     YOUR HONOR.

23                THE COURT:  BUT ESTOPPEL WOULD DO THE SAME THING AND

24     THE FEDERAL CIRCUIT HEARS THAT PREPONDERANCE WOULD BE

25     SUFFICIENT.
```

```
 1                 MS. BERNIKER:  THAT MAY BE THE CASE, YOUR HONOR.  I

 2      DON'T HAVE THAT AUTHORITY IN FRONT OF ME.  I APOLOGIZE.

 3                 THE COURT:  I KNOW THAT.  I KNOW THAT.  AND IT'S

 4      SOMETHING THAT PERHAPS YOU'LL HAVE TO LOOK AT.

 5           AND AFTER I CONSIDER ALL OF THE EVIDENCE, THIS MAY BECOME

 6      MOOT, AND IT MAY BE WHY THERE ACTUALLY IS NOT GOOD LAW ON IT

 7      BECAUSE COURTS HAVE NOT NEEDED TO ACTUALLY DRAW THE FINE

 8      DISTINCTION BETWEEN PREPONDERANCE AND CLEAR AND CONVINCING AND

 9      SO WE HAVEN'T -- NO ONE HAS BEFORE ME, IT APPEARS.

10                 MS. BERNIKER:  YES.

11                 THE COURT:  OKAY.

12                 MR. RABINOWITZ:  YOUR HONOR, MAY I MAKE ONE FURTHER

13      POINT FROM THE QUALCOMM VERSUS BROADCOM CASE?

14                 THE COURT:  YES, QUALCOMM.

15                 MR. RABINOWITZ:  THE QUALCOMM AT STAR 9 POINTED TO

16      THE FACT THAT THE NORTHERN DISTRICT OF CALIFORNIA, QUOTING FROM

17      THE OPINION, QUOTE, "HAS UPHELD A BANKRUPTCY COURT'S

18      APPLICATION OF A CLEAR AND CONVINCING STANDARD IN SUCH CASES,"

19      CITING READ RITE CORP. 206 WESTLAW 1214389, AND IT'S A NORTHERN

20      DISTRICT OF CALIFORNIA PRECEDENT.

21           SO ALTHOUGH THE LAW IS NOT SETTLED AT THE FEDERAL CIRCUIT

22      LEVEL, I DO BELIEVE THERE'S PRECEDENT IN THIS COURT AS WELL FOR

23      APPLYING A CLEAR AND CONVINCING STANDARD.

24                 THE COURT:  BUT GILEAD CITES AUTHORITY FROM THIS

25      DISTRICT TO APPLY PREPONDERANCE.
```

1          MR. RABINOWITZ:  SO IT APPEARS THAT THE LAW IS NOT

2     QUITE SETTLED.

3          THE COURT:  EVEN IN MY DISTRICT.

4          MR. RABINOWITZ:  OR IN THE FEDERAL CIRCUIT.  AND --

5     BUT THERE IS AUTHORITY IN THE WAIVER CONTEXT AS WELL.

6          THE COURT:  WELL, WAIVER YOU DON'T DISAGREE ON --

7     I'M SORRY.

8        WAIVER IS WHAT WE'RE TALKING ABOUT HERE?

9          MR. RABINOWITZ:  YES, YOUR HONOR.

10          THE COURT:  SO THERE'S CONFLICT ON WAIVER?

11          MR. RABINOWITZ:  THERE IS.

12          THE COURT:  THAT IS RIGHT, THERE'S CONFLICT IN THIS

13     CASE ON WHAT IT SHOULD BE.  ALL RIGHT.

14        I THINK THAT'S MAYBE THE BEST WE HAVE, AND I'LL HAVE TO

15     MAKE THAT DECISION.  YOU DON'T DISAGREE ON THE UNCLEAN HANDS

16     STANDARD AND SO WE'RE FINE ON THAT.

17        ALL RIGHT.  AND THAT'S HELPFUL.  THANK YOU.

18        THE NEXT ISSUE THAT I HAVE AND THAT I'VE BEEN BRIEFED

19     SIGNIFICANTLY ON, AND LET ME GET ME PAPERWORK IN FRONT OF ME

20     BECAUSE THIS IS -- I NEED TO BACK UP FROM YOUR OBJECTIONS A

21     LITTLE BIT BECAUSE I AM ACTUALLY STRUGGLING TO FIND THE LINE

22     BETWEEN AN UNCLEAN HANDS DEFENSE AND AN INEQUITABLE CONDUCT

23     DEFENSE.

24        I RECOGNIZE THAT THE ELEMENTS OF PROOF DIFFER AND THE

25     ELEMENTS OF PLEADING DIFFER BUT NEITHER OF YOU HAS GIVEN ME

1 ANYTHING FROM THE MODERN ERA ON UNCLEAN HANDS CASES.

2   AND I HAVE REVIEWED THERASENSE WHICH ACTUALLY IS NOT AN

3 UNCLEAN HANDS CASE, BUT IT IS AN EXCELLENT RECITATION OF THE

4 HISTORY AND EVOLUTION OF THE INEQUITABLE CONDUCT DEFENSE AND

5 HOW IT WAS SPAWN FROM UNCLEAN HANDS BUT THEN DEPARTED.

6   SO WHAT I AM INTERESTED IN, AND, FRANKLY, JUST READING ALL

7 OF THE PAPERS WAS ENOUGH FOR ME NOT TO GO OFF ON MY OWN TANGENT

8 OF RESEARCH IN THESE LAST COUPLE OF DAYS, IS TO UNDERSTAND WHAT

9 THE LINE IS BETWEEN UNCLEAN HANDS AND INEQUITABLE CONDUCT

10 BECAUSE -- MR. BOOKER, YOU'RE GOING TO BE ADDRESSING THIS.

11   I'M CLEARLY GOING TO LET YOU GO FORWARD ON AN UNCLEAN

12 HANDS DEFENSE.  YOU'VE PLED IT, AND YOU CAN TRY TO PROVE IT.

13   AND ALTHOUGH YOU MAKE A REQUEST TO -- IF I FEEL THAT THIS

14 IS ACTUALLY AN INEQUITABLE CONDUCT DEFENSE, YOU'VE MADE A

15 REQUEST TO AMEND TO CONFORM TO PROOF, I'M NOT GOING TO DO THAT.

16 THAT WOULD BE HIGHLY PREJUDICIAL AND BECAUSE THE ELEMENTS ARE

17 SO VASTLY DIFFERENT, I'M NOT GOING TO GO DOWN THAT ROAD AT ALL.

18   BUT I WANT TO ALLOW YOU TO OFFER EVIDENCE APPROPRIATELY

19 GEARED TO AN UNCLEAN HANDS DEFENSE, BUT I DON'T KNOW WHAT THAT

20 IS IN THE MODERN ERA.  IT'S HARD TO READ KEYSTONE AND

21 HAZEL-ATLAS AND PRECISION AND BEFORE THE INEQUITABLE CONDUCT

22 DEFENSE HAD EVOLVED TO UNDERSTAND IT.

23   SO WHETHER THERE'S MORE RESEARCH THAT YOU HAVE OR CAN DO

24 OR MORE THOUGHTS THAT YOU CAN SHARE WITH ME NOW, I'M NOT

25 COMFORTABLE GOING FORWARD UNTIL I HAVE A LITTLE BIT OF A BETTER

1    UNDERSTANDING.

2                MR. SINGER:  YOUR HONOR, MAY I ADDRESS THAT?

3                THE COURT:  YES.

4                MR. SINGER:  OKAY.  WE'VE ALL LOOKED AT THE SAME

5    AUTHORITY AND CANVASSED THE LITERATURE.  AND WHAT I'M STRUCK BY

6    IS WHEN YOU GO, IT HELPS A LITTLE BIT TO TAKE YOURSELF OUTSIDE,

7    ACTUALLY, THE PATENT CONTEXT AND REMIND ONE'S SELF WHAT IS

8    UNCLEAN HANDS JUST OUTSIDE OF THE PATENT CONTEXT FOR A MINUTE,

9    AND THEN WE'LL DRAW IT BACK IN.

10       BECAUSE I THINK UNCLEAN HANDS IN THE TRADITIONAL CASE,

11   RIGHT, IS ONE WHO COMES TO COURT SEEKING EQUITY OR RELIEF HAS

12   TO COME FOR PUBLIC POLICY REASONS WITH CLEAN HANDS, RIGHT?

13   THAT'S THE ORIGIN OF THE DEFENSE.

14       AND IF WE LOOK AT OTHER CASES, NOT PATENT CASES, WHAT WE

15   SEE IS THAT YOU LOOK AT THE TRANSACTION THAT IS AT STAKE,

16   RIGHT?  AND THE TRANSACTION THAT IS AT STAKE, WHETHER IT BE A

17   CONTRACT, A PROPERTY RIGHT, WHATEVER IT MIGHT BE, UNCLEAN HANDS

18   NEEDS TO RELATE TO THAT TRANSACTION THAT IS IN ISSUE OR THAT

19   SET OF FACTS THAT IS ACTUALLY AN ISSUE BETWEEN THE PARTIES.

20       AND THAT'S WHY THE REMEDY, RIGHT, FOR UNCLEAN HANDS VERSUS

21   INEQUITABLE CONDUCT, DRAWING IT BACK TO THE PATENT CASE, IS

22   VERY DIFFERENT.

23       IN THE PATENT WORLD UNCLEAN HANDS ONLY BLOCKS ENFORCEMENT

24   AGAINST THE PARTICULAR DEFENDANT.  ALL RIGHT.

25       IN THE PATENT WORLD INEQUITABLE CONDUCT BLOCKS ENFORCEMENT

1    TO THE PATENT AS TO THE WORLD.  AND THAT ARISES FROM THE

2    DISTINCTION BETWEEN UNCLEAN HANDS JUST AS A GENERAL MATTER

3    WHERE IT AROSE AND IN THE PATENT CONTEXT.

4         THE COURT:  SO I AGREE WITH YOU COMPLETELY, AND I

5    THINK THAT IS A REASONABLE COMMENT ON WHY THE ELEMENTS OF PROOF

6    FOR INEQUITABLE CONDUCT ARE SO EXTRAORDINARY.

7         MR. SINGER:  RIGHT.

8         THE COURT:  BUT IT STILL DOESN'T TELL ME HOW I'M

9    GOING TO RECOGNIZE AN UNCLEAN HANDS EVIDENCE VERSUS AN

10   INEQUITABLE CONDUCT BECAUSE I HAVE TO BE CAREFUL NOT TO ALLOW

11   YOU TO SUBMIT INEQUITABLE CONDUCT EVIDENCE IN THE CLOTHING OF

12   AN UNCLEAN HANDS DEFENSE.

13        MR. SINGER:  AND IF YOU LOOK AT OUR PROPOSED

14   FINDINGS, YOUR HONOR, THERE IS VERY -- THERE IS ONLY MAYBE ONE

15   OR TWO LINES ABOUT FAILURE TO DISCLOSE TO THE PATENT OFFICE.

16      SO THAT MOST OF THE EVIDENCE THAT WE ARE PUTTING IN ON

17   UNCLEAN HANDS RELATES, AS THE COURT MIGHT EXPECT, TO THE

18   CONDUCT OF DR. DURETTE BOTH IN CONNECTION WITH THE RELATION

19   WITH PHARMASSET, RIGHT?

20      WE HEARD THE TESTIMONY, AND I'LL SUM IT UP FOR YOU IN

21   CLOSING AGAIN, ABOUT THAT PHONE CALL ON ST. PATRICK'S DAY,

22   RIGHT?  AND THEN HIS CONDUCT IN THE DEPOSITION, AND THEN HIS

23   CONDUCT AT TRIAL.  AGAIN, THAT IS THE ESSENCE OF UNCLEAN HANDS

24   AS IT RELATES TO THE TRANSACTION AT ISSUE.

25        THE COURT:  AND SO THE -- YOU KNOW, FOLLOWING ONTO

1    THERASENSE'S SUMMARY AND FROM THE SUPREME COURT CASES YOU'RE

2    SAYING THAT YOU WOULD CLOAK DR. DURETTE'S CONDUCT AS THIS

3    EGREGIOUS MISCONDUCT THAT WAS DISALLOWED BY THE SUPREME COURT.

4         MR. SINGER:  ABSOLUTELY, YOUR HONOR.  I THINK IT

5    FITS VERY WELL INTO THE CATEGORY OF EGREGIOUS MISCONDUCT THAT

6    RESULTED IN THE PATENT RIGHTS THAT WERE ASSERTED IN THIS CASE,

7    RIGHT?  THAT IS WHAT IS GOING ON.

8         AND IT REALLY SPECIFICALLY RELATES TO THE TRANSACTION WITH

9    PHARMASSET AS OPPOSED TO THE WORLD AT LARGE, RIGHT?  YOU'RE

10   TALKING ABOUT, FROM OUR PERSPECTIVE -- AND I KNOW THE OTHER

11   SIDE DISAGREES, RIGHT? -- SOMEBODY WHO GOT CONFIDENTIAL

12   INFORMATION FROM PHARMASSET WHO SHOULDN'T HAVE GOTTEN IT,

13   RIGHT?  BY HIS OWN ADMISSION HE SHOULDN'T HAVE GOTTEN THAT

14   CONFIDENTIAL INFORMATION.

15        AND THEN WROTE CLAIMS, NARROWED CLAIMS.  WE HAD A VERY

16   BROAD GENUS THAT WAS SUDDENLY THEN VERY MUCH NARROWED DOWN TO

17   COVER THE VERY CONFIDENTIAL INFORMATION THAT HE SOUGHT.

18        AGAIN, THEY'LL SAY, WELL, IT BECAME PUBLIC.  BUT THAT

19   DOESN'T MAKE A DIFFERENCE.

20        WE DON'T THINK -- WE THINK THE COURT SHOULD NOT TO

21   TOLERATE IN THE DOCTRINE OF UNCLEAN HANDS SOMEONE WHO GETS

22   CONFIDENTIAL INFORMATION AND THEN SAYS, WELL, I CAN WRITE

23   CLAIMS TO THAT ONCE IS BECOMES PUBLIC BECAUSE HE HIMSELF SAID,

24   RIGHT, AND WE'LL SEE IT AGAIN, HIS JUDGMENT WAS TAINTED.

25        THE COURT:  UH-HUH.

1          MR. SINGER:  SO HE HAD TAINTED JUDGMENT, AND HE

2     PURSUED CLAIMS RIGHT ON TOP OF PHARMASSET, THAT PATENT NEVER

3     WOULD HAVE LOOKED THE WAY IT DID BUT FOR HIS KNOWLEDGE.  I

4     THINK THAT'S THE ESSENCE OF UNCLEAN HANDS.

5          AS TO THE SPECIFIC EVIDENTIARY OBJECTION ABOUT THE OTHER

6     PATENT APPLICATION, IF YOU RECALL, THAT DEMONSTRATES THAT WHAT

7     HE SAID ON THE STAND WAS UNTRUE, AND THAT'S WHAT WE'RE REALLY

8     USING IT FOR.  I THINK WE SAID SO IN OUR BRIEF.  THAT THE

9     CONDUCT BEFORE THE PATENT OFFICE IN THE '224 APPLICATION

10    DEMONSTRATES THAT HIS TESTIMONY AT TRIAL WAS UNTRUE.

11         THE ONLY ISSUE WITH RESPECT TO CONDUCT BEFORE THE PATENT

12    OFFICE AND CONDUCT NOT BEFORE THE PATENT OFFICE, PUTTING ASIDE

13    THAT WE'RE PUTTING THE '224 APPLICATION IN AS A REFLECTION OF

14    CREDIBILITY, IS I ACTUALLY DID FIND ONE CASE, YOUR HONOR, AND I

15    WILL GIVE IT TO YOU.  AND I DON'T DISAGREE WITH YOU THAT THE

16    PARTIES COULD DO MORE RESEARCH BECAUSE IT IS AN AREA WHERE

17    THERE ISN'T A LOT OF LAW.

18         THE COURT:  NO.  I WAS REALLY SAYING I COULDN'T DO

19    MORE RESEARCH IN THE AMOUNT OF TIME I HAD.

20         MR. SINGER:  BUT I'LL GIVE IT TO YOU BECAUSE IT IS

21    AN INTERESTING CASE BECAUSE IT IS ONE OF THE FEW DISTRICT COURT

22    DECISIONS THAT KIND OF WRESTLE WITH THE LINE THAT YOU'RE

23    WRESTLING WITH.  AND IT'S PAC TOOL INTERNATIONAL LIMITED VERSUS

24    KETT -- P-A-C TOOL -- INTERNATIONAL LIMITED VERSUS KETT TOOL

25    COMPANY, INC.  IT'S IN WESTLAW.  IT'S NOT REPORTED IN THE

1    F.SUPP.  IT'S 2011 WESTLAW 5335293.

2              THE COURT:  COULD YOU GIVE ME THAT LAST NUMBER, 533?

3              MR. SINGER:  5335293 NOVEMBER OF 2011.

4        AND IT'S ACTUALLY A SUMMARY JUDGMENT MOTION ON UNCLEAN

5    HANDS, AND THE DEFENDANT IS SAYING, WELL, THE UNCLEAN HANDS AND

6    THE INEQUITABLE CONDUCT ARE THE SAME THING, AND, THEREFORE, YOU

7    CAN'T RELY ON CONDUCT BEFORE THE PATENT OFFICE TO SUPPORT

8    UNCLEAN HANDS.

9              THE COURT:  WELL, THAT WOULD BE ONE OF MY QUESTIONS

10   IS DO I HAVE TO EXCLUDE CONDUCT BEFORE THE PATENT OFFICE?

11             MR. SINGER:  AND I THINK THE ANSWER IS, NO.

12             THE COURT:  WELL, THE SUPREME COURT WAS EVALUATING

13   CONDUCT BEFORE THE PATENT OFFICE IN OUR THREE SUPREME COURT

14   SEMINAL CASES.

15             MR. SINGER:  THAT'S RIGHT.  THAT'S RIGHT.  AND THE

16   DISTRICT COURT THERE CONCLUDED ON SUMMARY JUDGMENT, FIRST, IT

17   IS CLEAR THAT UNCLEAN HANDS AND INEQUITABLE CONDUCT ARE NOT

18   REDUNDANT DEFENSES AS THE LATTER HAS DIVERGED FROM --

19             THE COURT:  AND THERASENSE WOULD SAY THE SAME.

20             MR. SINGER:  THAT'S RIGHT.  SECOND, THERE'S NO

21   SUPPORT FOR PAC TOOL'S PROPOSITION THAT ALLEGATIONS OF

22   MISCONDUCT IN DEALING WITH THE PTO MAY ONLY SUPPORT THE DEFENSE

23   OF INEQUITABLE CONDUCT.  FOR EXAMPLE -- AND THEN IT CITES THE

24   PRECISION CASE, FAILURE TO DISCLOSE PERJURY TO THE PTO SUPPORTS

25   THE DEFENSE OF UNCLEAN HANDS AND DISMISSAL OF THE ACTION CITING

1    THE PRECISION CASE.

2         SO, AGAIN, IF THE DEFENSE IS, YOU KNOW, WE HAVE EGREGIOUS

3    MISCONDUCT BEFORE THE PTO, RIGHT, WHAT IS IT THAT SAYS THERE'S

4    INEQUITABLE CONDUCT?  YOU'VE GOT FAILURE TO DISCLOSE REFERENCES

5    AND THEN EGREGIOUS MISCONDUCT BEFORE THE PTO.  THAT IS

6    INEQUITABLE CONDUCT.

7         HERE WHAT WE ARE SAYING IS THAT THE CONDUCT BEFORE THE

8    PTO, THE LIMITED USE WE'RE MAKING OF IT, ONE, RELATES TO

9    CREDIBILITY OF THE WITNESS, RIGHT?  AND, TWO, SIMPLY SHOWS THE

10   RELATIONSHIP WITH PHARMASSET AND RELATES TO THE UNCLEAN HANDS

11   IN RELATION TO PHARMASSET.

12        DR. DURETTE WHEN PRESSED AT THE PATENT OFFICE IN THE LATER

13   APPLICATION POINTED TO PHARMASSET, RIGHT, AS THE SOURCE OF DATA

14   THAT SHOWED THE ACTIVITY OF THE COMPOUNDS?  AND THAT

15   INFORMATION, ONE, IMPACTS HIS CREDIBILITY AND PROVES THE POINT

16   THAT WE'RE MAKING THAT DR. DURETTE, HAVING HAD THAT INFORMATION

17   IN HIS HEAD, HIS JUDGMENT WAS TAINTED AND UNDERSTOOD IN

18   DEALINGS WITH THE PATENT OFFICE WHERE THE ORIGIN OF THAT

19   INFORMATION CAME.

20        SO I THINK THAT -- I HOPE THAT HELPS YOU KIND OF TRY TO

21   DRAW THE LINE BUT OUR DEFENSE, YOU KNOW, LARGELY IF YOU LOOK AT

22   OUR FINDINGS AND CONCLUSIONS, IT'S LARGELY -- IT'S 90 PERCENT

23   OR 95 PERCENT IS CONDUCT NOT IN THE PATENT OFFICE, AND THE

24   CONDUCT IN THE PATENT OFFICE ON THAT '224 APPLICATION REALLY

25   RELATES ALMOST EXCLUSIVELY TO CREDIBILITY OF THE WITNESS IN

1    COURT LAST WEEK.

2        IF THERE ARE ANY QUESTIONS, YOUR HONOR, I'M HAPPY TO

3    ANSWER THEM.

4          THE COURT:  NO.  THAT'S VERY HELPFUL.  ALL RIGHT.

5       MS. BERNIKER, ARE YOU GOING TO TAKE THIS ONE ON AS WELL?

6         MS. BERNIKER:  I AM.  THANK YOU.

7         THE COURT:  YOU HAVE A BIG JOB THEN.  YOU'RE

8    HANDLING ALL OF THAT.

9         MS. BERNIKER:  I'VE HAD A BUSY WEEKEND, WHAT CAN I

10   SAY.

11        THE COURT:  I THINK SO.

12        MS. BERNIKER:  SO, FIRST OF ALL, I THINK IT'S

13   IMPORTANT TO FIRST TAKE A LOOK AT WHAT GILEAD ACTUALLY

14   DISCLOSED TO MERCK IN THEIR INTERROGATORY RESPONSE BECAUSE

15   SEPARATE AND APART FROM WHETHER THEY COULD HAVE MADE SOME OF

16   THESE ARGUMENTS, THEY DIDN'T.

17        WHAT THEY DISCLOSED IN THE INTERROGATORY RESPONSE -- AND

18   IT'S DDX-700 IF YOU DON'T MIND PUTTING IT UP -- IT SAYS

19   SPECIFICALLY THE ONLY BASIS FOR UNCLEAN HANDS THAT THEY EVER

20   DISCLOSED WAS THAT GILEAD RESPONDS THAT ITS DEFENSE OF UNCLEAN

21   HANDS ARISES AT LEAST FROM MERCK'S OBTAINING ITS PATENT RIGHTS

22   BY DERIVING THE INVENTION FROM PHARMASSET'S CONFIDENTIAL

23   DISCLOSURES.

24        THERE WAS NEVER AN ASSERTION THAT INFORMATION WAS

25   MISREPRESENTED OR WITHHELD FROM THE PATENT OFFICE.  AND, IN

1    FACT, AT THIS POINT THE ONLY THING THAT THEY'RE ARGUING IS THAT

2    INFORMATION WAS WITHHELD FROM THE PATENT OFFICE.

3        NOW, TO YOUR QUESTION -- SO I GUESS BEFORE WE EVEN GET TO

4    THIS QUESTION OF LAW ABOUT WHAT THERASENSE SAYS ABOUT THE

5    DEVIATION BETWEEN UNCLEAN HANDS AND INEQUITABLE CONDUCT, THERE

6    WAS NO ALLEGATION OF INEQUITABLE CONDUCT EVER UNTIL THEY FILED

7    THEIR FINDINGS OF FACT AND CONCLUSIONS OF LAW.

8        THE COURT:  AND I'M NOT GOING TO LET THEM GO FORWARD

9    ON THAT.

10        MS. BERNIKER:  RIGHT.  AND THE OTHER THING THAT

11    THERE WASN'T ANY ALLEGATION OF WAS THAT THERE WAS ANYTHING

12    WITHHELD FROM THE PATENT OFFICE.

13        SO EVEN IF THEY COULD HAVE ARGUED THAT THAT IS SOMEHOW A

14    BASIS FOR UNCLEAN HANDS, THERE WAS NO ARTICULATION OF THAT AT

15    ANY POINT IN TIME.

16        AND REMEMBER WITH RESPECT TO THE '224 APPLICATION, THEY

17    NEVER IDENTIFIED ANYTHING FROM THE PROSECUTION OF THAT

18    APPLICATION AS BEARING ON THE UNCLEAN HANDS QUESTION.  THEY

19    ATTACHED A SERIES OF DOCUMENTS TO THIS INTERROGATORY, AND I

20    HAVE THEM FOR YOUR HONOR IF YOU WANT TO TAKE A LOOK, THEY DON'T

21    HAVE ANYTHING TO DO WITH THE '224 APPLICATION.

22        THE COURT:  WELL, THE '224 APPLICATION, I THINK

23    MR. SINGER PROBABLY JUST NAILS THAT.  IT'S ONLY BEING OFFERED

24    TO REBUT THE CREDIBILITY OF THE WITNESS, AND I THINK IT'S NOT

25    PARTICULARLY RELEVANT.  I THINK IT -- I MEAN, FRANKLY, ONE

1    COULD SAY THAT THIS SHOWS THE WHIM AND CAPRICE OF THE PATENT

2    EXAMINERS AND YOU GET A GOOD ONE, YOU GET A BAD ONE DEPENDING

3    ON YOUR POSITION, AND YOU HAVE TO WORK AT DIFFERENT LEVELS OF

4    RESPONSIVENESS TO THE PATENT OFFICE.

5        I HAVEN'T READ IT, AND I DON'T KNOW WHETHER I'M GOING TO

6    ADMIT IT, BUT THAT I SAW AS AN ENTIRELY DIFFERENT KIND OF

7    ARGUMENT.  AND I THINK IT'S ACTUALLY MORE ON THE RELEVANCE

8    ISSUE, AND I THINK IT'S IMPROPER IMPEACHMENT I THINK REALLY IS

9    WHAT MR. SINGER IS SUGGESTING AND, FRANKLY, DISCLOSURE IS NOT

10   REQUIRED FOR IMPEACHMENT, AND I THINK THAT'S A MINOR POINT.

11       MORE -- TO THE MORE IMPORTANT POINT THAT I THINK MERCK IS

12   RAISING, I AGREE WITH MERCK THAT I'M NOT GOING TO ALLOW AN

13   INEQUITABLE CONDUCT CASE TO GO FORWARD.  SO THAT MEANS TO

14   ACTUALLY ENFORCE MY OWN RULING, I HAVE TO DRAW THE LINE.

15       MS. BERNIKER:  RIGHT.  AND LET ME HELP YOU DO THAT,

16   YOUR HONOR.

17       THE COURT:  BECAUSE THAT WOULD BE A CHEAP BACK

18   DOORWAY FOR THE -- FOR A LESSER QUANTUM OF PROOF ON THE SAME

19   THING.

20       AND SO WE ALL GET THAT.  AND I KNOW MR. SINGER IS NOT

21   OFFERING THAT.  HE WANTS TO OFFER A PURE AND PROPER UNCLEAN

22   HANDS DEFENSE, AND WE'RE GOING TO LET HIM DO THAT.

23       BUT I NEED THAT BARRIER.

24       MS. BERNIKER:  CERTAINLY.  SO LET'S TAKE A LOOK AT

25   THERASENSE, AND I KNOW YOUR HONOR IS VERY FAMILIAR WITH IT.

1      THE COURT:  I'VE GOT IT RIGHT HERE.

2      MS. BERNIKER:  I THINK IT IS THE BEST DESCRIPTION WE

3   HAVE OF WHAT IS UNCLEAN HANDS AND WHAT IS NOT UNCLEAN HANDS.

4      AND AS YOUR HONOR NOTED, THERASENSE STARTS BY GOING

5   THROUGH A DESCRIPTION OF THE SUPREME COURT UNCLEAN HANDS CASES

6   THAT ULTIMATELY LED TO THE DOCTRINE OF INEQUITABLE CONDUCT.

7      AND IN SECTION 4 OF THE OPINION -- AND WE HAVE IT ON THE

8   SCREEN, BUT I AM SURE YOU HAVE IT IN FRONT OF YOU -- IT BEGINS

9   BY ARTICULATING THAT THOSE UNCLEAN HANDS CASES FORM THE BASIS

10  FOR THE NEW DOCTRINE OF INEQUITABLE CONDUCT.

11     THE COURT:  YES.

12     MS. BERNIKER:  IT GOES ON TO SAY THAT THOSE CASES

13  DEALT WITH PARTICULARLY EGREGIOUS MISCONDUCT WHICH, AS WE'RE

14  GOING TO EXPLAIN LATER, YOUR HONOR, IS NOT ANYWHERE CLOSE TO

15  WHAT IS ALLEGED HERE.

16     THE COURT:  BUT THAT'S A FACTUAL ISSUE, THOUGH, FOR

17  ME TO DETERMINE.

18     MS. BERNIKER:  OF COURSE.  AND THEN IT GOES ON TO

19  SAY IN THAT PARAGRAPH, AS THE INEQUITABLE CONDUCT DOCTRINE

20  EVOLVED FROM THESE UNCLEAN HANDS CASES, IT CAME TO EMBRACE A

21  BROADER SCOPE OF MISCONDUCT.  SO NOW IT'S DISTINGUISHING FROM

22  UNCLEAN HANDS TO AN EXTENT, AND IT SAYS INCLUDING NOT ONLY

23  EGREGIOUS AFFIRMATIVE ACTS OF MISCONDUCT INTENDED TO DECEIVE

24  BOTH THE PTO AND THE COURTS, BUT ALSO THE MERE NONDISCLOSURE OF

25  INFORMATION TO THE PTO.

1       SO I THINK WHAT THE FEDERAL CIRCUIT IS SAYING THERE IS

2   WHERE YOU HAVE ALLEGATIONS OF NONDISCLOSURE TO THE PATENT

3   OFFICE, THOSE ALLEGATIONS ARE PART OF AN INEQUITABLE CONDUCT

4   QUESTION AND NOT A SEPARATE UNCLEAN HANDS QUESTION.

5           THE COURT:  WELL, I THINK IF YOU WERE TO READ THE

6   TRIO OF CASES, THOUGH, YOU WOULD SEE THAT THERE IS AN ELEMENT

7   OF SUPPRESSING, SUPPRESSION OF EVIDENCE, KEYSTONE TALKS ABOUT

8   SUPPRESSION OF EVIDENCE.  HAZEL-ATLAS -- THEY ALL THREE OF THEM

9   TALK ABOUT SUPPRESSION OF EVIDENCE.

10          MS. BERNIKER:  AND WHAT THEY SAY IN EVERY ONE OF

11  THOSE CASES WAS THAT EVIDENCE WAS FABRICATED, AND THEN THE FACT

12  THAT THEY WERE FABRICATED WAS SUPPRESSED WHICH IS DIFFERENT

13  FROM SAYING THAT YOU DIDN'T DISCLOSE A REFERENCE TO THE PATENT

14  OFFICE, RIGHT?

15      AND THAT'S WHY THE FEDERAL CIRCUIT, I THINK, SAYS TWO

16  PARAGRAPHS DOWN THAT THEY RECOGNIZE THAT THERE'S SOME CONTINUED

17  VIABILITY OF UNCLEAN HANDS SEPARATE AND APART FROM INEQUITABLE

18  CONDUCT.

19      BUT WHAT THEY SAY IS, IS THAT THAT REMAINS A -- THAT THE

20  UNCLEAN HANDS DOCTRINE REMAINS AVAILABLE TO SUPPLY A REMEDY FOR

21  EGREGIOUS MISCONDUCT LIKE THAT IN THE SUPREME COURT CASES WHICH

22  IS WHERE THERE IS FABRICATION OF EVIDENCE AND SUPPRESSION OF

23  THAT.

24          THE COURT:  SURE.  IT'S A LITTLE DISTURBING TO ME

25  WHEN I LOOK AT BOTH KEYSTONE AND HAZEL-ATLAS SEEM TO

```
1     ESSENTIALLY BE BRIBES.

2              MS. BERNIKER:  YES.

3              THE COURT:  I MEAN, HUSH MONEY WAS PAID, WHATEVER

4     YOU WANT TO CALL IT.  IT'S ODIOUS.

5              MS. BERNIKER:  YES.

6              THE COURT:  AND HERE'S WHAT I CAN'T TELL, HAS

7     UNCLEAN HANDS BEEN RELEGATED TO THIS KIND OF NEFARIOUS

8     ACTIVITY?  AND MAYBE THAT'S WHAT GILEAD IS PLANNING TO PROVE

9     OR -- AND EVERYTHING ELSE BEYOND THIS HAS REALLY GONE UNDER

10    THIS UMBRELLA, THIS BROADER UMBRELLA OF INEQUITABLE CONDUCT

11    WITH THIS HEIGHTENED BURDEN OF PROOF AND HEIGHTENED ELEMENTS OF

12    PROOF OF INTENT AND MATERIALITY THAT IS A BUT FOR MATERIALITY.

13         AS I SAY, I'M GOING TO STRUGGLE WITH THIS PROBABLY BEYOND

14    WRITING A DECISION ON THIS.

15             MS. BERNIKER:  WELL, YOUR HONOR, WE ACTUALLY HAVE --

16    I'M HAPPY TO GO OVER THIS WITH YOU NOW.  THERE ARE A SERIES OF

17    CASES WHERE COURTS HAVE CONSIDERED UNCLEAN HANDS AND DETERMINED

18    THAT IT WAS NOT APPROPRIATE AND THAT INCLUDES CASES WHERE

19    PATENT ISSUES WERE AT STAKE.

20             THE COURT:  OKAY.  WELL, AND I'M MOST INTERESTED IN

21    THE PATENT CONTEXT, AND I WOULD CERTAINLY APPRECIATE IT.

22             MS. BERNIKER:  CERTAINLY.  SO IF WE CAN TURN TO

23    SLIDE DDX-714, PLEASE.

24         ACTUALLY, LET'S TAKE A STEP BACK.  YOU'RE FAMILIAR WITH

25    THE TRIO OF CASES THAT WERE ADDRESSED IN THERASENSE, BUT I WANT
```

1      TO TALK ABOUT ONE MORE FEDERAL CIRCUIT CASE ON UNCLEAN HANDS

2   AND THE FACTS THERE, THE APTIX CASE THAT WAS CITED BY GILEAD IN

3   ITS PAPERS.

4           THE COURT:  WHICH ONE?

5           MS. BERNIKER:  THE APTIX, 269 F.3D 1369, AND I'VE

6   GOT IT ON THE SCREEN AT DDX-713.  THAT'S ANOTHER CASE WHERE THE

7   FEDERAL CIRCUIT SPECIFICALLY FOUND UNCLEAN HANDS.

8       AND JUST LIKE THE SUPREME COURT CASES, WE HAVE FABRICATED

9   EVIDENCE.  THIS IS A CASE THAT READS LIKE A JOHN GRISHAM BOOK.

10  THE INVENTOR FAKED A SET OF LAB NOTEBOOKS.  AND THEN WHEN THE

11  OTHER SIDE MOVED FOR A DOCUMENT EXAMINER TO TAKE A LOOK AT

12  THEM, HE FAKED A THEFT FROM HIS CAR AND HAD THEM DESTROYED, AND

13  THEN THEY MYSTERIOUSLY CAME BACK.  I MEAN, IT REALLY DOES READ

14  LIKE A GRISHAM NOVEL.

15      AND AT THE VERY END, HE GETS EXAMINED AT TRIAL AND HE

16  ASSERTS HIS FIFTH AMENDMENT PRIVILEGE THE ENTIRE TIME.  SO THE

17  COURT FINDS EVERYTHING WAS A FAKE AND A COMPLETE SHAM.

18      SO THAT'S A CASE WHERE THEY FIND UNCLEAN HANDS, AND THAT'S

19  THE KIND OF EGREGIOUS MISCONDUCT THE FEDERAL CIRCUIT HAS TALKED

20  ABOUT.

21          THE COURT:  SO I DO HAVE TO BE CAREFUL.  WHAT I'M

22  LOOKING FOR IS THE ONE THAT GIVES US UNCLEAN HANDS.

23          MS. BERNIKER:  EXACTLY.

24          THE COURT:  BECAUSE THERE CAN ALWAYS BE A WORST

25  CASE.

1          MS. BERNIKER:  YES.

2          THE COURT:  AND THAT DOESN'T BECOME THE OUTER LIMIT,

3    YEAH.

4          MS. BERNIKER:  SO LET'S LOOK AT THAT.

5      AND THE NEXT SLIDE I HAVE IS FROM HUMAN GENOME VERSUS

6    GENENTECH, AND THIS IS A JUDGE PFAELZER OPINION FROM THE

7    CENTRAL DISTRICT OF CALIFORNIA IN 2011.

8      AND IN THAT CASE THEY ACTUALLY ARGUED BOTH INEQUITABLE

9    CONDUCT AND UNCLEAN HANDS BASED ON THE SAME SET OF FACTS, AND

10   SHE DISTINGUISHES THE THERASENSE EGREGIOUS MISCONDUCT OF THE

11   SUPREME COURT CASES.

12     AND IN THAT CASE SHE SPECIFICALLY FOUND THAT THEY HADN'T

13   EVEN PLED UNCLEAN HANDS OR INEQUITABLE CONDUCT EVEN THOUGH

14   THERE WAS INCONSISTENT STATEMENTS BY THE WITNESSES.

15         THE COURT:  SO HOW IS THAT HELPFUL TO ME IF SHE

16   BLOCKED IT -- DID SHE BLOCK IT ON A PLEADING?

17         MS. BERNIKER:  I BELIEVE THAT WAS THE ONE WHERE SHE

18   BLOCKED IT ON THE PLEADING.

19         THE COURT:  SO HERE I HAVE A VALID PLEADING OF THE

20   AFFIRMATIVE DEFENSE OF UNCLEAN HANDS.  SO I KNOW WE'RE LOOKING

21   FOR THE SPOTTED HORSE CASE.

22         MS. BERNIKER:  THAT'S FINE.  I CAN GIVE YOU ANOTHER

23   ONE IF THAT'S HELPFUL.

24         THE COURT:  THEY'RE ALL HELPFUL.

25         MS. BERNIKER:  THE HOFFMAN LA-ROCHE VERSUS PROMEGA

1    CASE WHICH IS TWO SLIDES AHEAD 319 F.SUPP 2D 2011, NORTHERN

2    DISTRICT OF CALIFORNIA.

3        IN THAT CASE THERE WAS AN ARGUMENT OF UNCLEAN HANDS WHERE

4    THERE WAS AN ASSERTION THAT THERE WERE MISSTATEMENTS MADE

5    DURING THE PROCEEDINGS IN THE DISTRICT COURT BY ONE OF THE

6    INVENTORS AND THE PLAINTIFF'S EXPERTS AND THERE WAS A

7    CONTENTION THAT THE STATEMENTS WERE, QUOTE, "UNCONSCIONABLE

8    ACTS," AND THIS IS ANOTHER PATENT CASE BY THE WAY,

9    "UNCONSCIONABLE ACTS BASED ON THERE HAD ACTUALLY BEEN A COURT

10   FINDING THAT THERE WAS ISSUES OF WITNESS CREDIBILITY," WHICH

11   THERE HAS NOT BEEN HERE AND WE DON'T THINK WOULD BE

12   APPROPRIATE.

13       AND ON THAT RECORD THE COURT NONETHELESS FOUND THAT THERE

14   WERE NO UNCLEAN HANDS BECAUSE IT DIDN'T RISE TO THE LEVEL OF

15   EGREGIOUSNESS OF THE MISCONDUCT IN KEYSTONE.

16           THE COURT:  OKAY.  SO THAT'S THE KIND OF DISCUSSION

17   I'M INTERESTED IN WHERE THE COURT IS DRAWING THE LINE AND

18   FINDING THAT IT WAS -- SO THAT'S HELPFUL TO ME.

19       OTHER CASES OF THAT SORT, OF COURSE, WE'LL DO SOME

20   RESEARCH BUT, FRANKLY, YOU ARE THE EXPERTS AND ALL COURTS RELY

21   ON YOUR EXPERTISE AND THE FACT THAT THERE ARE PROBABLY 50 OF

22   YOU AND 2 OF US, AND SO I'M GOING TO LET YOU KEEP DOING THAT

23   RESEARCH.

24           MS. BERNIKER:  IF I COULD STILL DRAW YOUR ATTENTION

25   TO ONE OTHER THING, THOUGH, IN THE HUMAN GENOME SCIENCES CASE,

1    WHICH IS IN THE NEXT SLIDE --

2              THE COURT:  YES.

3              MS. BERNIKER:  -- BECAUSE I WANT TO BE CLEAR THAT IN

4    THAT CASE THE COURT SPECIFICALLY CONSIDERED ALLEGATIONS THAT

5    GENENTECH HAD BEEN MAKING INCONSISTENT STATEMENTS.  AND THE

6    INCONSISTENT STATEMENTS WERE THAT -- THERE WERE A FEW EXAMPLES

7    OF THEM, BUT ONE OF THEM WAS AN ARGUMENT THAT IN ONE FORUM THEY

8    SAID THAT THE PATENTS WERE IRRELEVANT AND THE OTHER FORUM THEY

9    SUGGESTED THAT THEY WERE IMPORTANT.

10       THE COURT THOUGHT THAT THAT WAS INSUFFICIENT FOR PLEADING

11   UNCLEAN HANDS OR INEQUITABLE CONDUCT.

12             THE COURT:  WELL, I MEAN, I DON'T KNOW WHAT THIS

13   CASE WILL BE LIKE BECAUSE I HAVE TO HEAR THE EVIDENCE.

14             MS. BERNIKER:  CERTAINLY.

15             THE COURT:  I HAVE TO DECIDE WHAT IS CREDIBLE, AND I

16   HAVE TO DETERMINE WHAT MY FACTUAL FINDINGS ARE AND THEN APPLY

17   THE LAW.

18             MS. BERNIKER:  ABSOLUTELY.  I'D LIKE TO GET BACK TO

19   THIS QUESTION, THOUGH, ABOUT THE OMISSION OF INFORMATION FROM

20   THE PATENT OFFICE BECAUSE AS FAR AS I'M AWARE THERE ARE NO

21   CASES SUGGESTING THAT THE QUESTION OF WHETHER A PARTY OMITTED

22   INFORMATION THAT SHOULD HAVE BEEN DISCLOSED TO THE PATENT

23   OFFICE SHOULD BE ASSESSED NOT UNDER THE INEQUITABLE CONDUCT

24   RUBRIC BUT INSTEAD UNDER THE UNCLEAN HANDS RUBRIC.

25             ALL OF THE CASES THAT I'M AWARE OF WITH RESPECT TO THE

1    UNCLEAN HANDS RUBRIC RELATE TO AFFIRMATIVE MISREPRESENTATIONS,

2    NOT OMISSIONS FROM THE PATENT OFFICE.

3         AND, OF COURSE, THE ACTUAL INEQUITABLE CONDUCT STANDARD

4    SET BY THE FEDERAL CIRCUIT IS EXPRESSLY DESIGNED TO ADDRESS

5    WHAT HAPPENS IN THE CONTEXT OF ALLEGEDLY MATERIAL OMISSIONS OR

6    MISREPRESENTATIONS TO THE PATENT OFFICE.

7         THE COURT:  YES, BUT UNCLEAN HANDS DEALS WITH

8    CONDUCT BEFORE THE PATENT OFFICE AND THE COURT.

9         MS. BERNIKER:  I'M NOT SURE THAT IT'S TRUE THAT

10   UNCLEAN HANDS DEALS WITH OMISSIONS TO THE PATENT OFFICE.

11        THE COURT:  OMISSIONS -- RIGHT, BUT CONDUCT.  I WAS

12   SAYING CONDUCT.

13        MS. BERNIKER:  IT CAN ENCOMPASS CONDUCT.

14        THE COURT:  YES.  I APPRECIATE WHAT YOU'RE SAYING

15   ABOUT OMISSIONS.

16        MS. BERNIKER:  RIGHT.  BUT I THINK THAT'S IMPORTANT

17   BECAUSE THERE ARE, IN FACT, A NUMBER OF FINDINGS OF FACT THAT

18   GILEAD HAS PROPOSED IN ITS PAPERS REGARDING OMISSIONS TO THE

19   PATENT OFFICE.

20        THE COURT:  OKAY.

21        MS. BERNIKER:  SO I UNDERSTAND THAT COUNSEL FOR

22   GILEAD HAS JUST TOLD YOU THAT THEIR ARGUMENT IS NOT ABOUT THAT,

23   BUT THEY HAVE CONCLUDED IN THEIR PROPOSING FINDINGS BOTH WITH

24   RESPECT TO THE '224 APPLICATION AND OTHER THINGS THAT IT WAS

25   IMPROPER FOR DR. DURETTE OR -- AND NOW THEY'RE ACTUALLY TRYING

1    TO ARGUE THAT IT WAS IMPROPER FOR MR. BERGMAN WHO PROSECUTED

2    THE '712 PATENT, WHO THEY'VE NEVER POINTED A FINGER AT BEFORE,

3    THEY'RE SAYING THAT IT WAS IMPROPER FOR THEM TO NOT HAVE

4    CONVEYED INFORMATION TO THE PATENT OFFICE.

5              THE COURT:  SO THAT THEN BEGS THE QUESTION OF

6    WHETHER THOSE FACTUAL FINDINGS ARE ESSENTIAL TO A DETERMINATION

7    OF UNCLEAN HANDS, AND I DON'T KNOW THAT YET.

8              MS. BERNIKER:  AND I WOULD ARGUE --

9              THE COURT:  BECAUSE I WANT TO MAKE CLEAR -- YOU

10   SHOULD BE VERY CONCERNED ABOUT THIS ISSUE BECAUSE I'VE LISTENED

11   TO DR. DURETTE ALREADY.  I HAVE MOST -- I DON'T EXPECT -- IF

12   HE'S BACK TODAY, THAT'S GREAT.  IF HE'S NOT, THAT'S FINE, I'VE

13   HEARD EVERYTHING.

14       THIS SHOULD GIVE YOU GREAT PAUSE AND GREAT CONCERN, AND

15   THAT'S WHY I'M SPENDING SO MUCH TIME ON MAKING SURE THAT I

16   RESPECT THE LINE BECAUSE THE QUANTUM AND ELEMENTS OF PROOF ARE

17   SO LESS STRINGENT FOR UNCLEAN HANDS.

18       BUT THERE IS SOMETHING HERE, AND I AM CONCERNED ABOUT IT.

19              MS. BERNIKER:  WELL, I THINK I WOULD DISAGREE THAT

20   THE QUANTUM AND THE ELEMENTS OF PROOF ARE SUBSTANTIALLY LESS

21   STRINGENT THAN UNCLEAN HANDS.  THE COURT HAS FOUNDING THAT IT

22   REQUIRES CLEAR AND CONVINCING EVIDENCE OF AFFIRMATIVELY

23   EGREGIOUS BEHAVIOR.

24              THE COURT:  YES.

25              MS. BERNIKER:  AND INTENT TO DECEIVE.  SO I'M NOT

1    SURE THAT IT IS SIGNIFICANTLY DIFFERENT FROM THE LEVEL OF PROOF

2    REQUIRED FOR INEQUITABLE CONDUCT UNDER THERASENSE.

3         THE COURT:  WELL, THE MATERIALITY ISSUE, I THINK, IS

4    REALLY THE BIG DIFFERENCE AND THERASENSE REITERATES THAT THE

5    FEDERAL CIRCUIT CAN'T READ THE MATERIALITY INTO UNCLEAN HANDS

6    BECAUSE THE SUPREME COURT HAS CLEARLY SPOKEN ON THAT ISSUE.

7         SO, YOU KNOW, WE -- I'M MINDFUL OF THAT.  WELL, ALL RIGHT.

8    I THINK THAT ON THIS PARTICULAR ISSUE THAT I WOULD WELCOME

9    FURTHER BRIEFING, NOT ON HOW THESE FACTS -- I MEAN, THERE MAY

10   BE BRIEFING ON HOW THE EVIDENCE SUBMITTED APPLIES TO THE LAW

11   BUT IT'S -- THIS IS A VERY NARROW ISSUE.  IT'S VERY IMPORTANT

12   TO THE OUTCOME OF THIS CASE.

13        AND, YOU KNOW, ANY ASSISTANCE THAT YOU CAN GIVE THE COURT,

14   ESPECIALLY IN THE PATENT AREA BECAUSE I DON'T KNOW THAT OTHER

15   CASES WILL BE HELPFUL, OF WHAT KINDS OF FACTS STILL FALL UNDER

16   THE RUBRIC OF UNCLEAN HANDS AND WHAT KIND OF FACTS HAVE BEEN

17   TOSSED OUT.

18        WHAT IS -- SO IT'S, IT'S JUST THAT INTERSECTION.  AND

19   EVIDENCE OF WHAT IS CONSIDERED EGREGIOUS THAT IS REALLY AT THE

20   MOST ODIOUS IS NOT HELPFUL BECAUSE IT DOESN'T SAY THAT IT

21   HAS -- UNLESS THE CASE SAYS IT HAS TO BE THIS BAD.  I DON'T

22   KNOW OF THAT CASE.

23        AND THERASENSE, I MEAN, THAT'S WHAT YOU CITED TO ME, AND

24   IT'S PROBABLY THE BEST DISCUSSION THAT WE HAVE, BUT IT'S A

25   DEFENSE THAT -- I MEAN, THIS CASE, I GUESS I JUST -- I DON'T

1    WANT THERE TO BE ANY DOUBT IN ANYONE'S MIND ABOUT HOW SERIOUS I

2    TAKE THIS DEFENSE IN THE CONTEXT OF WHAT I'VE HEARD SO FAR.

3         MS. BERNIKER:  CERTAINLY, YOUR HONOR.

4         THE COURT:  AND, AGAIN, I DON'T KNOW THAT THERE WILL

5    BE CLEAR AND CONVINCING EVIDENCE TO ESTABLISH THAT.  I DON'T

6    KNOW THAT.  I DON'T KNOW ALL OF THE EVIDENCE, BUT I KNOW YOUR

7    BRIEFING ON IT.

8         MS. BERNIKER:  MAY I ADDRESS BRIEFLY THE '224

9    APPLICATION?

10        THE COURT:  SURE.

11        MS. BERNIKER:  SO COUNSEL FOR GILEAD SAID THAT THEY

12   WERE OFFERING THAT APPLICATION TO CHALLENGE THE CREDIBILITY OF

13   DR. DURETTE.  THAT'S ACTUALLY NOT WHAT THEY SAID IN THEIR

14   FINDINGS AND CONCLUSIONS THAT THEY SUBMITTED TO THIS COURT.

15        WHAT THEY SAID, AND I'LL DIRECT YOU TO THE FINDINGS AND

16   CONCLUSIONS WHERE THEY TALK ABOUT THIS, THEY STARTED THEIR

17   DISCUSSION OF THE '224 APPLICATION AT PARAGRAPH 85 WHERE THEY

18   SAID THAT "DR. DURETTE'S ADDITIONAL PROSECUTION ACTIVITIES

19   FURTHER DEMONSTRATE THAT THE FEBRUARY 2005 AMENDMENT WAS

20   SPURRED NOT BY ANY INVENTION ACTUALLY CONCEIVED IN THE

21   MERCK/ISIS COLLABORATION."

22        THIS IS A RENEWAL OF THE ARGUMENT THAT THEY DIDN'T PREVAIL

23   ON IN FRONT OF THE JURY ABOUT WHETHER OR NOT THE CLAIMS THAT

24   ISSUED WERE PROPERLY SUPPORTED BY THE ORIGINAL SPECIFICATION.

25        THEY DID NOT SAY IT HAD ANYTHING TO DO WITH HIS

1    CREDIBILITY STATEMENTS.

2         NOW, IF YOU CAN --

3              THE COURT:  WELL, I GUESS I HEARD CREDIBILITY ALL

4    OVER WHAT YOU JUST READ OR ONE COULD DISCERN IT AS CREDIBILITY

5    BECAUSE IT WOULD GO TO THE CREDIBILITY OF DR. DURETTE'S

6    TESTIMONY HERE IN COURT AND HIS -- I MEAN, IT GOES TO THE

7    CREDIBILITY OF HIS STATEMENT.

8         YOU KNOW, LET ME BACK UP.  I KNOW WE HAVE A BIG ISSUE WHEN

9    I GET TO THE EVIDENCE ABOUT THE EFFECT OF THE JURY'S VERDICT OF

10   ENABLEMENT OR NO INVALIDITY FOR LACK OF ENABLEMENT AND LACK OF

11   WRITTEN DESCRIPTION.  AND THAT MAY BE YOUR WINNING CARD HERE.

12        SO I DON'T WANT TO SCARE YOU THAT I'M IGNORING ALL OF THAT

13   BECAUSE WE HAD LENGTHY DISCUSSIONS ABOUT THAT AND THAT'S AN

14   ISSUE.

15        BUT I HAVE TO BE SURE THAT THE EVIDENCE ITSELF EVEN SETS

16   UP AS UNCLEAN HANDS, WHETHER IT'S A PROPER -- OR WHETHER I

17   THROW IT ALL OUT BECAUSE IT'S REALLY INEQUITABLE CONDUCT AND

18   THAT HASN'T BEEN PLED.

19        SO THESE THRESHOLD ISSUES ARE VERY MUCH OF A CONCERN TO

20   ME, BUT I DO HAVE VERY TROUBLING EVIDENCE THAT HAS BEEN

21   SUBMITTED IN THE CASE ALREADY.

22             MS. BERNIKER:  AND I UNDERSTAND THAT, YOUR HONOR.

23   BUT WITH RESPECT TO THE '224 APPLICATION, I DON'T THINK THAT

24   THEY'VE ARTICULATED ANY REASON THAT IT'S INCONSISTENT WITH HIS

25   TESTIMONY.  HE TESTIFIED THAT THE COMPOUNDS WERE IMPORTANT TO

1    MERCK AND YOU'VE SEEN DOCUMENT AFTER DOCUMENT THAT WE'LL GO

2    OVER SHOWING THAT MERCK HAD CONCEIVED OF THESE SPECIFIC

3    COMPOUNDS LONG BEFORE THE CALL.

4         THERE'S NOTHING THAT HAPPENED DURING THE PROSECUTION OF

5    THE '224 APPLICATION THAT UNDERMINES THAT.  IT IS UNDISPUTED

6    THAT MERCK HAD NOT TESTED A COMPOUND WITHIN THE SCOPE OF THE

7    CLAIM.

8             THE COURT:  BUT THEN ALL YOU'RE SAYING IS THAT THEY

9    SUBMITTED IT, AND IT DOESN'T MEAN ANYTHING AND SO DISREGARD IT.

10   I'VE GOT LOTS OF EVIDENCE IN THIS CASE THAT I'LL DISREGARD

11   BECAUSE IT DIDN'T ASSIST IN FINDING FACTS.  THAT'S THE WAY

12   TRIALS ARE.

13        THAT'S A DIFFERENT ISSUE.  YOU ARE OBJECTING TO IT EVEN

14   COMING IN.

15            MS. BERNIKER:  WE ARE BECAUSE WE BELIEVE THAT GILEAD

16   INTENDS TO MISUSE IT TO TRY TO UNDERMINE THE JURY'S VERDICT ON

17   WRITTEN DESCRIPTION WHICH THEY HAVE ALREADY INDICATED.

18            THE COURT:  I APPRECIATE THAT, AND I'LL HAVE A

19   FURTHER DISCUSSION WITH MR. SINGER ON THAT POINT.

20            MS. BERNIKER:  OKAY.  WELL, OUR CONCERN ABOUT IT

21   BEING ADDED TO THE RECORD, JUST TO BE CLEAR, IS THAT IT'S

22   SOMETHING THAT THEY MAY ARGUE TO THIS COURT OR THE FEDERAL

23   CIRCUIT AS A BASIS FOR UNDERMINING THE JURY'S VERDICT ON

24   WRITTEN DESCRIPTION EVEN THOUGH THEY WAIVED INCLUSION OF THE

25   EVIDENCE IN FRONT OF THE JURY.  WE BELIEVE IT WOULD HAVE BEEN

1    IMPROPER HAD THEY SOUGHT TO INCLUDE IT, BUT THEY DIDN'T SEEK TO

2    INCLUDE IT AND SO I DON'T THINK IT'S APPROPRIATE TO GIVE THEM

3    THE BENEFIT OF THAT RECORD NOW TO TRY TO ARGUE TO FROM IT AT

4    THIS POINT.  AND WE DON'T THINK IT'S RELEVANT TO ANY OF THE

5    ACTUAL ISSUES RELEVANT TO THE BENCH TRIAL.

6         AND THAT'S THE PRINCIPAL BASIS FOR OUR OBJECTION.

7              THE COURT:  GOOD.  I APPRECIATE THAT.  THANK YOU.

8    THAT WAS VERY HELPFUL.

9         MR. SINGER, ARE YOU TAKING THIS ONE ON?

10             MR. SINGER:  I AM AGAIN.

11             THE COURT:  OKAY.

12             MR. SINGER:  I WILL BE VERY BRIEF, YOUR HONOR,

13   BECAUSE I THINK THE -- I UNDERSTAND THE COURT'S CONCERNS, BUT I

14   JUST WANT TO BE EXPLICIT.  AND I PREFER MICHAEL CONNELLY TO

15   JOHN GRISHAM SO I THINK THIS DOES READ LIKE A MICHAEL CONNELLY

16   NOVEL HAVING READ MANY OF THEM.

17        BUT IN ANY EVENT, I JUST WANT TO LAY IT OUT FOR YOU

18   BECAUSE IT'S ALMOST AS IF THEY'RE SAYING WE SHOULD HAVE ALLEGED

19   INEQUITABLE CONDUCT AND WE SOMEHOW COULD HAVE.

20        AND DR. DURETTE'S, FROM OUR PERSPECTIVE, FROM HIS LIES TO

21   PHARMASSET, AND I HATE TO USE THAT WORD, BUT THAT'S THE BOTTOM

22   LINE, ABOUT BEING IN THE FIREWALL, THAT'S NOT INEQUITABLE

23   CONDUCT.  THAT'S UNCLEAN HANDS.  AND I SUBMIT TO THE COURT THAT

24   THAT'S UNCONSCIONABLE CONDUCT WHAT HAPPENED HERE WITH

25   PHARMASSET.  HE TOLD THEM THAT HE WAS IN THE FIREWALL AND THEY

1    GAVE HIM THE STRUCTURE, OKAY.

2        AND THEN HE TOLD THEM THAT HE WAS IN IT AGAIN.  SO THEY'RE

3    HANDS UP, OKAY, THIS GUY IS IN THE FIREWALL.  WE DON'T HAVE

4    ANYTHING TO WORRY ABOUT.

5        HIS FAILURE TO RECUSE HIMSELF FROM PROSECUTION AFTER

6    LEARNING IT, THAT'S UNCLEAN HANDS.  THAT'S NOT INEQUITABLE

7    CONDUCT.  WE COULDN'T PLEAD INEQUITABLE CONDUCT UNDER THE

8    FEDERAL CIRCUIT'S AUTHORITIES FOR EITHER OF THOSE THINGS.

9        HIS LYING AT HIS DEPOSITION, AGAIN, THIS IS WHERE THE

10   COURT'S SUPERVISION COMES INTO PLAY IN UNCLEAN HANDS.  THAT'S

11   UNCLEAN HANDS.  AGAIN, NOT INEQUITABLE CONDUCT.

12       AND HIS LYING IN THIS COURTROOM IN THIS COURTROOM IN FRONT

13   OF THAT JURY IS ABSOLUTELY UNCLEAN HANDS, AND IT'S NOT

14   INEQUITABLE CONDUCT.

15       AND AS IT RELATES TO THE '224 APPLICATION, HE TOLD THIS

16   JURY NOT THAT IT WAS JUST IMPORTANT; IT WAS THE MOST IMPORTANT,

17   THAT THESE CLAIMS, WHICH MERCK TESTED NOT A ONE, AND MADE NOT A

18   ONE, AND NEVER MADE UNTIL AFTER DR. DURETTE FILED THE CLAIMS,

19   AND AFTER MR. CLARK DISCLOSED THEM, IT WAS NOT THE MOST

20   IMPORTANT WORK OF THE COLLABORATION.  IT WAS THE MOST IMPORTANT

21   WORK TO GETTING CLAIMS THAT COVERED PHARMASSET.  THAT'S IT.

22   THAT'S UNCLEAN HANDS, AND THAT'S WHY WE'RE COMPLAINING ABOUT

23   WHAT HE DID BEFORE THE PATENT OFFICE.

24       I THINK THE COURT SHOULD TAKE THE EVIDENCE.  WE CAN GIVE

25   FURTHER BRIEFING, AND THE COURT CAN MAKE ITS DECISION, BUT I

1    THINK THAT IS THE PRUDENT COURSE HERE FOR THE COURT.  HEAR THE

2    EVIDENCE, REQUEST FURTHER BRIEFING, AND I'M HAPPY TO PROVIDE

3    FURTHER AUTHORITIES IF WE CAN FIND THEM, YOUR HONOR.

4         IF THERE ARE ANY QUESTIONS, I'M HAPPY TO ANSWER THEM.

5              THE COURT:  NO.  AND I WILL CERTAINLY TAKE THE

6    EVIDENCE TODAY.  THAT'S WHY YOU ALL ARE HERE.  WE ARE GOING TO

7    GO FORWARD.

8         I WANTED -- I CERTAINLY WANTED TO SPEND THE TIME FOR YOU

9    TO HELP ME UNDERSTAND IT, BUT MAYBE MORE IMPORTANTLY FOR YOU TO

10   UNDERSTAND WHERE I'M STRUGGLING SO THAT AS YOU DO BRIEF THIS

11   FURTHER, YOU CAN ADDRESS WHAT MIGHT BE MY MISCONCEPTIONS OF THE

12   LAW OR THE PARTICULAR SPOT THAT I'M TRYING TO IDENTIFY HERE.

13        YOU KNOW, THERE ARE NOT BRIGHT LINES.  I DON'T EXPECT

14   THERE TO BE A BRIGHT LINE.

15             MR. SINGER:  THERE ARE NOT.

16             THE COURT:  AND SO I DON'T SUGGEST THAT YOU'VE GOT

17   TO COME TO ME WITH A CASE THAT I'D HAVE IT.  I'D HAVE THAT

18   CASE.  THAT WOULD HAVE BEEN EASY TO FIND.

19        BUT I DO NEED -- I WILL ASK FOR THAT FURTHER BRIEFING ON

20   THIS ISSUE.  YOU'VE ALREADY ADDRESSED IT.  OBVIOUSLY YOU'VE PUT

21   A LOT OF EFFORT INTO IT ALREADY.  YOU KNEW THIS WAS AN ISSUE

22   BASED ON -- PROBABLY MONTHS AGO YOU KNEW THIS WAS THE ISSUE,

23   AND PRESUMABLY IT DIDN'T JUST COME UP IN THE LAST COUPLE OF

24   DAYS.

25             BUT CERTAINLY THE DEPTH OF YOUR RESEARCH AND PRESENTATION

1    SHOWS A LOT OF THOUGHT ON THE ISSUE, AND I THINK WE JUST NEED

2    TO CONTINUE EVALUATING IT.

3         MR. SINGER:  OKAY.  ALL RIGHT.  VERY WELL, YOUR

4    HONOR.  THANK YOU.

5         THE COURT:  SO I THINK MAYBE I HAVE RULED, THEN, ON

6    THE EVIDENTIARY OBJECTIONS.  I AM GOING TO HEAR EVIDENCE ON

7    UNCLEAN HANDS AND NOT ALLOW AN AMENDMENT TO THE PLEADING TO

8    ALLOW AN INEQUITABLE CONDUCT DEFENSE.

9         I AM GOING TO ALLOW THE PRESENTATION OF THE '224 PATENT,

10    AND I MAY RESTRICT ITS APPLICABILITY TO ISSUES OF CREDIBILITY.

11    AND I THINK I'M GOING TO NEED TO SEE HOW IT'S USED, AND WE CAN

12    TALK FURTHER DURING THE PRESENTATION OF EVIDENCE IF NEED BE

13    ABOUT HOW BROADLY I WILL CONSIDER THE '224 PATENT, BUT I DON'T

14    SEE ANY REASON TO EXCLUDE IT.

15         ARE THERE -- I'VE GOT TOO MANY PIECES OF PAPER HERE.  BUT

16    ARE THERE ANY OTHER RULINGS THAT YOU NEED BEFORE WE GO FORWARD

17    AT THIS NEXT STEP?

18         THEN WE HAVE ALL OF THE DAMAGES ISSUES.  I DON'T KNOW

19    WHETHER WE WANT TO JUMP AHEAD TO THAT DISCUSSION NOW OR TAKE

20    CARE OF THE PRESENTATION OF EVIDENCE ON UNCLEAN HANDS AND

21    WAIVER THAT WE'VE BEEN DISCUSSING RIGHT NOW?

22         I'M NEUTRAL ON IT.

23         MR. SINGER:  I THINK IT WOULD BE EASY TO DO THE

24    EVIDENCE NOW, YOUR HONOR.

25         MR. GENDERSON:  YEAH, I AGREE, YOUR HONOR.

```
 1              THE COURT:  OKAY.  I'M NOT ACTUALLY ANTICIPATING

 2    EVIDENCE ON DAMAGES TODAY, AND I THINK YOU ALL UNDERSTOOD THAT

 3    AS WELL.  SO THAT MAKES SENSE TO ME.

 4         AND THEN IF YOU HAVE WITNESSES WANT WHO TO BE ON THEIR

 5    WAY, OF COURSE, THAT HELPS OR IF THEY JUST WANT TO BE DONE,

 6    THAT HELPS, TOO.

 7         OKAY.  THAT'S FINE.  TELL ME BEFORE WE GET STARTED, IF YOU

 8    CAN GIVE ME AN OUTLINE OF WHAT YOU'LL BE PRESENTING TODAY SO I

 9    KNOW WHERE WE'RE HEADED.

10              MR. SINGER:  SO, YOUR HONOR, WE HAVE FROM -- IF THE

11    COURT WANTS WE HAVE FIVE MINUTES OF OPENING, I CAN CERTAINLY

12    GIVE IT.  I'M HAPPY TO DO SO.  I THINK THAT'S WHAT YOU HAD

13    MENTIONED PERHAPS WANTING.

14              THE COURT:  SURE.

15              MR. SINGER:  ITS CERTAINLY UP TO YOU.  AND IT'S FOR

16    YOUR BENEFIT, AND I CERTAINLY DON'T LIKE TO HEAR MYSELF TALK

17    LIKE MR. FARRELL.

18         (LAUGHTER.)

19              MR. SINGER:  BUT THEN AFTER THAT WE HAVE -- MOST OF

20    THE EVIDENCE FOR BOTH UNCLEAN HANDS AND WAIVER IS ALREADY IN

21    EVIDENCE.  MOST OF THE DOCUMENTS ARE IN.

22         THE PARTIES WORKED OUT A NICE STIPULATION FOR THE OTHER

23    DOCUMENTS THAT I SAW YOUR HONOR SIGN THIS MORNING.

24              THE COURT:  YES.

25              MR. SINGER:  WE THEN HAVE A DEPOSITION VIDEO FROM
```

1    THE GILEAD SIDE OF ROUGHLY -- MS. FLANAGAN?

2              MS. FLANAGAN:  ABOUT AN HOUR AND TEN MINUTES.

3              MR. SINGER:  ABOUT AN HOUR AND TEN MINUTES OF

4    DEPOSITION VIDEO.

5              THE COURT:  AND THE TRANSCRIPT I PRESUME YOU'LL HAND

6    ME AS WELL?

7              MS. FLANAGAN:  CORRECT.

8              THE COURT:  WILL I BE ABLE TO FOLLOW ALONG WITH THE

9    TRANSCRIPT WHILE I'M LISTENING, THAT WOULD REALLY HELP ME IF I

10   CAN.

11             MS. FLANAGAN:  YES, YOUR HONOR.  IT WILL BE UP ON

12   THE SCREEN, AND I CAN HAND YOU PAPER COPIES.

13             THE COURT:  THAT'S GREAT.  THAT WILL REALLY HELP ME.

14   THANK YOU.

15             MR. SINGER:  THE WITNESSES THAT WE HAVE ARE

16   DR. MALCOLM MACCOSS, WHO IS AN INVENTOR OF THE PATENT, AND

17   YOU'LL HEAR A FEW MINUTES FROM HIM; AND DR. WALLACE ASHTON, WHO

18   WAS A FIREWALL CHEMIST FROM MERCK; AND DR. DURETTE TALKING

19   ABOUT THE '224 APPLICATION.

20             THE COURT:  THAT MAKES UP THE HOUR AND TEN MINUTES?

21             MR. SINGER:  THAT'S THE HOUR AND TEN MINUTES.  AND

22   WE HAVE ONE OTHER SHORT CLIP FROM DR. BERGMAN ON THE '712

23   PATENT.

24        AND THEN WE WOULD REST, YOUR HONOR.

25             THE COURT:  SO YOU HAVE NO LIVE WITNESSES TODAY?

```
 1              MR. SINGER:  WE DON'T HAVE ANY LIVE WITNESSES.  I

 2    DON'T KNOW IF MERCK DOES OR NOT.

 3              THE COURT:  OKAY.

 4              MR. SINGER:  AND I ANTICIPATE WE'LL PRESENT

 5    30 MINUTES OF CLOSING BETWEEN MYSELF -- AND MR. BOOKER WILL

 6    ARGUE WAIVER.

 7              THE COURT:  OKAY.  I APPRECIATE THAT.

 8         AND, MR. GENDERSON, HOW IS YOUR CASE SHAPING?  UP.

 9              MR. GENDERSON:  MS. BERNIKER IS GOING TO HANDLE BOTH

10    SIDES OF THIS.

11              THE COURT:  OKAY.

12              MR. GENDERSON:  WE HAVE ONE LIVE WITNESS.

13    MS. DEMAIN IS GOING TO DO A TRI EFFECT.  SHE'S COMING FOR THE

14    THIRD TIME.  IF POSSIBLE, WE WOULD LIKE TO GET HER OFF THE

15    STAND SO SHE CAN TAKE A PLANE THIS AFTERNOON IF WE CAN GET HER

16    OFF THIS MORNING.

17              THE COURT:  ABSOLUTELY.

18              MR. GENDERSON:  HER DIRECT IS NOT GOING TO BE NO ANY

19    MORE THAN 20 MINUTES.

20              THE COURT:  GREAT.  I THINK THAT SHOULDN'T BE A

21    PROBLEM.  AND THEN YOU HAVE OTHER EVIDENCE AS WELL?

22              MR. GENDERSON:  YES.  THEN WE'RE RELYING ON THE

23    EVIDENCE IN THE RECORD.  WE WOULD LIKE AN HOUR FOR THE CLOSING.

24    THERE'S A LOT TO COVER.

25         I APOLOGIZE.  WE HAVE TWO SHORT DEPOSITION CLIPS.
```

1          THE COURT:  OKAY.

2          MR. GENDERSON:  BUT THEY'RE BOTH VERY SHORT.

3          THE COURT:  OKAY.  WELL, I DON'T KNOW ABOUT THE HOUR

4     YET.  WE'LL CERTAINLY -- WHEN DOES MS. DEMAIN NEED TO BE ON HER

5     WAY TO THE AIRPORT?

6          MR. GENDERSON:  I THINK SHE'S GETTING PICKED UP AT

7     1:00.

8          THE COURT:  THAT SHOULDN'T BE ANY PROBLEM.  WE

9     CERTAINLY WANT TO ACCOMMODATE HER SO THAT SHE CAN GET BACK.

10         I PRESUME THAT ALL OF THE EVIDENCE THAT HAS ALREADY BEEN

11    PRESENTED IN THE RECORD THAT YOU'RE RELYING ON I CAN FIND IN

12    YOUR PROPOSED FINDINGS OF FACT.

13         MR. GENDERSON:  NOT ALL OF IT BECAUSE A LOT OF OURS

14    IS RESPONSIVE TO WHAT THEY HAVE IN THEIR PROPOSED FINDINGS.  SO

15    WE WILL DO IT IN THE CLOSING.

16         I MEAN, WE WILL SUM IT UP, BUT SINCE WE FILED THESE

17    SIMULTANEOUSLY, SOME OF THE ALLEGATIONS THAT WERE MADE I THINK

18    WENT WAY BEYOND WHAT WAS IN THE INTERROGATORY ANSWERS AND FOR

19    THAT REASON WE DON'T THINK IT SHOULD BE CONSIDERED AS

20    MS. BERNIKER SAID, BUT I THINK WE NEED ANOTHER OPPORTUNITY IN

21    CLOSING WHERE WE'LL ADDRESS IT OR IN POST-TRIAL BRIEFS.

22         THE COURT:  I GUESS -- YES.  I WOULD LIKE YOUR FINAL

23    PROPOSED FINDINGS OF FACT TO DOCUMENT ALL OF THE EVIDENCE THAT

24    YOU THINK IS NECESSARY FOR ME TO REVIEW TO CONSIDER THESE

25    ISSUES BECAUSE TO ASK ME TO GO INTO THE HAYSTACK OF THE

1    EVIDENCE IN THIS CASE MEANS I WILL MISS THINGS BECAUSE I DON'T

2    KNOW WHAT YOU THINK IS RELEVANT, AND I'M NOT PREPARED TO DO

3    THAT.

4        SO I DON'T -- THAT WOULD BE THE MOST EFFICIENT THING FOR

5    ME IS FOR BOTH SIDES TO SIMPLY, NOT A SUPPLEMENTAL, BUT TO

6    SIMPLY PROVIDE ME AN AMENDED STATEMENT OF FACTS WITH YOUR

7    CITATIONS TO THE EVIDENCE SO THAT I CAN BE SURE THAT I LOOK AT

8    ALL OF THE EVIDENCE THAT YOU WANT TO DIRECT ME TO.

9        I MEAN, IT'S CERTAINLY POSSIBLE THAT I'LL FIND SOMETHING

10   ELSE IN THE RECORD, BUT I DON'T WANT TO MISS WHAT YOU THINK IS

11   KEY.

12            MR. GENDERSON:  AND WE CERTAINLY WOULD LOVE TO DO

13   THAT, YOUR HONOR.

14            THE COURT:  OKAY.  OKAY.  AND THEN -- I MEAN, I KNOW

15   THAT THERE ARE SOME NEW EXHIBITS AND IN CLOSING I -- IF YOU

16   DON'T TELL ME WHY THEY'RE IMPORTANT, I MAY NOT UNDERSTAND WHY

17   THEY'RE IMPORTANT.

18       SO I SAW THE LIST AND SIGNED THE DOCUMENT BECAUSE YOU

19   STIPULATED BUT THOSE ARE NEW EXHIBITS AND SO I DON'T KNOW WHAT

20   THEY ARE.  YOU MAY BE PLANNING -- I DON'T THINK YOU'RE PLANNING

21   TO GO THROUGH WITH THEM IN THE PRESENTATION OF EVIDENCE AND SO

22   YOU NEED TO DO SOMETHING OTHERWISE IT'S JUST A BINDER, AND I

23   MAY HAVE FEWER FINGERPRINTS ON MINE THAN THE JURY HAD ON

24   THEIRS.

25            MR. GENDERSON:  WE WERE PLANNING TO IN CLOSING, YOUR

1    HONOR, BUT WE WILL ALSO IN THE PROPOSED FINDINGS ADDRESS THEM.

2           THE COURT:  THAT'S HELPFUL.

3           MR. SINGER:  AND, YOUR HONOR, WHEN WOULD YOU LIKE

4    THOSE PROPOSED FINDINGS?

5           THE COURT:  WELL, WE CAN TALK ABOUT THAT AT THE END

6    OF THE DAY.

7           MR. SINGER:  VERY WELL.

8           THE COURT:  YOU KNOW, I'M ALWAYS ANXIOUS TO GET THE

9    CASE TO JUDGMENT, BUT I HAVE TWO MORE PATENT TRIALS IN THE NEXT

10   MONTH OR SO OR TWO MONTHS.  SO REALISTICALLY IT'S A LITTLE BIT

11   TIGHT.  SO I DON'T MEAN TO MAKE YOU MISERABLE AND THEN HAVE IT

12   SIT ON THE SHELF.  I'VE DONE PLENTY OF THAT.

13       ALL RIGHT.  WHY DON'T WE GET STARTED WITH THE EVIDENCE

14   THAT GILEAD WANTS TO PRESENT.  WE SHOULD BE DONE WITH THAT AND,

15   FRANKLY, IF -- ONCE THAT TAPE GETS STARTED, MAY I EXCUSE THE

16   COURT REPORTER FOR AN HOUR SO THAT SHE CAN ACTUALLY GET A BREAK

17   RATHER THAN SITTING AT THE READY?

18       AND IF SOMETHING NEEDS TO BE ON THE RECORD, WE WILL

19   CERTAINLY CALL HER BACK, BUT I EXPECT THAT WE WILL JUST BE

20   LISTENING FOR THAT HOUR.

21          MR. GENDERSON:  THAT'S FINE, YOUR HONOR.

22          THE COURT:  GOOD.  ALL RIGHT, THEN.  THANK YOU.

23       THEN I THINK WE ARE READY, THEN, TO HAVE THE PRESENTATION.

24       AND YOU'VE ALREADY INDICATED, MR. SINGER, WHO THE

25   WITNESSES ARE.  IS THIS JUST ONE CONTINUOUS VIDEO THAT YOU'VE

1    PUT TOGETHER NOW?

2              MR. SINGER:  I THINK IT'S SEPARATE VIDEOS BUT --

3              THE COURT:  IT WILL BE SEAMLESS.

4              MR. SINGER:  -- IT WILL BE SEAMLESS.

5              THE COURT:  AND YOU ARE GIVING ME TRANSCRIPTS.  ARE

6    THOSE TRANSCRIPTS HIGHLIGHTED TO THE PORTION THAT --

7              MR. SINGER:  I THINK THEY ONLY INCLUDE THE PORTIONS.

8              THE COURT:  THEY ONLY INCLUDE THE PORTIONS.

9              MR. SINGER:  AND WE WORKED IT OUT WITH THE OTHER

10   SIDE.

11             MS. FLANAGAN:  ALL FOUR OF THEM ARE IN EACH STACK.

12             MR. SINGER:  YOUR HONOR, DID YOU WANT A FIVE MINUTE

13   OPENING?

14             THE COURT:  THAT WOULD BE GREAT.  I JUMPED AHEAD.

15             MR. SINGER:  OKAY.

16             **(COUNSEL FOR PLAINTIFF GAVE THEIR OPENING STATEMENT.)**

17             MR. SINGER:  I WILL BE BRIEF BECAUSE I RECOGNIZE

18   THAT WE HAVE ALREADY TALKED ABOUT THIS 15 MINUTES AGO.

19             THE COURT:  I KNOW BECAUSE WE'VE HAD A LONG

20   DISCUSSION ALREADY, BUT I DO WANT TO HEAR YOUR COMMENTS.

21             MR. SINGER:  AND I THINK IT WILL HELP SET THE STAGE

22   AND A LITTLE BIT ABOUT WAIVER AS WELL.  AND AS I SAID,

23   MR. BOOKER WILL GIVE THE CLOSING.

24        IF WE CAN HAVE UP, MR. ANG, PDX-1400.

25        YOUR HONOR, I THINK JUST BASICALLY GILEAD'S UNCLEAN HANDS

1    DEFENSE, YOU KNOW, ASKS THE BASIC QUESTION OF HOW THIS CLAIM

2    CAME TO BE AND THEN SUBSEQUENTLY HOW THE '712 PATENT CAME TO

3    BE.

4          AND JUST FOCUSSING ON CLAIM 1 OF THE '499, YOU KNOW, THIS,

5    I THINK, AS ALL PARTIES WILL CONCEDE, THIS IS NOT IN THE

6    SPECIFICATION AS WRITTEN.  THIS CLAIM IS NOT TO BE FOUND AS

7    WRITTEN IN THE SPECIFICATION.  IT'S A PARTICULAR SELECTION FROM

8    A FORMULA THAT HAS MILLIONS OF POSSIBILITIES.

9          AND IF WE CAN GO TO THE PDX- --

10          THE COURT:  THAT'S FROM FORMULA III.

11          MR. SINGER:  YEAH, THAT IS FROM FORMULA III.

12    THERE YOU GO.  THANK YOU, MR. ANG.

13          AND AS YOU CAN SEE FORMULA III HAS MILLIONS OF

14    POSSIBILITIES, AND THIS IS A PARTICULAR SELECTION FROM IT.

15    THIS IS THE SELECTION SHOWN BY MERCK AT THE JURY TRIAL, AND THE

16    COURT CAN SEE THE SELECTIONS THAT WERE MADE FROM FORMULA III TO

17    GET TO CLAIM 1.

18          SO, YOU KNOW, SO THE QUESTION IS, YOU KNOW, HOW DID THIS

19    CLAIM TO BE, WHERE DID IT COME FROM?  AND I THINK THE EVIDENCE

20    HAS SHOWN ALREADY AND THE FURTHER EVIDENCE THAT WE'RE GOING TO

21    PUT ON WILL REINFORCE THE CONCLUSION THAT THE CLAIM ARISES FROM

22    UNCLEAN HANDS WHICH HAVE THEIR ROUTE IN THAT 2004 ST. PATRICK'S

23    DAY PHONE CALL WHERE PHARMASSET REVEALED THE STRUCTURE OF 6130

24    TO DR. DURETTE WHO UNBEKNOWNST TO PHARMASSET WAS PROSECUTING

25    THE MERCK PATENT.

1      HOW DO WE KNOW THAT?  AND WHAT SHOWS US THAT?  AND I THINK

2   IT'S REALLY DR. DURETTE HIMSELF WHEN HE SAID SO AT HIS

3   DEPOSITION.

4      AND IF WE GO TO THE NEXT SLIDE.  IN ADVANCE OF KNOWING

5   ABOUT ANY OF THE EVIDENCE THAT WAS AVAILABLE TO CONTRADICT HIS

6   TESTIMONY, DR. DURETTE TESTIFIED, AND WHILE HE SAYS HE DIDN'T

7   REMEMBER AT THE TIME, HE TESTIFIED WHY IT WOULD HAVE BEEN

8   INAPPROPRIATE FOR HIM TO LEARN OF THE 6130 STRUCTURE.  AND HE

9   SAID IT WOULD HAVE TAINTED HIS JUDGMENT AS TO WHAT CLAIMS TO

10   PURSUE.

11      AND BASICALLY THAT'S EXACTLY WHAT HAPPENED.  PHARMASSET

12   HAD A RIGHT IN ITS DEALINGS WITH MERCK, AS THE EVIDENCE WILL

13   SHOW, NOT TO HAVE DR. DURETTE ON THAT CALL.

14      AS THE COURT HEARD IN THE JURY TRIAL PHASE OF THIS CASE,

15   THERE WAS A FIREWALL IN PLACE BETWEEN THE TWO COMPANIES.  THAT

16   FIREWALL WAS SUPPOSED TO BE PEOPLE NOT INVOLVED IN THE HCV

17   PROGRAM.  DR. DURETTE WAS INTIMATELY INVOLVED IN THE HCV

18   PROGRAM.

19      AND HE TOOK THAT RIGHT FROM PHARMASSET AWAY AND MERCK BY

20   EXTENSION, AND THEN HE LIED ABOUT IT TO PHARMASSET IN THAT

21   PHONE CALL BY TELLING THEM THAT WHEN HE WAS WITHIN THE

22   FIREWALL, WHEN HE COULDN'T POSSIBLY BE IN THE FIREWALL.

23      HE MISLED PHARMASSET INTO REVEALING THE STRUCTURE TO HIM

24   AND PERHAPS HE WAS THE WORST POSSIBLE PERSON IN MERCK TO REVEAL

25   IT, TOO, AND THEN TOLD THEM TO NOT WORRY ABOUT IT BECAUSE HE

1    WAS IN THE FIREWALL.

2         AND AS HIS DEPOSITION SHOWS, HE KNEW IT WOULD BE WRONG FOR

3    HIM TO LEARN THAT STRUCTURE.  AND IT'S CLEAR LEARNING THAT

4    INFORMATION ABSOLUTELY TAINTED HIS JUDGMENT.

5         AFTER GETTING THE INFORMATION HE ENGAGED IN A MULTI-YEAR

6    CAMPAIGN TO PATENT THE WORK THAT PHARMASSET WAS DOING WHEN THAT

7    WORK BECAME PUBLIC.  HE NEVER WOULD HAVE DONE THIS BUT FOR

8    BEING GIVEN THAT INFORMATION ON THAT PHONE CALL AND KNOWING HOW

9    IMPORTANT IT WAS TO PHARMASSET.

10        HE NARROWED THOSE CLAIMS TO AIM PRECISELY AT WHAT

11   PHARMASSET WAS DOING BECAUSE IT WAS PHARMASSET THAT HEAVILY

12   INVESTED IN THE 2' METHYL, FLUORO WORK.  NOT MERCK AND ISIS.

13   THEY ADMITTED TO THE JURY THEY NEVER TESTED ONE OF THESE

14   COMPOUNDS AND THEY DIDN'T MAKE -- EXCUSE ME -- TEST ANYTHING

15   UNTIL AFTER MR. CLARK'S APPLICATION PUBLISHED.

16        COMPOUNDING THAT, HE LIED AT HIS DEPOSITION AND THEN HE

17   CAME TO TRIAL, HE TOOK AN OATH, AND HE WAS NOT TRUTHFUL TO THE

18   COURT OR THE JURY.

19        HE TOLD A STORY ABOUT HOW HE MISREMEMBERED EVERYTHING.  HE

20   WAS ASKED TO BE ON THE CALL BY MS. DEMAIN.  HE HAD NO IDEA WHAT

21   THE PHARMASSET NUCLEOSIDE WOULD BE, EVEN THAT IT ACTED BY THE

22   SAME MECHANISM OF THAT ACTION WILL SHOW, ALL OF THIS ISN'T

23   TRUE.  AND THAT HE WAS CLAIMING NOT PHARMASSET'S WORK BUT THE

24   MOST IMPORTANT WORK IN THE COLLABORATION, AND WE'LL SHOW THAT'S

25   NOT TRUE.  THAT'S WHAT THE EVIDENCE WILL SHOW.

1     YOUR HONOR, UNDER THESE OUTRAGEOUS CONDUCT STANDARD THAT

2     MIGHT APPLY, THIS IS OUTRAGEOUS CONDUCT AND IT WAS UNCLEAN

3     HANDS.  IT WAS UNCLEAN HANDS TO BE ON THAT CALL AND LIE TO

4     PHARMASSET.  IT WAS UNCLEAN HANDS TO LIE IN THE DEPOSITION

5     ABOUT THE PHONE CALL, AND IT WAS UNCLEAN HANDS TO LIE IN THE

6     COURTROOM.  IT WAS.  NO ONE LIKES TO HEAR THESE THINGS, BUT

7     THAT IS THE CASE.

8     HOW MANY TIMES, YOUR HONOR, DID MS. BROOKS ASK HIM ON HIS

9     EXAMINATION WHETHER IT WAS JUST A COINCIDENCE THAT HE HAD

10    CLAIMED THIS?  HE NEVER WOULD GIVE A STRAIGHT ANSWER TO THAT

11    QUESTION.

12    AND HOW MANY TIMES HAVE WE ASKED MERCK, WHY WAS HE ON THAT

13    PHONE CALL?  HE SAID IT WAS MS. DEMAIN.  SHE TESTIFIED, NOT ME,

14    I DIDN'T ASK HIM.

15    HE WAS ON THE PHONE CALL FOR ONE REASON, AND THAT WAS TO

16    GET THE INFORMATION THAT HE WOULDN'T HAVE BEEN ABLE TO GET, THE

17    STRUCTURE, THAT HE SHOULDN'T HAVE GOT.

18    AND, INTERESTINGLY, THE EVIDENCE IS GOING TO SHOW THAT

19    MERCK UNDERSTOOD THIS IN A BASIC SENSE.  THIS RELATES TO OUR

20    WAIVER DEFENSE.  THEY ALWAYS UNDERSTOOD THEIR PATENT WAS

21    TAINTED JUST AS DR. DURETTE SAID IT WOULD BE.

22    AFTER GETTING THE PATENT IN 2005, MERCK ACTED WITH

23    PHARMASSET AS IF THE PATENT HAD SOME KIND OF A DEFECT OR A

24    DISEASE, SORT OF ALWAYS KEEPING IT AT ARM'S LENGTH.

25    AS THE EVIDENCE WILL SHOW, MERCK NEVER ASSERTED ITS PATENT

1    RIGHTS IN THE '499 PATENT IN ANY MEANINGFUL WAY LEADING

2    PHARMASSET TO CONCLUDE THAT THE RIGHTS HAD BEEN ABANDONED.

3         INDEED, ASK YOURSELF THIS QUESTION WHEN YOU'RE THINKING

4    ABOUT THIS EVIDENCE, YOUR HONOR, WHY ELSE WOULD MERCK GET -- GO

5    BACK TO THE PATENT OFFICE IN 2012, FOR HEAVENS SAKES, TO GET

6    THE '712 PATENT SO MANY YEARS LATER?  THEY KNEW THE PATENT WAS

7    TAINTED, AND THEY KNEW THEY HADN'T GIVEN PHARMASSET A FAIR

8    SHAKE.  AND SO THEY GOT THE PATENT TO ENFORCE IT AGAINST GILEAD

9    ONCE GILEAD PURCHASED PHARMASSET.

10        MERCK COMES TO THIS COURT, YOUR HONOR, WITH UNCLEAN HANDS.

11   THE EVIDENCE HAS ALREADY SHOWN IT AND THE MORE EVIDENCE THAT WE

12   WILL PROVIDE TODAY WILL REINFORCE THAT CONCLUSION.

13        THANK YOU.

14        THE COURT:  MS. BERNIKER, DID YOU WANT TO GIVE AN

15   OPENING STATEMENT NOW OR AT THE BEGINNING OF YOUR CASE?

16        MS. BERNIKER:  NOW, YOUR HONOR.

17        THE COURT:  OKAY.  AND IF I COULD ASK YOU TO SLOW

18   DOWN A LITTLE BIT, I WOULD REALLY APPRECIATE IT.

19        MS. BERNIKER:  THANK YOU, YOUR HONOR.  I'M GUILTY OF

20   SPEAKING TOO QUICKLY VERY OFTEN.

21        **(COUNSEL FOR DEFENDANTS GAVE THEIR OPENING STATEMENT.)**

22        MS. BERNIKER:  ALL RIGHT.  I WANT TO START BRIEFLY

23   WITH THE DERIVATION LAW.  AND IF WE CAN PUT UP DDX-702, PLEASE.

24        UNDER THE PRECEDENT THAT GILEAD THEMSELVES CITE WITH

25   RESPECT TO DERIVATION, THERE'S ONLY DERIVATION IF THERE WAS A

1    PRIOR COMPLETE CONCEPTION OF THE INVENTION BEFORE IT WAS

2    COMMUNICATED TO THE PARTY RECEIVING IT.

3         THE JURY HEARD THE EVIDENCE REGARDING THE PHONE CALL WITH

4    RESPECT TO DR. DURETTE; THEY HEARD THE EVIDENCE ABOUT WHAT

5    MERCK'S OWN SCIENTISTS HAD DONE IN THEIR LABORATORIES AND

6    CONCEIVED OF IN 2001 AND 2002, AND THEY CONCLUDED THAT THE

7    CLAIMS OF BOTH THE '499 AND THE '712 PATENTS WERE SUPPORTED BY

8    THE INVENTIONS DISCLOSED IN 2002, TWO YEARS BEFORE THE PHONE

9    CALLS WITH DR. DURETTE.

10        THEY CONCLUDED THAT EVEN THOUGH THEY KNEW THAT DR. DURETTE

11   HAD, QUOTE, "NARROWED THE CLAIMS" AFTER THE CALL WITH

12   PHARMASSET.

13        THEY UNDERSTOOD THAT.  THEY CONCLUDED THAT THE CLAIMS WERE

14   SUPPORTED.  THAT IN AND OF ITSELF DISPOSES OF THIS ISSUE.

15        NOW, LET'S TALK A LITTLE BIT ABOUT THE EVIDENCE THAT THEY

16   HEARD ABOUT THE WORK THAT HAD BEEN DONE AT MERCK.

17            THE COURT:  DOES THAT ACTUALLY GO TO A MATERIALITY

18   ARGUMENT THAT IS NOT PRESENT HERE WHEN YOU TALK ABOUT THE

19   DERIVATION ISSUE?

20            MS. BERNIKER:  I DON'T THINK SO BECAUSE I THINK WHAT

21   IT GOES TO IS WHETHER THERE'S ANY POSSIBILITY OF PROVING THAT

22   DR. DURETTE WOULD NOT HAVE BEEN ENTITLED TO THOSE CLAIMS ABSENT

23   THE CALL WITH PHARMASSET.

24        IN OTHER WORDS, WE KNOW THAT HE WAS ENTITLED TO THOSE

25   CLAIMS INDEPENDENT OF THE CALL WITH PHARMASSET BECAUSE THE JURY

1    ALREADY FOUND THAT.  AND SO THEY CAN'T ASSOCIATE THE ALLEGED

2    MISCONDUCT IN CONNECTION WITH THE 2004 CALL WITH THE ISSUANCE

3    OF THESE PATENTS WHICH IS WHAT THEY NEED TO DO IN ORDER TO

4    PREVAIL ON THE UNCLEAN HANDS.

5              THE COURT:  BUT ISN'T THAT A BUT FOR ANALYSIS THAT

6    YOU'RE TELLING ME?

7              MS. BERNIKER:  I DON'T THINK THAT'S A BUT FOR

8    ANALYSIS.  I MEAN, IT MAY BE ALSO A BUT FOR ANALYSIS FOR

9    MATERIALITY, BUT THE LAW WITH RESPECT TO UNCLEAN HANDS REQUIRES

10   THAT THEY SHOW THAT THE MISCONDUCT BE ASSOCIATED WITH THE

11   ENFORCEMENT OF THE RIGHTS THAT MERCK IS SEEKING TO ENFORCE IN

12   THIS CASE.

13        AND THEY CAN'T TIE THOSE TWO TOGETHER BECAUSE THE JURY

14   FOUND THAT WE WERE ENTITLED TO THOSE PATENT CLAIMS BACK IN 2002

15   AND THAT THERE WAS NOTHING WRONG WITH HAVING NARROWED THE

16   CLAIMS IN 2004 OR '05.

17        AND SO IT'S NOT JUST -- CERTAINLY THAT WOULD BE A BUT FOR

18   MATERIALITY PROBLEM FOR INEQUITABLE CONDUCT BUT IT'S ALSO

19   DETERMINATIVE, IN OUR VIEW, OF THE UNCLEAN HANDS ISSUE.

20        BUT LET'S TALK ABOUT THE EVIDENCE BECAUSE TIME AND TIME

21   AGAIN WE'VE HEARD GILEAD TRY TO SUGGEST THAT MERCK HAD NEVER

22   THOUGHT ABOUT THESE COMPOUNDS BEFORE 2004, AND THAT IS FLATLY

23   WRONG.

24        LET'S PUT UP THE TIMELINE DDX-500, PLEASE.  YOUR HONOR IS

25   FAMILIAR WITH THIS TIMELINE AND DURING CLOSING I'M HAPPY TO GO

1      THROUGH IT WITH YOU IN GREATER DETAIL.

2          BUT IT STARTS WITH THE DATA POINT THAT IS NOT ON HERE,

3      DR. OLSEN'S TESTIMONY WHERE HE TESTIFIED THAT IN 2000, NOVEMBER

4      OF 2000, HE HAD ALREADY THOUGHT OF THE IDEA OF PUTTING A

5      FLUORINE SUBSTITUENT ON THE COMPOUND THAT HAD A METHYL UP, AND

6      THAT'S WHY HE TESTIFIED WITHOUT CONTRADICTION BY ANY WITNESS IN

7      THIS CASE THAT THEY INCLUDED THAT COMPOUND WITHIN THE ORIGINAL

8      PROVISIONAL APPLICATION THAT MERCK FILED IN JANUARY OF 2001.

9          THE FACT THAT THESE COMPOUNDS WERE INCLUDED BACK IN 2001

10     WAS CONFIRMED BY DR. OLSEN, DR. DURETTE, AND DR. SECRIST,

11     GILEAD'S OWN EXPERT.  IT WAS IN THERE FROM THE BEGINNING.

12         AND THERE WAS ALSO RECEIVED EVIDENCE.  THERE WERE SEVERAL

13     DOCUMENTS OF MERCK SPECIFICALLY RECEIVING SPECIFIC COMPOUNDS

14     WITH THE METHYL UP, FLUORINE DOWN IN 2001 INCLUDING

15     DR. PRAKASH'S LAB NOTEBOOK, THAT WE CAN LOOK AT AGAIN LATER,

16     AND INCLUDING A SET OF DOCUMENTS SHOWING OTHER COMPOUNDS WITH

17     THE METHYL UP, FLUORINE DOWN.

18         SO THE IDEA THAT THESE COMPOUNDS WEREN'T THOUGHT ABOUT BY

19     MERCK OR WEREN'T CONSIDERED IMPORTANT IS CLEARLY WRONG.  THEY

20     WERE CONSIDERED IMPORTANT ENOUGH TO BE DISCUSSED OVER AND OVER

21     AGAIN IN THE MERCK/ISIS COLLABORATION DOCUMENTS IN 2001, AND

22     THEY WERE CONSIDERED IMPORTANT ENOUGH TO BE INCLUDED IN EVERY

23     PATENT APPLICATION THAT MERCK FILED YEARS BEFORE THE PHONE CALL

24     OF 2004.

25         NOW, WITH RESPECT TO THAT -- IF WE CAN PLEASE PUT UP THE

1    ORIGINAL PATENT APPLICATION THAT LED TO THE '499 PATENT,

2    DDX-733, PLEASE.

3         THIS IS THE ORIGINAL APPLICATION THAT MERCK FILED IN 2002,

4    THE NONPROVISIONAL APPLICATION THAT LED TO THE '499 PATENT.

5         AND THE TESTIMONY WAS UNDISPUTED THAT IT SPECIFICALLY

6    ENCOMPASSED THE METHYL UP, FLUORINE DOWN AMONG A SMALL LIST OF

7    POSSIBLE SUBSTITUENTS IN THE SUGAR, AND, IN FACT, THERE WAS A

8    CLAIM, CLAIM 8, THAT WAS SPECIFICALLY NARROWED TO THE SINGLE

9    RING BASE.  THIS WAS NOT JUST ATTORNEY TALKING.  THIS WAS

10   CONFIRMED BY DR. SECRIST ON THE STAND.

11        THE PATENT THAT DR. DURETTE WAS PROSECUTING TWO YEARS

12   BEFORE THIS CALL ALREADY INCLUDED THIS SUBJECT MATTER.  IT WAS

13   NOT SOMETHING THAT HE STOLE OR DERIVED FROM PHARMASSET DURING

14   THE CALL.

15        AND, NOW, YOU'VE HEARD ABOUT THE CALL AND YOU'RE CLEARLY

16   GOING TO HEAR MORE ABOUT THAT.  I THINK ONE OF THE MOST

17   IMPORTANT THINGS THAT GILEAD KEEPS LEAVING OUT IS THAT

18   DR. DURETTE PIPED UP IMMEDIATELY ON THE CALL AND SAID THAT HE

19   HAD A PROBLEM.

20        IF THIS WERE SOME SORT OF COVERT SCHEME TO STEAL

21   PHARMASSET'S IDEAS AND PATENT THEM, WHY HE WOULD RAISE HIS HAND

22   AS SOON AS THERE BECAME AN ISSUE AND SAID, EXCUSE ME, THERE'S

23   AN ISSUE.  HE SAID THAT BECAUSE HE WAS BEING HONEST.

24        THE FACT THAT HE FORGET THAT HE WAS ON THE PHONE CALL WHEN

25   HE WAS DEPOSED DOES NOT PROVE PERJURY.  IT DOES NOT PROVE THAT

1    HE WAS A LIAR.  IT PROVES THAT HE DIDN'T REMEMBER SOMETHING

2    THAT HAPPENED ON A PHONE CALL 12 YEARS AGO.  I DON'T REMEMBER

3    MOST OF WHAT HAPPENED 12 YEARS AGO.  THAT HAPPENS TO PEOPLE.

4         THAT'S NOT THE GROUNDS FOR UNCLEAN HANDS, AND IT HAS VERY

5    LITTLE RELATION TO THE FACT OF THE CASES THAT YOUR HONOR IS

6    FAMILIAR WITH WHERE COURTS HAVE FOUND UNCLEAN HANDS WHERE THERE

7    ARE FABRICATED DOCUMENTS THAT ARE COVERED UP OVER A COURSE OF

8    MANY MONTHS BY PARTIES.  THAT'S NOT THE SAME AS FORGETTING YOU

9    WERE ON A PHONE CALL.

10        SO -- BUT THEN, OF COURSE, WE KNOW WHAT HAPPENED AFTER THE

11   PHONE CALL, WHICH IS THAT DR. DURETTE DIDN'T DO ANYTHING DURING

12   PROSECUTION FOR ALMOST A YEAR.  HE DIDN'T DO ANYTHING BECAUSE

13   HE WAS BEING CAREFUL WITH RESPECT TO THE CONFIDENTIALITY.

14        AND THE ONLY TIME HE DID ANYTHING, THE FIRST TIME HE

15   FINALLY DID SOMETHING, IN TERMS OF THE PROSECUTION OF THAT

16   PATENT, WAS AFTER THE PUBLICATION OF THE CLARK PATENT

17   APPLICATION, AFTER PHARMASSET PUT THE INFORMATION VOLUNTARILY

18   INTO THE PUBLIC DOMAIN.

19        AND IF WE COULD PUT UP DDX-772.

20        THIS IS THE CONFIDENTIALITY AGREEMENT THAT APPLIED.

21   EXHIBIT 2298.  IT IS UNAMBIGUOUS THAT DR. DURETTE'S

22   CONFIDENTIALITY OBLIGATIONS ENDED WITH SEVERAL DIFFERENT THINGS

23   MATERIALIZING.

24        I'VE GOT HIGHLIGHTED ON HERE 1 AND 3, AND THAT IS IF MERCK

25   WAS ALREADY IN LAWFUL POSSESSION OF THE SUBJECT MATTER.  AND OF

1    COURSE MERCK WAS ALREADY IN POSSESSION OF THE SUBJECT MATTER.

2    WE HAD INVENTED IT IN 2001.  WE HAD ALREADY PUT IT IN OUR

3    PATENT APPLICATION IN 2001.

4        BUT IF THAT WEREN'T ENOUGH -- IF WE CAN GO TO THE NEXT

5    SLIDE -- BULLET 2 SAYS THAT IT'S NO LONGER CONFIDENTIAL IF IT

6    IS IN THE PUBLIC DOMAIN AT THE TIME OF THE DISCLOSURE OR

7    BECOMES PART OF THE PUBLIC DOMAIN OTHER THAN BY BREACH OF THE

8    AGREEMENT.

9        AND THERE'S NO QUESTION THAT DR. DURETTE DIDN'T PUT THIS

10   IN THE PUBLIC DOMAIN FIRST.  PHARMASSET OPTED TO PUBLISH THE

11   CLARK PATENT APPLICATION DISCLOSING THEIR COMPOUNDS, DISCLOSING

12   THEIR ACTIVITY, AND AT THAT POINT DR. DURETTE HAD NO FURTHER

13   OBLIGATIONS OF CONFIDENTIALITY.

14       AND THEY HAVE NEVER ARGUED THAT THEY BREACHED THIS

15   AGREEMENT.  OF COURSE THEY DIDN'T ARGUE THAT HE BREACHED THIS

16   AGREEMENT.  HE COULDN'T HAVE BREACHED THIS AGREEMENT.  IT WAS

17   PUBLIC BEFORE HE DID ANYTHING.

18       AND, OF COURSE, AS YOU KNOW, YOUR HONOR, AT THAT POINT

19   WHAT HE DID WAS NARROW THE CLAIMS.  HE DIDN'T ADD ANYTHING THAT

20   WASN'T THERE BEFORE.  HE NARROWED THEM.  AND THAT IS PERFECTLY

21   CONSISTENT WITH THE AUTHORITY OF THE FEDERAL CIRCUIT THAT

22   SPECIFICALLY SAYS THAT IT IS NOT IMPROPER TO MODIFY YOUR CLAIMS

23   TO CLAIM A COMPETITOR.

24       AND IF WE CAN PUT UP DDX-718, PLEASE.

25       THIS IS THE KINGSDOWN CASE OF WHICH YOU'RE FAMILIAR.  AND

1    I WANT TO POINT OUT THE VERY SPECIFIC LANGUAGE OF THIS CASE.

2    IT SAYS, "NOR IS IT IN ANY MANNER IMPROPER TO AMEND OR INSERT

3    CLAIMS," SO ASSERT NEW CLAIMS, WHICH HE DIDN'T DO HERE BUT HE

4    COULD HAVE, "INTENDED TO COVER A COMPETITOR'S PRODUCT THAT THE

5    APPLICANT'S ATTORNEY HAS LEARNED ABOUT DURING PROSECUTION."

6        THEY SPECIFICALLY RECOGNIZED THE POSSIBILITY THAT THE

7    ATTORNEY DIDN'T KNOW WHAT THE PRODUCT WAS EXCEPT DURING

8    PROSECUTION AND AT THAT POINT DECIDED TO GO ABOUT CLAIMING

9    THEM.

10       NOW, DR. DURETTE HAD ALREADY CLAIMED THIS COMPOUND BEFORE

11   THE CALL, BUT EVEN IF HE HADN'T, THERE WOULD BE NOTHING WRONG

12   WITH THIS.

13       AND THERE'S ANOTHER CASE THAT WE CITED IN OUR PAPERS,

14   ORMCO, WHICH IS THE NEXT SLIDE DDX-719, WHICH SPECIFICALLY

15   ADDRESSED THE QUESTION OF WHETHER THAT COULD FORM THE BASIS FOR

16   UNCLEAN HANDS.  THE ORMCO CASE FROM THE CENTRAL DISTRICT OF

17   CALIFORNIA 2009 ASKED THE QUESTION:  COULD THAT SUPPORT A

18   FINDING OF UNCLEAN HANDS?  AND WHAT THE COURT SAID WAS, NO.

19   THE MERE FACT THAT ORMCO KNEW OF ALIGN'S PROCESSES AND FILED

20   CLAIMS THAT COVERED THESE PROCESSES IS INSUFFICIENT IN AND OF

21   ITSELF TO SUPPORT A FINDING OF UNCLEAN HANDS.

22       THE JURY HAS ALREADY FOUND THAT THESE CLAIMS WERE

23   SUPPORTED AND THAT MEANS THAT DR. DURETTE WAS PERMITTED TO DO

24   ANYTHING HE WANTED WITH THE PUBLIC INFORMATION THAT PHARMASSET

25   HAD DISCLOSED.

1          THERE IS NOTHING THAT BORDERS ON INEQUITABLE CONDUCT --

2     EXCUSE ME, ON UNCLEAN HANDS, OR INEQUITABLE CONDUCT, WHILE

3     WE'RE TALKING ABOUT IT.

4          NOW, I WANT TO MAKE A COMMENT BRIEFLY ON THE '712 PATENT

5     BECAUSE THERE'S NO ALLEGATION WHATSOEVER THAT COULD SOMEHOW

6     LEAD THIS TO THE TAINTING OF THE '712 PATENT.  THE CLAIMS OF

7     THE '712 PATENT WERE ORIGINALLY BROAD AND COVERED, AMONG OTHER

8     THINGS, THIS COMPOUND.

9          THERE'S NO ALLEGATION THAT MR. BERGMAN WAS IN POSSESSION

10    OF CONFIDENTIAL INFORMATION THAT HE MISUSED, AND THERE'S NO

11    EVIDENCE THAT HE EVER EVEN TALKED TO DR. DURETTE ABOUT THE

12    PROSECUTION OF THE '712 PATENT.

13         SO THE IDEA THAT THIS WOULD SOMEHOW LEAD TO UNCLEAN HANDS

14    WITH THE '712, WHICH BY THE WAY WAS FILED IN 2007, WE DIDN'T

15    WAIT YEARS AND YEARS AND YEARS TO FILE IT, BUT IN ANY EVENT,

16    THE IDEA THAT THIS WOULD TAINT THAT IS ENTIRELY UNFOUNDED ON

17    THIS RECORD.

18         NOW, BRIEFLY WITH RESPECT TO WAIVER, YOUR HONOR, BEFORE WE

19    GET TO WAIVER, I THINK THIS IS A GOOD SEGUE, YOU KNOW, THIS

20    ARGUMENT THAT MERCK HAD DONE SOMETHING IMPROPER IN 2002 IS AN

21    ARGUMENT THAT FIRST SURFACED DURING THIS LITIGATION.

22         FOR YEARS AND YEARS AND YEARS AND YEARS MERCK AND

23    PHARMASSET WERE DISCUSSING COLLABORATING, THEY WERE DISCUSSING

24    POTENTIAL LICENSES, INCLUDING TO THESE PATENTS.  AND PHARMASSET

25    NEVER ONCE LOOKED AT MERCK AND SAID, YOU KNOW, I THINK YOU

1    BREACHED THE FIREWALL.  I THINK YOU USED OUR CONFIDENTIAL

2    INFORMATION.  I THINK YOU STOLE OUR INVENTION.  THEY DIDN'T

3    BELIEVE THAT.  AND, OF COURSE, THEY DIDN'T BELIEVE THAT BECAUSE

4    YOUR HONOR IS NOW FAMILIAR WITH THE EVIDENCE THAT I WILL GO

5    OVER IN CLOSING, THAT PHARMASSET KNEW IT WAS INFRINGING MERCK'S

6    PATENTS EVEN BEFORE MERCK KNEW.  THAT IN 2003 PHARMASSET'S OWN

7    SCIENTISTS HAD DETERMINED THAT THEY HAD A PROBLEM WITH THE

8    MERCK PATENTS.

9         AND, IN FACT, GOING INTO THE PHONE CALL WITH DR. DURETTE,

10   THEY KNEW THAT MERCK HAD PATENTS COVERING THEIR COMPOUND.  IT

11   WAS DR. DURETTE WHO HAD NO IDEA BECAUSE HE HAD NO IDEA ABOUT

12   THE STRUCTURE OF THEIR COMPOUND.

13        AND BY THE WAY, THEY NEVER SAID TO MERCK, YOU KNOW, YOU

14   HAVE A PATENT ON THIS PRODUCT AND WE'RE ABOUT TO TRY TO LICENSE

15   YOU.

16        IN ANY EVENT, THIS IS AN AFTER-THE-FACT ARGUMENT THAT

17   GILEAD HAS COME UP WITH AND FOR YEARS AND YEARS AND YEARS AND

18   YEARS THEY NEVER SAID IT BEFORE.

19        AND LET'S TALK ABOUT THOSE YEARS BECAUSE THAT GOES TO THE

20   WAIVER ISSUE.  THEY'RE NOW TRYING TO ARGUE THAT MERCK KNEW THE

21   PATENT WAS TAINTED FOR YEARS.  THERE'S ZERO EVIDENCE OF THAT IN

22   THE RECORD, AND THERE WILL BE NO EVIDENCE IN THE RECORD ON

23   THAT.

24        BUT THE EVIDENCE ACTUALLY SHOWS THAT ACTUALLY MERCK PUT

25   PHARMASSET ON NOTICE OF THESE PATENTS AS SOON AS THEY WERE

1     FAMILIAR WITH THE STRUCTURE OF THE COMPOUND.

2          IF WE CAN PUT UP DDX-764.

3          THIS IS THE SECOND SET OF NOTES FROM A SECOND PATENT DUE

4     DILIGENCE CALL THAT MERCK HAD WITH PHARMASSET IN 2004.  THIS IS

5     THE ONE THAT HAPPENED AFTER DR. DURETTE HAD ALREADY FULLY

6     RECUSED HIMSELF FROM THE PROCESS.  THESE ARE THE NOTES THAT

7     MR. ROEMER TESTIFIED ABOUT.

8          AND RIGHT THERE AS SOON AS MERCK FOUND OUT WHAT THE

9     STRUCTURE WAS OF THE COMPOUND, LAWYERS FOR MERCK, KEN AND VAL,

10    AS IT'S REFLECTED IN THIS DOCUMENT, TOLD THEM YOU HAVE A

11    FREEDOM TO OPERATE ISSUE, AND THIS WAS CONFIRMED BY

12    MR. ROEMER'S TESTIMONY.  THEY SAID YOUR COMPOUND 6130 MIGHT BE

13    SEPARATELY PATENTABLE, BUT YOU HAVE A FREEDOM TO OPERATE ISSUE.

14    THAT IS A DIFFERENT ISSUE.

15         NOW, UNDER THE WAIVER AUTHORITY, INCLUDING THE JUDGE ALSUP

16    OPINION THAT YOUR HONOR REFERENCED EARLIER TODAY, IN ORDER TO

17    FIND WAIVER, THERE MUST BE AN AFFIRMATIVE RELINQUISHMENT OF

18    RIGHTS BY MERCK.  IT'S NOT SUFFICIENT TO SIT QUIETLY BY TO FIND

19    WAIVER WHICH WE DIDN'T DO EITHER.

20         BUT GILEAD DOES NOT HAVE A SHRED OF EVIDENCE OF ANY

21    AFFIRMATIVE RELINQUISHMENT OF RIGHTS.  IN FACT, WHAT THE

22    EVIDENCE SHOWS IS THAT THE PARTIES GOING BACK TO 2004, OVER THE

23    COURSE OF THE NEXT DECADE, DISCUSSED POTENTIAL COLLABORATIONS

24    AND EVERY TIME THERE WAS A DISCUSSION OF MERCK GRANTING A

25    LICENSE BACK TO PHARMASSET FOR THESE PATENTS OVER AND OVER AND

1    OVER AGAIN.  AND, OF COURSE, THAT CULMINATED IN THE TESTIMONY

2    OF SCHAEFER PRICE THAT YOUR HONOR IS FAMILIAR WITH, AND I THINK

3    IT'S BEEN REITERATED A FEW OF TIMES.

4        BUT IF WE CAN PUT UP SLIDE DDX-811, PLEASE.

5        MR. PRICE TESTIFIED THAT THE LAWYERS FOR MERCK CAME TO HIS

6    OFFICE AND THEY HAD A MEETING AND THEY, AGAIN, REMINDED HIM

7    THAT WE HAVE THIS PATENT THAT IS A PROBLEM FOR YOU BECAUSE

8    THERE'S A FREEDOM TO OPERATE ISSUE FOR YOU.

9        AND WHAT HE SAID WAS, WELL, I HOPE YOU FIND IT EASIER TO

10   FIND THE COURTHOUSE.  THAT IS NOT THE LANGUAGE OF SOMEBODY WHO

11   THINKS THAT MERCK HAS WAIVED ITS PATENT RIGHTS.

12       THANK YOU, YOUR HONOR.

13           THE COURT:  OKAY.  THANK YOU.  ALL RIGHT.  WE ARE

14   GOING TO BEGIN THE LISTENING TO THE VIDEOS, AND I HAVE THE

15   TRANSCRIPTS.

16       WE SHOULD FINISH THIS AT ABOUT 11:30, AND MS. DEMAIN CAN

17   TESTIFY RIGHT AFTER THAT.

18       IS THAT ACCEPTABLE?

19           MR. GENDERSON:  YES, YOUR HONOR.

20           THE COURT:  AND THAT SHOULDN'T TAKE ANY MORE THAN AN

21   HOUR ONCE SHE STARTS.

22           MR. GENDERSON:  SO IT WOULD BE AT 11:30.  IF YOU

23   DON'T MIND GOING UNTIL 12:30?

24           THE COURT:  I DON'T.  I DON'T WANT TO GO UNTIL 1:00,

25   BUT I DON'T MIND GOING UNTIL 12:30.

1          (DISCUSSION OFF THE RECORD.)

2               MR. GENDERSON:  THEN WE SHOULD BE FINE, YOUR HONOR.

3               THE COURT:  GOOD.  THANK YOU.  AND WITH THAT MAY WE

4     EXCUSE THE COURT REPORTER AND ASK HER TO -- WELL, WE'LL SEND

5     HER -- SHE'LL BE EXCUSED FOR ABOUT AN HOUR, IS THAT RIGHT,

6     MS. FLANAGAN?

7               MS. FLANAGAN:  THAT'S RIGHT.  MAY I FIRST READ WHO

8     IS GOING TO BE DEPOSED AND IDENTIFY THE CLIPS FOR THE RECORD

9     THAT WE'VE MARKED AS EXHIBITS?

10              THE COURT:  THANK YOU.

11              MS. FLANAGAN:  YOUR HONOR, FIRST WE'RE GOING TO BE

12    PLAYING DEPOSITION TESTIMONY FROM DR. MALCOLM MACCOSS WHO IS A

13    LISTED INVENTOR ON THE PATENT AND A PH.D. CHEMIST AT MERCK.  HE

14    WAS INVOLVED IN THE MERCK/ISIS COLLABORATION AND WILL BE

15    PROVIDING TESTIMONY ABOUT THE IMPORTANCE OF A FIREWALL WHEN

16    PARTIES ARE NEGOTIATING AND SHARING STRUCTURAL INFORMATION

17    ABOUT IMPORTANT COMPOUNDS.

18         WE'VE MARKED HIS DEPOSITION TESTIMONY AS EXHIBIT 2400 FOR

19    IDENTIFICATION PURPOSES FOR THE RECORD.

20         (PLAINTIFF'S EXHIBIT 2400 WAS MARKED FOR IDENTIFICATION.)

21              MS. FLANAGAN:  NEXT WE WILL BE OFFERING DEPOSITION

22    TESTIMONY OF DR. WALLACE ASHTON.  HE IS A MERCK SCIENTIST WHO

23    PARTICIPATED IN THE MERCK/PHARMASSET NEGOTIATIONS AS A FIREWALL

24    CHEMIST, AND HE'LL BE TESTIFYING ABOUT HIS ROLE AS A FIREWALL

25    CHEMIST.  WE'VE MARKED FOR PURPOSES HIS DEPOSITION AS 2397.

1          (PLAINTIFF'S EXHIBIT 2397 WAS MARKED FOR IDENTIFICATION.)

2          MS. FLANAGAN:  THEN WE WILL BE PLAYING DEPOSITION

3     TESTIMONY OF DR. PHIL DURETTE, A MERCK PATENT ATTORNEY.  HE

4     WILL BE TESTIFYING AS TO THE PROSECUTION OF THE '224

5     APPLICATION WHICH IS EXHIBIT 158.

6          WE HAVE MARKED DR. DURETTE'S DEPOSITION TESTIMONY FOR

7     IDENTIFICATION PURPOSES AS EXHIBIT 2399.

8          (PLAINTIFF'S EXHIBIT 2399 WAS MARKED FOR IDENTIFICATION.)

9          MS. FLANAGAN:  AND THEN LASTLY WE WILL BE PLAYING

10    THE DEPOSITION TESTIMONY OF MR. JEFFREY BERGMAN WHO IS A PATENT

11    PROSECUTOR AT MERCK AND HE WROTE AND PROSECUTED THE CLAIMS OF

12    THE '712 PATENT.

13         AND HIS DEPOSITION TESTIMONY HAS BEEN IDENTIFIED AS

14    EXHIBIT 2398 FOR THE RECORD.

15         (PLAINTIFF'S EXHIBIT 2398 WAS MARKED FOR IDENTIFICATION.)

16         MS. FLANAGAN:  I ALSO WANT TO NOTE FOR YOUR HONOR

17    THAT A PORTION OF HIS DEPOSITION TESTIMONY YOU'LL BE LOOKING AT

18    AN EMPTY CHAIR BECAUSE WE TOOK A SECOND DEPOSITION WHERE IT WAS

19    BY PHONE.  JUST FOR YOUR REFERENCE.

20         ANOTHER BIT OF HOUSEKEEPING, YOUR HONOR, WITH TWO OF THESE

21    DEPOSITIONS WE'RE SEEKING TO ADMIT TWO EXHIBITS.  FIRST WITH

22    DR. DURETTE IS EXHIBIT 158, WHICH IS THE '224 APPLICATION, AND

23    WE WOULD MOVE THAT INTO EVIDENCE.

24         AND WITH DR. MACCOSS, EXHIBIT 183, WHICH WE WOULD ALSO

25    MOVE INTO EVIDENCE.

1          THE COURT:  AND WHAT IS EXHIBIT 183?

2          MS. FLANAGAN:  I BELIEVE IT'S AN E-MAIL, BUT I HAVE

3     A BINDER OF ALL OF THE EXHIBITS FOR THE COURT IF YOU WOULD LIKE

4     THEM.

5          THE COURT:  ALL RIGHT.

6          MS. FLANAGAN:  WE HAVE A BINDER OF THE DOCUMENTS

7     ADMITTED PER THE STIPULATION THAT YOUR HONOR SIGNED THIS

8     MORNING AND THESE ADDITIONAL TWO EXHIBITS.

9          THE COURT:  ALL RIGHT.  MS. BERNIKER, IS THERE ANY

10    OBJECTION TO THE ADMISSION OF THESE TWO EXHIBITS, RECOGNIZING

11    YOUR OBJECTION TO THE '224 THAT I'VE ALREADY RULED ON, BUT ANY

12    FURTHER OBJECTION?

13         MS. BERNIKER:  NO FURTHER OBJECTION, YOUR HONOR.

14         THE COURT:  ALL RIGHT.  THEN I WILL -- AND NO

15    OBJECTION TO EXHIBIT 183.  I WILL ADMIT BOTH.

16      (PLAINTIFF'S EXHIBIT 158 AND 183 WERE RECEIVED IN

17    EVIDENCE.)

18         MS. FLANAGAN:  THANK YOU, YOUR HONOR.  AND WOULD YOU

19    LIKE THE BINDER OF HARD COPIES IN CASE YOU WANT TO FOLLOW ALONG

20    FOR DEPOSITIONS?

21         THE COURT:  DO I NEED TO AT THIS POINT?

22         MS. FLANAGAN:  YOU DON'T NEED TO.

23         THE COURT:  OKAY.  THE BINDER WILL BE GREAT WHEN

24    WE'RE DONE.  THAT'S GOOD.

25      OH, MY BINDERS ARE GONE.  I'VE GOTTEN SO USED TO THEM.

1   AND NOW WE WILL EXCUSE THE COURT REPORTER.  THANK YOU.

2   **(VIDEOTAPED DEPOSITIONS OF MALCOLM MACCOSS, WALLACE**

3 **ASHTON, AND PHILIPPE DURETTE PLAYED IN OPEN COURT OFF THE**

4 **RECORD.)**

5   (RECESS FROM 11:28 A.M. UNTIL 11:38 A.M.)

6   MR. SINGER:  TWO THINGS.  SO THAT WE CAN GET

7 MS. DEMAIN OUT OF HERE, WE AGREED THAT WE WOULD TAKE HER OUT OF

8 ORDER.

9   THE COURT:  YES.

10   MR. SINGER:  AND SHE'LL TESTIFY, AND MR. FISHER IS

11 GOING TO DO HER DIRECT EXAMINATION.

12   THE COURT:  GREAT.

13   MR. SINGER:  AND THE DEPOSITIONS YOU SAW ENCOUNTERED

14 MERCK FROM DR. DURETTE.  IS IT OKAY IF WE AGREE ON THE TIMING?

15 I DON'T KNOW IF TIME IS STILL AN ISSUE FOR LATER ON.

16  IS IT OKAY IF WE AGREE ON TIMING AND SUBMIT IT TO

17 MS. HARWELL?

18   MR. EPNER:  YOUR HONOR, WE HAVE BEEN DOING THAT

19 THROUGHOUT SO WHEN THERE ARE COUNTER-DESIGNATIONS, THEY'VE BEEN

20 COUNTED AGAINST THE DESIGNATED PARTY'S THROUGHOUT.

21   MR. SINGER:  GREAT.

22   THE COURT:  SO, MR. FISHER, ARE YOU GOING TO BE

23 CALLING MS. DEMAIN.

24   MR. FISHER:  YES, YOUR HONOR.

25   THE COURT:  WE WILL SWITCH OVER TO THE DEFENSE CASE

1      AND MS. DEMAIN ARE YOU IN THE COURTROOM?

2                  MR. FISHER:  YES.

3                  THE COURT:  GOOD MORNING BACK AND I KNOW YOU'RE

4      ANXIOUS TO GET BACK OUT OF TIME.  WE'LL MISS YOU BUT COME BACK

5      UP TO THE WITNESS STAND AND STAND TO BE SWORN.

6             **(DEFENDANTS' WITNESS, PAMELA DEMAIN, WAS SWORN.)**

7                  THE WITNESS:  YES.

8                  THE CLERK:  PLEASE BE SEATED.

9                  THE WITNESS:  THANK YOU.

10                 THE CLERK:  IF YOU WOULD ONCE AGAIN PLEASE STATE

11     YOUR NAME AND SPELL YOUR LAST NAME FOR THE RECORD.

12                 THE WITNESS:  OKAY.  DO YOU WANT ME TO DO THAT NOW?

13                 JUROR:  PAMELA DEMAIN, D AS IN DAVID E-M AS IN MARY

14     A-I-N AS IN NANCY.

15                         **DIRECT EXAMINATION**

16     BY MR. FISHER:

17     Q.   GOOD MORNING, MS. DEMAIN.

18     A.   GOOD MORNING.

19     Q.   COULD YOU REMIND THE COURT OF YOUR POSITION AT MERCK,

20     PLEASE.

21     A.   YES.  I'M EXECUTIVE DIRECTOR OF BUSINESS DEVELOPMENT AND

22     LICENSING.

23     Q.   OKAY.  AND AS I RECALL FROM YOUR TESTIMONY PRIOR IN THIS

24     CASE YOU HAD SOME DISCUSSIONS OR INVOLVEMENT WITH DISCUSSIONS

25     WITH PHARMASSET OVER THE YEARS; IS THAT RIGHT?

1      A.   THAT'S CORRECT.

2      Q.   AND DURING WHAT TIMEFRAME DID YOU HAVE CONVERSATIONS WITH

3      PHARMASSET ABOUT EITHER 6130 OR SOFOSBUVIR?

4      A.   FROM MY 2003 TIMEFRAME TO 2011.

5      Q.   OKAY.  AND DID YOU EVER DISCUSS MERCK'S PATENT RIGHTS WITH

6      PHARMASSET DURING THAT PERIOD OF TIME?

7      A.   YES.

8      Q.   OKAY.  AND WITH WHAT FREQUENCY DID YOU DISCUSS THOSE

9      PATENT RIGHTS?

10     A.   WELL, AS YOU'RE DOING VARIOUS NEGOTIATIONS, THEY WERE

11     ALWAYS IN THE BACKGROUND OF OUR DISCUSSIONS.

12     Q.   NOW, DURING THAT TIMEFRAME FROM 2003 UNTIL 2011, DID YOU

13     EVER TELL ANYONE AT PHARMASSET THAT MERCK WAS NOT PLANNING TO

14     ENFORCE ITS PATENT RIGHTS AGAINST PHARMASSET?

15     A.   NO.

16     Q.   DID ANYONE AT PHARMASSET EVER TELL YOU THAT THEY BELIEVED

17     MERCK WOULD NOT ENFORCE ITS PATENT RIGHTS AGAINST PHARMASSET?

18     A.   NO.

19     Q.   WHEN YOU DISCUSSED PATENT RIGHTS WITH PHARMASSET, WHO DID

20     YOU HAVE DISCUSSIONS WITH?

21     A.   MOSTLY ABEL, DR. ABEL DE LA ROSA.

22     Q.   AND WHAT DID YOU DISCUSS WITH DR. ABEL -- DR. DE LA ROSA?

23     A.   WELL, WE WOULD DISCUSS VARIOUS NEGOTIATIONS AND THE

24     IMPORTANCE OF MERCK'S PATENTS AND IN THESE NEGOTIATIONS.

25     Q.   AND DID YOU EVER DISCUSS SPECIFICS WITH DR. DE LA ROSA

1    ABOUT PARTICULAR PATENTS THAT MERCK HAD?

2    A.   NO.  THEY WERE JUST GENERAL DISCUSSIONS.

3    Q.   OKAY.  NOW, LET ME ASK YOU THIS, DURING THAT TIMEFRAME,

4    WOULD MERCK, TO YOUR UNDERSTANDING, HAVE BEEN ABLE TO ASSERT

5    ITS PATENTS AGAINST PHARMASSET?

6    A.   NO, BECAUSE YOU DON'T INFRINGE UNTIL YOU COME TO MARKET

7    WITH A PRODUCT AND THEY WERE MUCH EARLIER THAN THAT STAGE.

8    Q.   OKAY.  SO I WANT TO GO THROUGH SOME DOCUMENTS WITH YOU,

9    MS. DEMAIN, IF THAT'S OKAY?

10   A.   UH-HUH.

11   Q.   DO YOU HAVE A BINDER IN FRONT OF YOU?

12   A.   YES, I DO.

13   Q.   AND I WANT TO START WITH EXHIBIT 1768.  AND I UNDERSTAND

14   NOW ALL OF THESE DOCUMENTS ARE IN EVIDENCE THROUGH STIPULATION

15   OR THROUGH PRIOR TESTIMONY IN THE CASE.

16        LET ME KNOW WHEN YOU HAVE 1768 IN FRONT OF YOU.

17   A.   YES, I DO.

18   Q.   AND WHAT IS THE DOCUMENT?

19   A.   YES.

20   Q.   AND WHAT IS THIS DOCUMENT?

21   A.   OH.  IT'S A LETTER FROM RICH KENDER, WHO IS OUR SENIOR

22   VICE PRESIDENT OF BUSINESS DEVELOPMENT AND CORPORATE LICENSING,

23   TO SCHAEFER PRICE, WHO WAS THE PRESIDENT AND CEO OF PHARMASSET.

24   Q.   AND WHAT DATE WAS THIS LETTER TRANSMITTED?

25   A.   OCTOBER 10TH, 2008.

1    Q.   AND I'D LIKE TO DIRECT YOUR ATTENTION TO THE SECOND PAGE

2    OF THE DOCUMENT.

3    A.   UH-HUH.

4    Q.   LET ME KNOW WHEN YOU'RE THERE.

5    A.   YEP.

6    Q.   AND I WANT YOU TO FOCUS ON THE THIRD BULLET?

7    A.   UH-HUH.

8    Q.   DO YOU SEE THAT?

9    A.   YES.

10   Q.   AND WHAT IS THIS LANGUAGE CONVEYING TO PHARMASSET ABOUT

11   MERCK'S PATENT RIGHTS?

12   A.   THAT WE HAVE IMPORTANT PATENT RIGHTS AND THAT IF THEY WANT

13   TO LEVERAGE OUR INTELLECTUAL PROPERTY ESTATE GOING FORWARD TO

14   REDUCE THE UNCERTAINTY, THAT WE WOULD BLOCK THEM AT SOME POINT.

15   THIS WOULD ENHANCE THE VALUE OF PHARMASSET'S ASSETS AND

16   COMPOUNDS GOING FORWARD.

17   Q.   OKAY.  AND WHY WOULD IT ENHANCE THE VALUE?

18   A.   BECAUSE THEY WOULDN'T HAVE TO WORRY ABOUT SOMEBODY

19   BLOCKING THEM AND HAVING TO PAY ROYALTIES.

20   Q.   OKAY.  NOW, I'D LIKE TO MOVE TO THE NEXT DOCUMENT,

21   EXHIBIT 1622.  LET ME KNOW WHEN YOU HAVE THAT IN FRONT OF YOU?

22   A.   OKAY.  1622, YES.

23   Q.   OKAY.  AND I SEE THAT THERE ARE A COUPLE OF E-MAIL CHAINS.

24   DO YOU SEE THOSE?

25   A.   YES, I DO.

1    Q.   AND COULD YOU, STARTING AT THE BOTTOM, COULD YOU RELATE IN

2    SUMMARY FASHION TO THE COURT WHAT IS BEING CONVEYED HERE IN

3    THESE CHAINS?

4    A.   THIS IS A NEW TERM SHEET THAT WAS PROVIDED FROM PHARMASSET

5    TO MERCK FOR PSI-7851, WHICH IS SOFOSBUVIR.  THAT WAS SENT TO

6    US IN OCTOBER 2009.

7    Q.   OKAY.  AND DID YOU REVIEW THE TERM SHEET AT OR AROUND THAT

8    TIME?

9    A.   YES, I DID.

10   Q.   AND IF YOU COULD TURN TO THE NEXT FEW PAGES OF THE

11   DOCUMENT.

12   A.   UH-HUH.

13   Q.   CAN YOU DESCRIBE WHAT THE NEXT FEW PAGES ARE?  IS THAT THE

14   TERM SHEET?

15   A.   IT IS THE TERM SHEET, YES.

16   Q.   AND I'D DIRECT YOUR ATTENTION TO PARAGRAPH 5 ON PAGE 2 OF

17   THE TERM SHEET.  DO YOU SEE THAT?

18   A.   YES, I DO.

19   Q.   AND WHAT IS BEING CONVEYED IN PARAGRAPH 5 OF THE TERM

20   SHEET?

21   A.   THAT PHARMASSET WOULD GET A LICENSE UNDER MERCK'S PATENTS

22   IN THIS DEAL THAT WE WERE NEGOTIATING.

23   Q.   AND WHAT WAS YOUR UNDERSTANDING AT THIS POINT IN TIME IN

24   OCTOBER OF 2009 AS TO WHY PHARMASSET WANTED THIS TERM?

25   A.   WELL, THEY WANTED TO BE ABLE TO COMMERCIALIZE THEIR

1    PRODUCT WITHOUT BEING BLOCKED.

2    Q.   OKAY.  AND DID THEY EVER SUGGEST TO YOU AT THIS TIME IN

3    OCTOBER OF 2009, THAT MERCK HAD WAIVED ITS RIGHTS TO ASSERT ITS

4    PATENTS AGAINST PHARMASSET?

5    A.   NO.

6    Q.   ALL RIGHT.  LET'S TURN TO EXHIBIT 1625.  LET ME KNOW WHEN

7    YOU'RE THERE.

8    A.   YES.

9    Q.   AND WHAT IS EXHIBIT 1625?

10   A.   THIS IS ANOTHER VERSION OF THE TERM SHEET.  I GUESS IT'S

11   AT A LATER POINT IN TIME, DECEMBER 9TH, 2009.

12   Q.   AND IS THAT THE LEDGER DOWN AT THE BOTTOM?  IS THAT WHAT

13   IT'S CONVEYING THAT IT'S DECEMBER 9, 2009?

14   A.   YES.

15   Q.   OKAY.  SO IF WE COULD TURN TO PARAGRAPH 5 OF THIS TERM

16   SHEET.

17   A.   OKAY.

18   Q.   AND WHAT IS PARAGRAPH 5 OF THIS TERM SHEET CONVEYING?

19   A.   SIMILARLY PHARMASSET WANTED A LICENSE TO MERCK'S PATENTS

20   SO THAT THEY COULD COMMERCIALIZE THEIR PRODUCTS.

21   Q.   OKAY.  I WANT TO TURN NOW TO EXHIBIT 1630.

22   A.   OKAY.

23   Q.   DO YOU HAVE THAT?

24   A.   YES.

25   Q.   AND WHAT IS EXHIBIT 1630?

1    A.    AGAIN, ANOTHER TERM SHEET ON THE SAME COMPOUNDS,

2    SOFOSBUVIR.

3    Q.    OKAY.  AND IS THIS A TERM SHEET THAT MERCK WAS PROVIDING

4    TO PHARMASSET OR THE OTHER WAY AROUND?

5    A.    I BELIEVE THIS WAS FROM PHARMASSET TO MERCK.

6    Q.    OKAY.  AND LET'S HAVE A LOOK AT, AGAIN, PARAGRAPH 5 OF THE

7    TERM SHEET, WHICH IS PART OF THE DOCUMENT I BELIEVE.  ARE YOU

8    THERE?

9    A.    UH-HUH, YES.

10   Q.    AND WHAT IS PARAGRAPH 5 CONVEYING WITH RESPECT TO LICENSE

11   GRANTS TO PHARMASSET?

12   A.    AGAIN, IT WAS A REQUEST BY PHARMASSET TO LICENSE OUR

13   PATENTS TO THEM SO THAT THEY WOULDN'T BE BLOCKED MOVING FORWARD

14   WITH THEIR PRODUCT.

15   Q.    ALL RIGHT.  NOW, I'D LIKE TO GO TO EXHIBIT 1634,

16   MS. DEMAIN.

17   A.    UH-HUH.

18   Q.    AND WE HAVE THE COVER PAGE UP ON THE SCREEN.  WHAT IS

19   EXHIBIT 1634?

20   A.    THIS IS A PRESENTATION WHICH SUMMARIZES THE TERM SHEET

21   THAT WE WERE DISCUSSING WITH PHARMASSET FOR INTERNAL REVIEW BY

22   OUR TEAM.

23   Q.    OKAY.  AND THE DATE ON THIS IS?

24   A.    MAY 25, 2010.

25   Q.    WERE YOU INVOLVED IN PUTTING TOGETHER THIS POWERPOINT

1    PRESENTATION?

2    A.   YES, I WAS.

3    Q.   AND WHAT IS THE PURPOSE OF THE DOCUMENT GENERALLY?  YOU

4    MENTIONED ITS INTERNAL USE, BUT WHO DOES IT GO TO?

5    A.   YEAH.  IT WILL GO TO OUR TEAM AND SENIOR MANAGEMENT, THOSE

6    FOLKS THAT ARE INVOLVED WITH OUR TEAM, OUR NEGOTIATION TEAM ON

7    THIS DEAL TO REVIEW WHAT THE TERMS ARE, HOW THEY'VE CHANGED,

8    WHAT SOME COMMENTS ON WHAT THEY MEAN SO WE COULD GET FEEDBACK

9    ON WHETHER OR NOT WE SHOULD PROCEED WITH THIS.

10   Q.   OKAY.  I'D DIRECT YOUR ATTENTION TO WHAT APPEARS TO BE

11   PAGE 3 OF THE DOCUMENT.  IT'S EXHIBIT 1634.0003.

12   A.   SORRY.

13   Q.   IT SAYS LICENSES UP AT THE TOP.

14   A.   YES.

15   Q.   OKAY.  AND I NOTICE THAT THERE'S A BULLET THAT SAYS TO

16   MERCK AND THEN ANOTHER BULLET ABOUT HALFWAY DOWN THE PAGE THAT

17   SAYS TO PHARMASSET.

18        DO YOU SEE THAT?

19   A.   YES, YES.

20   Q.   AND WHAT IS BEING CONVEYED ON THIS PAGE ABOUT LICENSES TO

21   PHARMASSET?

22   A.   THAT THEY WERE LOOKING FOR AN UNBLOCKING LICENSE, COVERAGE

23   UNDER MERCK'S PATENT RIGHTS TO DEVELOP AND COMMERCIALIZE

24   SOFOSBUVIR.

25   Q.   AND WHAT IS, IN PARTICULAR, THIS SAYING ABOUT THE SCOPE OF

1    THE LICENSE THAT THEY WERE SEEKING?

2    A.   IT SEEMED THAT THE LANGUAGE THAT THEY WERE USING SEEMED

3    PRETTY BROAD.

4    Q.   OKAY.  NOW, I WANT TO MOVE TO THE NEXT DOCUMENT,

5    EXHIBIT 1652.  LET ME KNOW WHEN YOU'RE THERE, MA'AM?

6    A.   OKAY.

7    Q.   AND WHAT IS EXHIBIT 1652?

8    A.   THIS IS A LETTER FROM PHARMASSET DATED AUGUST 5TH, 2010,

9    TO MYSELF AND STEPHEN DE LASZLO, WHO WAS MY COLLEAGUE IN THE

10   RESEARCH LABS.

11   Q.   AND WHAT WAS THE PURPOSE OF THIS LETTER THAT PHARMASSET

12   WAS SENDING TO YOU AT THAT TIME IN AUGUST OF 2010?

13   A.   THEY WERE JUST TELLING US THAT WE ARE GOING TO BE GETTING

14   A LICENSE AGREEMENT FROM THEIR ATTORNEYS AND THEY WANTED TO

15   BRING FOUR MAJOR POINTS TO OUR ATTENTION AND SO THESE WERE THE

16   FOUR POINTS THAT THEY WANTED TO LET US KNOW AHEAD OF TIME

17   BEFORE WE GOT THE DOCUMENT FROM THE ATTORNEYS.

18   Q.   AND YOU SAID THAT WAS A LICENSE AGREEMENT.  WOULD THAT BE

19   A DRAFT LICENSE AGREEMENT?

20   A.   YES, THIS WOULD HAVE BEEN THE FIRST DRAFT.

21   Q.   OKAY.  AND I NOTICE, I DON'T KNOW, SAY 85 PERCENT OF THE

22   WAY DOWN THE PAGE THERE'S A HEADING THAT SAYS LICENSE GRANTS TO

23   PHARMASSET.

24        DO YOU SEE THAT?

25   A.   YES, YES.

1    Q.   AND WHAT WAS BEING CONVEYED TO MERCK?  WHAT WAS YOUR

2    UNDERSTANDING OF WHAT WAS BEING CONVEYED TO MERCK AT THAT

3    POINT?

4    A.   YEAH.  SO THEY WERE SAYING THAT THEY STILL WANTED THE

5    LICENSE GRANT FROM MERCK TO PHARMASSET BUT THEY WERE SPECIFYING

6    HERE THAT IT WOULD COVER ONLY 7977, NOT ANY REACH THROUGH

7    RIGHTS OF ANY MERCK PRODUCTS OR FOR THE BENEFIT OF ANY OTHER

8    PRODUCTS.  SO THEY HAD NARROWED IT BECAUSE I'M SURE WE HAD SOME

9    DISCUSSIONS ABOUT THIS PROVISIONS BEFORE AND SOME OF OUR

10   CONCERNS.

11   Q.   DURING THIS PERIOD OF 2010 AND IN WHICH YOU WERE

12   NEGOTIATING WITH PHARMASSET ABOUT THIS TERM SHEET AND THESE

13   PROVISIONS FOR PROVIDING PHARMASSET A LICENSE, DID PHARMASSET

14   EVER CONVEY TO YOU OR SUGGEST THAT MERCK HAD WAIVED ITS RIGHTS

15   TO ENFORCE ITS PATENTS AGAINST PHARMASSET?

16   A.   NO.

17   Q.   ALL RIGHT.  WHY DON'T WE TAKE A LOOK AT EXHIBIT 686.

18   A.   OKAY.  YES.

19   Q.   AND DO YOU HAVE THAT DOCUMENT?

20   A.   YES.

21   Q.   AND WHAT IS EXHIBIT 686, MS. DEMAIN?

22   A.   686 IS A LETTER FROM RICH KENDER, OUR SENIOR VICE

23   PRESIDENT OF BUSINESS DEVELOPMENT AND CORPORATE LICENSING AT

24   MERCK, TO SCHAEFER PRICE, WHO IS THE CEO OF PHARMASSET.

25   Q.   AND CAN WE LOOK AT THE LANGUAGE ON THE SECOND PAGE AND

1    LET'S TAKE A LOOK AT I BELIEVE IT'S THE THIRD BULLET.

2         DO YOU SEE THAT?

3    A.   YES, I DO.

4    Q.   AND WHAT IS IT THAT MERCK IS CONVEYING TO PHARMASSET AT

5    THIS POINT ABOUT MERCK'S INTELLECTUAL PROPERTY?

6    A.   THAT BY WORKING TOGETHER THEY WOULD GAIN MERCK'S

7    INTELLECTUAL ASSETS OR PATENTS AND THAT WOULD HELP REDUCE THEIR

8    UNCERTAINTY AND RISK MOVING FORWARD AS THEIR COMPOUNDS GO TO

9    MARKET.

10        SO WHAT IT'S SAYING IS THAT WE WOULD NOT BLOCK THEM.

11   Q.   OKAY.  AND WERE YOU SUGGESTING THAT YOU WOULDN'T ASSERT

12   YOUR PATENT RIGHTS AGAINST PHARMASSET IF THIS DEAL FELL APART?

13   A.   NOT AT ALL.

14   Q.   ALL RIGHT.  NOW, AT THIS TIME THAT MERCK ATTEMPTED TO

15   ACQUIRE SOFOSBUVIR, EITHER BY AN IN LICENSE OR BUYING

16   PHARMASSET IN THE 2009 TO 2011 TIMEFRAME, DID YOU EVER BELIEVE

17   THAT YOUR OFFERS WERE INCONSISTENT WITH MERCK'S ASSERTING

18   PATENT RIGHTS AGAINST PHARMASSET DOWN THE LINE?

19   A.   NOT AT ALL.

20   Q.   WHY NOT?

21   A.   BECAUSE WE HAD PATENTS COVERING THE COMPOUND.  WE DIDN'T

22   OWN THE WHOLE COMPOUND.  THERE WERE OTHER PATENTS.  THERE WAS

23   DATA AND KNOW-HOW THAT PHARMASSET CREATED THAT THAT WASN'T OURS

24   AND SO WE WOULD NEED -- IF WE WANTED THAT, IF WE WANTED TO

25   MARKET THE PRODUCT, WE WOULD NEED ACCESS TO ALL OF THEIR

1    KNOW-HOW AND PATENTS AND SO THAT'S WHY WE WOULD NEED TO DO A

2    LICENSING AGREEMENT WITH THEM OR AN ACQUISITION.

3    Q.    AND DURING THAT TIMEFRAME, DID PHARMASSET EVER SUGGEST TO

4    YOU, MERCK, THAT THERE WAS SOME INCONSISTENCY WITH WANTING TO

5    IN LICENSE SOFOSBUVIR OR BUY PHARMASSET ON THE ONE HAND AND

6    HAVE MERCK ASSERT ITS PATENTS DOWN THE LINE ON ANOTHER?

7    A.    NOT AT ALL.

8    Q.    NOW, I WANT TO SWITCH GEARS FOR A LITTLE BIT.  NOW THROUGH

9    YOUR BUSINESS DEVELOPMENT ROLE, ARE YOU FAMILIAR WITH THE WAY

10   THAT MERCK CALCULATES ITS INTERNAL RATE OF RETURN?

11   A.    YES.

12   Q.    AND HOW DOES IT DO THAT?

13   A.    WELL, IT'S A NUMBER THAT WE CALCULATE BASED ON A GOOD

14   PRACTICES FINANCIAL FORMULA THAT WE USE IN ALL DEALS AND

15   ANALYZE ALL DEALS.

16       I'M SORRY.

17   Q.    WHAT WAS MERCK'S INTERNAL RATE OF RETURN BETWEEN THE

18   PERIOD OF 2013 AND 2015?

19   A.    I BELIEVE IT WAS 10 PERCENT.

20   Q.    OKAY.  WAS IT 10 PERCENT THROUGHOUT THAT WHOLE PERIOD OR

21   DID IT VARY AT ALL?

22   A.    IT HAS GONE DOWN TO 9 STARTING IN 2015, AND IT'S CURRENTLY

23   AT 9, I BELIEVE.

24   Q.    OKAY.  AND IN YOUR LICENSING WORK, DO YOU EVER NEED TO

25   KNOW INTEREST RATES OF RETURN SUCH AS THE PRIMARY?

1      A.   YES, SOMETIMES WE USE THAT.

2      Q.   AND WHERE DO YOU TYPICALLY GET THAT INFORMATION --

3                MR. BOOKER:  OBJECTION.  RELEVANCE, THIS LINE OF

4      QUESTIONING, YOUR HONOR.

5                MR. FISHER:  IT'S RELEVANT TO THE PREJUDGMENT

6      INTEREST PORTION OF THE PROCEEDING TODAY.

7                MR. BOOKER:  THIS IS NOT THAT PROCEEDING RIGHT NOW,

8      YOUR HONOR.

9                THE COURT:  WELL, IT WASN'T CLEAR THAT WE WERE GOING

10     TO DO THAT.  MS. DEMAIN IS HERE AND SHE NEEDS TO TRAVEL AND SO

11     I DON'T MIND PRESERVING HER TESTIMONY AT THIS POINT.

12         IF FOR SOME REASON SHE WOULD LATER NEED TO BE RECALLED ON

13     THIS POINT, WE CAN DISCUSS THAT.  BUT I'LL LET YOU MAKE THE

14     RECORD.  WE NEED TO GET TO THAT ISSUE.

15               MR. FISHER:  THERE ARE VERY FEW QUESTIONS.

16               THE COURT:  AND I RESPECT THE WITNESS'S DISTANCE

17     FROM THE COURTHOUSE.

18               THE WITNESS:  THANK YOU SO MUCH.

19               THE COURT:  AND WE'LL PRESERVE THAT HERE.

20     BY MR. FISHER:

21     Q.   THANK YOU SO MUCH.

22         SO I BELIEVE I WAS ASKING WHERE DO YOU TYPICALLY GET THE

23     INFORMATION ON INTEREST RATES THAT YOU USE DURING THE COURSE OF

24     YOUR PRACTICE?

25     A.   ON INTEREST RATES WE USE?

1        I'M NOT SURE I UNDERSTAND THE QUESTION.

2    Q.   LET ME BACK UP AND START OVER.

3        WE WERE TALKING ABOUT INTERNAL RATES OF RETURN; RIGHT?

4    A.   RIGHT.

5    Q.   AND YOU SAY YOU'RE FAMILIAR WITH INTERNAL RATES OF RETURN

6    DURING THE COURSE OF YOUR BUSINESS DEVELOPMENT WORK; IS THAT --

7    A.   YES.

8    Q.   AND HOW ARE YOU FAMILIAR WITH INTERNAL RATES OF RETURN?

9    A.   SO EVERY DEAL THAT WE'RE LOOKING AT, ACQUISITION, LICENSE

10   THAT IS FAR ENOUGH ALONG TO DO A FINANCIAL ANALYSIS, WHEN WE

11   LOOK AT THESE DEALS, WE COMPARE IT TO OUR COST OF CAPITAL AND

12   IF THE RETURN FROM THE DEAL FINANCIALLY IS MORE THAN OUR COST

13   OF CAPITAL, THAT WOULD BE AN INDICATION THAT IT WOULD BE A GOOD

14   DEAL FOR US TO DO.

15       IF IT'S LOWER THAN OUR COST TO CAPITAL, THEN IT PROBABLY

16   ISN'T GOING TO PROVIDE THE RETURN THAT WE'RE LOOKING FOR.

17   Q.   SO WERE YOU FAMILIAR WITH MERCK'S INTERNAL RATE OF RETURN

18   THAT IT USED TO BENCHMARK DEALS FROM 2013 THROUGH 2015?

19   A.   YES.

20   Q.   AND WHAT WAS THIS INTERNAL RATE OF RETURN OR COST TO

21   CAPITAL I THINK WHAT YOU REFERRED TO DURING THAT PERIOD OF TIME

22   FROM 2013 TO TODAY?

23   A.   SO IN 2013 IT WAS 10 PERCENT; 2014 IT WAS 10 PERCENT; AND

24   THEN IN 2015 IT WENT DOWN TO 9 PERCENT, AND IT'S 9 PERCENT IN

25   2016.

1     Q.   IS THIS WHAT IS CALLED THE HURDLE RATE?

2     A.   YES.

3     Q.   OKAY.  AND SO IN YOUR BUSINESS DEVELOPMENT WORK, YOUR

4     LICENSING WORK, HAVE YOU BECOME FAMILIAR WITH INTEREST RATES

5     THAT MERCK USES?

6     A.   YES.

7     Q.   AND HOW IS THAT RELEVANT TO THE WORK THAT YOU DO?

8     A.   WELL, IN CERTAIN DEALS THERE'S A PROVISION IN THE PAYMENT

9     SECTION THAT TALKS ABOUT IF THERE'S A LATE PAYMENT MADE OR

10    EITHER MILESTONES OR ROYALTIES, THAT THERE WOULD BE AN INTEREST

11    RATE ADDED WHICH WOULD BE THE PRIME PLUS -- THE PRIME OR THE

12    PRIME PLUS A CERTAIN AMOUNT DEPENDING ON THE NEGOTIATIONS.

13    Q.   OKAY.  AND SO THESE ARE INTEREST RATES THAT YOU'VE BECOME

14    FAMILIAR WITH BECAUSE THEY ARE PART OF CERTAIN LICENSE

15    AGREEMENTS THAT YOU'RE INVOLVED WITH?

16    A.   YES, YES.

17    Q.   AND YOU SAID THAT IT'S TYPICALLY EITHER PRIME OR PRIME

18    PLUS IN THOSE AGREEMENTS?

19    A.   YES, UH-HUH.

20    Q.   AND THROUGH THE WORK THAT YOU DO IN THE BUSINESS

21    DEVELOPING LICENSE SPACE, DO YOU KNOW WHAT THE PRIME RATES WERE

22    FOR LATE 2013 THROUGH PRESENT DAY?

23    A.   I BELIEVE IN 2013 IT WAS 3.25 PERCENT.

24    Q.   HOW ABOUT 2014?

25    A.   I THINK IT'S 3.25 PERCENT AS WELL.

1      Q.   HOW ABOUT 2015?

2      A.   3.26 PERCENT.

3      Q.   AND HOW ABOUT TODAY?

4      A.   3.5 PERCENT.

5      Q.   AND ARE YOU FAMILIAR WITH THE T BILL RATE?

6      A.   A LITTLE BIT.  NOT MUCH.

7      Q.   AND DO YOU USE THE T BILL RATE AT ALL IN YOUR WORK?

8      A.   NO.

9      Q.   AND WHY IS THAT?

10     A.   IT'S, IT'S VERY LOW AND, I MEAN, IT'S NEVER COME UP.

11     Q.   OKAY.

12          I HAVE NOTHING FURTHER AT THIS TIME, YOUR HONOR.

13               THE COURT:  OKAY.  CROSS-EXAMINATION OF THIS

14     WITNESS?

15               MR. BOOKER:  YES, YOUR HONOR.

16               THE COURT:  IS THIS ONE BINDER THAT WE'RE USING,

17     MR. BOOKER?

18               MR. BOOKER:  ONE BINDER OF EXHIBITS, YES, YOUR

19     HONOR.

20          MAY I PROCEED?

21               THE COURT:  YES, PLEASE.

22                         **CROSS-EXAMINATION**

23     BY MR. BOOKER:

24     Q.   GOOD MORNING, MS. DEMAIN.

25     A.   GOOD MORNING.

1    Q.   I WANT TO TALK JUST BRIEFLY ABOUT WHAT YOU, PHIL DURETTE,

2    AND MERCK KNEW ABOUT PSI-6130 BEFORE PHIL DURETTE GOT ON THAT

3    MARCH 17TH, 2004, CALL TO PHARMASSET?

4              MR. FISHER:  OBJECTION, YOUR HONOR.  BEYOND THE

5    SCOPE.  WE DIDN'T ASK ANYTHING ABOUT PHIL DURETTE.

6              MR. BOOKER:  THEY MENTIONED SHE WAS INVOLVED WITH

7    NEGOTIATIONS SINCE 2003.  THIS IS THE TIMEFRAME THAT THIS

8    HAPPENED.  IT ALSO GOES TO CREDIBILITY, YOUR HONOR, AND IT GOES

9    TO THE START OF THE NEGOTIATIONS THAT LED TO VARIOUS LICENSES

10   PROPOSALS THAT THEY PUT INTO EVIDENCE.

11             MR. FISHER:  MS. DEMAIN WAS ALREADY CROSS-EXAMINED

12   ON THIS SUBJECT IN THE INITIAL PHASE OF THE CASE, YOUR HONOR.

13   AND WE WERE VERY CLEAR IN ASKING QUESTIONS ABOUT THE WAIVER

14   PORTION WHICH HAS REALLY NEVER BEEN ADDRESSED.  IT'S BEYOND THE

15   SCOPE.

16             THE COURT:  THE OBJECTION IS OVERRULED.

17   BY MR. BOOKER:

18   Q.   NOW, MERCK KNEW THAT 6130 WAS AN ANTI-HCV NUCLEOSIDE

19   COMPOUND; CORRECT?

20   A.   YES.

21   Q.   AND IN PARTICULAR, MERCK AND PHIL DURETTE KNEW THAT 6130

22   WAS AN NS5B POLYMERASE INHIBITOR?

23             MR. FISHER:  OBJECTION, YOUR HONOR.  LACK OF

24   FOUNDATION AS TO WHAT PHIL DURETTE KNEW.

25             THE WITNESS:  I DON'T KNOW WHAT PHIL DURETTE KNEW.

1    BY MR. BOOKER:

2    Q.   YOU KNEW THAT PSI-6130 WAS AN NS5B POLYMERASE INHIBITOR;

3    CORRECT?

4    A.   YES.

5    Q.   AND PHARMASSET ACTUALLY TOLD MERCK IN A PRESENTATION THAT

6    6130 WAS AN NS5B POLYMERASE INHIBITOR; TRUE?

7    A.   I DON'T RECALL, BUT I BELIEVE SO, YES.

8    Q.   AND MERCK ACTUALLY WAS GIVEN A SAMPLE OF 6130 FOR TESTING

9    AND MERCK TESTED THAT IN THE NS5B POLYMERASE ASSAY; CORRECT?

10   A.   I KNOW WE WERE -- WE HAD A MATERIAL TRANSFER AGREEMENT.  I

11   DON'T KNOW WHAT WAS IN THAT.  I DID NOT NEGOTIATE THAT

12   AGREEMENT.

13   Q.   FAIR ENOUGH.  AND YOU ACTUALLY WROTE BEFORE THE CALL A

14   MEMO TO THE LICENSING MANAGEMENT COMMITTEE CONTAINING A SUMMARY

15   OF PSI-6130.

16       DO YOU REMEMBER THAT?

17   A.   I'D HAVE TO SEE THE DOCUMENT.

18   Q.   YOU DON'T RECALL THAT DOCUMENT RIGHT NOW?

19   A.   I'M SORRY?

20   Q.   YOU DON'T RECALL THAT DOCUMENT RIGHT NOW?

21   A.   TO THE LICENSING MANAGEMENT COMMITTEE ABOUT?

22   Q.   ABOUT PSI-6130?

23   A.   I'D LIKE TO SEE THE DOCUMENT.

24   Q.   OKAY.  I KNOW YOU'RE PRESSED FOR TIME.  I'LL MOVE ON.

25   A.   OKAY.  THANK YOU.

1     Q.   LET'S GO TO A DOCUMENT THAT DOES INCLUDE PHIL DURETTE.

2          NOW, WE SAW A FEW WEEKS AGO YOUR MARCH 11TH E-MAIL THAT

3     INDICATED PHIL DURETTE WOULD BE ON THE CALL WITH PHARMASSET;

4     CORRECT?

5     A.   YES.

6     Q.   OKAY.  I WANT TO TURN TO THAT DOCUMENT.  IT SHOULD BE IN

7     YOUR BINDER, EXHIBIT 153.

8     A.   OKAY.

9     Q.   AND DO YOU HAVE THAT?

10    A.   YES.

11    Q.   OKAY.  AND I WANT TO FOCUS ON THE TERM SHEET THAT YOU

12    ATTACHED TO THAT E-MAIL.

13         DO YOU SEE THERE'S A REFERENCE AND IT'S ON THE SCREEN FOR

14    YOU, IT SAYS FILE:  PHARMASSET TERM SHEET?

15    A.   OH, YES, PHARMASSET TERM SHEET, YES.

16    Q.   OKAY.  NOW, ACTUALLY, IF YOU LOOK ON THAT E-MAIL JUST

17    BELOW THAT, YOU HAD MENTIONED THAT THIS TERM SHEET, IT'S THE

18    SECOND LINE DOWN, HAS ALREADY BEEN REVIEWED BY A NUMBER OF

19    PEOPLE.

20         DO YOU SEE THAT?

21    A.   UH-HUH.

22    Q.   AND THAT INCLUDES PHIL DURETTE?

23    A.   OKAY.  YES.

24    Q.   AND SO AT LEAST AS OF MARCH 11TH, PHIL DURETTE HAD

25    REVIEWED THAT TERM SHEET; TRUE?

1    A.   YES.

2              MR. FISHER:  OBJECTION.  LACK OF FOUNDATION.

3              THE COURT:  OVERRULED.

4    BY MR. BOOKER:

5    Q.   NOW, LET'S TURN TO THAT TERM SHEET.  TURN IN YOUR BINDER

6    TO EXHIBIT 2394.

7    A.   2394.

8    Q.   AND THIS ALSO IS IN EVIDENCE.

9    A.   OKAY.

10   Q.   AND DO YOU SEE THAT THAT'S THE DRAFT MARCH 11TH, 2004,

11   TERM SHEET?

12   A.   YES, I DO.

13   Q.   AND IF YOU TURN TO THE SECOND PAGE OF THAT DOCUMENT, THE

14   TOP OF THE PAGE, AND DO YOU SEE THE SECOND BULLET POINT TALKING

15   ABOUT THE LEAD COMPOUND PSI-6130?

16   A.   YES, I DO.

17   Q.   OKAY.  AND THE SECOND BULLET POINT BELOW THAT IT STATES

18   THAT 6130 IS A CHAIN TERMINATOR OF HCV POLYMERASE?

19   A.   UH-HUH.

20   Q.   RIGHT?

21   A.   YES, I SEE THAT.

22   Q.   SO BEFORE THE CALL WITH PHARMASSET, PHIL DURETTE KNEW THAT

23   6130 WAS A NUCLEOSIDE NS5B POLYMERASE INHIBITOR; TRUE?

24             MR. FISHER:  OBJECTION.  LACK OF FOUNDATION.

25             THE COURT:  OVERRULED.

1          THE WITNESS:  I'M SORRY?

2          THE COURT:  YOU MAY ANSWER.

3          THE WITNESS:  OH, OKAY.  THANK YOU.

4      YES.

5    BY MR. BOOKER:

6    Q.   AND THAT'S THE SAME TYPE OF COMPOUND THAT PHIL DURETTE WAS

7    PATENTING AS PART OF THE MERCK/ISIS COLLABORATION; CORRECT?

8          MR. FISHER:  OBJECTION.  LACK OF FOUNDATION.

9          THE COURT:  WELL, WHY DON'T YOU -- LET'S MAKE SURE

10   THAT SHE KNOWS THIS PORTION.

11   BY MR. BOOKER:

12   Q.   OKAY.  OUT OF THE MERCK/ISIS COLLABORATION, PHIL DURETTE

13   WAS SEEKING PATENTS COMING FROM THAT COLLABORATION; CORRECT?

14   A.   I DID NOT KNOW THAT.

15   Q.   DO YOU KNOW THAT NOW?

16   A.   I DO KNOW THAT NOW.

17   Q.   AND YET THE FOCUS OF THOSE PATENTS WERE ON NS5B POLYMERASE

18   INHIBITORS?

19   A.   YES, I DON'T KNOW -- I DIDN'T KNOW THAT AT THE TIME.  HE

20   WAS SIMPLY A PERSON THAT WAS ASSIGNED TO THIS LICENSING DEAL,

21   AND THAT'S WHAT I DO FOR EVERY LICENSING DEAL, I CALL --

22   CONTACT MY -- THE VARIOUS FUNCTIONAL AREAS AND A PERSON IS

23   ASSIGNED.

24      I DON'T KNOW WHAT ELSE THEY DO IN THEIR DAY JOB.

25   Q.   UNDERSTOOD.

1      A.   OKAY.  THANK YOU.

2      Q.   AND YOU NOW KNOW THAT PHIL DURETTE WAS PROSECUTING

3      MERCK/ISIS PATENTS RELATING TO NS5B POLYMERASE INHIBITORS?

4      A.   YES.

5      Q.   THANK YOU.  IF WE CAN NOW TURN TO THE NEGOTIATIONS THAT

6      MERCK HAD WITH PHARMASSET SURROUNDING SOFOSBUVIR, OKAY?

7      A.   OKAY.

8      Q.   AND I BELIEVE YOU BEGAN WITH A DOCUMENT FROM OCTOBER 2008.

9      IT WAS EXHIBIT 1768; IS THAT RIGHT?

10     A.   LET ME LOOK IT UP.  17 -- IS THIS IN YOUR BINDER?

11     Q.   I'M SORRY.  I HAD A DIFFERENT EXHIBIT NUMBER.  I WAS USING

12     THE ONE FROM THE OLD BINDER, THE ONE YOU USED ON DIRECT.  SO

13     IT'S EXHIBIT 1768 FROM THE BINDER YOU USED ON YOUR BINDER.

14     A.   SO IT'S THE OTHER BINDER?

15     Q.   DO YOU HAVE THAT BINDER?  YES, I'M SORRY.

16     A.   I DON'T -- IT'S THIS ONE?  IT'S THIS ONE (INDICATING)?

17            THE COURT:  NO, NOT PRIOR.  IT IS THIS ONE.  SO IT

18     SAYS EXHIBITS ACCOMPANYING DIRECT EXAM.

19            THE WITNESS:  OKAY.  SORRY.

20            THE COURT:  IT'S OKAY.

21            THE WITNESS:  17?

22            MR. BOOKER:  68.

23            THE WITNESS:  OKAY.

24     BY MR. BOOKER:

25     Q.   DO YOU HAVE IT?

1    A.   YES.

2    Q.   AND THAT'S THE OCTOBER 2008, LETTER FROM SCHAEFER PRICE

3    THAT YOU TESTIFIED ABOUT?

4    A.   YES.

5    Q.   AND, NOW, IN THIS PROPOSAL, IT WAS MERCK SEEKING A LICENSE

6    FROM PHARMASSET; CORRECT?

7    A.   YES.

8    Q.   AND THE PROPOSAL IS FOR PHARMASSET TO GRANT MERCK THAT

9    LICENSE; CORRECT?

10   A.   YES, IT WAS EITHER A LICENSE OR AN ACQUISITION IF I'M NOT

11   MISTAKEN.

12   Q.   AND ACTUALLY BOTH, EITHER A LICENSE OR AN ACQUISITION?

13   A.   YES.

14   Q.   AND IT WAS NOT A PROPOSAL FOR MERCK TO GRANT PHARMASSET A

15   LICENSE; TRUE?

16   A.   NO.

17   Q.   AND IN THIS PROPOSAL, MERCK WOULD BE PAYING PHARMASSET A

18   ROYALTY; CORRECT?

19   A.   CORRECT.

20   Q.   AND MERCK WAS ALSO OFFERING TO BUY PHARMASSET AT A PREMIUM

21   PRICE ON THE SECOND PAGE OF THAT DOCUMENT THEY MENTION THAT.

22   DO YOU SEE THAT?

23   A.   RIGHT.

24   Q.   AND YOU POINTED TO THE THIRD BULLET POINT ON THE SECOND

25   PAGE WHICH IS CONCERNING MERCK'S INTELLECTUAL PROPERTY DURING

1     YOUR TESTIMONY.

2          DO YOU REMEMBER THAT?

3     A.   YES.

4     Q.   AND, NOW, IN THAT THE '499 PATENT IS NOT MENTIONED; RIGHT?

5     A.   RIGHT.

6     Q.   AND THE '712 PATENT APPLICATION IS NOT MENTIONED?

7     A.   CORRECT.

8     Q.   AND, AGAIN, THERE'S NO MENTION ABOUT A ROYALTY GOING FROM

9     PHARMASSET TO MERCK, IS THERE?

10    A.   THERE IS NOT, HOWEVER, THIS IS JUST A VERY -- IT'S AN

11    OVERVIEW OF A PROPOSAL, HEADS OF AGREEMENT, AND SO THAT WOULD

12    NOT HAVE COME UP AT THIS POINT.

13    Q.   MY ONLY QUESTION IS THAT IN THIS DOCUMENT, THERE'S NO

14    MENTION OF ROYALTY GOING FROM PHARMASSET TO MERCK?

15    A.   THAT'S CORRECT.

16    Q.   AND I BELIEVE THE NEXT DOCUMENT YOU WENT TO WAS

17    EXHIBIT 1622 FROM OCTOBER 2009?

18    A.   YES.

19    Q.   OKAY.  AND THIS IS THE E-MAIL FROM PHARMASSET TO MERCK

20    ATTACHING A TERM SHEET; IS THAT RIGHT?

21    A.   YES.

22    Q.   AND I WANT TO LOOK AT THE E-MAIL AND WHAT PHARMASSET TELLS

23    MERCK IN THAT E-MAIL.

24         SO IF YOU'RE ON THE FIRST PAGE OF THAT DOCUMENT --

25    A.   UH-HUH.

1      Q.   -- AND DO YOU SEE IN THE E-MAIL TO MR. DE LASZLO THE

2      SECOND LINE IT STARTS WITH "PLEASE BE AWARE"?

3      A.   YES.

4      Q.   IT STATES, "THESE MINIMUM TERMS HAVE BEEN AGREED BY

5      MULTIPLE PARTIES, AND WE ARE CURRENTLY ENTERING CONTRACT

6      NEGOTIATIONS."

7           DO YOU SEE THAT?

8      A.   YES, I DO.

9      Q.   SO PHARMASSET IS TELLING MERCK THAT THEY SENT SIMILAR

10     TERMS TO OTHER COMPANIES; TRUE?

11     A.   THAT'S WHAT IT SEEMS THAT THEY WERE NEGOTIATING WITH

12     MULTIPLE PARTIES.

13     Q.   AND THAT PHARMASSET IS TREATING MERCK JUST LIKE THESE

14     OTHER COMPANIES; FAIR?

15     A.   I DON'T KNOW THAT.

16     Q.   BUT THEY -- IT SAYS THAT THESE TERMS HAVE BEEN AGREED TO

17     BY MULTIPLE PARTIES; TRUE?

18     A.   THAT'S WHAT IT SAYS.

19     Q.   NOW, MERCK DOESN'T WRITE BACK AND SAY WAIT A MINUTE, WE

20     HAVE PATENTS THAT COVER YOU, WE SHOULD BE TREATED DIFFERENTLY?

21     A.   RIGHT.  THIS IS HIS PROPOSAL TO US.

22     Q.   RIGHT.  MY QUESTION IS MERCK DOESN'T WRITE BACK AND SAY,

23     WAIT A MINUTE, TREAT US DIFFERENTLY, WE HAVE PATENTS THAT COVER

24     YOU, DO THEY?

25     A.   I DON'T KNOW WHAT WE WROTE BACK.  SORRY.

1      Q.    YOU DIDN'T WRITE THAT BACK, DID YOU?

2      A.    I DON'T RECALL.

3      Q.    LET'S GO ON TO 2010.  EXHIBIT 1630.

4      A.    1630, ALL RIGHT.

5      Q.    AND THIS, I BELIEVE, IS ANOTHER TERM SHEET THAT YOU SPOKE

6      ABOUT ON DIRECT EXAMINATION; CORRECT?

7      A.    YES.

8      Q.    AND LET'S ACTUALLY JUST TURN TO THE SECOND PAGE -- I'M

9      SORRY, THE THIRD PAGE OF THAT DOCUMENT AND SECTION 5 THE

10     LICENSE GRANTS TO PHARMASSET?

11     A.    UH-HUH, YES.

12     Q.    AND DO YOU RECALL THAT YOU LOOKED AT THAT LANGUAGE IN

13     MULTIPLE TERM SHEETS ON DIRECT?

14     A.    YES.

15     Q.    NOW, THIS LANGUAGE, IT DOESN'T SPECIFY ANY PARTICULAR

16     PATENTS, DOES IT?

17     A.    NO, IT DOESN'T.

18     Q.    IT DOESN'T MENTION THE '499 PATENT; RIGHT?

19     A.    NO.  IT JUST SAYS LICENSEE PATENT RIGHTS AND KNOW-HOW.

20     Q.    AND IT DOESN'T MENTION THE '712 PATENT APPLICATION, DOES

21     IT?

22     A.    NO.

23     Q.    AND IN THIS TERM SHEET, THERE'S NO ROYALTIES GOING FROM

24     PHARMASSET TO MERCK, IS THERE?

25     A.    I DON'T BELIEVE SO.  I'D HAVE TO LOOK AT IT BECAUSE THERE

1    WAS ONE VERSION THAT DID HAVE ROYALTIES GOING BACK TO MERCK.

2         I DON'T SEE IT IN THIS VERSION.

3    Q.   NOW, EXHIBIT 1634, TURN TO THAT.

4    A.   YES.

5    Q.   AND THAT'S THE MERCK INTERNAL MAY 2010 OVERVIEW OF

6    PHARMASSET'S TERM SHEETS; CORRECT?

7    A.   YES.

8    Q.   AND YOU LOOKED AT THE THIRD PAGE ON LICENSES?

9    A.   YES.

10   Q.   AND YOU LOOKED AT THE LANGUAGE ABOUT THE LICENSE TO

11   PHARMASSET; CORRECT?

12   A.   UH-HUH, YES.

13   Q.   AND I BELIEVE YOU SAID ON DIRECT THAT THIS LANGUAGE WAS --

14   THIS WAS BROAD LANGUAGE; CORRECT?

15   A.   YES.

16   Q.   AND THIS WAS A BROAD CROSS-LICENSE PHARMASSET WAS SEEKING?

17   A.   YES.

18   Q.   AND IN THIS LANGUAGE INTERNAL MERCK, NO MENTION OF THE

19   MERCK '499 PATENT, IS THERE?

20   A.   NO.  THAT WOULD HAVE COME ONCE WE HIT AN AGREEMENT, THEN

21   ALL OF THE PATENTS WOULD BE SPELLED OUT, BUT THESE ARE TERM

22   SHEETS.  THIS IS THE SHORTCUT THAT WE TAKE TO NEGOTIATE THE

23   MAJOR POINTS OF THE AGREEMENT AND THEN WE TURN IT INTO A

24   CONTRACT AND THINGS ARE SPELLED OUT.

25   Q.   MY ONLY QUESTION IS, IN THIS DOCUMENT THERE'S NO MENTION

1    OF THE '499 PATENT, IS THERE?

2    A.   THAT'S CORRECT.

3    Q.   AND NO MENTION OF THE '712 PATENT APPLICATION?

4    A.   YES.

5    Q.   AND IT'S NOT YOUR TESTIMONY, IS IT, THAT THAT THE ONLY

6    TIME YOU MENTION A PATENT BY NUMBER IS ONCE YOU GOT AN ACTUAL

7    AGREEMENT IN PLACE, THAT'S NOT YOUR TESTIMONY, IS IT?

8    A.   WELL, IT COULD BE IN SOME OF THE TERM SHEETS.  IT DOESN'T

9    HAVE TO BE.

10        I THINK IN THE AGREEMENT IT WOULD NEED TO BE SPECIFIED, AN

11   EXHIBIT WHICH IS WHAT USUALLY HAPPENS.

12        IN THE TERM SHEET IT COULD BE THERE.  IT DOESN'T HAVE TO

13   BE THERE.  PEOPLE UNDERSTAND THAT IT WOULD BE THE PATENTS, THE

14   MERCK PATENTS COVERING THE PHARMASSET COMPOUND.

15   Q.   AND IN YOUR OWN EXPERIENCE AT MERCK, YOU HAVE SENT PARTIES

16   IN WRITING PATENTS THAT THEY NEED TO LICENSE WITHOUT HAVING AN

17   AGREEMENT IN PLACE WITH THOSE PARTIES, HAVEN'T YOU?

18   A.   SAY THAT AGAIN.

19   Q.   IN YOUR EXPERIENCE WITH MERCK --

20   A.   YES.

21   Q.   -- ON OCCASION YOU HAVE SENT LETTERS TO PARTIES SAYING

22   THAT THEY NEED A LICENSE FROM CERTAIN MERCK PATENTS BEFORE EVER

23   HAVING A TERM SHEET FROM THAT PARTY; TRUE?

24   A.   YES, I WOULD SEND THAT TO -- YES.  SOMETIMES IT'S IN

25   THERE.  SOMETIMES IT'S NOT.  OBVIOUSLY IF YOU'RE WRITING TO

1    ANOTHER PARTY, YOU WANT TO BE SPECIFIC SO THAT THERE'S AN

2    UNDERSTANDING BETWEEN THE PARTIES OF WHAT YOU'RE TRYING TO

3    COMMUNICATE.

4    Q.   NOW, IF YOU CAN, PLEASE, TURN IN YOUR BINDER TO

5    EXHIBIT 1642.

6             THE COURT:  IS THAT THE OTHER BINDER?

7             MR. BOOKER:  I'M SORRY.

8    Q.   THIS IS THE OTHER BINDER THAT I GAVE YOU, MS. DEMAIN.

9    A.   OKAY.

10   Q.   AND THIS IS A DOCUMENT THAT IS IN BY STIPULATION AND THAT

11   YOU DIDN'T TALK ABOUT I DON'T THINK.

12   A.   OKAY.

13   Q.   AND THIS IS AN E-MAIL THAT YOU WROTE ON JUNE 24TH, 2010?

14   A.   EXCUSE ME.  I'LL HAVE TO REVIEW THIS FOR A FEW MINUTES.

15   Q.   SURE.  PLEASE.

16   A.   OKAY.

17   Q.   TURN YOUR ATTENTION TO THE SECOND PARAGRAPH OF YOUR

18   E-MAIL, THE LAST LINE IN THE MIDDLE OF THE SENTENCE TALKING

19   ABOUT THAT THEY WANT TO KEEP EVERYONE.

20   A.   YES.

21   Q.   AND THAT'S REFERRING TO PHARMASSET.  YOU WRITE HERE, "THEY

22   WANT TO KEEP EVERYONE ON SIMILAR TERMS SO THEY ARE COMPARING

23   APPLES TO APPLES WHEN THEY PRESENT THE OFFERS TO THEIR BOARD."

24        DO YOU SEE THAT?

25   A.   YES.

1      Q.   AND SO, ONCE AGAIN, PHARMASSET WAS TELLING MERCK THAT

2      MERCK IS BEING TREATED THE SAME OR SIMILAR TO OTHER COMPANIES;

3      CORRECT?

4      A.   I CAN'T REALLY SAY THAT BECAUSE THIS IS COMING FROM THEM.

5      THERE'S A LOT OF NEGOTIATION TACTICS USED SO I CAN'T REALLY

6      SAY.

7           I CAN READ THE WORDS, I CAN SEE WHAT THEY'RE SAYING, WHAT

8      THEY SAID TO ME AND THAT I WAS CONVEYING TO OUR TEAM, BUT I

9      DON'T KNOW IF THAT WAS REAL OR NOT AS A NEGOTIATOR.

10     Q.   I'M SORRY.  AND THAT'S WHAT THEY TOLD YOU; RIGHT?

11     A.   THAT IS WHAT THEY TOLD US.

12     Q.   FAIR ENOUGH.  NOW LET'S LOOK AT THE NEXT PARAGRAPH, "THEY

13     TOLD US."

14          THIS IS THE THIRD SENTENCE?

15     A.   OKAY.

16     Q.   "THEY TOLD US THAT THERE IS NOT MUCH ROOM TO MOVE ON THE

17     FINANCIALS, SINCE THEY HAVE OTHER OFFERS AT OR CLOSE TO THESE

18     TERMS."

19          DO YOU SEE THAT?

20     A.   YES.

21     Q.   AND, AGAIN, THIS IS WHAT PHARMASSET TOLD YOU?

22     A.   RIGHT.

23     Q.   AND THEY HAVE OTHER OFFERS CLOSE TO THESE TERMS; RIGHT?

24     A.   THAT'S WHAT IT SAYS, YES.

25     Q.   NOW, AGAIN, YOU DIDN'T WRITE BACK TO PHARMASSET SAYING,

1    WAIT A MINUTE, DON'T GIVE US THE SAME TERMS, WE HAVE PATENTS

2    THAT COVER WHAT YOU'RE DOING?

3    A.   I DON'T KNOW WHAT I WROTE BACK TO PHARMASSET.

4    Q.   YOU DON'T RECALL WRITING TO PHARMASSET PUT US ON DIFFERENT

5    TERMS BECAUSE WE HAVE PATENTS THAT COVER YOU?

6    A.   I DON'T RECALL IF WE EVER HAD THAT CONVERSATION.

7    Q.   LET'S JUMP OVER TO JULY OF 2010, SAME BINDER,

8    EXHIBIT 1647.

9    A.   YES.

10   Q.   THIS IS ANOTHER PROPOSED TERM SHEET BETWEEN MERCK AND

11   PHARMASSET; CORRECT?

12   A.   YES.

13   Q.   AND HERE AGAIN, YOU CAN LOOK THROUGH IT IF YOU WANT,

14   THERE'S NO MENTION OF THE '499 PATENT, NO MENTION OF THE '712

15   PATENT APPLICATION, AND NO MENTION OF A ROYALTY GOING TO MERCK;

16   TRUE?

17   A.   NO MENTION OF A ROYALTY GOING TO MERCK, YES.

18   Q.   NOW, WE'RE GOING TO COME BACK TO THIS JULY TERM SHEET IN A

19   FEW MINUTES WHEN WE LOOK AT SOME OF MERCK'S INTERNAL ASSESSMENT

20   OF 7977.  SO JUST KEEP THIS JULY TERM SHEET IN MIND AGAIN.

21   A.   OKAY.

22   Q.   NOW FLIP TO YOUR ORIGINAL BINDER ON DIRECT, PLEASE, SO I

23   CAN KEEP WITH THE ORIGINAL EXHIBIT NUMBER, TO 686?

24   A.   YES.

25   Q.   AND THIS IS THE LETTER THAT MERCK SENT TO PHARMASSET,

1    MR. SCHAEFER PRICE, IN SEPTEMBER OF 2010; CORRECT?

2    A.   YES.

3    Q.   AND, AGAIN, ON DIRECT, I THINK, YOU POINTED TO ON THE

4    SECOND PAGE THAT THIRD BULLET RELATED TO MERCK'S INTELLECTUAL

5    PROPERTY; RIGHT?

6    A.   YES.

7    Q.   AND, AGAIN, THIS LETTER TO MR. PRICE IN 2010 THERE'S NO

8    MENTION HERE OF THE '499 PATENT; RIGHT?

9    A.   THERE IS NO MENTION IN THIS LETTER.

10   Q.   NO MENTION OF THE '712 PATENT APPLICATION?

11   A.   UH-HUH, RIGHT.

12   Q.   AND NO MENTION OF A ROYALTY GOING FROM PHARMASSET TO

13   MERCK, IS THERE?

14   A.   RIGHT.

15   Q.   AND --

16   A.   THERE IS MENTION, THOUGH, THAT WITH WORKING TOGETHER WE

17   WOULD HAVE A VERY STRONG PATENT ESTATE AND LESS RISK AND LESS

18   UNCERTAINTY FOR PHARMASSET.

19   Q.   AND NO ACTUAL PATENTS NAMED?

20   A.   NO PATENTS NAMED.

21   Q.   AND A FEW LINES BELOW THAT THIRD BULLET POINT MERCK IS

22   OFFERING TO BUY PHARMASSET FOR $1.4 BILLION; CORRECT?

23   A.   YES, I SEE THAT.

24   Q.   AND MERCK IS TRYING TO CONVINCE PHARMASSET THAT THIS IS A

25   GOOD DEAL THAT THEY SHOULD TAKE; RIGHT?

1    A.   YES.

2    Q.   AND HERE AGAIN YOU NEVER TELL MERCK IF THEY DON'T TAKE THE

3    DEAL, THEY'RE GOING TO NEED A LICENSE FROM MERCK TO GET 7977 TO

4    MARKET, YOU DON'T TELL THEM THAT, DO YOU?

5    A.   SAY THAT AGAIN, I'M SORRY.

6    Q.   YOU DON'T TELL PHARMASSET THAT IF THEY DON'T DO THE DEAL

7    WITH MERCK, THEY'RE GOING TO NEED A LICENSE TO THE '499 PATENT

8    IN ORDER TO GET SOFOSBUVIR TO MARKET?

9    A.   WELL, I WOULD SAY THAT WAS IN BULLET NUMBER 3 THAT WE HAD

10   DISCUSSED SEVERAL TIMES.

11   Q.   BULLET POINT NUMBER 3 DOES NOT SAY THAT PHARMASSET NEEDS A

12   LICENSE TO THE '499 PATENT IN ORDER TO GET TO MARKET, DOES IT?

13   A.   IT TALKS ABOUT THE -- THEIR ABILITY TO REDUCE THEIR

14   UNCERTAINTY AND ENHANCE THE VALUE OF THEIR ASSETS GOING FORWARD

15   BY WORKING WITH MERCK.

16   Q.   IT DOESN'T MENTION THE '499 PATENT; RIGHT?

17   A.   IT DOES NOT MENTION THE '499 PATENT.

18   Q.   AND IT DOESN'T SAY THAT PHARMASSET NEEDS A LICENSE, DOES

19   IT?

20   A.   NOT HERE, NO.

21   Q.   AND, NOW, YOU KNOW THAT PHARMASSET REJECTED THIS OFFER BY

22   MERCK; RIGHT?

23   A.   YES.

24   Q.   AND SOME TIME AFTER THAT REJECTION MERCK'S DR. POMERANTZ

25   AND A MERCK ATTORNEY WENT TO MR. PRICE; RIGHT?

1    A.   YES, AND PERHAPS MR. KENDER.  I'M NOT 100 PERCENT SURE.

2    Q.   OKAY.  AND THEY SHOWED HIM THEN THE '499 PATENT; RIGHT?

3    A.   I KNOW PATENTS WERE DISCUSSED AS ONE OF THE SUBJECTS OF

4    CONVERSATION.  I DON'T KNOW WHAT HAPPENED AT THAT MEETING, I

5    WAS NOT THERE.

6    Q.   SO YOU DON'T KNOW THAT MR. PRICE TOLD MERCK THAT HE

7    BELIEVED THAT MERCK'S PATENTS WERE INVALID FOR A NUMBER OF

8    REASONS?

9    A.   I DON'T KNOW THAT.

10   Q.   OKAY.  FAIR ENOUGH.

11        NOW, AFTER THIS MEETING I WANT TO TURN TO WHAT MERCK

12   THOUGHT INTERNALLY ABOUT 7977.

13   A.   OKAY.

14   Q.   AND IF YOU TURN TO EXHIBIT 99 IN THE BINDER I GAVE YOU.

15   A.   OKAY.

16   Q.   AND THIS IS A -- THIS IS AN EVALUATION ON RG-7128 VERSUS

17   PSI-7977; CORRECT?

18   A.   YES.

19   Q.   AND YOU TESTIFIED ABOUT THIS DOCUMENT, I THINK, LAST WEEK

20   SOME TIME?

21   A.   YES.

22   Q.   OKAY.  NOW, I WANT TO TURN TO THE SECOND PAGE OF THAT

23   DOCUMENT.  AND HERE MERCK IS EVALUATING SIX DIFFERENT SCENARIOS

24   OF STRIKING A DEAL FOR EITHER RG-7128 OR PSI-7977; CORRECT?

25   A.   YES.

1    Q.   AND SCENARIO 1 MERCK RECEIVES A 10 PERCENT ROYALTY FROM

2    ROCHE?

3    A.   YES.

4    Q.   FOR RG-7128; TRUE?

5    A.   YES.

6    Q.   AND SCENARIO 4 IS MERCK IS LICENSING 7977 FROM PHARMASSET;

7    RIGHT?

8    A.   SCENARIO 4 YOU SAID?

9    Q.   SCENARIO 4.

10   A.   YES.

11   Q.   AND IT'S BASED ON THOSE JULY 2010, TERMS THAT WE JUST

12   LOOKED AT A FEW EXHIBITS AGO; RIGHT?

13   A.   RIGHT.

14   Q.   THERE ARE NO SCENARIOS HERE WHERE PHARMASSET HAS TO PAY A

15   ROYALTY TO MERCK, IS THERE?

16   A.   I'D HAVE TO LOOK THROUGH THE DOCUMENT.

17   Q.   OH, I'M SORRY.  I'M TALKING ABOUT THIS PAGE WHERE IT SHOWS

18   THE SIX DIFFERENT SCENARIOS.

19   A.   ON THIS -- IN THIS SUMMARY SECTION, NO, THAT DID NOT MAKE

20   THE SUMMARY.

21   Q.   OKAY.  AND LET'S SEE WHAT MERCK SAID ABOUT THE PATENT

22   SITUATION SURROUNDING RG-7128.

23   A.   RIGHT.

24   Q.   AND PSI-7977.

25   A.   RIGHT.

1       Q.   IF YOU WOULD TURN TO PAGE 27 OF THE DOCUMENT.

2       A.   UH-HUH.

3       Q.   DO YOU SEE THIS IS MERCK'S ASSESSMENT OF THE INTELLECTUAL

4       PROPERTY SUMMARY SURROUNDING RG-7128?

5       A.   YES, REGARDING 7128.  SO FROM THE ROCHE PERSPECTIVE.

6       Q.   AND THIS TALKS ABOUT MERCK/ISIS METHOD OF USE.  IT'S THE

7       THIRD ONE DOWN OR SECOND COLUMN BOLDED?

8       A.   YES.

9       Q.   AND IF WE TURN TO PAGE 29, AND THIS IS THE PSI-7977

10      INTELLECTUAL PROPERTY; CORRECT?

11      A.   RIGHT, RIGHT.

12      Q.   THERE'S NO MENTION OF ANY MERCK/ISIS PATENTS, IS THERE?

13      A.   YES.  BECAUSE IF WE DID A DEAL WITH PHARMASSET, IT WOULD

14      INCLUDE THAT -- THOSE PATENTS.

15      Q.   I'M SORRY.  YOUR TESTIMONY IS THAT IF YOU DID A DEAL WITH

16      PHARMASSET IT WOULD INCLUDE --

17      A.   IT WOULD INCLUDE THOSE PATENTS.  SO THAT'S NOT AN ISSUE

18      REGARDING 7977.  IT'S ONLY AN ISSUE REGARDING '7128.

19      Q.   WELL, IF YOU DID A DEAL WITH ROCHE, THAT WOULD INCLUDE THE

20      MERCK/ISIS PATENTS, TOO, WOULDN'T IT?

21      A.   BUT THESE ARE THINGS THAT ROCHE HAS TO CONSIDER, WORRY

22      ABOUT.  THESE ARE THINGS THAT PHARMASSET, IF WE BOUGHT THEM OR

23      WE'RE NOT GOING TO BUY ROCHE, BUT WE'RE GOING TO -- WE'RE

24      CONSIDERING BUYING PHARMASSET OR LICENSING THE COMPOUND.

25           SO IT WOULDN'T HAVE BEEN ON THIS SHEET.

1    Q.   YOU WERE CONSIDERING LICENSING AT THIS TIME EITHER THE

2    ROCHE COMPOUND OR THE PHARMASSET COMPOUND; CORRECT?

3    A.   UH-HUH.

4    Q.   AND ON THE PAGE RELATED TO THE ROCHE COMPOUND, THERE'S A

5    MENTION OF A MERCK/ISIS PATENT; TRUE?

6    A.   LET ME JUST LOOK BACK AT THE SIX SCENARIOS, PLEASE.

7         OKAY.  YES.

8    Q.   AND ON THE PAGE DISCUSSING 7977, THERE'S NO MENTION OF ANY

9    MERCK/ISIS PATENTS; IS THAT TRUE?

10   A.   THAT'S CORRECT.

11   Q.   NOW, A FEW MONTHS LATER MERCK DOES STRIKE A DEAL WITH

12   ROCHE; CORRECT?

13   A.   YES.

14   Q.   AND IF YOU COULD TURN TO EXHIBIT 1668 IN THE BINDER THAT I

15   GAVE YOU?

16   A.   1668.

17   Q.   THAT'S THE DEAL WITH ROCHE?

18   A.   YES, IT IS.

19   Q.   AND IF YOU COULD TURN TO THE LAST PAGE OF THAT DOCUMENT,

20   PAGE 14?

21   A.   RIGHT.

22   Q.   NOW, BEFORE I ASK YOU ANY QUESTIONS THERE, AT THIS TIME IN

23   2011, THE ROCHE DRUG HAD NOT GOTTEN FDA APPROVAL; CORRECT?

24   A.   CORRECT.

25   Q.   AND ROCHE WAS HOPING AT SOME POINT IT MIGHT GET FDA

1    APPROVAL; TRUE?

2    A.   YES.

3    Q.   AND DESPITE THAT, YOU WERE ABLE TO LICENSE PATENTS TO

4    ROCHE AND WE SEE THAT ON PAGE 14; CORRECT?

5    A.   YES, THEY CAME TO US LOOKING FOR A LICENSE.

6    Q.   AND THE LICENSE YOU GAVE THEM WAS TO THE '499 PATENT;

7    TRUE?

8    A.   YES.

9    Q.   AND YOU ALSO GAVE THEM A LICENSE TO -- IF YOU LOOK DOWN TO

10   THE LICENSE NUMBER 11/701682.

11   A.   WHERE IS THAT?

12   Q.   FIVE LINES DOWN IF YOU WANT TO LOOK ON YOUR SCREEN YOU CAN

13   SEE THAT?

14   A.   OH, YES.

15   Q.   AND THAT ENDS UP BECOMING THE '712?

16   A.   YES.

17   Q.   AND SO MERCK IS ABLE TO LICENSE BOTH A PATENT AND A PATENT

18   APPLICATION TO A COMPANY BEFORE THAT COMPANY GETS FDA APPROVAL;

19   TRUE?

20   A.   YES.  AS I SAID, THEY CAME TO US.  WE DID NOT GO TO THEM.

21   Q.   NOW, EVENTUALLY -- THIS IS IN 2011.  EVENTUALLY PHARMASSET

22   ENDS UP GETTING PURCHASED BY GILEAD?

23   A.   YES.

24   Q.   FOR $11 BILLION; RIGHT?

25   A.   YES.

1    Q.   AND THAT WAS PRETTY BIG NEWS IN THE HCV FIELD AT THE TIME?

2    A.   YES.

3    Q.   NOW, TWO YEARS AFTER THE ACQUISITION, MERCK SENDS GILEAD A

4    LETTER SAYING THAT GILEAD NEEDS A LICENSE UNDER THE '499 AND

5    '712 PATENTS?

6    A.   YES, WE ARE OFFERING GILEAD A LICENSE.

7    Q.   AND IF YOU CAN TURN TO EXHIBIT 2566 IN THE BINDER THAT I

8    GAVE YOU?

9    A.   YES.

10   Q.   AND THAT'S THE LETTER THAT YOU SENT GILEAD IN AUGUST OF

11   2013?

12   A.   YES.

13   Q.   AND IT MENTIONS BY NUMBER THE '499 PATENT; RIGHT?

14   A.   YES.

15   Q.   AND THE '712 PATENT?

16   A.   YES.

17   Q.   AND IT INDICATES THE LICENSE, RIGHT, THAT MERCK EXPECTS

18   FROM FOR THOSE TWO PATENTS?

19   A.   YES.

20        MR. BOOKER:  YOUR HONOR, I DON'T HAVE ANY MORE

21   QUESTIONS.  I DON'T KNOW IF MS. BROOKS MAY.

22        MS. BROOKS:  NOT ON THE INTEREST RATE.

23        MR. BOOKER:  NOTHING FURTHER.

24        THE COURT:  MR. FISHER, ANY FURTHER REDIRECT?

25        MR. FISHER:  VERY BRIEFLY.

1          **REDIRECT EXAMINATION**

2     BY MR. FISHER:

3     Q.   MS. DEMAIN, CAN YOU GO TO EXHIBIT 2394.

4     A.   IN WHICH BINDER?

5     Q.   IN THE BINDER THAT COUNSEL GAVE YOU OR PROVIDED YOU.

6     A.   WHAT WAS THE NUMBER AGAIN?

7     Q.   2394.

8     A.   OKAY.

9     Q.   AND I BELIEVE HE ASKED YOU A QUESTION ABOUT PAGE 2 OF THIS

10    TERM SHEET UNDER FINANCIAL TERMS.

11         DO YOU SEE THAT?

12    A.   OH, YES, UH-HUH.

13    Q.   AND I WANT TO DIRECT YOUR ATTENTION TO THE SECOND SUB

14    BULLET IT SAYS, "THAT LEAD COMPOUND PSI-6130," AND THEN THE

15    SECOND BULLET UNDER THAT "IS A CHAIN TERMINATOR OF HCV

16    POLYMERASE."

17    A.   YES.

18    Q.   DO YOU KNOW WHETHER OR NOT THAT'S AN NS5B INHIBITOR?  IS

19    THAT SOMETHING THAT YOU KNOW?

20    A.   I DO NOT KNOW.

21    Q.   AND I WANT TO ASK YOU A QUESTION.  COUNSEL ASKED YOU A

22    NUMBER OF QUESTIONS ABOUT WHETHER YOU REFER TO SPECIFIC PATENTS

23    THAT MERCK HAD WITH PHARMASSET?

24    A.   YES.

25    Q.   DO YOU RECALL THOSE QUESTIONS?

1    A.   YES, I DO.

2    Q.   AND DID YOU EVER HAVE A CONVERSATION WITH DR. DE LA ROSA

3    ABOUT MERCK'S I.P. AND VALUE THAT IT PROVIDED TO PHARMASSET

4    THAT OTHERS COULDN'T PROVIDE?

5    A.   YES.

6    Q.   AND WHAT DID YOU TELL THEM?

7    A.   I ALWAYS TOLD THEM THAT WE HAVE VERY STRONG PATENTS IN THE

8    AREA AND TOGETHER WE WOULD HAVE A VERY STRONG PATENT ESTATE.

9    Q.   IS THERE ANY AMBIGUITY AS TO WHAT PATENTS YOU WERE

10   REFERRING TO?

11   A.   NO, THERE'S NO AMBIGUITY.

12   Q.   AND WHY DO YOU SAY THAT?

13   A.   BECAUSE THERE WERE TWO PATENTS, AND IT WAS VERY CLEAR WHAT

14   WE WERE SPEAKING ABOUT.

15   Q.   NOW, COUNSEL JUST ASKED YOU A FEW QUESTIONS ABOUT THE

16   ROCHE LICENSE.

17        DO YOU REMEMBER THAT?

18   A.   YES.

19   Q.   AND DID PHARMASSET CONSENT TO THAT LICENSE?

20   A.   YES, THEY DID.

21   Q.   OKAY.  AND, MS. DEMAIN, REALLY BRIEFLY, ON THE PRIME

22   INTEREST RATE THAT YOU WERE TESTIFYING ABOUT EARLIER.

23   A.   YES.

24   Q.   AND JUST SO THE RECORD IS CLEAR ON THIS, WERE THOSE

25   PAYMENT FROM MERCK TO -- TO MERCK OR THAT MERCK WOULD PAY TO

1    OTHERS IN TERMS OF THE PRIME INTEREST RATE THAT --

2    A.   IF SOMEBODY MISSED A PAYMENT, DEPENDING ON WHETHER IT WAS

3    AN IN LICENSE OR AN OUT LICENSE, IT WOULD AFFECT THE OTHER

4    PARTY.

5    Q.   OKAY.  SO THE PRIME RATE WAS IN BOTH TYPES OF LICENSES?

6    A.   YES.

7    Q.   OKAY.

8         NOTHING FURTHER.

9              THE COURT:  MR. BOOKER, ANYTHING ELSE FOR THIS

10   WITNESS?

11             MR. BOOKER:  NO, YOUR HONOR.

12             THE COURT:  MAY MS. DEMAIN BE EXCUSED?

13             MR. FISHER:  NOTHING FURTHER, YOUR HONOR.

14             MR. BOOKER:  YES.

15             THE COURT:  MS. DEMAIN, THANK YOU FOR YOU TESTIMONY.

16   GOOD LUCK ON YOUR FLIGHT.

17        WELL, 12:30 IS WHAT YOU SAID, MR. GENDERSON, AND I

18   APPRECIATE THAT.

19        SHOULD WE TAKE OUR LUNCH BREAK?

20             MR. GENDERSON:  THAT WOULD BE GREAT, YOUR HONOR.

21             THE COURT:  ALL RIGHT.  WE'LL COME BACK IN AN HOUR.

22             MR. GENDERSON:  THANK YOU.

23             THE CLERK:  COURT IS IN RECESS.

24        (LUNCH RECESS TAKEN AT 12:31 P.M.)

25

1          **AFTERNOON SESSION**

2          (COURT CONVENED AT 1:32 P.M.)

3               THE COURT:  PLEASE BE SEATED.  WE HAVE EVERYONE

4     BACK.

5          ALL RIGHT.  WE'RE GOING TO RETURN THEN TO THE DEPOSITION

6     TESTIMONY.

7               MR. SINGER:  I THINK WE HAVE ONE MORE TO PLAY; IS

8     THAT RIGHT?

9               MS. FLANAGAN:  THAT'S RIGHT, MR. BERGMAN.

10              THE COURT:  OKAY.

11         **(VIDEOTAPED DEPOSITION OF JEFFREY BERGMAN PLAYED IN OPEN**

12    **COURT.)**

13              MR. SINGER:  YOUR HONOR, THAT GIVES A NEW MEANING TO

14    THE EMPTY CHAIR.

15              THE COURT:  IT'S A LITTLE JARRING.

16              MR. SINGER:  BUT IN ANY EVENT, YOUR HONOR, THE

17    PLAINTIFFS REST ON THE INEQUITABLE DEFENSES.

18              THE COURT:  OKAY.  THANK YOU, MS. BERNIKER, IS THERE

19    ANY FURTHER EVIDENCE THAT MERCK IS GOING TO SUBMIT?

20              MS. BERNIKER:  WE ACTUALLY HAVE VERY SHORT

21    DEPOSITION CLIPS FROM TWO WITNESSES.  ONE WITNESS.

22              MR. LAUD:  ONE WITNESS.  MERCK WILL NOW PLAY A SHORT

23    CLIP FROM THE DEPOSITION OF DR. KRZYSZTOF PANKIEWICZ.

24    DR. PANKIEWICZ WAS A CHEMIST AT PHARMASSET, AND HE WAS A

25    SUPERVISOR OF JEREMY CLARK.  I HAVE HERE MARKED AS EXHIBIT 2791

1    FOR IDENTIFICATION ONLY THE CLIP REPORT OF THE TRANSCRIPT.  I

2    CAN HAND THAT TO THE CLERK.

3         (DEFENDANTS' EXHIBIT 2791 WAS MARKED FOR IDENTIFICATION.)

4         (HANDING.)

5         **(VIDEOTAPED DEPOSITION OF KRZYSZTOF PANKIEWICZ PLAYED IN**

6    **OPEN COURT OFF THE RECORD.)**

7              MR. RABINOWITZ:  YOUR HONOR, AT THIS TIME WE WOULD

8    REQUEST THE OPPORTUNITY TO BE HEARD ON THE MOTION FOR JUDGMENT

9    AS A MATTER OF LAW ON THE AFFIRMATIVE -- ON THE EQUITABLE

10   DEFENSES RAISED BY GILEAD.

11             THE COURT:  ALL RIGHT.

12             MR. RABINOWITZ:  YOUR HONOR, I'LL BE VERY BRIEF.  AS

13   TO THE DEFENSE OF WAIVER, IT IS CLEAR FROM GILEAD'S TRIAL BRIEF

14   THAT THEY ARE RELYING ON A DEFENSE OF IMPLIED WAIVER, NOT TRUE

15   WAIVER.

16        THERE IS ABSOLUTELY NO EVIDENCE THAT MERCK MADE ANY

17   STATEMENTS AFFIRMATIVELY WAIVING THE RIGHTS TO ASSERT THESE

18   PATENTS AGAINST PHARMASSET.

19        AS FOR IMPLIED WAIVER, THE CASES APPLY THAT SPECIES OF

20   WAIVER ONLY IN THE CONTEXT OF A STANDARD SETTING ORGANIZATION

21   WHERE THE OWN PARTY WHO HAS WAIVED HAS UNDERTAKEN A DUTY TO

22   AFFIRMATIVELY DISCLOSE PATENTS TO OTHERS WHO ARE ADOPTING A

23   STANDARD WHICH THE INDUSTRY WILL USE THAT, THAT HAVE PATENTS --

24   WHO ARE PROSECUTING PATENTS THAT COVER THE PROPOSED STANDARD.

25             THE COURT:  YOU'RE SAYING IMPLIED WAIVER ONLY IS

1     APPLICABLE AS A LEGAL THEORY IN STANDARD SETTING CASES?

2          MR. RABINOWITZ:  WE HAVE NOT FOUND ANY CASES THAT

3     APPLY A THEORY OF IMPLIED WAIVER AS TO PATENT RIGHTS OTHER THAN

4     IN THE STANDARD SETTING ORGANIZATION WHERE THERE WAS A

5     VOLUNTARILY ASSUMED DUTY TO DISCLOSE THE EXISTENCE OF PATENTS

6     OR PENDING PATENT APPLICATIONS AND WHERE THE FAILURE TO MAKE

7     THAT DISCLOSURE IN ACCORDANCE WITH THE REQUIREMENTS AND

8     OBLIGATIONS OF THE ORGANIZATION WAS DEEMED TO WORK AN IMPLIED

9     WAIVER OF THE PATENT RIGHTS THAT WE'VE COVERED.

10         THE COURT:  SO OTHERWISE IT'S YOUR POSITION THAT

11     THERE MUST BE A CLEAR AFFIRMATIVE STATEMENT OF WAIVER?

12         MR. RABINOWITZ:  THAT'S CORRECT, YOUR HONOR.  THAT'S

13     REFERRED TO IN THE CASES AS TRUE WAIVER.

14     I SUPPOSE THAT GILEAD COULD HAVE MADE SOME ARGUMENT THAT

15     THERE WAS SOME OTHER VOLUNTARILY ASSUMED AFFIRMATIVE DUTY TO

16     DISCLOSE THE EXISTENCE OF PATENTS OR PATENT APPLICATIONS WHICH

17     WAS NOT DONE, BUT THEY'VE NOT DONE SO AND, IN FACT, THE RECORD

18     SHOWS THAT MERCK'S PATENT APPLICATION WAS VERY WELL-KNOWN TO

19     PHARMASSET.

20     IN FACT, CLARK, WHEN HE CAME TO DR. OTTO WITH THE IDEA FOR

21     6130, ACTUALLY CARRIED MERCK'S PUBLISHED PATENT APPLICATION IN

22     HIS HAND.  SO THERE WAS AFFIRMATIVE DISCLOSURE OF THE

23     SPECIFICATION THAT SUPPORTS ALL OF THE CLAIMS IN SUIT BOTH AS

24     TO THE '499 AND AS TO THE '712 PATENT.

25     SO NOT ONLY WAS THERE AN ABSENCE OF DUTY BUT THERE WAS, IN

1    FACT, THE PRESENCE OF DISCLOSURE AND SO WE SAY THAT THERE CAN

2    BE NO IMPLIED WAIVER.

3            THE COURT:  ALL RIGHT.

4            MR. RABINOWITZ:  AS TO UNCLEAN HANDS, WELL, THE

5    THEORY IDENTIFIED IN THE INTERROGATORY RESPONSE IS THAT THE

6    UNCLEAN HANDS SUBSISTS IN MERCK'S HAVING OBTAINED PATENT RIGHTS

7    TO AN INVENTION THAT WAS DERIVED FROM JEREMY CLARK AND WAS

8    DISCLOSED TO MERCK'S PATENT ATTORNEYS IN A TELEPHONE CALL IN

9    2004, MARCH OF 2004.

10           THE JURY'S FINDING THAT ALL OF THE CLAIMS IN SUIT WERE

11   DESCRIBED AND ENABLED, AND, THEREFORE, IN POSSESSION OF MERCK'S

12   INVENTORS AS OF JANUARY 18TH, 2002, MEANS THAT DERIVATION WOULD

13   REQUIRE PROOF THAT JEREMY CLARK HAD A PRIOR CONCEPTION OF THE

14   INVENTION AND A PRIOR COMMUNICATION TO MERCK'S INVENTORS WHO I

15   SUPPOSE IS THEIR PATENT ATTORNEY.

16           THE EVIDENCE AFFIRMATIVELY SHOWS THAT JEREMY CLARK ONLY

17   BEGAN WORKING ON HEPATITIS C VIRUS AT PHARMASSET, HE SAID, IN

18   SEPTEMBER OR OCTOBER OF 2002.

19           MORE THAN THAT, THE RECORD SHOWS THAT THE VERY STRUCTURE

20   OF THE SUGAR, THE METHYL UP, FLUORO DOWN THAT IS SAID TO BE THE

21   INVENTION OF JEREMY CLARK THAT WAS DISCLOSED WAS ACTUALLY DRAWN

22   AND DEPICTED IN APRIL OF 2001, AT A JOINT MEETING OF ISIS AND

23   MERCK.

24           THE COURT:  ARE THOSE -- IS THAT THE NOTEBOOK THAT

25   YOU'RE REFERRING TO?

1      MR. RABINOWITZ:  NO, YOUR HONOR.  WE'RE REFERRING

2  NOW TO THE -- THIS WAS IN THE TESTIMONY OF DR. OLSEN.  THEY

3  WERE DEPICTING STRUCTURES OF COMPOUNDS TO BE SYNTHESIZED.  THIS

4  WAS DR. SONG'S PROPOSAL TO.

5      MS. BERNIKER:  EXHIBITS 36 --

6      THE COURT:  I'M SORRY.  YOU'RE GETTING THOSE NUMBERS

7  FOR US.

8      MR. RABINOWITZ:  EXHIBIT 1543 AT THE PAGE NUMBER

9  DESIGNATED -- AT 1543.0003.  IT'S THE PAGE ENTITLED FUTURE

10  PLAN, 4-25-6130, APRIL 25, 2001, IT DEPICTS A METHYL UP, FLUORO

11  DOWN COMPOUND.

12      THE COURT:  THERE WAS SOMETHING -- AND I CAN'T

13  REMEMBER THE WORDS, I'M SORRY -- THAT DR. SONG'S TESTIMONY AND

14  THE DOCUMENT SHOWED THAT THAT WAS NOT --

15      MR. RABINOWITZ:  THAT THAT WAS A STRUCTURE

16  IDENTIFIED AS ONE THAT DR. SONG WAS PROPOSING TO MAKE.

17      THE COURT:  BUT HE DID NOT MAKE IT OR DID NOT

18  PROPOSE IT IN THE FORM OF THE COMPOUND, AND I --

19      MR. RABINOWITZ:  SO THE STRUCTURE HAD THE METHYL UP,

20  FLUORO DOWN CONFIGURATION OF THE SUGAR IN ASSOCIATION WITH A

21  DOUBLE RING BASE, A PURINE BASE.  SO THE BASE WAS DIFFERENT.

22      BUT THE INNOVATION THAT IS SAID TO LIE AT THE HEART OF

23  JEREMY CLARK'S INVENTION WAS THE SUGAR.  JEREMY CLARK'S

24  INVENTION WAS A CYTOSINE BASE, A PYRIMIDINE BASE, BUT THE SUGAR

25  WAS DIFFERENT FROM NATURALLY APPEARING NUCLEOSIDES.

1    AND THE DIFFERENCE WAS THAT IT HAD AT THE 2' CARBON

2    POSITION A METHYL UP, FLUORO DOWN AND THE PRESENCE OF THAT

3    METHYL UP, FLUORO DOWN STRUCTURE IS WHAT GAVE IT THE PROPERTIES

4    THAT MADE IT USEFUL.

5         THE COURT:  THERE IS COUNTERVAILING EVIDENCE THAT

6    I'M SURE I'LL HEAR ABOUT THAT I RECALL ABOUT DR. SONG'S

7    TESTIMONY, AND I CAN'T RECALL IT MYSELF.  AND I HOPE I CAN FIND

8    IT.

9         MR. RABINOWITZ:  SO THAT'S ONE PIECE OF EVIDENCE.

10   THE NEXT IS THAT THE EVIDENCE SHOWED THAT MERCK HAD

11   PATENT CLAIMS THAT COVERED THE USE OF WHAT LATER WOULD BECOME

12   PSI-6130 IN ITS APPLICATION -- IN ITS PROVISIONAL APPLICATION

13   AS FILED ON JANUARY 22ND, 2001.

14   SO THAT WAS ALREADY COVERED BY MERCK'S PATENT APPLICATION,

15   EVEN AT THAT DATE, THREE YEARS BEFORE THE TELEPHONE

16   CONVERSATION.

17   THE CLAIMS THAT WERE FILED IN THE NONPROVISIONAL

18   APPLICATION OF JANUARY 18TH, 2002, LIKEWISE COVERED THE USE OF

19   WHAT WOULD LATER BE INVENTED BY CLARK AS PSI-6130.

20   AND IN THE PRELIMINARY AMENDMENT FILED IN 2003 WHERE

21   MR. DURETTE NARROWED THE CLAIMS, HE PRESERVED THE COVERAGE OF A

22   METHOD WHICH COMPRISED THE ADMINISTRATION OF A COMPOUND

23   INCLUDING PSI-6130.

24   AND IN PARTICULAR, CLAIM 44 OF THAT PRELIMINARY AMENDMENT

25   IS MUCH NARROWER THAN FORMULA III OR FORMULA I IN THE PATENT

SPECIFICATION, YET PRESERVES THAT COVERAGE OF THE METHOD OF TREATING HEPATITIS C VIRUS INFECTION BY ADMINISTERING A CLASS OF COMPOUNDS THAT INCLUDES PSI-6130.

AND SO THAT WAS SOMETHING LIKE SIX MONTHS BEFORE THE CONVERSATION, THE DUE DILIGENCE CONVERSATION IN 2004 DURING WHICH PHARMASSET FOR THE FIRST TIME DISCLOSED TO MR. DURETTE THE STRUCTURE OF 6130.

HE THEN -- THE RECORD THEN SHOWS THAT HE DID ABSOLUTELY NOTHING WITH REGARD TO PROSECUTION OF THE PATENTS-IN-SUIT.

THE COURT: HE IS?

MR. RABINOWITZ: DR. DURETTE. THE PROSECUTION HISTORY OF THE '499 PATENT IS IN EVIDENCE, AND HE TOOK NO ACTION OF ANY KIND WITH RESPECT TO THE '499 PATENT, THAT IS THE APPLICATION THAT IS AT ISSUE IS THE '499 PATENT, UNTIL AFTER PHARMASSET PUBLISHED THE CLARK PATENT PUBLICATION IN JANUARY OF 2005 WHICH DISCLOSES THE STRUCTURE OF 6130 AS WAS CONCEDED ACTUALLY IN THE TESTIMONY OF PHARMASSET'S -- OR OF GILEAD'S WITNESSES AT THE TRIAL OF INVALIDITY AND WHICH PROVIDES DATA.

SO BY PUBLISHING THE STRUCTURAL INFORMATION, THEY HAD PROVIDED -- THAT GILEAD HAD PROVIDED TO DR. DURETTE ON THE PHONE CALL, THEY PUT IT INTO THE PUBLIC DOMAIN AND UNDER THE CONTRACTUAL AGREEMENTS BETWEEN MERCK AND PHARMASSET, THAT RELIEVED MERCK, AND INCLUDING DR. DURETTE, OF ANY OBLIGATION OF CONFIDENTIALITY AS TO THE INFORMATION THAT PHARMASSET HAD VOLUNTARILY PUBLISHED.

1    IT WAS ONLY AFTER THAT, THAT DR. DURETTE MADE A FURTHER

2    NARROWING AMENDMENT WHICH PRESERVED THE COVERAGE THAT HAD

3    ALWAYS BEEN THERE FROM 2001 ONWARDS OF METHODS THAT COMPRISED

4    ADMINISTERING PSI-6130 TO TREAT HEPATITIS C VIRUS INFECTION.

5    THAT IS THE VERY REVERSE OF DERIVATION.  THERE WAS PRIOR

6    CONCEPTION BY THE MERCK/ISIS INVENTORS.  I DON'T SAY

7    NECESSARILY REDUCTION TO PRACTICE AS OF APRIL 2001 BUT

8    CERTAINLY CONCEPTION AS SHOWN BY A DRAWING THAT WAS VIEWED BY

9    THE ENTIRE TEAM, AND THAT IS ENOUGH TO DEFEAT DERIVATION.

10   THERE WAS CONCEPTION OF THAT SUBJECT MATTER THREE YEARS

11   BEFORE THE PHONE CALL.  THERE WAS CONSTRUCTIVE REDUCTION TO

12   PRACTICE AS EARLY AS JANUARY OF 2001, AND AGAIN IN JANUARY OF

13   2002, BY FILING PATENTS CLAIMS WHICH THE JURY HAS DESCRIBED AND

14   ENABLED THE SUBJECT MATTER NOW CLAIMED.  UNDER THOSE

15   CIRCUMSTANCES THERE CANNOT BE A DERIVATION FROM THE SUBSEQUENT

16   INVENTION BY JEREMY CLARK IN THE FALL OR NOVEMBER OF 2002, AND

17   THE SUBSEQUENT DISCLOSURE IN 2004 TO MERCK'S PATENT ATTORNEYS

18   ON ANY PART OF THAT SUBJECT MATTER.

19   SO WE THINK THAT THE UNCLEAN HANDS DEFENSE FAILS BECAUSE

20   THE JURY'S VERDICT WOULD REQUIRE PROOF OF CONCEPTION AND

21   DISCLOSURE PRIOR TO JANUARY 18TH, 2002, AND THERE'S NO EVIDENCE

22   OF THAT.  IN FACT, THE EVIDENCE AFFIRMATIVELY SHOWS THAT

23   CONCEPTION AND DISCLOSURE WAS LATER.

24   THE COURT:  WOULD IT BE AN OVERSTATEMENT TO SAY THAT

25   -- IF I WERE TO SAY THAT YOUR ARGUMENT WOULD MEAN THAT A

1    FINDING BY THE COURT IN FAVOR OF GILEAD ON UNCLEAN HANDS WOULD

2    BE INCONSISTENT WITH THE JURY'S VERDICT ON ENABLEMENT AND

3    WRITTEN DESCRIPTION?

4            MR. RABINOWITZ:  IT WOULD BECAUSE THE EVIDENCE DOES

5    NOT SHOW CONCEPTION AND DISCLOSURE PRIOR TO THE DATE THAT THE

6    JURY FOUND THAT MERCK WAS IN POSSESSION OF THE SUBJECT MATTER.

7            THE COURT:  CLARK CONCEPTION.

8            MR. RABINOWITZ:  CONCEPTION BY CLARK AND DISCLOSURE

9    BY CLARK OR HIS COMPANY TO MERCK.

10       THE REASON WE DIDN'T MOVE FOR SUMMARY JUDGMENT ON THIS,

11   YOUR HONOR, WAS THEY WOULD HAVE SAID THAT THE EVIDENCE WAS

12   CAPABLE OF BEING CONSTRUED FOR THE PROPOSITION THAT THE CLAIMS

13   WERE NOT DESCRIBED OR ENABLED AS OF THAT DATE.

14       BUT ONCE THE JURY HAS DETERMINED THAT IT IS BINDING IN

15   THIS PHASE OF THE TRIAL, OF THE BENCH TRIAL, ONCE THE JURY HAS

16   DETERMINED THAT THE CLAIMS WERE ENABLED AND DESCRIBED SO THAT

17   MERCK'S INVENTORS WERE IN POSSESSION OF THE SUBJECT MATTER THEY

18   CLAIMED IN THE ASSERTED CLAIMS AS OF THAT DATE, THE ONLY WAY

19   THAT TENABLE DEFENSE OF DERIVATION COULD BE MADE UP IS BY

20   PROOF, BY CLEAR AND CONVINCING EVIDENCE, IN FACT, THAT CLARK

21   HAD THE CONCEPTION EARLIER THAN THAT AND THAT CLARK'S

22   CONCEPTION WAS TRANSMITTED, WAS DISCLOSED, TO MERCK'S INVENTORS

23   OR THEIR ATTORNEYS EARLIER THAN JANUARY 18TH, 2002.

24       AND THAT SIMPLY DIDN'T HAPPEN.  CLARK CONCEIVED LATER.

25   AND THE ONLY DISCLOSURE THEY POINT TO WAS TWO YEARS LATER.

1    SO ON -- BECAUSE OF THE JURY'S FINDING, THE EVIDENCE JUST

2    CANNOT MAKE UP THAT DEFENSE AND ANY CONTRARY FINDING, I

3    BELIEVE, WOULD CONFLICT WITH THE JURY'S VERDICT AS TO

4    ENABLEMENT AND WRITTEN DESCRIPTION.

5    THE DIFFERENCE BETWEEN, JUST TO DEMYSTIFY THIS SLIGHTLY,

6    THE DIFFERENCE BETWEEN PRIOR INVENTION AND DERIVATION IS THAT

7    YOU CAN HAVE TWO INDEPENDENT ACTS OF INVENTION, A INVENTS AND B

8    KNOWS NOTHING OF A AND INVENTS LATER, AND THAT'S SIMPLY A

9    MATTER OF TWO CONSECUTIVE INDEPENDENT INVENTIONS.

10   DERIVATION IS WHEN A INVENTS AND THEN DISCLOSES IT TO B

11   WHO DOESN'T MAKE A SEPARATE LATER INVENTION, BUT YOU NEED A

12   PRIOR INVENTION BY A IN ORDER TO TRANSMIT TO B.

13   HERE MERCK INVENTED AT LEAST AS EARLY AS JANUARY 18TH,

14   2002.  CLARK INVENTED LATER.  AND UNLESS ONE BELIEVES IN TIME

15   TRAVEL, THERE SIMPLY CAN'T BE DERIVATION.

16   AND DERIVATION IS THE ONLY THEORY THAT GILEAD ARTICULATED

17   IN ITS INTERROGATORIES FOR UNCLEAN HANDS.

18   AND EVERYTHING WE SAW TODAY IN THE DEPOSITION OF

19   MR. DURETTE IS SIMPLY CONSISTENT WITH A PATENT ATTORNEY WHO IS

20   ZEALOUSLY PROSECUTING AND ARGUING WITH THE EXAMINERS AND MAKING

21   ARGUMENTS THAT PERHAPS THE EXAMINERS DIDN'T THEN ACCEPT BUT

22   WHICH THE JURY ACCEPTED IN SO FAR AS IT RELATES TO THE '499

23   PATENT.

24   HE WAS ARGUING THAT THERE WAS ENABLEMENT AND DESCRIPTION

25   FOR THE CLAIMED SUBJECT MATTER.  AS TO THE SUBJECT MATTER OF

1    THE '499 CLAIMS, INDEED THE JURY HAS FOUND THAT, AND THAT'S

2    BINDING.  THERE'S NO INEQUITABLE CONDUCT IN HIS MAKING

3    THAT ARGUMENT TO THE PATENT --

4            THE COURT:  WE'RE NOT GOING DOWN THAT ROAD.

5            MR. RABINOWITZ:  I BEG YOUR PARDON, NO UNCLEAN

6    HANDS.  BY WHATEVER NAME THEY WISH TO CALL WHAT IN EFFECT

7    AMOUNTS TO INEQUITABLE CONDUCT IF IT COULD BE PROVED, AND IT

8    DOESN'T AMOUNT TO UNCLEAN HANDS.

9        AS TO THE '712 PATENT, THERE'S NO SHOWING AT ALL THAT

10   MR. BERGMAN LEARNED ANYTHING FROM PHIL DURETTE ABOUT WHAT

11   PHARMASSET DISCLOSED TO HIM ON THE DUE DILIGENCE CALL.

12       IN FACT, 6130 HAS A CYTOSINE BASE.  HE WAS FOCUSSING ON

13   SOFOSBUVIR WHICH HAS A URIDINE BASE.  IT IS A DIFFERENT

14   COMPOUND.  IT MAY HAVE BEEN A STEP IN WHAT HAPPENED INTERNALLY

15   AT PHARMASSET, BUT IT'S A DIFFERENT COMPOUND.  AND SOFOSBUVIR

16   WAS PUBLISHED BY THAT STAGE SO IT SIMPLY DOESN'T RELATE TO THE

17   '712 PATENT AT ALL.

18       SO WE WOULD SUBMIT THAT THERE'S A COMPLETE ABSENCE OF

19   EVIDENCE SUFFICIENT TO SUPPORT A FINDING BY CLEAR AND

20   CONVINCING EVIDENCE OF UNCLEAN HANDS AS TO EITHER THE '499 OR

21   THE '712 PATENT.

22       WE WOULD ASK FOR JUDGMENT AS A MATTER OF LAW DISMISSING

23   BOTH OF THE EQUITABLE DEFENSES THAT GILEAD RAISES IN THIS

24   MATTER.

25            THE COURT:  ALL RIGHT.  THANK YOU.  AND I PRESUME

1    THAT YOU ARE MAKING THIS MOTION TO PRESERVE YOUR RIGHTS IN THE

2    FUTURE?

3            MR. RABINOWITZ:  THAT'S CORRECT, YOUR HONOR.

4            THE COURT:  AND I APPRECIATE THAT.  AT A BENCH TRIAL

5    IT MAKES VERY LITTLE DIFFERENCE WHETHER I CONSIDER THE EVIDENCE

6    NOW AT JMOL PREDETERMINATION BY THE COURT OR AFTERWARDS.  IT'S

7    THE SAME ANALYSIS FOR ME.

8        SO THE PARTIES HAD ASKED FOR CLOSING ARGUMENTS IN THIS

9    MATTER, WHICH, OF COURSE, I'M INTERESTED IN HEARING.  AND SO I

10   WILL CERTAINLY DEFER ANY RULING ON THIS MOTION UNTIL AFTER.

11       SO, MR. SINGER, YOU DON'T HAVE TO SAY THINGS TWICE, OR

12   MR. BOOKER.  ALL RIGHT.

13           AND THANK YOU, MR. RABINOWITZ.  I APPRECIATE THAT.

14       THERE ARE A NUMBER OF THINGS WE NEED TO ACCOMPLISH WITH

15   THE REST OF THE AFTERNOON.  I NEED TO HEAR CLOSING ARGUMENTS ON

16   THE EVIDENCE PRESENTED TODAY AND THEN WE HAVE TO TALK ABOUT ALL

17   OF THE MONEY ISSUES.

18       BUT AS I SAID, I THINK THAT IS A MUCH SHORTER CONVERSATION

19   BASED ON THE BRIEFING AND WHAT WE HAD DISCUSSED PREVIOUSLY.

20       MR. GENDERSON, YOU SUGGESTED AN HOUR FOR CLOSING WHICH I'M

21   RELUCTANT TO AGREE TO.  I'M A LITTLE BIT SURPRISED BY WHY YOU

22   WOULD NEED THAT MUCH TIME WHEN FOR THE WHOLE TWO WEEK TRIAL YOU

23   ONLY ASKED FOR AN HOUR AND A HALF.

24           MR. GENDERSON:  WELL, THE EVIDENCE THAT THE OTHER

25   SIDE IS POINTING TO, THAT GILEAD IS POINTING TO, IS QUITE A LOT

1        AND A LOT OF IT WE HAVEN'T ADDRESSED, AND I THINK IT'S

2        IMPORTANT THAT WE DO ADDRESS IT.

3            WE WILL TRY TO BE AS QUICK AS WE CAN.

4            THE COURT:  I'M NOT PREPARED TO GIVE YOU AN HOUR

5        BECAUSE I'M NOT GOING TO STAY HERE UNTIL 8:00 O'CLOCK TONIGHT.

6        IT'S JUST TOO MUCH.  SO IT NEEDS TO BE -- AND IT CAN'T BE

7        SPOKEN IN DOUBLE TIME.

8            BUT I WOULD LIKE -- YOU KNOW, THERE'S MORE EVIDENCE, I

9        SUPPOSE.  I MEAN, THE PROBLEM THAT I HAVE IS THAT I DON'T KNOW

10       WHAT THE EVIDENCE IS.  AND THE WHOLE POINT OF HAVING YOU COME

11       TODAY FOR A TRIAL IS THAT YOU WOULD NOT THEN SAY, AND, JUDGE,

12       HERE'S THE REST OF THE HAYSTACK TO GO THROUGH BECAUSE I WON'T

13       DO IT.  I WILL NOT ACCEPT EVIDENCE THAT I HAVE NO BASIS TO LOOK

14       AT.

15           MR. GENDERSON:  BUT, YOUR HONOR, THAT'S OUR PROBLEM.

16       AND IN THEIR PROPOSED FINDINGS OF FACT THEY RELY ON A LOT OF

17       THINGS THAT IS FAR REMOVED FROM THEIR INTERROGATORY ANSWER.

18           THE COURT:  NO, THAT'S NOT -- IF IT WAS A DOCUMENT

19       THAT WAS DISCUSSED DURING THE EARLIER PART OF THE TRIAL, THAT'S

20       NOT WHAT I'M REFERRING TO.  I'M REFERRING TO NEW DOCUMENTS THAT

21       MIGHT HAVE BEEN INTRODUCED TODAY.

22           IF I'VE NEVER SEEN THEM THROUGH THE WITNESS TESTIMONY, I'M

23       NOT OPENING THEM UP.  I WANT YOU TO UNDERSTAND THAT I WILL NOT

24       CONSIDER THEM.  I MADE THAT CLEAR TO YOU LAST WEEK.  SO I HOPE

25       THAT'S NOT WHAT YOU'RE SUGGESTING.

1          MR. GENDERSON:  THAT'S NOT WHAT I'M SUGGESTING, YOUR

2     HONOR.

3          THE COURT:  OKAY.  THAT'S FINE.  AND IF YOU'RE -- I

4     MEAN, I MADE A NOTE HERE.  I DON'T EVEN KNOW THE EXHIBIT NUMBER

5     OF ALAN ROEMER'S NOTES FROM THE DR. DURETTE MEETING, AND I

6     PRESUME IT'S IN YOUR FINDINGS OF FACT SO I CAN LOCATE IT.

7          MR. GENDERSON:  AND IT WILL BE PART OF THE CLOSING.

8          THE COURT:  OKAY.  GOOD.  AND THAT WILL HELP ME TO

9     FIND THINGS.

10          MR. GENDERSON:  AND, IN FACT, I THINK THAT WOULD BE

11     USEFUL.  WHEN WE GET TO THAT POINT, I'LL MAKE SURE WE HAVE AN

12     EXTRA COPY, AND WE CAN HAND IT TO YOU.

13          THE COURT:  I'M SURE I HAVE AMPLE COPIES OF THEM,

14     BUT I THINK THAT'S AN IMPORTANT DOCUMENT THAT I NEED TO LOOK

15     AT, AND IT WAS CERTAINLY BROUGHT UP TODAY, AND I CERTAINLY WANT

16     TO GO BACK OVER THAT.

17          I'M PREPARED TO GIVE YOU 45 MINUTES AND NOT A MINUTE MORE.

18     I THINK THAT'S WAY MORE THAN YOU NEED, AND I'M NOT QUITE SURE

19     WHAT YOU'RE REFERRING TO ON ALL OF THE EVIDENCE THAT GILEAD IS

20     REFERRING TO, BUT I GUESS I'LL FIND OUT.

21          MR. GENDERSON:  THANK YOU, YOUR HONOR.

22          THE COURT:  OKAY.  AND IS -- WAS IT MR. BOOKER WHO

23     WAS GIVING THE CLOSING?

24          MR. SINGER:  YOUR HONOR, WITH YOUR PERMISSION WE

25     WILL SPLIT IT.  I WILL TALK UNCLEAN HANDS, AND HE WILL TALK

1    WAIVER, IF THAT'S OKAY.

2            THE COURT:  OF COURSE.  AND I'LL GIVE YOU

3    45 MINUTES.  IF YOU WANT A FINAL REBUTTAL, YOU NEED TO RESERVE

4    SOME TIME.

5            MR. SINGER:  ALL RIGHT.  VERY WELL.

6            THE COURT:  AND ARE YOU GOING TO HAVE SLIDES FOR

7    THIS?

8            MR. SINGER:  I AM, YOUR HONOR.

9            THE COURT:  AND WILL YOU BE ABLE TO LEAVE THOSE WITH

10   ME?

11           MR. SINGER:  I THINK WE WILL WORK ON IT.

12           THE COURT:  YOU CAN SEND THEM TO ME.

13           MR. SINGER:  I THINK THAT'S WHAT WE'LL HAVE TO DO,

14   AND I WILL ADDRESS SOME OF THE LEGAL ARGUMENTS MADE BY

15   MR. RABINOWITZ AT THE END OF CLOSINGS.  I THINK THAT'S WHERE

16   THEY BELONG.

17           THE COURT:  OKAY.

18       **(PLAINTIFF'S GAVE THEIR CLOSING ARGUMENT.)**

19           MR. SINGER:  JUST TO GIVE THE COURT SORT OF OUR

20   PERSPECTIVE ON IT.  I DO WANT TO SAY ONE THING RIGHT OFF THE

21   BAT BEFORE I START TO GO THROUGH THE EVIDENCE.

22       JUST TO POINT OUT, THE JURY DID NOT DECIDE ISSUES OF

23   CONCEPTION.  THE JURY WAS ASKED TO DECIDE ISSUES OF WRITTEN

24   DESCRIPTION AND ENABLEMENT.  THE CONCEPTION AND REDUCTION TO

25   PRACTICE ISSUES WERE IN THE DERIVATION INSTRUCTIONS, AND THOSE

1    INSTRUCTIONS TOLD THE JURY NOT TO CONSIDER THE ISSUE IF THEY

2    FOUND WRITTEN DESCRIPTION AND ENABLEMENT.

3        I WAS VERY SURPRISED TO HEAR MY LEARNED COLLEAGUE,

4    MR. RABINOWITZ, TALK ALL ABOUT CONCEPTION WHEN THE JURY DIDN'T

5    DECIDE IT.  AND I WOULD REFER YOUR HONOR FOR SOME BACKGROUND TO

6    THE PAPER THAT WE FILED IN OPPOSITION TO THEIR OVERALL

7    OBJECTION WHICH TALKS ABOUT THIS DICHOTOMY BETWEEN WRITTEN

8    DESCRIPTION, ENABLEMENT SUPPORT AND ACTUAL CONCEPTION AND WHAT

9    THE DIFFERENCE BETWEEN THOSE TWO ARE.  THEY ARE NOT THE SAME.

10       AND IN OUR JMOL'S YOU'LL GET A LENGTHY DETAILED POINT OF

11   IT, AND I WILL ADDRESS IT AT THE END AS WELL TO POINT YOU TO

12   THE LAW ON THAT.

13           THE COURT:  SO I GUESS I'M JUST A LITTLE BIT BAFFLED

14   BECAUSE BASED UPON ALL OF OUR DISCUSSIONS OF THE JURY VERDICT,

15   IT SEEMED THAT IF THE JURY HAD FOUND THAT YOU HAD NOT PROVED

16   LACK OF WRITTEN DESCRIPTION AND LACK OF ENABLEMENT ON THE 2002

17   PATENT APPLICATION, THAT THE OTHER ISSUES WERE EFFECTIVELY

18   MOOT.

19           MR. SINGER:  AND, YOUR HONOR, I WOULD RESPECTFULLY

20   DISAGREE.

21           THE COURT:  I DON'T UNDERSTAND THE LAW ON THIS.

22   THIS IS SOMETHING THAT WE HAVE SPENT A LOT OF TIME THINKING

23   ABOUT, AND LOGICALLY YOU WRAP ME UP IN PRETZELS TRYING TO ARGUE

24   THIS AND YOU HAVE, IN MY VIEW, NEVER ARTICULATED HOW IT'S NOT

25   COMPLETELY INCONSISTENT WHICH I TAKE THIS JURY'S VERDICT AND

1    THEN TO COME BACK ON THE DERIVATION.

2         AND, IN FACT, I'VE BEEN UNABLE TO AGREE WITH YOUR ARGUMENT

3    ON IT OR MAYBE EVEN TO UNDERSTAND IT.

4         CLEARLY I UNDERSTOOD, OR THOUGHT I DID, THE MERCK

5    DISCUSSION ON THIS AS BEING SOMETHING LOGICAL AND FOUND IN THE

6    LAW.

7         SO YOU'VE STILL LOST ME ON THIS.

8              MR. SINGER:  AND THAT'S WHY I WANTED TO ACTUALLY

9    ADDRESS IT AT THE END TO LET YOU KNOW I WOULD ADDRESS IT.

10             THE COURT:  THAT'S FINE.

11             MR. SINGER:  I THINK IT'S MORE USEFUL TO GO THROUGH

12   THE EVIDENCE THAT WE HAVE ON THE THEORY OF UNCLEAN HANDS AND

13   THEN I WILL ADDRESS IT AT THE END AND THEN PASS THE TIME TO

14   MR. BOOKER, IF THAT'S OKAY.

15             THE COURT:  OKAY.

16             MR. SINGER:  SO, AGAIN, JUST TO START, JUST TO KIND

17   OF SET THE TABLE, YOUR HONOR.  WE'RE GOING BACK TO 2003 AND

18   THIS IS THE EVIDENCE FROM TRIAL.  JUST A REMINDER OF WHAT WE'RE

19   DEALING WITH HERE IN TERMS OF THE TWO COMPANIES.

20        WE HAVE A PHARMASSET, A VERY SMALL COMPANY, AND HERE'S

21   MS. DEMAIN'S TESTIMONY ABOUT MERCK AND HER HUMOROUS EXCHANGE

22   WITH MR. MCCANN ABOUT THE SLIGHT MANPOWER ADVANTAGE THAT MERCK

23   HAD AS THESE PARTIES SAT DOWN TO DISCUSS MATTERS IN 2003 AND

24   2004.  A VERY SMALL COMPANY ON THE ONE HAND AND A VERY LARGE

25   COMPANY WITH LOTS OF RESOURCES ON THE OTHER.

1        AND THE COURT ALSO HEARD AT TRIAL THAT THE CONFIDENTIAL

2    INTERACTIONS BEGAN AT PHARMASSET IN 2001 BETWEEN MERCK AND

3    PHARMASSET AND THAT THEY WERE RE-UPPED AN NDA IN AUGUST OF

4    2003.

5        IN THAT PHARMASSET MADE A PRESENTATION TO MERCK ABOUT 6130

6    AFTER THAT NDA WAS SIGNED AND DESCRIBED 6130 AS AN HCV

7    NUCLEOSIDE INHIBITOR OF THE NS5B POLYMERASE.

8        IN FACT, THAT'S WHY MERCK WAS INTERESTED IN THE COMPOUND

9    BECAUSE, IN FACT, IT WAS A NUCLEOSIDE INHIBITOR OF THE

10   POLYMERASE ENZYME.

11       AND AS YOU ALSO HEARD, MERCK THEN ASKED FOR SAMPLES TO

12   TEST IT.  YOU'VE HEARD THAT EVIDENCE.

13       AND MERCK TOLD PHARMASSET IN JANUARY OF 2004, THAT THOSE

14   IN VITRO REPLICON RESULTS WERE VERY ENCOURAGING.  AND THIS IS

15   AN E-MAIL FROM DOUGLAS PON AT MERCK WHOSE NAME YOU HAVE SEEN IN

16   SOME OF THE NOTES TO MR. ROEMER.  AND I'VE HIGHLIGHTED THERE

17   THAT HE SAYS THE IN VITRO REPLICON ASSAY RESULTS WERE VERY

18   ENCOURAGING.

19       AND THIS IS WHERE THE -- WE STARTED DOWN THE PATH TO WHAT

20   WE PRESENTED TODAY AND THE EVIDENCE THAT YOU HAVE HEARD.  IN

21   THIS EXCHANGE BETWEEN MR. ROEMER AND DOUGLAS PON, MR. PON ASKED

22   FOR STRUCTURAL INFORMATION.  AND THAT'S ACTUALLY RIGHT HERE,

23   YOUR HONOR, RIGHT THERE IS WHERE HE'S ASKING FOR STRUCTURE

24   INFORMATION (INDICATING).

25       YOU HEARD DR. MACCOSS -- I'LL TRY TO TIE THIS TOGETHER FOR

1    YOU -- TALK ABOUT THESE QUESTIONS.  THIS WAS WHAT DR. MACCOSS

2    WAS SAYING THAT MERCK INITIALLY WANTED TO KNOW, AND YOU'LL SEE

3    WHICH OF THE BASIS DOES THE COMPOUND HAVE?  IS IT AN

4    L-NUCLEOSIDE OR A D-NUCLEOSIDE?  IS IT AN ACYCLONUCLEOSIDE?

5        THESE WERE QUESTIONS THAT ONE OF THE MERCK INVENTORS HAD

6    THAT HE WAS TRYING TO EVALUATE THE DEAL, RIGHT?  AND THAT'S WHY

7    THESE QUESTIONS WERE ASKED.

8        AND PHARMASSET WAS WILLING TO DO THAT.  AND THOSE ARE THE

9    QUESTIONS THAT I'VE HIGHLIGHTED.  AND THEY DID IT IN A FASHION,

10   YOUR HONOR, WHERE THEY ACTUALLY PROPOSED THIS FIREWALL.  THIS

11   WASN'T PHARMASSET PROPOSING THE FIREWALL.  THIS WAS MERCK'S

12   IDEA SAYING, HEY, IT WOULD BE REALLY HELPFUL FOR US IF YOU

13   WOULD ALLOW CONSIDERING THIS MERCK MEDICINAL CHEMIST WHO IS

14   FIREWALLED FROM OUR INTERNAL HCV PROGRAM TO ASSESS THE LEAD AND

15   BACK UP PHARMASSET COMPOUNDS.

16       AND THAT'S THE FIREWALL THAT THEY'RE TALKING ABOUT FROM

17   THE INTERNAL PROGRAM AND THAT'S THE EVIDENCE THAT WE HAVE

18   HEARD.

19       PHARMASSET AGREES TO THE FIREWALL.  DR. SCHINAZI,

20   DR. OTTO, MR. ROEMER, AND DR. DE LA ROSA.

21       AND YOU HEARD TODAY FROM DR. MACCOSS WHY FIREWALLS MATTER,

22   AND I DON'T NEED TO BELABOR THIS.  I THINK WE CAN ALL AGREE

23   THEY'RE ALL IMPORTANT.

24       PHARMASSET THEN PROVIDED AN ANSWER TO THOSE INITIAL

25   QUESTIONS, OKAY?  THOSE ONES THAT YOU SAW DR. MACCOSS ASK,

1    PHARMASSET PROVIDED THEM UNDER THE FIREWALL.  RIGHT HERE,

2    DR. ASHTON WHO YOU HEARD FROM TODAY (INDICATING).  DR. ASHTON

3    WAS THE CHEMIST IN THE FIREWALL, AND HE TESTIFIED WHAT THAT

4    MEANT TODAY, HE KNEW WHAT IT MEANT, I'M NOT SUPPOSED TO SHARE

5    THAT INFORMATION.

6         AND YOU'VE ALSO SEEN THIS MANY TIMES.  EXHIBIT 153, THIS

7    IS THE PAMELA DEMAIN E-MAIL.  AND AS YOU SEE, IT SAYS HERE, "AS

8    A FIRST STEP, PHIL DURETTE WILL VIEW THE STRUCTURE DURING A

9    PATENT DUE DILIGENCE MEETING."

10        MERCK WANTED THE ACTUAL STRUCTURE.  THE ANSWERS THAT IT

11   HAD BEEN GIVEN PEAKED ITS INTEREST, BUT IT WANTED THE FULL

12   STRUCTURE.  THAT WAS SORT OF, AS DR. MACCOSS TALKED ABOUT, THAT

13   WAS THE CROWN JEWELS, THE FULL STRUCTURE, THE CROWN JEWELS AND

14   YOU HOLD ON TO IT UNTIL YOU HAVE TO DISCLOSE IT TO SEE IF YOU

15   CAN DO THIS DEAL.

16        AND THEN THE PHONE CALL HAPPENED, THE ST. PATRICK'S DAY

17   PHONE CALL.  AND IF YOU LOOK AT DR. DURETTE'S TESTIMONY, YOU'LL

18   SEE THAT HE UNDERSTOOD IT WAS A FIREWALLED CONVERSATION,

19   MEANING YOU HAVE TO BE INSIDE OF THE FIREWALL IN ORDER TO

20   OBTAIN THIS CONFIDENTIAL INFORMATION; CORRECT, SIR?

21        YES.

22        SO THAT WAS BEFORE THE INFORMATION WAS GIVEN.  SO BEFORE

23   THE INFORMATION WAS GIVEN, DR. DURETTE UNDERSTOOD THAT IT WAS A

24   FIREWALLED CONVERSATION.

25        AND THEN AFTER THE STRUCTURAL INFORMATION REVEALED AND HE

1    SAID HE HAD THIS CONFLICT, HE ASSURED THEM ESSENTIALLY I'M IN

2    THE FIREWALL.

3        AND WHAT COULD PHARMASSET TAKE FROM THAT?  IT'S ONLY

4    NATURAL, OKAY, WE'RE GIVING THIS TO SOMEBODY WHO IS UNDER

5    MERCK'S PROPOSAL, THE FIREWALL, YOUR HONOR, WHO IS ISOLATED

6    FROM THE INTERNAL HCV PROGRAM.  THAT WAS THE IDEA ABOUT A

7    FIREWALL.  AND WHEN DR. DURETTE RAISED HIS HAND AND HE SAID I

8    HAVE A CONFLICT, AND HE DIDN'T IDENTIFY WHAT IT WAS, AND HE

9    JUST SIMPLY SAID THIS IS I CONFLICT FOR ME.

10       HE DIDN'T SAY WHAT IT WAS.  HE DIDN'T SAY HE WAS A MERCK

11   PATENT ATTORNEY WORKING HERE, RIGHT?  I'M SURE THAT WOULDN'T

12   HAVE GONE OVER VERY WELL.

13       BUT HE THEN SAID RIGHT THERE, I'M IN THE FIREWALL.  SO AS

14   FAR AS PHARMASSET IS CONCERNED, NO PROBLEM.  WE'VE TOLD THIS TO

15   SOMEBODY.  HE SAID HE MIGHT HAVE CONFLICT AND WHATEVER THAT

16   MIGHT BE, BUT HE SAID HE'S FIREWALLED.  SO THEY DO NOT BELIEVE

17   THAT IT'S GOING TO ANYBODY WHO IS IN THE INTERNAL HCV PROGRAM

18   BECAUSE THAT'S WHAT THE FIREWALL WAS.

19       BUT FROM THE EVIDENCE, NO, HE WAS NOT FIREWALLED, RIGHT?

20   HE'S A PATENT ATTORNEY IN CHARGE OF THE MERCK/ISIS HCV

21   COLLABORATION; HE'S ACTIVELY PROSECUTING A DOCKET FOR THE HCV

22   NS5B NUCLEOSIDE INHIBITORS; AND HE'S A PH.D. ORGANIC CHEMIST.

23   JUST SO THAT ADDED POINT, OF COURSE, THAT IN AND OF ITSELF DOES

24   NOT ESTABLISH HE'S OUTSIDE OF THE FIREWALL, BUT THE WHOLE IDEA

25   WAS TO GIVE IT TO A CHEMIST WHO WAS INSIDE OF THE FIREWALL.

1      SO HE'S NOT FIREWALLED, AND HE GETS THIS INFORMATION AND,

2  OF COURSE, DR. ROEMER -- MR. ROEMER TESTIFIED AT TRIAL HE

3  DIDN'T KNOW DR. DURETTE'S ROLE, AND DR. DURETTE DID NOT

4  VOLUNTEER HIS ROLE ON THAT CALL.

5      SO NOW WE HAVE JEREMY CLARK'S PATENT APPLICATION PUBLISHES

6  JANUARY 13TH, 2005, AND THEN DR. DURETTE FILED HIS NEW CLAIMS

7  TO COVER THE CLARK COMPOUNDS.

8      AND HERE IS, YOUR HONOR, WHAT I SHOWED YOU IN OPENING,

9  THIS NARROWING THAT WAS DONE.  AND YOU CAN SEE IT'S A RATHER

10  SIGNIFICANT NARROWING FROM FORMULA III.

11      AND IT'S OUR CONTENTION THAT THIS NARROWING WAS DONE

12  BECAUSE OF THE PHONE CALL.  YOU KNOW, THAT'S WHEN PHARMASSET

13  DISCLOSED TO DR. DURETTE THEIR CROWN JEWELS.  THAT'S WHAT IT

14  WAS.  I UNDERSTAND THAT THEY'RE GOING TO SAY KINGSDOWN

15  PUBLISHED --

16          THE COURT:  BUT WHAT IS IN THE DISCLOSURE IN MARCH

17  OF -- I'M LOSING THE YEAR -- OF 2011 THAT WAS NOT IN THE CLARK

18  PUBLICATION?

19          MR. SINGER:  SO REMEMBER THE PURPOSE OF THE PHONE

20  CALL.

21          THE COURT:  OH, I UNDERSTAND THAT.  BUT THE QUESTION

22  IS THAT IT'S NOT -- AND I'M VERY CONCERNED ABOUT A CASE THAT

23  INVOLVES SIGNIFICANT EVIDENCE OF LYING IN MULTIPLE LOCATIONS

24  BETWEEN THE PARTIES TO THE -- AND TO THE COURT THROUGH A

25  DEPOSITION AND TRIAL.  I'M VERY CONCERNED ABOUT THAT.

1          HOWEVER, YOU KNOW, WITH UNCLEAN HANDS, I UNDERSTAND

2     THERE'S NO STANDARD FOR MATERIALITY BUT I'M VERY -- I'M ALSO

3     CONCERNED THAT WHAT -- IF THE AMENDMENT TO THE CLAIMS CAN BE

4     COMPLETELY FOUND IN THE PUBLICATION AND THE LAW SUPPORTS A

5     PATENT HOLDER AMENDING CLAIMS TO INCLUDE A COMPETITOR'S

6     PRODUCTS, HOW DO I FIND BY CLEAR AND CONVINCING EVIDENCE THAT

7     IT CAME FROM THE PHONE CONVERSATION VERSUS THE PUBLICATION?

8          MR. SINGER:  BECAUSE, YOUR HONOR, WHAT HAPPENED IN

9     THE PHONE CALL WAS AN IDENTIFICATION OF HOW IMPORTANT THIS WAS.

10          THE COURT:  YOU DON'T THINK THE PUBLICATION

11     IDENTIFIED THAT?

12          MR. SINGER:  THE PUBLICATION IS A PATENT, AND IT

13     DOESN'T TELL THE WORLD THAT THIS IS PHARMASSET'S CROWN JEWELS

14     AND THAT IT'S THE SUBJECT OF A HUNDRED MILLION DOLLAR LICENSING

15     NEGOTIATION BECAUSE THAT'S WHAT THEY WERE TALKING ABOUT.

16          IT'S A PATENT.  PHARMASSET HAD OTHER PATENTS, AND

17     DR. DURETTE KNEW WHICH PATENTS TO LOOK FOR.

18          THE COURT:  SO YOU'RE SUGGESTING THAT IT'S

19     REASONABLE THAT IF PHARMASSET HAD MERELY PUBLISHED THE CLARK

20     PATENT, THAT THAT WOULD NOT HAVE ALERTED DR. DURETTE TO THE

21     SIGNIFICANCE OF THE INVENTION?

22          MR. SINGER:  YOUR HONOR, I THINK BY ITSELF, NUMBER

23     ONE KNOW, WE CAN'T KNOW.  WE CAN'T KNOW BECAUSE OF WHAT

24     HAPPENED, AND THAT'S VERY IMPORTANT.  I DON'T THINK THE COURT

25     SHOULD PUT THAT ASIDE.

1     BUT, NUMBER TWO, AGAIN, A PUBLICATION OF A PATENT, WE'RE

2     TALKING ABOUT A SMALL COMPANY THAT IS MANY, MANY YEARS AWAY

3     FROM COMMERCIALIZING THIS PRODUCT, RIGHT?

4     AND SO WHAT WOULD LEAD A LARGE COMPETITOR LIKE MERCK TO

5     NARROW DOWN CLAIMS, TO COVER A COMPETITOR'S COMPOUND VERY EARLY

6     IN THIS STAGE?  I MEAN, WE'RE TALKING ABOUT SOMETHING THAT WAS

7     YEARS AWAY FROM A LICENSING DEAL WITH ROCHE.

8     NORMALLY WHEN YOU SEE THE KINGSDOWN SITUATION, YOU'RE

9     TALKING ABOUT AN ACTUAL COMPETITOR PRODUCT.

10          THE COURT:  SO YOU'RE SAYING THAT DURETTE WAS LYING

11     IN WAIT?

12          MR. SINGER:  ABSOLUTELY, YOUR HONOR.  ABSOLUTELY,

13     YOUR HONOR.  AND I THINK THAT'S THE FAIR INFERENCE FROM THE

14     FACTS.

15     HE LEARNED ON THE PHONE CALL IT WOULD PUBLISH, THAT'S IN

16     MR. ROEMER'S NOTES; HE KNEW FROM THE CONTEXT OF THE DEAL THAT

17     THIS WAS, IN FACT, PHARMASSET'S CROWN JEWEL; AND, HE KNEW IT

18     WAS WORTH, AT A MINIMUM, THE HUNDRED MILLION DOLLAR PRICE TAG

19     THAT THE PARTIES WERE TALKING ABOUT.  HE WAS, IN FACT, LYING IN

20     WAIT.  THAT'S HOW WE GOT THESE CLAIMS.

21     AND, AGAIN, YOUR HONOR, I URGE THE COURT TO PAY ATTENTION

22     AND TO THINK HARD ABOUT WHAT DR. DURETTE SAID WHEN MR. FARRELL

23     CONFRONTED HIM AT HIS DEPOSITION BEFORE HE KNEW ABOUT

24     MR. ROEMER'S NOTES, BEFORE HE FOUND HIS MEMORY ABOUT WHAT

25     HAPPENED ON THAT DAY IN ADVANCE OF TRIAL.

1        HE SAID IT HIMSELF, IN THE ABSENCE; RIGHT?  WHY SHOULD YOU

2    TAKE MY WORD FOR IT?  DR. DURETTE TOLD US.  HE TOLD US THAT IF

3    I LEARN THAT STRUCTURE AND THAT CONFIDENTIAL, MY JUDGMENT WOULD

4    BE TAINTED.  THAT'S WHAT HE SAID.  THIS IS NOT ME SAYING IT.

5    AND IT WAS VOLUNTEERED WHEN MR. FARRELL ASKED HIM THOSE

6    QUESTIONS.

7        HIS JUDGMENT WAS TAINTED, AND IT DOESN'T GO AWAY.  YOU

8    KNOW, IT DOESN'T GO AWAY.  AND I'M SORRY, BUT THAT'S WHAT

9    HAPPENED HERE.  AND THAT LED TO THIS NARROWING OF THESE CLAIMS.

10        AND LET'S REMEMBER ANOTHER THING FROM TRIAL THAT YOU'VE

11    HEARD, YOUR HONOR, IS THAT THE INVENTORS, RIGHT, THIS IS NOT AS

12    IF THE INVENTORS CAME TO MR. OR DR. DURETTE AND TOLD HIM TO

13    MAKE THESE CLAIM AMENDMENTS.  THEY SAID THAT THEY WEREN'T

14    INVOLVED IN IT.  SO IT WAS REALLY DR. DURETTE WHO DID THE

15    NARROWING, AND THIS NARROWING CAME FROM THAT PHONE CALL.  HE,

16    AS YOU SAID, LIE IN WAIT.

17        I KNOW WE'RE GOING TO BE PROVIDING MORE BRIEFING ON WHAT

18    IS AND WHAT ISN'T UNCLEAN HANDS.  AND I KNOW THE CIRCUMSTANCES

19    IN THESE CASES, THERE ARE NOT MANY OF THEM, BUT UNETHICAL

20    BUSINESS CONDUCT LIKE THIS CAN LEAD TO CONSTITUTE UNCLEAN

21    HANDS.

22            THE COURT:  SO THEN WE REALLY VARY IMMEDIATELY TO

23    THE SUBJECT OF MR. RABINOWITZ'S ARGUMENT ON THE JMOL WHICH, OF

24    COURSE, IS RIPE FOR THIS DISCUSSION AS WELL, HOW DO I -- AT

25    THIS STAGE I'M NOT DEALING WITH JMOL, THE JURY'S VERDICT.  SO I

1    TAKE THE JURY'S VERDICT AS IT IS AND THEIR FINDINGS.  AND SO I

2    -- AND I DON'T KNOW WHAT HAPPENS NEXT, BUT BASED ON THE JURY'S

3    VERDICT, HOW DO I -- THAT THE AMENDMENT, WHAT BECAME THE '499,

4    IS DESCRIBED IN THE 2002 AND THE -- AND IS ENABLED.

5         THE PROBLEM THAT I HAD, I MEAN, WE HAD THIS DISCUSSION AT

6    LENGTH BEFORE ON DERIVATION.  I DON'T HAVE ANY EVIDENCE OF

7    CLARK CONCEPTION BEFORE 2003, DO I?

8              MR. SINGER:  NO, AND HE DIDN'T DO IT.

9              THE COURT:  OKAY.  SO EVEN MR. RABINOWITZ GOES BACK

10   TO 2001, BUT ACTUALLY, THE 2002 IS JUST AS GOOD.  I DON'T EVEN

11   NEED TO BE CONCERNED ABOUT 2001, DO I?

12             MR. SINGER:  MY COLLEAGUES WILL GET MAD AT ME.  I

13   BELIEVE IT WAS LATE IN 2002 THAT MR. CLARK CONCEIVED.

14        IT IS AFTER THE JANUARY DATE?  SORRY, YOUR HONOR.

15             THE COURT:  SO I DON'T EVEN NEED TO WORRY ABOUT THE

16   FACT THAT THE JURY DID OR DID NOT CONSIDER CONCEPTION PRIOR TO

17   2002, YOU WOULD AGREE?

18             MR. SINGER:  I DO ACTUALLY -- WE DO NOT AGREE ON

19   THAT POINT.  THAT'S THE ISSUE --

20             THE COURT:  WELL, YOU JUST TOLD ME.  I'M SORRY.  I

21   WANT TO GET THIS CLEAR.

22        I THOUGHT YOU JUST TOLD ME THAT THERE'S NO EVIDENCE IN THE

23   RECORD THAT JEREMY CLARK CONCEIVED OF 6130 BEFORE 2002 AND IN

24   2002.

25             MR. SINGER:  THAT'S RIGHT.

1           THE COURT:  ALL RIGHT.  SO IT DOESN'T MATTER THAT

2   WHAT HAPPENED AT MERCK IN 2001 BASED ON THIS JURY'S VERDICT.

3           I MEAN, IF THIS JURY'S VERDICT GETS THROWN OUT, THEN THE

4   2001 BECOMES RELEVANT AS WELL, I SUPPOSE, BUT I'M NOT DEALING

5   WITH THAT AT THIS STAGE.  AND I HAVE TO STAY -- THIS IS JUST

6   A -- IT'S JUST A STICKY WICKET WE ALL HAVE TO DEAL WITH HERE IS

7   THAT RIGHT NOW I'M STANDING ON THE SHOULDERS OF THE JURY.

8           MR. SINGER:  AND I UNDERSTAND THAT, YOUR HONOR.  I

9   WANT TO GIVE YOU A CHANCE -- I WANT TO READ YOU SOME LAW.  AND

10  WE OBJECTED TO THE INSTRUCTIONS AS WE'RE PROPERLY ALLOWED TO DO

11  AND WE CITED IN OUR BRIEF, THE OTHER BRIEF, NOT THE ONE IN THE

12  '224, THE LEVITON CASE.  AND THIS IS THE DIFFICULT ASPECT OF

13  THE LAW AND WHY WE WERE URGING YOUR HONOR NOT TO ADOPT THAT

14  INSTRUCTION THAT DERIVATION CONCERNS ORIGIN AND NOT DATE.

15          AND LET ME READ YOU FROM, FOR EXAMPLE, FROM THE LEVITON

16  CASE AND IN PARTICULAR YOU HAVE TO THINK, YOUR HONOR, ABOUT

17  CONCEPTION OF A CHEMICAL COMPOUND AND A METHOD OF USING A

18  CHEMICAL COMPOUND.

19          THE CASES TALK ABOUT NOT JUST WRITING IT DOWN, OKAY, BUT

20  THE POSSESSION OF A METHOD OF MAKING IT.  AND ACTUALLY

21  SOMETIMES, SOMETIMES ACTUALLY MAKING IT DEPENDING ON THAT.

22          AND SO WHAT YOU HAVE HERE IS SOMEONE WRITING THE COMPOUND

23  DOWN, AND YOU HEARD ABOUT DR. SONG FROM MR. RABINOWITZ, WHO IS

24  NOT EVEN AN INVENTOR.  DR. SONG TESTIFIED HE NEVER ACTUALLY

25  COMPLETED THE COMPOUND THAT WAS WRITTEN DOWN.

1        AND WE'VE CITED IN OUR BRIEF -- I DON'T HAVE IT QUITE

2   HANDY -- THE CASES IN A CHEMICAL CONTEXT, CHEMICAL COMPOUNDS,

3   WRITING IT DOWN, THAT IN AND OF ITSELF DOESN'T ESTABLISH

4   CONCEPTION.

5            THE COURT:  SO YOU'RE SAYING THAT THE -- AND IF

6   YOU -- YOU'VE BEEN SAYING THIS FOREVER AND MAYBE I'M JUST

7   GETTING YOUR ARGUMENT, YOU'RE SAYING THE FACT THAT IT'S ENABLED

8   AND THERE'S A WRITTEN DESCRIPTION IS NOT ENOUGH HERE.

9            MR. SINGER:  IT IS NOT, YOUR HONOR.  LET ME READ

10  FROM THE LEVITON CASE, AND THIS IS RIGHT ON POINT.

11       "IT IS NOT ENOUGH FOR LEVITON TO CLAIM THAT THE EARLIER

12  SPECIFICATION DOES, IN FACT, SUPPORT THE CLAIMS."

13       AND WHAT THIS CASE WAS ABOUT WAS AN INVENTOR -- EXCUSE ME,

14  AN ATTORNEY PROSECUTING CLAIMS ON AN EARLIER SPECIFICATION THAN

15  THERE WAS EVIDENCE THAT ACTUALLY HAD BEEN INVENTED.

16       "NEITHER AN INVENTOR NOR HIS COUNSEL MAKE GRAFT CLAIMS

17  ONTO AN EARLIER SPECIFICATION IF THOSE CLAIMS DO NOT REFLECT

18  WHAT THE INVENTOR ACTUALLY INVENTED AT THE TIME OF THE EARLIER

19  APPLICATION.

20       "INVENTION, CONCEPTION, HAVING AN IDEA, BEING ABLE TO MAKE

21  IT IN THE CHEMICAL CONTEXT IS SEPARATE FROM WHAT A PATENT

22  APPLICATION MIGHT ACTUALLY SAY."

23       THERE'S MORE IN BURROUGHS WELLCOME.  AND THIS HAS TO DO

24  WITH THE CONSTRUCTIVE REDUCTION TO PRACTICE THAT MR. RABINOWITZ

25  IS RELYING ON.

1              THE COURT:  AND WHAT CASE IS THIS?

2              MR. SINGER:  THIS IS BURROUGHS WELLCOME V. BARR, 40

3       F.3D FROM THE CONCURRENCE OF --

4              THE COURT:  PAGE NUMBER?

5              MR. SINGER:  I'LL SLOW DOWN.  40 F.3D 1223, 1233.

6       "IT IS, OF COURSE, POSSIBLE FOR AN INVENTION TO BE REDUCED

7       TO PRACTICE CONSTRUCTIVELY, I.E., BY FILING A PATENT

8       APPLICATION RATHER THAN ACTUALLY BY DOING THE WORK IN WHICH

9       CASE THE REDUCTION TO PRACTICE CLEARLY SAYS NOTHING ABOUT THE

10      COMPLETENESS OF THE CONCEPTION."

11         SO HAVING A PATENT APPLICATION THAT HAS A COMPOUND IN IT,

12      LET'S SAY IT ACTUALLY HAD THIS --

13             THE COURT:  REDUCTION TO PRACTICE MEANING THE

14      APPLICATION?

15             MR. SINGER:  THE APPLICATION, RIGHT.  SO YOU HAVE TO

16      STILL HAVE CONCEPTION.  AND CONCEPTION IN THE CHEMICAL CONTEXT

17      REQUIRES ACTUAL INVENTION.

18         AND, YOU KNOW, I HEARD MR. RABINOWITZ SAY IT, BUT I CAN

19      MAKE ARGUMENTS AS TO WHY THE JURY COULD HAVE CONCLUDED THAT

20      THEY DIDN'T CONCEIVE THIS, BUT THE JURY DIDN'T DECIDE THE ISSUE

21      OF CONCEPTION.

22         AND THE LEVITON CASE, JUST FOR THE COURT'S BENEFIT FOR THE

23      CITATION, IS 606 F. 3D 1353 AT 1360.

24         THIS IS A CONUNDRUM, AND WE TRIED AS BEST WE COULD TO

25      EXPLAIN IT IN THE CONTEXT OF THE JURY INSTRUCTIONS, AND I'M

1    SORRY TO SAY THAT I BELIEVE THAT MERCK LED YOU ASTRAY IN THAT

2    REGARD.

3        THERE IS CASE LAW ABOUT THIS THAT WE'VE CITED.  WE WILL

4    ADDRESS IT MORE POST-TRIAL, BUT IT CAN ACTUALLY BE THAT A

5    PATENT APPLICATION CAN SUPPORT THE CLAIMING OF SOMETHING BUT

6    THAT THE PERSON WHO FILED IT DIDN'T INVENT IT.  THAT IS

7    RECOGNIZED IN THE LAW, AND THAT'S THE DIFFERENCE THAT WE WERE

8    TRYING TO EXPLAIN, YOUR HONOR, BETWEEN ORIGIN AND WHAT A PATENT

9    APPLICATION SAYS.

10        AND I DON'T THINK IT'S FAIR TO COME INTO COURT TODAY AND

11    ARGUE ABOUT WHAT THE EVIDENCE ON CONCEPTION SHOWED BECAUSE THE

12    JURY DID NOT MAKE A FINDING ON CONCEPTION.  THAT'S --

13             THE COURT:  WELL, AND IN YOUR SHOES, OF COURSE, I

14    AM -- AT THIS STAGE I'M RULING ON YOUR UNCLEAN HANDS DEFENSE

15    BASED ON THE JURY VERDICT AND NOT THIS OTHER ISSUE OF

16    DERIVATION.

17             MR. SINGER:  THAT'S RIGHT.

18             THE COURT:  BECAUSE I FORECLOSED IT.

19             MR. SINGER:  THAT'S RIGHT.  I UNDERSTAND THAT.

20             THE COURT:  AND IT IS A JURY ISSUE IF IT IS

21    ANYTHING.  I CAN'T NOW DECIDE THIS ISSUE.

22             MR. SINGER:  THAT'S OUR POINT.  AND HOPEFULLY THAT

23    IS --

24             THE COURT:  AND I MEAN, I'VE CERTAINLY REVIEWED

25    THESE CASES BEFORE.  I WILL BE REVIEWING THEM AGAIN ON JMOL.

1    AS I SIT HERE NOW I DON'T WANT TO SUGGEST I'M DOUBTING WHAT I

2    DID BEFORE.  I FELT CONFIDENT THAT WITH THE BENEFIT OF THE

3    ARGUMENT FROM BOTH SIDES THAT THAT WAS THE PROPER STATEMENT ON

4    THE LAW.

5         BUT I APPRECIATE THAT YOU WILL WALK DOWN THIS ROAD WITH ME

6    AGAIN.

7              MR. SINGER:  WELL, AND THOSE ARE REALLY THE KEY

8    CASES, YOUR HONOR.  I DON'T HAVE ALL OF THEM, AND I DON'T WANT

9    TO BELABOR IT.

10             THE COURT:  SURE.

11             MR. SINGER:  WE'RE NOT JUST, YOU KNOW, WE'RE NOT

12   JUST CITING SOMETHING FROM THE MPEP THAT THE MPEP SAYS BECAUSE

13   THE MPEP DOES SAY THIS AND NOT ACTUALLY GOING INTO FED CIRCUIT

14   LAW.

15             THE COURT:  BECAUSE YOU'RE SAYING THAT ANY PATENT

16   THAT DEALS WITH A CLASS OF DRUGS -- OF COMPOUNDS HAS THIS

17   PROBLEM OF CONCEPTION AND DERIVATION.  YOU'RE SAYING -- I MEAN,

18   IT'S A BIG STATEMENT THAT YOU'RE MAKING HERE.

19             MR. SINGER:  NO, NOT ANY.  NO, NOT ANY PATENT, YOUR

20   HONOR.

21        IN THE CIRCUMSTANCE PRESENT IN THIS CASE WHERE YOU HAVE A

22   BROAD GENUS, RIGHT, AND SOMEONE HAS NARROWED IT DOWN TO A

23   PARTICULAR SUBGENUS, THE QUESTION OF DERIVATION ARISES.

24        WHERE?  THAT SUBGENUS IS NOT IN THE SPECIFICATION.  THEY

25   CAN'T POINT TO IT AND SAY THAT SUBGENUS WAS A SELECTION THAT WE

1    FILED ON DAY ONE.  IT WAS A SELECTION MADE BY THE LAWYER.  WE

2    UNDERSTAND THEIR ARGUMENT THAT IF YOU GO HERE AND THERE AND

3    IT'S ALL THERE, BUT IT WAS A SELECTION MADE BY THE LAWYER, A

4    LAWYER WHOSE HEAD, BY HIS OWN ADMISSION, WAS TAINTED, AND

5    THAT'S THE BOTTOM LINE.

6         AND, YOU KNOW, YOUR HONOR, I WOULD, FOR YOUR BENEFIT,

7    SINCE WE'RE AT THE EVIDENTIARY PHASE, I WOULD LIKE TO GO

8    THROUGH JUST THROUGH SOME OF THE EVIDENCE MORE ABOUT THE

9    LITIGATION MISCONDUCT AS WELL.

10              THE COURT:  OKAY.

11              MR. SINGER:  AND I ACTUALLY THINK THIS IS

12   INDEPENDENT OF -- LITIGATION MISCONDUCT ITSELF CAN BE UNCLEAN

13   HANDS AND BOTH PARTIES CITED CASES WHERE THAT HAS OCCURRED.

14        AND I'D LIKE TO POINT THAT OUT.  HERE, DR. DURETTE AT HIS

15   DEPOSITION AGAIN HE STATED I ONLY LEARNED OF THE STRUCTURE FROM

16   THE PUBLIC SOURCES.

17        AND THEN AT TRIAL, RIGHT, AND THIS IS HIS TESTIMONY AT HIS

18   DEPOSITION.  HOW ARE YOU SURE?  ELEVEN YEARS LATER YOU WERE

19   NEVER TOLD.  AND HE WENT THROUGH THE REASONS AND BECAUSE IT

20   WOULD TAINTED MY JUDGMENT.  I WOULD NOT DO IT, AND IT WOULD BE

21   A VIOLATION OF PUBLIC POLICY.

22        AND THEN AT TRIAL HE ADMITTED IT.  HE SAID I DID, IN FACT,

23   LEARN IT AT DUE DILIGENCE.  AND HE NOT ONLY ADMITTED IT -- I

24   WANT TO BE CLEAR, IT WASN'T AS IF MR. FARRELL WAS UNFAIR WITH

25   HIM AT HIS DEPOSITION.

1     MR. FARRELL TRIED TO REFRESH HIS RECOLLECTION.  THIS

2     WASN'T THE CASE OF SOMEBODY LEAPING OUT AT THE BUSHES AND

3     SAYING, HEY, DO YOU REMEMBER THIS BAD THING YOU DID?

4     MR. FARRELL WAS FAIR.  HE TRIED TO REFRESH.  HE GAVE HIM THE

5     DOCUMENT RIGHT THERE, THE E-MAIL FROM MS. DEMAIN THAT SAYS THAT

6     YOU'RE GOING TO BE AT THIS MEETING, RIGHT?  AND HE SAYS, I

7     DON'T -- IT DOESN'T REFRESH MY RECOLLECTION.

8     AND THEN WE COME TO TRIAL AND SUDDENLY HE HAS A REFRESHED

9     RECOLLECTION, AND HE CONCEDES THAT THE ROEMER NOTES FORCE THE

10    CHANGE IN HIS TESTIMONY.

11    AND IT GETS -- THERE'S MORE, YOUR HONOR.  HE SAID HE

12    DIDN'T KNOW WHAT PHARMASSET WAS DOING.  MS. BROOKS WAS ASKING

13    HIM QUESTIONS THAT WEREN'T EVEN RELATED MUCH OF THE TIME TO THE

14    ANSWERS HE GAVE, AND HE WOULD JUST GIVE THESE ANSWERS.

15    AND HERE SHE'S ASKING HIM JUST GENERALLY ABOUT MERCK'S

16    APPLICATIONS BEING NUCLEOSIDES DESIGNED TO TREAT HCV.

17    AND THEN HE GOES OFF ON ONE OF HIS TANGENTS WHERE HE TALKS

18    ABOUT, YES, BUT THEY HAVE A CERTAIN MECHANISM OF ACTION.  AND

19    IF YOU REMEMBER THIS TESTIMONY, HE WAS UP THERE TRYING TO

20    INTIMATE, I HAD NO IDEA WHEN I GOT ON THAT CALL THAT WE WOULD

21    BE TALKING ABOUT SOMETHING THAT WOULD HAVE THE SAME MECHANISM

22    OF ACTION.  THAT'S WHAT HE WAS TRYING TO INTIMATE.

23    AND HE SAYS RIGHT HERE THEY WERE NS5B POLYMERASE

24    INHIBITORS, AND THERE WERE NUCLEOSIDES ON THE MARKET, THIS IS

25    HIS TRIAL TRANSCRIPT AT PAGE 367 TO 368, SUCH AS RIBAVIRIN.

1    THEY WORK BY A TOTALLY DIFFERENT MECHANISM OF ACTION AND HAVE

2    TOTALLY DIFFERENT STRUCTURES.  SO NOT ALL NUCLEOSIDES ARE THE

3    SAME AND NOT ALL ORGANIC MOLECULES ARE THE SAME.  I CAN'T MAKE

4    A DETERMINATION, ET CETERA.

5        AND, YOUR HONOR, MR. BOOKER JUST WENT THROUGH IT WITH

6    MS. DEMAIN.  THIS WAS JUST UNTRUE.  DR. DURETTE WAS GIVEN THE

7    TERM SHEET, AND IT SAYS THAT IT HAD BEEN REVIEWED AND HE

8    PROVIDED COMMENTS TO THE TERM SHEET AND MR. BOOKER WENT THROUGH

9    IT.

10       WHAT DOES THAT TERM SHEET SAY?  AN EVALUATION BY MERCK HAS

11   DETERMINED, RIGHT, ET CETERA, AND THAT THE LEAD COMPOUND IS A

12   CHAIN TERMINATOR OF HCV POLYMERASE AND NUCLEOSIDE

13   SUBSTRUCTURES.

14       THERE'S ONLY ONE HCV POLYMERASE, THAT'S THE NS5B

15   POLYMERASE.  DR. DURETTE HAD A TERM SHEET THAT SAID IT WAS THE

16   EXACT SAME THING.

17       THIS IS WHAT DR. DURETTE KNEW.  THE MERCK/ISIS

18   COLLABORATION WAS ON NUCLEOSIDE ANALOGS; THE PHARMASSET, SAME.

19   IT'S RIGHT ON THE TOP.  THE CHANCES FOR CONFLICT WERE HIGH.  I

20   WOULD SAY THAT THEY WERE ALMOST CERTAIN.

21       THEN HE TESTIFIED, YOUR HONOR, THAT HE NARROWED THE

22   CLAIMS.  HE WOULDN'T EVEN ADMIT -- I MEAN, WE HAVE A DEFENSE TO

23   UNCLEAN HANDS THAT KINGSDOWN, WE'RE ALLOWED TO COPY A

24   COMPETITOR'S COMPOUND.

25       DR. DURETTE DIDN'T SAY THAT.  HE DIDN'T SAY I NARROWED IT.

1    HE WOULDN'T ADMIT TO THAT.

2        MS. BROOKS ASKED HIM AND I THINK I MENTIONED THIS IN

3    OPENING MULTIPLE TIMES, ARE YOU TELLING THIS JURY IT'S JUST A

4    COINCIDENCE?  NOW, HE WOULDN'T GIVE A STRAIGHT ANSWER TO THAT

5    ON CROSS-EXAMINATION BUT WHEN DIRECT-EXAMINED BY HIS COUNSEL HE

6    SAID WHY DID YOU NARROW THE CLAIMS?

7        I NARROWED THE CLAIMS BECAUSE WE WANTED TO GET AN

8    ALLOWANCE ON THE SUBJECT MATTER THAT WAS MOST IMPORTANT TO THE

9    COLLABORATION.  THAT THESE CLAIMS FILED SEVERAL YEARS LATER FOR

10   WHICH, AGAIN, MERCK STIPULATED THAT NONE OF THE EXAMPLES IN THE

11   PATENT WERE WITHIN THE CLAIMS AND THEY NEVER EVEN TESTED ANY OF

12   THE COMPOUNDS, THAT THESE WERE THE MOST IMPORTANT MATERIAL FROM

13   THE COLLABORATION.

14       AND AS THE EVIDENCE ALREADY CAME IN, MERCK NEVER DID ANY

15   OF THIS MOST IMPORTANT WORK UNTIL AUGUST OF 2005.  THESE ARE

16   THE REPRESENTATIVES TALKING ABOUT IT.

17       AND THIS IS WHERE THE '224 APPLICATION COMES IN, YOUR

18   HONOR.  AND REALLY, I THINK, THE STIPULATION AND THE PRIOR

19   TESTIMONY DEMONSTRATES THE UNTRUTHFULNESS OF THIS.  BUT

20   DR. DURETTE WAS GIVEN SORT OF THE OPPORTUNITY IN THE PATENT

21   OFFICE TO PUT HIS MONEY WHERE HIS MOUTH WAS IN TERMS OF HOW

22   IMPORTANT THIS WORK WAS.

23       AND YOU CAN SEE, YOUR HONOR, IT'S NOT -- IF YOU COMPARE

24   THE TWO EXHIBITS, AND I DON'T THINK THERE WILL BE ANY CONTEST

25   ON THIS, BUT THE '224 APPLICATIONS, ALL THEY ARE ARE THE '499

1    PATENT WITH A DOUBLE RING.  SO IT'S A SINGLE RING VERSUS A

2    DOUBLE RING.  AND I PUT THE CLAIMS UP THERE SO AT LEAST THE

3    COURT COULD GET IT, AND WHEN WE E-MAIL YOU THE SLIDES YOU CAN

4    SEE IT FOR YOURSELF A LITTLE CLOSER.

5         AND AS MR. FARRELL WENT THROUGH WITH HIM, THE EXAMINER

6    REJECTED THE CLAIM.  AND IT'S NOT, IT'S NOT THE EXAMINER'S

7    STATEMENTS THAT ARE THE ISSUE HERE.  AND THE EXAMINER SAID WHAT

8    HE SAID.  THE EXAMINER REJECTED THEM.

9         WHAT IS AN ISSUE HERE IS WHAT DR. DURETTE DID IN RESPONSE,

10   RIGHT?  HE DIDN'T -- THIS MOST IMPORTANT WORK, HE DIDN'T GO TO

11   THE EXAMINER AND SAY, WELL, THIS IS REALLY IMPORTANT WORK FROM

12   THE COLLABORATION.  HERE'S THE EVIDENCE THAT WE HAVE AS TO HOW

13   IMPORTANT IT WAS AND WE SHOWED THESE HAVE ACTIVITY.  I DON'T

14   SEE ANYTHING IN THE FILE HISTORY ABOUT A STRUCTURE ACTIVITY

15   RELATIONSHIP PREDICTING THIS, ET CETERA.

16        HE FELL BACK ON PHARMASSET'S WORK.

17        AND, AGAIN, RIGHT, HE POINTED TO CLARK AND, AGAIN, IT'S

18   JUST ANOTHER MANIFESTATION OF HIS TAINTED JUDGMENT GOING

19   FORWARD.  IT WAS A CAMPAIGN --

20             THE COURT:  I GUESS I HAVE A PROBLEM WITH ALL THAT

21   YOU'RE ASKING ME TO INFER FROM THE '224 BECAUSE, AS I SAID THIS

22   MORNING, IS IT THE WHIM AND CAPRICE OF DIFFERENT PATENT

23   EXAMINERS?  I DON'T KNOW WHICH PATENT EXAMINER -- WE HAVE THREE

24   HERE NOW.  I DON'T KNOW WHICH ONE IS RIGHT, AND IT'S NOT MY

25   PLACE TO DETERMINE THAT.

1           MR. SINGER:  RIGHT.

2           THE COURT:  AND THE PATENTS THAT ISSUED ARE PRESUMED

3      TO BE VALID.

4           MR. SINGER:  ALL I'M TRYING TO GET AT HERE, YOUR

5      HONOR, IT'S NOT REALLY WHAT THE EXAMINER IS SAYING.  IT'S

6      REALLY DR. DURETTE'S RESPONSE.

7           THE COURT:  ALL RIGHT.  SO ASSUMING THAT IF I

8      DETERMINE THAT YOU'VE ESTABLISHED THAT HE DID NOT PRESENT THE

9      DECLARATION ON THE SAMPLING RESULTS AND THERE'S NO EVIDENCE

10     THAT THERE IS SUCH SAMPLING RESULT, BUT ABANDONMENT CAN BE DONE

11     FOR MANY REASONS.

12          AND SO YOU'RE ASKING ME TO INFER SOMETHING, AND I ACTUALLY

13     DON'T HAVE ANY EVIDENCE ON WHY HE EXPRESSLY ABANDONED IT.  AND

14     IT'S NOT HIS PERSONAL CALL.  IT'S MERCK THAT ABANDONS A PATENT

15     APPLICATION THAT CAN BE ABANDONED AND IT CAN COME BACK AND

16     THESE THINGS CAN GO ON FOREVER.

17          SO I'M NOT SURE THAT'S VERY PERSUASIVE.

18          MR. SINGER:  VERY WELL, YOUR HONOR.  THEN I'LL MOVE

19     ON BECAUSE I THINK IT'S QUITE CLEAR FROM THE RECORD AT TRIAL

20     WHAT WAS IMPORTANT TO THE COLLABORATION AND WHAT WAS NOT

21     IMPORTANT TO THE COLLABORATION.

22          THE COURT:  SURE.

23          MR. SINGER:  AND I DON'T MEAN TO BELABOR THIS AND

24     MAYBE I'M TOO MUCH OF A PATENT GEEK.  SO I FIND THIS

25     PERSUASIVE, YOUR HONOR, BUT THAT'S OKAY.

1          YOU KNOW, AT THE END OF THE DAY WHAT REALLY MATTERS IS

2     THAT HE TESTIFIED THAT THIS WAS THE MOST IMPORTANT WORK OF THE

3     COLLABORATION, SOMETHING THAT NEVER HAD EVEN BEEN DONE BY THE

4     COLLABORATION.  THIS WAS JUST CONFIRMATION OF THE POINTS THAT

5     MERCK HAS ALREADY STIPULATED TO.

6          THE COURT:  MAYBE IT'S MORE SIGNIFICANT THAT BERGMAN

7     NEVER SPOKE TO THE INVENTORS WHEN HE DID WHAT HE DID, BUT I

8     DON'T -- AND YOU'LL GET TO BERGMAN.  I DIDN'T SEE MUCH THERE ON

9     THE '712.

10          MR. SINGER:  AND REALLY ALL WE'RE SAYING ABOUT THE

11     '712 IS THAT IT'S JUST A CONTINUATION OF THE PATENT.

12     DR. DURETTE UPON BEING UNSUCCESSFUL WITH THE '224 APPLICATION,

13     HE ABANDONED IT, AS YOU SAID, YOUR HONOR, HE THEN FILED THE

14     '712 APPLICATION AND THEN --

15          THE COURT:  SO LET ME ASK YOU THIS, IF I AGREE WITH

16     EVERYTHING YOU'VE SAID IN YOUR POSITION ON THE '499 AND DECIDE

17     THAT YOU WIN AND THAT THE SUIT INVOLVING THE '499 CAN'T GO

18     FORWARD, WHAT ABOUT THE '712?

19          MR. SINGER:  I THINK THAT THEN BECOMES, YOUR HONOR,

20     A QUESTION OF REMEDY AND WHETHER OR NOT THE CONDUCT IS

21     SUFFICIENTLY UNCONSCIONABLE TO NOT ONLY -- YOU SEE THIS ALL OF

22     THE TIME IN THE -- NOT ALL OF THE TIME BECAUSE THIS DOESN'T

23     HAPPEN ALL OF THE TIME, RIGHT?  THANK GOODNESS THIS DOESN'T

24     HAPPEN ALL OF THE TIME.

25          BUT IT BECOMES A QUESTION OF REMEDY AND WHETHER THE COURT

1    IN ITS DISCRETION BELIEVES, AND WE CERTAINLY DO, THAT THE

2    CONDUCT IS UNCONSCIONABLE ENOUGH TO PREVENT THE ENFORCEMENT OF

3    THE PATENT ESTATE AGAINST GILEAD.

4        DR. DURETTE'S CONDUCT, IS IT -- DOES IT GET OVER THE BAR

5    SUCH THAT THE COURT SHOULD FIND THAT APPLICATIONS RELATED TO

6    THE VERY SAME SUBJECT MATTER THAT DR. DURETTE INITIALLY FILED,

7    THE '712 APPLICATION, IS SUFFICIENT TO FIND -- FOR THE COURT TO

8    FIND THAT UNENFORCEABLE AS WELL?

9        BECAUSE THE POINT OF UNCLEAN HANDS IS NOT, AGAIN, TO

10   INVALIDATE OR RENDER THE PATENTS UNENFORCEABLE.

11           THE COURT:  UNDERSTOOD.

12           MR. SINGER:  IT'S TO REQUIRE SOMEONE WHO SHOWS UP IN

13   COURT, RIGHT, TO HAVE TREATED THEIR LITIGANT, OPPONENT, WITH

14   FAIRNESS AND EQUITY BEFORE ASKING FOR THE COURT'S FAIRNESS AND

15   EQUITY.

16           THE COURT:  SO YOU'RE SUGGESTING THAT I COULD MAKE

17   FINDINGS IN GILEAD'S FAVOR ON DR. DURETTE AND THE '499 AND I

18   DON'T NEED TO FIND THAT MR. BERGMAN IS GUILTY OF UNCLEAN HANDS

19   OR THAT ANYONE AT MERCK IS GUILTY OF UNCLEAN HANDS ON THE '712?

20       BECAUSE, QUITE FRANKLY, THE TESTIMONY FROM MR. BERGMAN

21   ABOUT TO TRACE HIM BACK TO DURETTE WAS A DEAD END.

22           MR. SINGER:  AS I'VE SAID, YOUR HONOR, I THINK IT

23   WOULD BE WITHIN YOUR DISCRETION TO RULE THAT THE '712 PATENT

24   COULD NOT BE ENFORCED AGAINST GILEAD FOR THE SAME REASON.

25       IT REALLY COMES DOWN TO IS IT -- YOU KNOW, WE BELIEVE IT

1      IS.  I BELIEVE THERE IS SUFFICIENT CONDUCT TO DO THAT, AND I'VE

2      SUMMARIZED IT HERE ON ONE PAGE BECAUSE DR. DURETTE AT THE END

3      OF THE DAY LED MERCK DOWN THIS PRIMROSE PATH TO CLAIM SOMEONE

4      ELSE'S WORK AND TO NARROW THE CLAIMS IN THE WAY THAT THEY DID.

5          AND WE BELIEVE IT WOULD BE WITHIN THE COURT'S DISCRETION

6      TO FIND UNCLEAN HANDS ON THE '499 AND APPLY THAT TO THE '712 AS

7      A CONTINUATION OF THE SAME PATTERN OF CONDUCT.

8          THE COURT:  WELL, THAT'S WHERE YOU GET ME, THOUGH,

9      THE SAME PATTERN OF CONDUCT.  I DON'T THINK YOU HAD ANY

10     EVIDENCE THAT SHOWED A PATTERN OF CONDUCT BECAUSE YOU HAVE --

11     NOT ONLY DO YOU NOT HAVE DR. DURETTE, BUT THEN YOU'VE GOT

12     MR. WALTON FOLLOWED BY THEN MR. BERGMAN.  SO THE TRAIL REALLY

13     RAN COLD.

14         AND THE ONLY EVIDENCE I HAVE IS MR. BERGMAN SAYING I DON'T

15     KNOW ANYTHING ABOUT WHAT PHIL DURETTE DID.

16         MR. SINGER:  AND THAT'S WHAT HE'S TESTIFIED.  AND,

17     AGAIN, I BELIEVE IT'S A QUESTION OF REMEDY, YOUR HONOR.  AND IF

18     THE COURT MAKES A FINDING OF UNCLEAN HANDS, THEN IT BECOMES A

19     QUESTION OF REMEDY.

20         THE COURT:  OKAY.

21         MR. SINGER:  AND I WOULD LIKE MR. BOOKER TALK A

22     LITTLE BIT ABOUT WAIVER.  AND I THINK I HAVE -- I WILL RESERVE

23     ABOUT FIVE MINUTES OR SO FOR REBUTTAL.

24         THE COURT:  MR. GENDERSON IS GOING TO AGAIN PROVE

25     TRUE THAT THE TIME HE ESTIMATES IS THE ACCURATE TIME THAT WE

1    NEED.

2                MR. GENDERSON:  I AM PUTTING IT DOWN, YOUR HONOR.

3                THE COURT:  I KNOW YOU ARE THINKING THAT, BUT I CAN

4    ARTICULATE IT SO YOU CAN GET CREDIT BECAUSE I WILL CERTAINLY --

5    AS THEY RUN OVER, YOU WILL CERTAINLY GET THE SAME AMOUNT OF

6    TIME.

7                MR. GENDERSON:  THANK YOU, YOUR HONOR.  AND I

8    WOULDN'T TRY TO HOLD ANYBODY TO ANYTHING.

9                THE COURT:  NO, NO.  I KNOW YOU WOULDN'T.  BUT I DO

10   ASK A LOT OF QUESTIONS.

11       MR. BOOKER.

12               MR. BOOKER:  MAY IT PLEASE THE COURT.

13               THE COURT:  YES.

14       **(PLAINTIFF GAVE THEIR CLOSING ARGUMENT.)**

15               MR. BOOKER:  I'LL START WITH JUST THE LAW OF WAIVER

16   BRIEFLY.  REALLY TWO MAIN THINGS WHEN WAIVER COULD EXIST.

17   FIRST, WHEN YOU HAVE CONDUCT THAT WAS SO INCONSISTENT WITH AN

18   INTENT TO ENFORCE PATENT RIGHTS.  WE HAVE THAT.

19       SECOND, IT CAN RESULT FROM SILENCE OR INACTION.  AND WE

20   REALLY HAVE BOTH PRESENT HERE.

21       MERCK'S CONDUCT WHILE TRYING TO LICENSE 7977 OR ACQUIRE

22   PHARMASSET DEMONSTRATES WAIVER, AS DOES MERCK'S SILENCE AFTER

23   PHARMASSET TOLD MERCK IN 2010 THAT THEIR PATENT WAS INVALID AND

24   THAT THEY WOULD SEE THEM IN THE COURTHOUSE.  WE HAD PURELY

25   THREE YEARS OF SILENCE AFTER THAT STATEMENT.

1          AND I'LL WALK THROUGH THE EVIDENCE BRIEFLY.

2               THE COURT:  BUT MR. RABINOWITZ HAS JUST TOLD ME THAT

3     THIS SILENCE ONLY APPLIES IN THE STANDARD SETTING ORGANIZATION

4     CONTEXT.

5          DO YOU REJECT THAT?

6               MR. BOOKER:  I DO, YOUR HONOR.  AND TWO OF CASES I

7     CITE HERE ARE NOT STANDARD SETTING CASES.

8               THE COURT:  QUALCOMM IS.  IS THAT A DIFFERENT

9     QUALCOMM THAN WE TALKED ABOUT THIS MORNING.

10              MR. BOOKER:  QUALCOMM IS.  AND DANE TECHS V.

11    GATEKEEPER SYSTEMS, INC. IS NOT AND THAT'S CIVIL ACTION 12-2730

12    ADM/JJK.

13              THE COURT:  I'LL TAKE THE WESTLAW CITE.

14              MR. BOOKER:  2005 WL 5719142.

15              THE COURT:  WE'LL SEE IF MY COLLEAGUES IN THE

16    DISTRICT OF MINNESOTA HAVE COVERED THIS ISSUE.  I HAVE NOT READ

17    THE DANE TECHS CASE.

18              MR. BOOKER:  I CAN GIVE YOU ONE MORE CITE OF THE

19    COURT USING IMPLIED WAIVER OUTSIDE OF THE STANDARDS CONTEXT.

20              THE COURT:  OKAY.

21              MR. BOOKER:  UNIVERSAL V. LOGITECH, CIVIL ACTION

22    NUMBER 8:11-CV-01056.

23              THE COURT:  IS THERE A WESTLAW?

24              MR. BOOKER:  IT'S NOT -- IT'S AT DOCKET 144.

25              THE COURT:  I'LL NEVER FIND IT.  ALL RIGHT.

1          MR. BOOKER:  LET ME COMPLETE THE CITE, IF I MAY, SO

2     IT'S ON THE RECORD.

3          THE COURT:  I BEG YOUR PARDON.

4          MR. BOOKER:  CENTRAL DISTRICT OF CALIFORNIA, MAY

5     9TH, 2012.

6        IF I CAN GO THROUGH THE EVIDENCE BRIEFLY, YOUR HONOR.

7          THE COURT:  YES.

8          MR. BOOKER:  IT REALLY STARTS IN 2008 AS FAR AS

9     SOFOSBUVIR IS CONCERNED.  AND THAT'S WHEN MERCK CONTACTS

10    PHARMASSET TO TRY TO GET A LICENSE, EITHER GET A LICENSE OR BUY

11    PHARMASSET.

12       AND THEY OFFERED TO BUY PHARMASSET AT A PREMIUM.  AND IN

13    SO DOING, THEY MADE NO MENTION OF THE '499 PATENT, OF THE '712

14    APPLICATION, OR ANY MENTION THAT PHARMASSET MIGHT HAVE TO PAY

15    MERCK A ROYALTY.  THAT'S THE FIRST CONTACT THAT WE HAVE HERE.

16       THE NEXT YEAR, OCTOBER OF 2009, PHARMASSET SENDS MERCK A

17    GENERIC TERM SHEET SIMILAR TO WHAT THEY SEND OTHER COMPANIES IN

18    THE HCV FIELD.

19       AND PHARMASSET TELLS MERCK THAT THIS TYPE OF TERM SHEET

20    HAS BEEN AGREED TO BY SOME OF THESE COMPANIES.  UPON HEARING

21    THAT, MERCK DOESN'T SAY ANYTHING ABOUT HOW MERCK SHOULD BE

22    TREATED ANY DIFFERENTLY.  THEY DON'T SAY THAT WE HAVE A

23    BLOCKING PATENT; THAT YOU NEED US TO GET TO MERCK.  MERCK IS

24    TOTALLY SILENT ON THAT POINT.

25       AGAIN, THE TERM SHEET HAS NO MENTION OF MERCK'S '499

1      PATENT, THE '712 APPLICATION, OR ANY ROYALTIES THAT WOULD HAVE

2      TO BE PAID TO MERCK.

3            APRIL 2010, A YEAR LATER, SOME MORE NEGOTIATIONS AND

4      ANOTHER BOILERPLATE TERM SHEET EXCHANGED BETWEEN THE PARTIES.

5      AGAIN, NO MENTION OF ANY SPECIFIC MERCK PATENTS AND NO MENTION

6      OF THE NEED FOR ANY TYPE OF ROYALTY TO BE PAID TO MERCK.

7            WHEN WE GET TO JUNE OF 2010, ANOTHER TERM SHEET SENT TO

8      MERCK AND THERE'S AN E-MAIL FROM PHARMASSET TO MERCK DISCUSSING

9      THE TERMS -- ACTUALLY, I'M SORRY.  THIS IS MS. DEMAIN'S E-MAIL

10     RECOUNTING A CONVERSATION THAT SHE HAD WITH PHARMASSET.

11           AN E-MAIL SHOWS THAT PHARMASSET IS TELLING MERCK THAT

12     THEY'RE TRYING TO KEEP ALL COMPANIES ON SIMILAR TERMS AND THAT

13     PHARMASSET HAS FINANCIAL OFFERS ALL CLOSE TO THOSE TERMS.

14           WITH THAT SAID, MERCK DOES NOT GET BACK TO THEM AGAIN AND

15     SAY, WELL, WAIT A MINUTE, YOU SHOULD TREAT OUR COMPANY

16     DIFFERENTLY.  WE'RE ABLE TO BLOCK YOU WITH A PATENT.  IF YOU

17     DON'T JOIN US, YOU NEED TO GET A LICENSE FROM US.

18           RIGHT THERE IF MERCK BELIEVED THEY HAD PATENTS THAT COVER

19     PHARMASSET, THEY HAD AN OBLIGATION TO LET THEM KNOW.

20                 THE COURT:  AN OBLIGATION?  BECAUSE OF THE

21     IMPLIED --

22                 MR. BOOKER:  THAT'S SILENCE RIGHT THERE.  THAT

23     CONDUCT IS INCONSISTENT WITH AN INTENT TO ENFORCE PATENT

24     RIGHTS.  THESE PARTIES FOR YEARS ARE JUST DISCUSSING A

25     POTENTIAL COLLABORATION, AND PHARMASSET IS TELLING MERCK THAT

1    OTHER COMPANIES ARE IN THE MIX UNDER SIMILAR TERMS, AND MERCK

2    SAYS NOTHING ABOUT TREATING MERCK DIFFERENTLY BECAUSE MERCK

3    POTENTIALLY BLOCKED PHARMASSET FROM GETTING TO THE MARKET.

4         THAT SILENCE SPEAKS VOLUMES.

5         IN JULY OF 2010, THERE'S SORT OF A FINAL DRAFT TERM SHEET

6    EXCHANGED BETWEEN THE PARTIES.  AND, AGAIN, NO MENTION OF

7    MERCK'S '499 PATENT, AND NO MENTION OF THE '712 APPLICATION,

8    AND NO MENTION OF ANY ROYALTIES HAVING TO BE PAID FROM

9    PHARMASSET TO MERCK.

10        THIS ALL ENDS UP IN SEPTEMBER OF 2010 WHEN MERCK SENDS A

11   LETTER TO PHARMASSET OFFERING TO PURCHASE THEM FOR

12   $1.4 BILLION.  IT'S A PREMIUM PRICE OVER PHARMASSET'S CURRENT

13   STOCK PRICE.  AND THEY WERE TRYING TO CONVINCE PHARMASSET THAT

14   MERCK IS THE COMPANY PHARMASSET SHOULD JOIN.

15        AGAIN, IN DOING THAT, NO MENTION OF THE MERCK '499 PATENT,

16   THE '712 APPLICATION OR THE NEED FOR PHARMASSET TO WORK WITH

17   MERCK IN ORDER TO GET SOFOSBUVIR TO THE MARKET.

18        SO WE HAVE A TWO-YEAR HISTORY FROM 2008 TO 2010 OF MERCK

19   AND PHARMASSET GOING BACK AND FORTH ABOUT A POTENTIAL

20   COLLABORATION, ABOUT MERCK WANTING TO LICENSE 7977.  THAT

21   CONDUCT IS INCONSISTENT WITH SOME INTENT MERCK HAD OF ENFORCING

22   PATENT RIGHTS.

23        AND MERCK NOT RAISING THESE PATENT RIGHTS WHEN PHARMASSET

24   TOLD MERCK THAT MERCK IS ON THE SAME FOOTING OF OTHER

25   COMPANIES, IS INCONSISTENT CONDUCT WITH AN INTENT TO ENFORCE

1       PATENT RIGHTS.

2            NOW, WHAT ENDS UP HAPPENING IS THAT PHARMASSET REJECTS

3       MERCK'S $1.4 BILLION OFFER, AND THAT'S THE FIRST TIME THAT

4       MERCK SHOWS UP AND WAIVES THE '499 PATENT IN FRONT OF

5       SCHAEFER PRICE.  AND HE TELLS THEM GET LOST, THAT PATENT IS

6       INVALID.

7            AND WHAT DOES MERCK DO IN RESPONSE?  THAT'S 2010.  TOTAL

8       SILENCE.  FOR THREE YEARS AFTER PHARMASSET SAID HIT THE ROAD,

9       MERCK WAS TOTALLY QUIET UNTIL AUGUST OF 2013.  AFTER GILEAD

10      PURCHASES PHARMASSET, MERCK THEN GOES TO GILEAD AND SAYS YOU

11      NEED A LICENSE, THE '499 AND THE '712 PATENT.

12           THAT SILENCE FOR THREE YEARS THAT PHARMASSET TOLD THEM WE

13      BELIEVE THAT YOUR PATENTS ARE INVALID, THAT'S WAIVER.

14           NOW, WHY IS IT THAT MERCK NEVER RAISED THE '499 WITH

15      PHARMASSET UNTIL SCHAEFER PRICE REJECTED THE OFFER?  WELL, WHAT

16      DOES THE MERCK INTERNAL DOCUMENT SAY?  THE DOCUMENT THAT MERCK

17      CREATED NEVER KNOWING THAT GILEAD OR PHARMASSET WOULD EVER SEE

18      THIS DOCUMENT.

19           IN FEBRUARY OF 2011, MERCK EVALUATED THEIR OPTIONS WITH

20      ROCHE AND WITH PHARMASSET.  THEY WERE THINKING ABOUT TRYING TO

21      LICENSE OR ACQUIRE ROCHE OR LICENSE RG-7128 OR PHARMASSET'S

22      PSI-7977.

23           THE SCENARIO WITH ROCHE WAS THAT MERCK WOULD LICENSE THE

24      '499 PATENT AND RECEIVE A ROYALTY FROM ROCHE.  THAT WAS NEVER

25      AN OPTION MERCK PUT ON THE TABLE WITH RESPECT TO 7977.

1      MERCK INTERNALLY DID NOT BELIEVE THAT THEY HAD A VALID

2      PATENT THAT COVERED 7977.

3          AND THAT'S WHY THEY NEVER TOLD PHARMASSET THAT THEY WOULD

4      NEED A LICENSE IN ORDER TO GET THAT DRUG TO MARKET.

5          THEY HAD IN THAT SAME PRESENTATION, THEY HAD A COMPARISON

6      OF THE PATENT SITUATION BETWEEN THE ROCHE COMPOUND AND THE

7      PHARMASSET COMPOUND.  FOR ROCHE, THEY MENTIONED THE MERCK/ISIS

8      PATENTS.  FOR PHARMASSET, NOTHING.

9          SO THAT'S WHY WE END UP IN AUGUST OF 2013, THE FIRST TIME

10     MERCK PUTS IN WRITING THAT FOR SOFOSBUVIR TO GET TO MARKET IT

11     NEEDS A LICENSE FOR THE '499 AND THE '712 PATENTS.  THIS IS

12     FIVE YEARS AFTER MERCK FIRST APPROACHED PHARMASSET ABOUT

13     ACQUIRING THE 7977 AND THREE YEARS AFTER PHARMASSET REJECTED

14     MERCK'S $1.4 BILLION OFFER.  THIS IS CONDUCT INCONSISTENT WITH

15     AN INTENT TO ENFORCE PATENT RIGHTS.  THIS IS WAIVER.

16         THANK YOU, YOUR HONOR.

17             THE COURT:  THANK YOU.  ALL RIGHT.  I THINK WE NEED

18     TO TAKE A BREAK BEFORE WE THEN -- SO I DON'T HAVE TO INTERRUPT

19     YOU.  WE'VE BEEN GOING FOR AN HOUR AND A HALF.  WE'LL TAKE TEN

20     MINUTES.

21             MR. GENDERSON:  YOUR HONOR, YOU ASKED ABOUT THESE,

22     AND THEY'RE GOING TO BE DISCUSSED.  SO IF YOU WOULD LIKE A

23     COPY, I HAVE TWO DOCUMENTS THAT WILL BE DISCUSSED EXTENSIVELY.

24             THE COURT:  ALL RIGHT.  GREAT.  THANK YOU.

25         (RECESS FROM 3:03 P.M. UNTIL 3:15 P.M.)

1          THE COURT:  WE'RE BACK ON THE RECORD.  WHO IS GOING

2    TO ARGUE THE CLOSING OF THIS?

3          MS. BERNIKER:  I WILL ARGUE PRINCIPALLY MOST OF IT,

4    BUT MR. RABINOWITZ IS GOING TO ARGUE ON THE CASE LAW THAT HAD

5    BEEN DISCUSSED ON HIS MOTION.

6       SO HE'S GOING TO ADDRESS THAT POINT OF LAW, AND THEN I

7    WILL ADDRESS THE REST OF THE MERITS.

8          THE COURT:  OKAY.  AND WHAT WAS IT THAT YOU HANDED

9    UP TO ME?

10          MR. GENDERSON:  YOUR HONOR, MS. BERNIKER WILL

11    ADDRESS THAT MEMO, BUT IT'S THE TWO SETS OF CONVERSATIONS, AND

12    THOSE ARE THE NOTES FROM THOSE TWO SETS OF CONVERSATIONS.

13          MS. BERNIKER:  ROEMER NOTES.

14          THE COURT:  ROEMER.  THAT'S WHAT I COULDN'T TELL.

15          MR. GENDERSON:  ONE WAS WITH DR. DURETTE AND THEN

16    ONE IS A WEEK LATER WHERE DR. DURETTE WAS NOT ON.

17          THE COURT:  THANK YOU.

18          **(DEFENDANTS' GAVE THEIR CLOSING ARGUMENT.)**

19          MR. RABINOWITZ:  YOUR HONOR, I THOUGHT I WOULD TAKE

20    A FEW MINUTES JUST TO ADDRESS THE CASE LAW THAT WAS ARGUED TO

21    YOUR HONOR AT THE BEGINNING OF MR. SINGER'S REMARKS.

22          THE COURT:  AND SO THAT WILL BE ON --

23          MR. RABINOWITZ:  ON DERIVATION.

24          THE COURT:  DERIVATION, OKAY.

25          MR. RABINOWITZ:  JUST TO CLARIFY.  AND I WOULD LIKE

1    TO LOOK IN THE FIRST INSTANCE AT TWO CASES THAT ARE CITED IN

2    ECF NUMBER 383, WHICH IS ENTITLED GILEAD SCIENCES INCORPORATED,

3    INC.'S, RESPONSE TO MERCK'S OBJECTIONS TO GILEAD'S BENCH TRIAL

4    EVIDENCE ON PAGE 2.  AND THEY CITE TWO CASES.

5         ONE IS HEDGEWICK VERSUS AKERS, AND THIS IS AT LINE 13, AND

6    THEN PRICE VERSUS SYMSEK AT LINE 14.  SO I WOULD LIKE TO POINT

7    YOUR HONOR TO TWO STATEMENTS IN THOSE CASES CITED BY GILEAD.

8         IN HEDGEWICK VERSUS AKERS AT PAGE 908, "DERIVATION IS

9    SHOWN BY A PRIOR, COMPLETE CONCEPTION OF THE CLAIMED SUBJECT

10   MATTER AND COMMUNICATION OF THE COMPLETE CONCEPTION TO THE

11   PARTY CHARGED WITH DERIVATION."

12        THE KEY WORD THERE IS "PRIOR."

13        AND THEN I'LL SHOW YOU A THIRD CASE WHICH SHOWS YOU

14   EXACTLY WHAT "PRIOR" MEANS AND I THINK CLARIFIES THIS IN A

15   USEFUL WAY.

16        PRICE VERSUS SYMSEK AT PAGE 1190 SAYS, "TO PROVE

17   DERIVATION IN AN INTERFERENCE PROCEEDING," THE STANDARD IS THE

18   SAME IN THIS PROCEEDING, "THE PERSON ATTACKING THE PATENT MUST

19   ESTABLISH PRIOR CONCEPTION OF THE CLAIMED SUBJECT MATTER AND

20   COMMUNICATION OF THE CONCEPTION TO THE ADVERSE CLAIMANT."

21        AND THERE THE OPINION IN PRICE VERSUS SYMSEK CITES AN

22   EARLIER CASE, MEAD VERSUS MCKIRNAN, 585 F.2D 504 AT 507.  AND

23   IN MEAD VERSUS MCKIRNAN, THE CCPA GLOSSED THE LANGUAGE.  SO

24   BOTH EXCERPTS ARE ON PAGE 507.

25        THE SECOND ONE REALLY REITERATES THE SAME LANGUAGE THAT

1    WE'VE SEEN IN SUBSTANCE FROM THE TWO OTHER CASES.  THE PARTY

2    CHARGING DERIVATION HAS THE BURDEN OF PROVING PRIOR COMPLETE

3    CONCEPTION OF THE CLAIMED SUBJECT MATTER AND SUFFICIENT

4    COMMUNICATION OF THE SUBJECT MATTER TO THE PARTY CHARGED TO

5    ENABLE ONE OF ORDINARY SKILL IN THE ART TO CONSTRUCT AND

6    SUCCESSFULLY OPERATE THE INVENTION.

7         BUT EARLIER ON THAT SAME PAGE WHEN THE COURT DEFINES THE

8    ISSUE THAT THE BOARD OF PATENT APPEALS HAD TO DECIDE, THEY SAY

9    THE ISSUE BEFORE THE BOARD WAS WHETHER MCKIRNAN CONCEIVED AND

10   COMMUNICATED THE INVENTION TO MEAD PRIOR TO THE LATTER'S FILING

11   DATE OF SEPTEMBER 30, 1971.

12           THE COURT:  SO THIS WOULD BE CLARK HAVING TO

13   COMMUNICATE TO MERCK?

14           MR. RABINOWITZ:  PRECISELY.  AND THAT'S HOW

15   DERIVATION WORKS IN THIS CONTEXT JUST AS THE CCPA, THE FEDERAL

16   CIRCUIT'S PREDECESSOR, DEFINED IN MEAD VERSUS MCKIRNAN.

17        THE ISSUE HERE IS HAS GILEAD PROVED THAT CLARK OR

18   PHARMASSET, THAT CLARK CONCEIVED THAT HIS CONCEPTION WAS

19   COMMUNICATED TO MERCK PRIOR TO MERCK'S FILING DATE.  AND WE

20   KNOW FROM THE JURY'S VERDICT THAT THE RELEVANT DATE IS

21   JANUARY 18TH, 2002.

22        SO THAT'S WHY THE JURY'S VERDICT IS DISPOSITIVE OF THE

23   ISSUE OF DERIVATION BECAUSE THERE IS NO EVIDENCE OF A PRIOR

24   CONCEPTION.

25           THE COURT:  IT'S A COMPLETELY DIFFERENT ARTICULATION

1    OF DERIVATION THAN WHAT MR. SINGER PROVIDED SO I KNOW WE'LL BE

2    ADDRESSING THIS FURTHER.

3            MR. RABINOWITZ:  RIGHT.  I SUBMIT THAT MEAD VERSUS

4    MCKIRNAN IS THE KEY AND GLOSSES WHAT IS MEANT BY PRIOR

5    CONCEPTION AND COMMUNICATION BY DEFINING THE ISSUE IN THAT WAY.

6        SO BOTH OF THE CASES RELIED ON IN THIS PROCEEDING BY

7    GILEAD TALK ABOUT PRIOR CONCEPTION AND COMMUNICATION PRIOR TO

8    WHAT?  PRIOR IN THIS INSTANCE TO THE FILING DATE.

9        AND THEN JUST TO DEAL, IF I MAY, BRIEFLY WITH THE TWO

10   OTHER CASES THAT WERE MENTIONED.

11           THE COURT:  AND THAT HAS TO DO WITH WHICH ISSUE?

12           MR. RABINOWITZ:  ON THE SAME ISSUE, LEVITON --

13           THE COURT:  LEVITON, YES.

14           MR. RABINOWITZ:  -- VERSUS UNIVERSAL SECURITY

15   INSTRUMENTS.  LEVITON WAS AN INEQUITABLE CONDUCT CASE AND WHAT

16   HAPPENED WAS THAT THERE WERE TWO RIVAL APPLICATIONS FILED BY

17   THE SAME COMPANY.

18       ONE OF THEM WAS THE INVENTOR WAS CALLED JERMAINE AND THE

19   OTHER OF THE INVENTORS WERE DESALVO AND ZIEGLER.  EACH OF THEM

20   INDEPENDENTLY SWORE THAT THEY WERE THE FIRST AND ORIGINAL

21   INVENTORS OF THE SAME SUBJECT MATTER, AND THEY ACTUALLY COPIED

22   CLAIMS FROM THE ONE INTO THE OTHER.

23       AND THE PATENT OFFICE WAS NEVER TOLD BY THE ATTORNEYS WHO

24   WERE PROSECUTING BOTH APPLICATIONS FOR THE SAME COMPANY THAT

25   THEY HAD TWO MUTUALLY INCONSISTENT SWORN DECLARATIONS PENDING

1      BEFORE PATENT EXAMINERS IN THE PATENT OFFICE AND THAT WAS

2      RELEVANT TO DOUBLE PATENTING AND ALSO POSSIBLY TO DERIVATION.

3          NOW, THERE WAS NO EVIDENCE WHICH SET OF INVENTORS ACTUALLY

4      CONCEIVED FIRST.  WE KNOW THE RELATIVE FILING DATES, BUT IT'S

5      NOT NECESSARILY THE CASE THAT THE INVENTORS WHO FILED FIRST

6      WERE THE FIRST TO CONCEIVE AND WORKING IN THE SAME COMPANY, IT

7      WAS NOT UNLIKELY THAT CONCEPTION FROM THE ONE SET MAY HAVE BEEN

8      COMMUNICATED TO THE OTHER.

9          SO THERE THE FACT THAT IT WAS DESCRIBED AND ENABLED IN AN

10     APPLICATION DIDN'T SETTLE THE ISSUE OF DERIVATION BECAUSE WE

11     NEED TO KNOW THE RELATIVE DATES OF CONCEPTION FOR THAT.

12         HERE WE DO KNOW THE RELATIVE DATE OF CONCEPTION OF CLARK

13     VERSUS THE FILING DATE OF MERCK BECAUSE THE JURY HAS TOLD US

14     THE RELEVANT FILING DATES AND THAT'S BINDING, AND THE EVIDENCE

15     TELLS US THAT CLARK CONCEIVED LATER.  THAT WASN'T ESTABLISHED

16     IN THE LEVITON CASE.

17         SO IT WAS SOMETHING THAT THE PATENT OFFICE NEEDED TO BE

18     TOLD ABOUT.  THEY COULDN'T FILE TWO MUTUALLY INCONSISTENT SWORN

19     DECLARATIONS IN THAT WAY.

20             THE COURT:  SO LEVITON IS A FACTUALLY COMPLICATED

21     CASE.

22             MR. RABINOWITZ:  IT'S FACTUALLY COMPLICATED AND

23     DISTINGUISHABLE.

24             THE COURT:  OKAY.

25             MR. RABINOWITZ:  AND FINALLY IN THE BURROUGHS V.

1    BARR CASE, THE LANGUAGE THAT MR. SINGER QUOTED FROM WAS FROM

2    JUDGE LOURIE'S CONCURRENCE IN PART AND DISSENT IN PART BUT

3    PARTICULARLY THE PART THAT JUDGE LOURIE WAS DISSENTING FROM

4    WHAT THE PANEL SAID.  BURROUGHS WELLCOME VERSUS BARR STOOD FOR

5    THE PROPOSITION THAT YOU DON'T NEED TO KNOW THAT YOUR INVENTION

6    WORKS TO HAVE A COMPLETED CONCEPTION.

7            THE COURT:  THAT'S THE DISSENT?

8            MR. RABINOWITZ:  THAT'S THE MAJORITY HOLDING.

9            THE COURT:  OH.

10           MR. RABINOWITZ:  THAT YOU CAN HAVE A COMPLETE

11   CONCEPTION AND BE THE INVENTORS WITHOUT HAVING TO TEST YOUR

12   COMPOUND AND KNOW THAT IT WORKS.

13       THAT, I THINK, WOULD STAND FOR MERCK'S SIDE OF THE CASE

14   AND NOT GILEAD'S.  THEY WERE SEARCHING FOR COMPOUNDS THAT WOULD

15   TREAT HIV AND SOME INDIVIDUALS IDENTIFIED SOME COMPOUNDS THAT

16   THEY THOUGHT WOULD WORK AND THEY SENT IT CODED, BLIND CODED TO

17   SOMEONE ELSE AT ANOTHER LAB WHO COULD ACTUALLY TEST THEM AND

18   SEE WHETHER THEY WORKED.

19       AND THEN THE ISSUE WAS WERE THE PEOPLE WHO THOUGHT OF IT

20   THE SOLE INVENTORS OR DID THE PERSON WHO ACTUALLY REDUCED IT TO

21   PRACTICE BY SHOWING THAT IT WORKED IN THE CELL LINE, DID THEY

22   ALSO BECOME CO-INVENTORS?  AND THE DECISION WAS, NO.  THE

23   PEOPLE WHO THOUGHT OF IT IN THE DEFINITE WAY WERE THE

24   INVENTORS, AND THEY DIDN'T NEED TO KNOW THAT IT WORKED IN ORDER

25   TO HAVE A COMPLETE CONCEPTION, AND, THEREFORE, THEY WERE THE

1    SOLE INVENTORS.

2         BUT JUDGE LOURIE'S STATEMENT THAT WAS QUOTED IS A DICTUM

3    IN A DISSENTING PART AND IS NOT OF GREAT HELP IN DECIDING THE

4    ISSUES IN THIS CASE.

5         THANK YOU, YOUR HONOR.

6              THE COURT:  ALL RIGHT.  THANKS.

7         **(DEFENDANTS' GAVE THEIR CLOSING ARGUMENT.)**

8              MS. BERNIKER:  THANK YOU, YOUR HONOR.  I'M COGNIZANT

9    OF THE COURT'S INDICATION OF THE TIME LIMITS.

10             THE COURT:  YOU KNOW, WE NEED TO FINISH TODAY.  YOU

11   KNOW, I WORK HERE EVERY DAY AND YOU DON'T.

12             MS. BERNIKER:  I UNDERSTAND.  I'M AS EXCITED TO GET

13   HOME AS EVERYONE ELSE I THINK.

14             THE COURT:  ALL RIGHT.  I KNOW.

15             MS. BERNIKER:  I'D LIKE TO START JUST TO WRAP UP

16   WHAT MR. RABINOWITZ WAS SAYING AND GO BACK TO GILEAD'S

17   INTERROGATORY RESPONSE AND JUST CLOSE THE LOOP ON THAT.

18        THE ONLY THEORY OF UNCLEAN HANDS THAT WAS EVER ALLEGED IN

19   THIS CASE WAS BASED EXCLUSIVELY ON THE ISSUE OF DERIVATION THAT

20   WE BELIEVE IS NOW PRECLUDED AS A RESULT OF THE JURY'S VERDICT.

21        I WANT TO NOW TURN A LITTLE BIT MORE TO --

22             THE COURT:  YOU'RE SAYING THAT I SHOULDN'T EVEN

23   BE -- WELL, I'M NOT EXACTLY SURE WHAT YOU MEAN BY THAT BECAUSE

24   WE HAD STARTED THIS MORNING WITH IT, AND BECAUSE I HEARD THE

25   TRIAL BEFORE, I HAVE PRETTY STRONG EVIDENCE THAT AN ATTORNEY

1    LIED IN MANY PHASES OF THIS CASE AND INCLUDING BEFORE THE

2    COURT, AND I'M INCLUDING THE DEPOSITION AS BEING BEFORE THE

3    COURT.

4        AND YOU'RE SAYING THAT BECAUSE GILEAD ONLY PUT FORTH IN

5    ITS INTERROGATORY A THEORY OF DERIVATION THAT I CAN'T EVEN

6    CONSIDER THAT?

7            MS. BERNIKER:  I BELIEVE UNDER THE DISCLOSURE RULES

8    THAT'S CORRECT.  NOW, I UNDERSTAND THAT YOU MAY CONSIDER IT

9    NONETHELESS, AND I'M PREPARED TO ADDRESS THE FACTS ON IT.

10           THE COURT:  GOOD.

11           MS. BERNIKER:  BUT OUR VIEW IS THAT THAT'S THE ONLY

12   THEORY THEY DISCLOSED AND NOW THEY DRAMATICALLY EXPANDED THE

13   THEORY OF UNCLEAN HANDS AND INCLUDING NOT JUST WHAT YOU

14   IDENTIFIED BUT A NUMBER OF OTHER THINGS THAT HAVE BEEN POPPING

15   UP IN THE LAST FEW DAYS.

16           THE COURT:  OKAY.

17           MS. BERNIKER:  IN ANY EVENT, I WANT TO TALK MORE

18   ABOUT THE UNCLEAN HANDS LAW BEFORE I DELVE INTO THE FACTS AND

19   BEFORE THAT I WANT TO TALK ABOUT THE STANDARD OF UNCLEAN HANDS.

20       THIS IS FROM THE JOINT PRETRIAL STATEMENT, AND I BELIEVE

21   IT'S DISPUTED THAT UNCLEAN HANDS REQUIRES A SHOWING THAT ONE

22   COMING FOR RELIEF HAS COMMITTED SOME UNCONSCIONABLE ACT AND

23   THAT IT BE IMMEDIATELY AND NECESSARILY RELATED TO THE EQUITY

24   THAT HE SEEKS IN RESPECT TO THE MATTER IN LITIGATION.

25       IN THAT LANGUAGE "IMMEDIATELY AND NECESSARILY RELATED" IS,

1    OF COURSE, DIRECTLY RELATED TO THE QUESTION THAT I BELIEVE YOU

2    POSED EARLIER WHICH IS, WELL, DOES THERE HAVE TO BE ANY SORT OF

3    SHOWING THAT SOMEHOW RESEMBLES THE MATERIALITY STANDARD OF THE

4    PATENT OFFICE?  I'M NOT -- OF THE INEQUITABLE CONDUCT TEST.

5         I'M NOT SAYING THAT THEY'RE EXACTLY THE SAME, BUT WHAT I

6    THINK IS CLEAR FROM ALL OF THE CASES THAT HAVE BEEN CITED ON

7    THIS POINT IS THAT THERE IS AN OBLIGATION FOR GILEAD TO PROVE

8    BY CLEAR AND CONVINCING EVIDENCE THAT THE ALLEGED

9    UNCONSCIONABLE ACTS WERE IMMEDIATELY AND NECESSARILY RELATING

10   TO THE ENFORCEMENT OF MERCK'S PATENTS HERE.

11        AND I THINK THAT --

12             THE COURT:  AND TEMPERED BY THE FEDERAL CIRCUIT'S

13   COMMENTS IN THERASENSE ABOUT THERE BEING NO MATERIALITY

14   STANDARD IN THE SUPREME COURT CASES AND THE FEDERAL CIRCUIT

15   UNDERSTANDS THAT IT AND CLEARLY A DISTRICT COURT CANNOT IMPOSE

16   ONE.

17             MS. BERNIKER:  CERTAINLY, AND THAT'S UNDERSTOOD.

18             THE COURT:  UH-HUH.

19             MS. BERNIKER:  BUT I THINK WHETHER OR NOT THE PER SE

20   BUT FOR MATERIALITY STANDARD IS GRAFTED ONTO UNCLEAN HANDS IS

21   DIFFERENT FROM THIS LANGUAGE.

22        THIS LANGUAGE IS FOUND DIRECTLY IN THE SUPREME COURT

23   CASES.

24             THE COURT:  AND WHERE DOES THIS COME FROM?

25             MS. BERNIKER:  THE QUOTATION ON THE SCREEN IS

1    ACTUALLY FROM THE PARTIES' JOINT PRETRIAL ORDER.  IT'S THE

2    JOINT RECITATION OF THE STANDARD WITH RESPECT TO UNCLEAN HANDS.

3            THE COURT:  THAT'S HELPFUL BECAUSE I WAS GOING TO

4    ASK THE PARTIES TO GIVE ME AN ARTICULATION OF THE STANDARD, AND

5    YOU'VE TOLD ME NOW THAT I HAVE A JOINT STATEMENT OF IT.

6            MS. BERNIKER:  YOU DO.

7            THE COURT:  THAT'S, THAT'S VERY IMPORTANT.  THANK

8    YOU.

9            MS. BERNIKER:  AND OBVIOUSLY THE PARTIES HAVE BOTH

10   SUBMITTED ADDITIONAL BRIEFING ON THE SUBJECT AS WELL, BUT THIS

11   LANGUAGE IS JOINT LANGUAGE THAT I HAVE HERE.

12           THE COURT:  WELL, I NEED TO KNOW THE STANDARD THAT

13   I'M GOING TO APPLY.  I'LL FIGURE OUT WHAT THE BURDEN OF PROOF

14   IS.

15       I THINK WE KNOW THE BURDEN OF PROOF ON UNCLEAN HANDS IS

16   CLEAR AND CONVINCING AND SO NO WORRY THERE.

17           MS. BERNIKER:  YES.  THAT IS UNDISPUTED.  BUT TO BE

18   CLEAR, THE IMMEDIATELY AND NECESSARILY LANGUAGE COMES STRAIGHT

19   FROM THE AUTHORITY OF THE SUPREME COURT CASES AND THERASENSE.

20           THE COURT:  GOOD.

21           MS. BERNIKER:  SO INDEPENDENT OF WHAT YOU THINK THE

22   FEDERAL CIRCUIT MEANT WHEN THEY SAID THAT THERE WAS A

23   MATERIALITY STANDARD, THEY WERE NOT IN A POSITION TO UNDERMINE

24   THE IMMEDIATELY AND NECESSARILY RELATED OBLIGATION THAT THE

25   SUPREME COURT HAD SET FORTH.

1    ALL RIGHT.  NOW, I'D LIKE TO JUMP AHEAD BRIEFLY.  WE

2    TALKED ABOUT THESE THIS MORNING, AND SO I'M NOT GOING TO

3    BELABOR THE FACTS OF THEM.

4        BUT YOUR HONOR IS AWARE OF THE FACTS OF THE SUPREME COURT

5    CASES THAT WERE DISCUSSED IN THERASENSE AND THAT ARE THE

6    PRINCIPAL AUTHORITIES THAT GILEAD IS RELYING ON.

7        AND IN EVERY SINGLE ONE OF THOSE CASES, THE FACTS SHOWED

8    THAT EVIDENCE WAS FABRICATED AND SUBMITTED TO THE PATENT OFFICE

9    AND THEN THERE WAS CONTINUED, AS IN THE WORDS OF THE FEDERAL

10   CIRCUIT, THERE WERE DELIBERATELY PLANNED AND CAREFULLY EXECUTED

11   SCHEMES TO DEFRAUD IN THOSE CASES.

12       EVERY SINGLE ONE OF THEM HAD FAKE DOCUMENTS AND AFFIDAVITS

13   THAT HAD BEEN CREATED, AND I WOULD SUBMIT, YOUR HONOR, THAT

14   EVEN IF YOU ACCEPTED EVERY SINGLE ALLEGATION THAT GILEAD MAKES

15   IN THIS CASE, MANY OF WHICH I THINK ARE DEMONSTRABLY FALSE, IT

16   STILL WOULD NOT RISE TO THE LEVEL OF THE TYPE OF CONDUCT THAT

17   THE FEDERAL CIRCUIT AND THE SUPREME COURT HAVE IDENTIFIED AS

18   UNCONSCIONABLE CONDUCT THAT QUALIFIES AS UNCLEAN HANDS.

19       THE COURT:  IT IS HARD TO KNOW WHAT THE STANDARD IS

20   WHEN AN ATTORNEY LIES.

21       MS. BERNIKER:  UNDERSTOOD, YOUR HONOR.  AND

22   OBVIOUSLY IT IS OUR VIEW THAT HE DIDN'T LIE, AND I'M ABOUT TO

23   GET TO THAT.

24       THE COURT:  I APPRECIATE THAT.

25       MS. BERNIKER:  NOW, I'D LIKE TO ACTUALLY TURN TO THE

1    FACTS.  AND IF WE CAN PLEASE GO TO DDX-720.  AND I WANT TO

2    START WITH BRIEFLY TALKING ABOUT THE EVENTS LEADING UP TO THE

3    CALL AND THEN WE'LL SPEND A LITTLE TIME TALKING ABOUT THE CALL.

4         AND THE FIRST ALLEGATION THAT GILEAD MAKES, OF COURSE, AND

5    IT'S REALLY THE LINCHPIN OF THEIR ARGUMENT HERE IS THAT THE

6    CLAIMS THAT DR. DURETTE ULTIMATELY OBTAINED IN THE '499 PATENT

7    WERE NOT RELATED TO ANY INVENTION ACTUALLY CONCEIVED AT MERCK.

8         AND I THINK THE EVIDENCE WAS VERY CLEAR AND UNDISPUTED ON

9    THIS POINT AT TRIAL AND I'D LIKE TO GO INTO IT NOT IN GREAT

10   DETAIL BUT JUST TO REMIND YOUR HONOR OF THE CONTEXT OF WHAT

11   DR. DURETTE KNEW GOING INTO THE 2004 CALL.

12        SO I'M GOING TO START WITH DR. OLSEN'S TESTIMONY THAT I'VE

13   PUT UP ON THE SCREEN FROM THE TRIAL.  THIS IS FROM THE TRIAL AT

14   924, THAT'S THE TRANSCRIPT CITE, WHERE HE FIRST INDICATED THAT

15   HE FIRST HAD THE IDEA OF MAKING A METHYL UP, FLUORINE DOWN

16   COMPOUND IN NOVEMBER OF 2000.

17        AND, YOUR HONOR, I'M HAPPY TO PROVIDE YOU WITH A COPY OF

18   THE SLIDE DECK.

19             THE COURT:  WOULD YOU?  THAT WOULD BE GREAT BECAUSE

20   IT'S A SHORTCUT FOR ME.

21             MS. BERNIKER:  WOULD YOU LIKE IT NOW?

22             THE COURT:  NO, NO.

23             MS. BERNIKER:  AS I NOTED THIS MORNING, THE

24   PROVISIONAL APPLICATION WAS FILED IN ON JANUARY 21, AND IT WAS

25   UNDISPUTED AND CONFIRMED BY GILEAD'S OWN EXPERT THAT THAT

1    PROVISIONAL INCLUDED RELATIVELY NARROW DISCLOSURES THAT

2    INCLUDED THE METHYL UP, FLUORINE DOWN WITH ANY OF THE BASES AND

3    SPECIFICALLY INCLUDED THE CYTIDINE BASE.

4        THAT WAS, OF COURSE, ACCORDING TO DR. OLSEN'S TESTIMONY,

5    INCLUDED ON PURPOSE BECAUSE HE THOUGHT THAT THAT WAS AN

6    IMPORTANT COMPOUND.

7        THEN WE HAVE THE 2001 INVENTION NOTEBOOK OF DR. PRAKASH,

8    ONE OF THE NAMED INVENTORS ON THE PATENT, AND HERE HE

9    SPECIFICALLY DREW OUT THE STRUCTURES HAVING A METHYL UP, FLUORO

10   DOWN BOTH WITH A DOUBLE RING BASE AND ALSO WITH THE SINGLE RING

11   BASE.  THIS COMPOUND ON THE RIGHT IS 6130 ITSELF.  HE DREW THAT

12   IN HIS NOTEBOOK IN JANUARY 2001.  HE HAD --

13           THE COURT:  WELL, THE EVIDENCE WAS NOT CONTESTED ON

14   THAT.

15           MS. BERNIKER:  THE EVIDENCE ON THIS WAS THAT HE

16   SUBMITTED IT INTO HIS NOTEBOOK.  THERE WAS A QUESTION ABOUT

17   WHEN EXACTLY HE -- WHETHER HE HAD SIGNED IT AFTER HE

18   SUBMITTED -- AFTER HE DREW THE STRUCTURE ON IT, THAT WAS THE

19   DEPOSITION TESTIMONY.

20       LET ME INTERJECT FOR A SECOND AND MAKE SURE WE'RE TALKING

21   ABOUT THE SAME THING.  I'M WONDERING WHETHER YOU'RE THINKING

22   ABOUT WHAT DR. PRAKASH WAS SAYING OR WHAT DR. SONG HAD SAID

23   BECAUSE THEY ARE ACTUALLY TWO DIFFERENT INDEPENDENT

24   CONCEPTIONS.

25           THE COURT:  THIS IS NOT A PAGE WHERE SOME WERE

1    PRINTED FROM --

2              MS. BERNIKER:  THIS IS THE PAGE.

3              THE COURT:  AND I THOUGHT THERE WAS TESTIMONY THAT

4    HE ACKNOWLEDGED THAT HE HAD FAILED TO DATE THE DIAGRAM THAT WAS

5    HANDWRITTEN THAT WAS KEY TO YOUR POINT.

6              MS. BERNIKER:  I THINK THAT'S RIGHT WITH RESPECT TO

7    THE ONE ON THE RIGHT.

8              THE COURT:  YES.

9              MS. BERNIKER:  I'M NOT SURE THE SAME WAS SAID WITH

10   THE ONE ON THE LEFT.

11             THE COURT:  THE ONE ON THE LEFT, I DON'T KNOW IF

12   THAT'S INITIALS OR NOT ON THE LEFT, BUT I DON'T SEE A DATE.

13             MS. BERNIKER:  I BELIEVE THERE WAS NO QUESTION ABOUT

14   THE DATING ON THE ONE ON THE LEFT WHICH IS ON THE EARLIER PAGE

15   OR WHICH IS ON THE FIRST PAGE OF THE DOCUMENT.

16        I BELIEVE THE ONLY QUESTION WAS WHETHER HE HAD PROPERLY

17   DATED THE ONE ON THE RIGHT.

18        BUT TO BE CLEAR, GILEAD HAS NEVER ALLEGED THAT THIS IS A

19   FABRICATION.  THERE'S NO BASIS TO SUGGEST THAT HE MADE THIS

20   DOCUMENT UP.  THERE WAS NEVER ANY ALLEGATION OF THAT.

21        IN ANY EVENT, WE DO KNOW THAT THERE ARE OTHER DOCUMENTS IN

22   THE CASE SHOWING THE INVENTOR'S CONCEPTION, SPECIFICALLY WITH

23   THE COMPOUND OF A METHYL UP, FLUORINE DOWN, INCLUDING

24   EXHIBIT 36, FOR EXAMPLE, WHERE THEY SPECIFICALLY HAVE THE

25   METHYL UP, FLUORINE DOWN WITH A DOUBLE RING BASE.

1          AND FURTHER DOCUMENTS FROM THE COLLABORATION, INCLUDING

2     EXHIBIT 1543 WITH THE METHYL UP, FLUORINE DOWN.  THERE WAS

3     NEVER A SUGGESTION BY GILEAD IN THIS CASE THAT THE ENTIRE SET

4     OF DOCUMENTS SHOWING THIS CONCEPTION WERE FAKE.  THEY'RE NOT.

5          AND DR. OLSEN TESTIFIED ABOUT THE FACT THAT THEY HAD

6     DISCUSSED THESE DOCUMENTS DURING THE MEETINGS, AND DR. DURETTE

7     TESTIFIED THAT HE WAS PRESENT AT THOSE MEETINGS AS WELL AND WAS

8     FAMILIAR WITH THE STRUCTURES FROM THE MEETINGS.

9          THAT TESTIMONY IS AT TRIAL TRANSCRIPT 396 WHERE HE

10    TESTIFIED THAT HE ATTENDED THE MEETINGS TO BE KEPT APPRISED OF

11    THE RESEARCH AND THE IDEAS THAT THE COLLABORATORS WERE ACTUALLY

12    WORKING ON.

13         THEN WE GET TO DR. SONG, AND I THINK I'LL BE ABLE TO CLEAR

14    UP THE QUESTION THAT YOU HAD EARLIER ABOUT DR. SONG.

15              THE COURT:  THANK YOU.

16              MS. BERNIKER:  DR. SONG'S LAB NOTEBOOK SHOWS THAT HE

17    WAS SYNTHESIZING THE COMPOUND WITH A METHYL UP, FLUORINE DOWN.

18    IT IS A PROTECTED COMPOUND.  I THINK THAT'S THE WORD THAT YOU

19    WERE LOOKING FOR EARLIER.

20              THE COURT:  IT WAS.

21              MS. BERNIKER:  AND HE TESTIFIED AT HIS DEPOSITION

22    THAT HE MADE THE NUCLEOSIDE WITH THE METHYL UP AND FLUORINE

23    DOWN, BUT THAT IT WAS PROTECTED.

24         AND, OF COURSE, THERE WAS NO DISPUTE THAT THE COMPOUND WAS

25    NEVER TESTED.

1          I WANT TO REMIND THE COURT THAT GILEAD WITHDREW IT'S

2     ARGUMENT THAT THERE WAS AN ENABLEMENT PROBLEM IN CONNECTION

3     WITH SYNTHESIZING A COMPOUND WITH THE METHYL UP, FLUORINE DOWN.

4     THEY WITHDREW THAT ARGUMENT WITH PREJUDICE.

5          IN ANY EVENT, WHAT YOU SEE HERE IS THAT THE INVENTORS AND

6     THE SCIENTISTS IN THE COLLABORATION TIME AND TIME AGAIN WERE

7     THINKING ABOUT THESE COMPOUNDS LONG BEFORE THE CALL THAT

8     DR. DURETTE WAS ON.

9          AND, FRANKLY, IT REALLY DOESN'T MATTER WHETHER THEY EVER

10    MADE ONE.  THAT'S NOT NECESSARY AT ALL HERE BECAUSE THEIR

11    CONCEPTION IS APPARENT BOTH FROM THEIR OWN DOCUMENTS FROM 2001

12    AND FROM THE FILING OF THE PATENT APPLICATIONS THAT

13    SPECIFICALLY ENCOMPASS THEM.

14         NOW, GILEAD HAS REPEATEDLY TRIED TO ASK THIS COURT VIA THE

15    JURY AND NOW YOUR HONOR TO CONCLUDE THAT DR. DURETTE HAD WAITED

16    UNTIL THE STRUCTURE OF 6130 WAS PUBLISHED BEFORE CLAIMING 6130

17    IN ITS PATENT, AND THEY INCLUDED THAT AGAIN IN THEIR FINDINGS

18    OF FACT.

19         BUT EVERY SINGLE TIME THAT THEY HAVE RAISED THIS, MERCK

20    HAS, I THINK, SUCCESSFULLY SHOWN THAT, IN FACT, 6130 WAS

21    INCLUDED IN MERCK'S ORIGINAL PATENT APPLICATION FROM THE

22    BEGINNING.  AND I'VE GOT ON THE SCREEN EXHIBIT 524.  THIS IS

23    THE ORIGINAL PATENT APPLICATION FOR THE '499 THAT WAS FILED IN

24    JANUARY OF 2002, THE ORIGINAL CLAIMS.  EVERY WITNESS THAT WAS

25    EXAMINED ON THIS CONFIRMED THAT IT ALWAYS INCLUDED 6130.  THAT

1    WAS CONFIRMED NOT JUST BY DR. DURETTE BUT ALSO BY DR. SECRIST.

2    IT WAS ALWAYS WITHIN THE CLAIMS AND, OF COURSE --

3              THE COURT:  IN THE BILLIONS IN THE MILKY WAY.

4              MS. BERNIKER:  WELL, ACTUALLY, THIS CLAIM -- I DON'T

5    THINK THERE'S TESTIMONY THAT THIS CLAIM WAS IN THE BILLIONS.

6    AND WE'LL GET TO 34 -- ACTUALLY WHY DON'T WE GET TO THAT.  THE

7    CLAIMS THAT WERE PENDING IN JULY OF 2003, SO THIS IS BEFORE THE

8    CALL, THESE ARE THE CLAIMS THAT WERE EVENTUALLY AMENDED BY

9    DR. DURETTE WERE MUCH NARROWER ALREADY.  THEY WERE LIMITED TO A

10   SINGLE RING BASE AND THEY HAD COMPARABLY FEWER OPTIONS.

11       NOW, I'M NOT IN A POSITION TO QUANTIFY THAT FOR YOU RIGHT

12   HERE, BUT THEY HAD ALREADY BEEN SUBSTANTIALLY NARROWED TO FOCUS

13   ON COMPOUNDS WITH THE SINGLE RING BASE AND FEWER SUBSTITUENTS

14   TO BE SURE ON THE SUGAR.

15       SO THE IDEA THAT WHAT HAPPENED AFTER THE CALL WAS THAT IT

16   WENT FROM SOMETHING MASSIVE TO SOMETHING TINY IS NOT ACCURATE.

17   IT HAD ALREADY BEEN REDUCED SUBSTANTIALLY BEFORE THE CALL AND,

18   OF COURSE, ALREADY INCLUDED THE 6130 COMPOUND.

19       BUT I WANT TO TAKE A MINUTE AND TALK ABOUT WHAT PHARMASSET

20   KNEW GOING INTO THE CALL BECAUSE THAT'S SOMETHING THAT WE

21   HAVEN'T SPENT MUCH TIME ON TODAY, BUT I THINK IT'S ACTUALLY

22   VERY IMPORTANT.

23       SO I WANT TO REMIND YOUR HONOR ABOUT EXHIBIT 1892.  WE

24   KNOW THAT RAY SCHINAZI AND BRYCE ROBERTS OF PHARMASSET

25   IMMEDIATELY UPON UNDERSTANDING THAT MERCK HAD PUBLISHED A

1    PATENT IN THIS SPACE GOT THEIR HANDS ON IT.  THIS IS

2    UNDISPUTED.  THIS IS JULY OF 2002.

3         AND WE KNOW WHAT HAPPENED AFTER THAT WITH RESPECT TO

4    JEREMY CLARK STUDYING IT AND COMING UP WITH HIS OWN IDEA FOR

5    6130 AND WALKING INTO DR. OTTO'S OFFICE WITH THE PATENT IN ONE

6    HAND AND THE STRUCTURE OF 6130 IN THE OTHER HAND.

7         BUT THE OTHER THING THAT I WANT TO REMIND YOU OF, YOUR

8    HONOR, IS THAT BY MAY OF 2003, AND THIS IS EXHIBIT 1721,

9    PHARMASSET HAD ALREADY CONCLUDED THAT MERCK'S PATENT COVERED

10   6130.  THAT'S IN THE DOCUMENT WHERE THEY SAID LET'S COME UP

11   WITH A -- PERHAPS WE CAN MAKE A BROMO ANALOG TO TRY TO

12   INVALIDATE THE CLAIM.  AND THAT IS EXPRESSLY CONFIRMED BY

13   DR. OTTO AT THIS TRIAL.

14        WHAT HE SAID AT PAGE 542 OF THE TRIAL TRANSCRIPT IS THAT

15   HE KNEW AS OF THAT TIME THAT MERCK'S PATENT DID CLAIM 6130.  HE

16   KNEW THAT BY MAY OF 2003.

17        THAT WAS ALSO CORROBORATED IN ANOTHER DOCUMENT,

18   EXHIBIT 1904, FROM THAT TIMEFRAME FROM PHARMASSET WHERE

19   RAY SCHINAZI AND ALAN ROEMER, WHO WERE BOTH PRESENT ON THE CALL

20   THAT WE'RE GOING TO TALK ABOUT IN A MINUTE, ALSO IDENTIFY THE

21   FACT THAT IN THE MERCK PATENTS THERE IS A METHYL UP AND A

22   FLUORINE DOWN BOTH AT THE 2' AND 3' POSITIONS.

23        GOING INTO THE CALL THEY KNEW THAT MERCK HAD A PATENT THAT

24   ALREADY COVERED 6130.

25        NOW, I WANT TO TALK FOR A MINUTE BEFORE WE GET TO THE CALL

1    ABOUT WHAT DR. DURETTE KNEW.  DR. DURETTE TESTIFIED THAT HE DID

2    KNOW GOING INTO THE CALL THAT HE HAD A PORTFOLIO INVOLVING

3    NUCLEOSIDES AND THAT HE KNEW THAT PHARMASSET WAS WORKING IN THE

4    NUCLEOSIDE SPACE.

5         BUT WHAT HE SAID WAS, YOU HAVE TO REMEMBER NUCLEOSIDES IS

6    A VERY BROAD AREA OF RESEARCH AND THERE ARE MANY DIFFERENT

7    STRUCTURAL TYPES AND DIFFERENT MECHANISMS OF ACTION.

8         AND THAT'S BEEN CONFIRMED BY A NUMBER OF WITNESSES WHO

9    HAVE TESTIFIED AT THIS TRIAL, INCLUDING DR. OLSEN AND MANY OF

10   THE EXPERTS, THE VARIETY OF DIFFERENT KINDS OF NUCLEOSIDES

11   THERE ARE.

12        SO PHARMASSET SAYS, WELL, HE CLAIMS THAT HE DIDN'T KNOW

13   THAT IT WAS AN NS5B POLYMERASE INHIBITOR, THE COMPOUND THAT

14   PHARMASSET WAS TRYING TO SHOP TO THEM.  AND THAT'S WHAT HE

15   TESTIFIED TO AT TRIAL.  AT TRIAL HE SAID I DON'T THINK I KNEW

16   THAT IT WAS AN NS5B POLYMERASE INHIBITOR.

17        BUT LET'S LOOK AT WHAT THEY SAY IN THEIR FINDINGS OF FACT

18   IN THEIR RESPONSE.  THEY SAY THAT HIS TESTIMONY IS CONTRADICTED

19   BY DOCUMENTARY EVIDENCE THAT OTHER PEOPLE AT MERCK KNEW THAT IT

20   WAS AN NS5B INHIBITOR.

21        THEY SAY THAT THERE ARE NON-FIREWALLED INDIVIDUALS AT

22   MERCK WHO KNEW THAT.  THEY CITE TWO DOCUMENTS IN THIS INSTANCE,

23   EXHIBITS 90 AND 2300, THAT DR. DURETTE WAS NOT COPIED ON AND

24   THEY HAVE NO WAY OF ASSOCIATING THAT KNOWLEDGE WITH THEM.

25        THEY ARE TRYING TO INFER KNOWLEDGE TO HIM THAT HE DIDN'T

1      HAVE, AND THOSE ARE EXHIBITS 90 AND 2300.

2          AND EXHIBIT 90 SPECIFICALLY HAS A RECIPIENT LIST THAT HE'S

3      NOT NAMED ON.

4          ALL RIGHT.  SO THEN THEY SAID, AND THEY TRIED TO DO THIS

5      WITH MS. DEMAIN TODAY, THEY SAID WHAT ABOUT THIS OTHER DOCUMENT

6      THAT TALKED ABOUT SOMETHING BEING A CHAIN TERMINATOR?  SO.

7          I WANT TO CALL UP THAT DOCUMENT BECAUSE MR. SINGER CALLED

8      IT UP A MINUTE AGO.  IT IS EXHIBIT 2394 AT PAGE 2.  AND THIS IS

9      THE DRAFT DOCUMENT THAT WAS PREPARED AT MERCK.  IT WAS A DRAFT

10     PROPOSED TERM SHEET FOR A COLLABORATION, AND I WANT TO LOOK AT

11     WHAT IT ACTUALLY SAYS.

12         FIRST OF ALL, IT DOESN'T SAY IT'S AN NS5B INHIBITOR.  WHAT

13     IT SAYS, WE HAVE WRITTEN THIS BASED ON THE UNDERSTANDING THAT

14     MERCK WILL EVALUATE THE STRUCTURE DURING THE DUE DILIGENCE

15     PROCESS.  UNTIL THEN, THE AMOUNT OF -- AND THIS IS THE AMOUNT

16     OF THE PROPOSED SIGNATURE FEE -- IS BASED ON THE FOLLOWING

17     ASSUMPTIONS.

18         IT SAYS ASSUMPTIONS.  AND THEY ASSUMED AT THAT MOMENT ON

19     THIS DOCUMENT THAT IT WAS A CHAIN TERMINATOR.  THEY DIDN'T KNOW

20     THAT AT THAT POINT IN TIME.  THEY SAID IT WAS AN ASSUMPTION.

21     THERE IS NOTHING IN THIS DOCUMENT THAT INDICATES THAT

22     DR. DURETTE'S TESTIMONY WAS FALSE WHEN HE SAID I DIDN'T KNOW IT

23     WAS AN NS5B INHIBITOR.

24         AND WHAT YOU HEARD HIM SAY -- IF WE CAN GO BACK TO THE

25     SLIDE DECK.  AND WHAT HE TESTIFIED TO IS THAT NUCLEOSIDES CAN

1    BE ATTACKING A LOT OF DIFFERENT -- AND THEN HE SAYS MANY OF

2    THESE ENZYMES OR SOME OF THEM, AND THEY HAVE TOTALLY DIFFERENT

3    STRUCTURES.  AND, OF COURSE, THAT'S CONSISTENT WITH WHAT WE

4    HAVE HEARD ABOUT THE STRUCTURES OF VARIOUS COMPOUNDS.

5         BUT I WANT TO TAKE A MINUTE JUST TO THINK ABOUT THE

6    ARGUMENT THAT PHARMASSET IS MAKING AND THEN WE'RE GOING TO GET

7    TO THE NOTES, YOUR HONOR.

8         DR. DURETTE TESTIFIED, AND I THINK DR. OTTO SAID THE SAME

9    THING, THAT IT WAS ROUTINE IN THE INDUSTRY FOR COMPETITORS TO

10   BE LOOKING AT PUBLISHED APPLICATIONS OF DIFFERENT PEOPLE.  AND

11   HE DID THAT, AND I THINK DR. OTTO SAID HE DID THE SAME THING

12   ROUTINELY.

13        DR. DURETTE KNEW THAT MERCK'S PATENT APPLICATION HAD BEEN

14   PUBLIC FOR A YEAR AND A HALF AND PHARMASSET HAD NEVER ONCE

15   INDICATED TO THEM THAT PHARMASSET WAS WORKING ON A COMPOUND

16   WITHIN THE SCOPE OF MERCK'S PATENTS.

17        DR. DURETTE HAD NO REASON TO THINK GOING INTO THIS CALL

18   THAT THEY WERE GOING -- THAT PHARMASSET WAS SHOPPING THEM A

19   COMPOUND THAT WAS ALREADY WITHIN MERCK'S PATENTS AND THAT

20   PHARMASSET WASN'T TELLING THEM ABOUT IT.

21        GOING INTO THIS CALL HE HAS NO REASON TO THINK THAT THE

22   PHARMASSET COMPOUND FALLS SQUARELY WITHIN PATENTS THAT HE'S

23   PROSECUTING.

24        BUT LET'S KEEP GOING BECAUSE I THINK YOU'RE GOING TO SEE

25   THAT THAT FACT IS ACTUALLY SOMETHING THAT PHARMASSET

1    AFFIRMATIVELY WITHHELD FROM MERCK FOR A PERIOD OF TIME.

2         BEFORE I DO THAT, I JUST WANT TO POINT OUT ONE THING WHICH

3    IS IT MAY BE THE CASE THAT IN HINDSIGHT DR. DURETTE SHOULDN'T

4    HAVE JOINED THAT CALL.  I THINK WE AGREE IN HINDSIGHT HE

5    SHOULDN'T HAVE JOINED THAT CALL, AND HE TESTIFIED THAT IT WAS A

6    MISTAKE IN HINDSIGHT.

7         BUT THE COURT HAS FOUND THAT NEGLIGENCE IS NOT UNCLEAN

8    HANDS.  AND IF HE WENT INTO THAT CALL THINKING IN GOOD FAITH

9    THAT THE COMPOUNDS THAT THEY WERE GOING TO DISCLOSE WERE NOT

10   RELATED TO THE WORK THAT HE WAS DOING, THAT IS NOT A BASIS FOR

11   FINDING UNCLEAN HANDS.  PEOPLE ARE PERMITTED TO MAKE MISTAKES.

12        NOW, LET'S TALK ABOUT THE CALL, AND YOUR HONOR HAS BEEN

13   PROVIDED WITH A COPY OF THE NOTES WHICH I'M ALSO CALLING OUT ON

14   THE SCREEN.

15             THE COURT:  THANK YOU.

16             MS. BERNIKER:  MR. ROEMER'S NOTES ARE EXHIBIT 2098,

17   AND I'M GOING TO WALK THROUGH THEM.  WE FOCUSSED ON SNIPPETS OF

18   THEM, BUT WE NEVER WALKED THROUGH THEM CAREFULLY TO SEE WHAT

19   THE PURPOSE OF THE CALL WAS.

20        SO LET'S START.  IT'S MARCH 17TH, 2004, THE CALL IS FOR

21   MERCK PATENT DUE DILIGENCE.  THIS IS MERCK TRYING TO UNDERSTAND

22   WHETHER THEY WANT TO LICENSE THIS COMPOUND AND UNDERSTANDING

23   WHAT PATENT PROTECTION THERE IS THAT COVERS IT.

24        AND, REMEMBER, MERCK DOESN'T KNOW ANYTHING ABOUT THE

25   COMPOUND STRUCTURE BUT PHARMASSET KNOWS THAT THE COMPOUND IS

1    SQUARELY WITHIN MERCK'S PATENTS.  THEY ALREADY CONCLUDED THAT

2    MONTHS EARLIER.

3          THE MERCK OBJECTIVE, ACCORDING TO THE NOTES, IS TO

4    DETERMINE -- FIRST THEY WANT TO KNOW THE STRUCTURE AND THEY

5    WANT TO KNOW IF THE COMPOUND IS NOVEL, THEY WANT TO KNOW THE

6    PATENT PROTECTION THERE IS.  THEY WANT TO KNOW THE CLOSEST

7    PRIOR ART, WHETHER THERE ARE OTHER PATENTS COVERING THE

8    COMPOUND, ASSESSMENTS OF PATENTABILITY, AND FREEDOM TO OPERATE

9    BECAUSE GOING IN THEY DIDN'T KNOW ANY OF THIS.  THAT WAS THE

10   POINT OF THE CALL.

11         DR. DURETTE DIDN'T KNOW ANY OF THIS GOING IN.  THAT'S

12   ALREADY REFLECTED IN MR. ROEMER'S NOTES.

13         AND THEN WE HAVE RFS, RAY SCHINAZI, AND HE SAYS WE WILL

14   PROVIDE THE LANDSCAPE.

15         AND REMEMBER THAT RAY SCHINAZI KNEW HE WAS ON ONE OF THOSE

16   E-MAILS KNOWING THAT THE COMPOUNDS WERE IN MERCK'S PATENTS

17   ALREADY.

18         SO THEN WE HAVE PHIL DURETTE, AND HE'S PD, AND IT SAYS AS

19   BEST YOU KNOW THIS IS A NOVEL COMPOUND?  AND THEY SAY, YES,

20   SOME SEARCHES.

21         NOTHING ABOUT MERCK'S PATENT YET.

22         THEN WE GET PHIL DURETTE.  HE'S ASKING MORE ABOUT THE

23   PATENT COVERAGE.  AND HE SAYS, ARE THERE THIRD PARTY PATENTS

24   COVERING THE COMPOUND?  AND WHAT THEY SAY TO HIM IS, YES, THERE

25   ARE.  WE'VE LICENSED THEM.

1       THEY DON'T SAY, YES, YOU HAVE ONE, WE NEED A LICENSE FROM

2   YOU.  THEY WITHHELD THAT INFORMATION.  THEY WEREN'T HONEST

3   ABOUT THAT ON THE CALL.

4       SO THEN RAY SCHINAZI SAYS, THIS IS RFS NOW, 1999 FILING,

5   PUBLISHED AS --

6           THE COURT:  WELL, WAIT A MINUTE.  LET ME BACK UP.

7   YOU'RE ATTRIBUTING TO PHARMASSET AS AN ANSWER TO THE QUESTION

8   THIRD PARTY PATENTS?

9           MS. BERNIKER:  YES.  WHERE IT SAYS, YES, WHICH WE'VE

10  LICENSED.  I THINK THAT'S THE ONLY REASONABLE INTERPRETATION OF

11  THE LANGUAGE THERE.

12          THE COURT:  OKAY.

13          MS. BERNIKER:  THEN WE HAVE RAY SCHINAZI, 1999

14  FILING PUBLISHED AND THEN HE'S GOT THIS '587 PATENT THAT HE'S

15  REFERRING TO AND HE SAYS COVERS BROAD CLAIMS.  NOW FILED

16  ADDITIONAL AMENDMENTS TO COVER THE COMPOUND OF INTEREST.

17      WELL, TWO THINGS ON THAT, YOUR HONOR.  THERE'S NEVER BEEN

18  ANY EVIDENCE IN THIS CASE THAT PHARMASSET HAD A 1999 PATENT

19  THAT COVERED 6130.  WE WOULD HAVE HEARD IT BY NOW.

20      AND WHEN YOU TAKE A LOOK AT EXHIBIT 587, THE PATENT THAT

21  HE'S TALKING ABOUT, AND WE'VE GOT IT ON THE SCREEN HERE,

22  EXHIBIT 810, IT DOESN'T PERMIT HAVING A METHYL UP.  IT DOESN'T

23  COVER 6130.  IT NEVER DID AND YOU HADN'T HEARD -- YOU HAVEN'T

24  HEARD ANYTHING FROM ANY EXPERT SUGGESTING THAT IT EVER DID.

25          NONETHELESS, THAT'S WHAT RAY SCHINAZI SAYS IN RESPONSE TO

1       PHIL DURETTE SAYING WHAT ABOUT THIRD PARTY PATENTS.

2           AND THEN THEY GO ON AND MENTION THE CLARK APPLICATION.

3       BUT LET'S KEEP GOING IN TERMS OF WHAT ELSE HAPPENS AS

4       PHIL DURETTE IS TRYING TO UNDERSTAND THE STATE OF THE PATENT

5       SITUATION.

6           SO THEN PHIL DURETTE SAYS, AND NOW I'M ON THE SECOND PAGE

7       OF THE EXHIBIT, PHIL SAYS, AND THIS IS THE MIDDLE OF THE PAGE,

8       OTHER THAN THE BROAD CLAIM, THERE ARE NO THIRD PARTY?

9           AND THEN HE LISTS ROCHE, MERCK OR SOMEBODY LISTS ROCHE,

10      MERCK, IDENIX, AND ISIS.  SO WE KNOW THAT THAT WAS MENTIONED.

11      BUT, OF COURSE, THERE'S NO REFERENCE THERE TO PHARMASSET

12      SAYING, YEAH, MERCK, YOU HAVE A PATENT ON THIS.

13          AND THEN WE HAVE THE BEGINNING OF A DISCLOSURE WHERE IT

14      SAYS D-NUCLEOSIDE NATURAL BASE, PYRIMIDINE, A CYTOSINE

15      NUCLEOSIDE, SUGAR IS A RIBOSE, 2' H, METHYL UP AT 2'.

16          THE COURT:  SO THIS LOOKS -- THIS IS ALL ATTRIBUTED

17      TO PHIL DURETTE.  I'M CONFUSED.

18          MS. BERNIKER:  WELL, MY UNDERSTANDING OF THE WAY

19      THESE NOTES WERE WRITTEN WAS THAT HE WOULD KIND OF IDENTIFY THE

20      SUBJECT MATTER OF THE CONVERSATION, BUT THE BULLET POINTS DON'T

21      NECESSARILY MEAN THAT EXACTLY.

22          THE COURT:  THIS WOULD BE INCONSISTENT WITH

23      PHIL DURETTE'S ROLE SO THAT STANDS OUT.

24          MS. BERNIKER:  OKAY.  I'M SORRY.  WHAT DID YOU MEAN

25      BY THAT?

1            THE COURT:  THAT PHIL DURETTE COULDN'T HAVE OFFERED

2    THIS INFORMATION.  HE WAS ON THE RECEIVING END.  THIS IS -- I

3    DON'T KNOW WHO GAVE THIS INFORMATION, BUT IT COULDN'T HAVE BEEN

4    PHIL DURETTE SO THAT'S WHY I'M CONFUSED.

5            MS. BERNIKER:  I'M HAPPY TO AGREE THAT IT'S A LITTLE

6    AMBIGUOUS ABOUT WHO IS GIVING THIS INFORMATION, BUT I WANTED TO

7    POINT SOMETHING OUT.  THAT'S WHERE HE SAYS IT'S A PROBLEM FOR

8    ME.  I NEED TO HAVE A CONVERSATION WITH MY SUPERVISOR.  IT

9    SEEMS QUITE RELATED TO THINGS THAT I'M INVOLVED WITH.  THAT'S

10   WHERE HE SAYS THAT.  THEY HAVEN'T DISCLOSED THE STRUCTURE YET.

11   HE IDENTIFIED THE PROBLEM BEFORE THEY EVEN DISCLOSED THE

12   STRUCTURE.

13           THEN THERE'S A QUESTION, HAVE YOU MADE ANY INTERNAL

14   ASSESSMENT?  AND I THINK IT'S PRETTY CLEAR THAT THIS IS

15   PHARMASSET ANSWERING BECAUSE THEY GO BACK TO THE 1999 PATENT.

16   AND THEY SAY, YES, WE BELIEVE THAT THE 1999 ISSUED PATENTS BEAT

17   EVERYONE ELSE.

18           THEY'RE TRYING TO PERSUADE MERCK THAT THEY HAVE A PATENT

19   THAT BEATS EVERYONE ELSE BECAUSE THEY STILL HAVE WITHHELD THE

20   FACT FROM MERCK THAT THEIR COMPOUND FALLS WITHIN A MERCK

21   PATENT.

22           AND, IN FACT, IF YOU LOOK AT GILEAD'S TRIAL BRIEF, THEY

23   CONCEDE THAT DESPITE THE CONFIDENTIALITY AGREEMENT, PHARMASSET

24   WAS UNWILLING TO PROVIDE THE STRUCTURE TO ANYONE AT MERCK

25   INITIALLY.

1          AND THE REASON FOR THAT, YOUR HONOR, I THINK, IS CLEAR

2     WHICH IS THAT THEY DIDN'T WANT MERCK TO FIGURE OUT THAT THE

3     COMPOUND THAT THEY WERE SELLING THEM MERCK ALREADY HAD PATENT

4     RIGHTS TO.  THEY WERE THE ONES WITHHOLDING INFORMATION ON THIS

5     CALL.  THEY KEPT NOT SAYING, YOU KNOW, YOU GUYS HAVE A PATENT

6     ON THIS AND WE SHOULD PROBABLY TALK ABOUT IT, AND THEY DIDN'T

7     WANT MERCK TO FIGURE IT OUT.

8          BUT MORE IMPORTANTLY FOR THE ISSUE PRESENTED HERE, YOUR

9     HONOR, DR. DURETTE POINTED OUT THAT HE HAD A CONFLICT BEFORE

10    THEY DESCRIBED THE STRUCTURE TO HIM.

11         AND THEN AFTER THAT, YOU SEE THE STRUCTURE DESCRIBED.  I

12    THINK IT'S WHERE IT SAYS COMPOUND DESCRIBED.  IT MIGHT BE LATER

13    IN THE BULLET THAT SAYS FULL DISCLOSURE OF THE COMPOUND

14    STRUCTURE, BUT REGARDLESS OF WHICH ONE YOU THINK IS THE

15    DISCLOSURE OF THE STRUCTURE, IT COMES AFTER HE RAISED HIS HAND

16    AND SAID I HAVE A PROBLEM.

17         AND THEY DISCLOSE IT TO HIM ANYWAY.  AND THE REASON THAT

18    THEY DISCLOSED IT TO HIM ANYWAY WAS BECAUSE, AS WE SAW FROM THE

19    EARLIER DOCUMENTS, THEY KNEW THE WHOLE TIME THAT MERCK HAD A

20    PATENT COVERING THIS.

21              THE COURT:  WELL, LET'S BE FAIR HERE AND LOOK AT

22    FULL DISCLOSURE OF THE COMPOUND STRUCTURE TO PHIL DURETTE AND

23    DOUG PON, BOTH OF WHOM WERE ASKED IF THEY WERE FIREWALLED.

24    THEY BOTH SAID THAT THEY WERE WITHIN THE FIREWALL.

25              MS. BERNIKER:  AND I SEE THAT, YOUR HONOR.  AND I'LL

1    TELL YOU THAT I DON'T THINK ANY WITNESS ON EITHER SIDE HAS

2    EXPLAINED HOW THAT CORRESPONDS TO THE FACT THAT DR. DURETTE HAD

3    ALREADY ANNOUNCED THAT HE HAD A PROBLEM.

4         IN OTHER WORDS, I UNDERSTAND THAT THAT GIVES YOU

5    HEARTBURN.  I GET THAT.  AND I CAN'T TELL YOU EXACTLY WHY THAT

6    BULLET IS THERE OR IN THAT ORDER, BUT IT'S THERE AND WE HAVE TO

7    LIVE WITH THAT.

8         BUT WHAT IS IMPORTANT, I THINK THE POINT I WANT TO MAKE

9    THAT I THINK HAS NOT PREVIOUSLY BEEN CLEAR BEFORE, IS THAT HE

10   HAD ALREADY SPOKEN UP, AND THEY HAD AN OPPORTUNITY AT THAT

11   POINT TO SAY, YOU KNOW WHAT, WE DON'T WANT TO TELL YOU THE

12   STRUCTURE.

13        THEY COULD HAVE AT THAT POINT SAID, WAIT, YOU JUST SAID

14   THAT THIS IS RELATED TO SOMETHING YOU'RE WORKING WITH, FULL

15   STOP, WE DON'T WANT TO TALK ABOUT THE STRUCTURE.  BUT THEY MADE

16   A DECISION TO GO FORWARD ANYWAY, AND I THINK THAT DECISION IS

17   CONSISTENT WITH THE FACT THAT THEY ALWAYS KNEW THAT THIS

18   COMPOUND HAD BEEN CLAIMED BY MERCK.

19        BUT MORE IMPORTANTLY, YOUR HONOR, IN THE YEARS AFTER THIS

20   THEY NEVER SUGGESTED THAT DR. DURETTE HAD DONE ANYTHING

21   IMPROPER.  YOU HAVE SEEN AND YOU WILL CONTINUE TO SEE THAT

22   THERE ARE BACK AND FORTHS OVER AND OVER AND OVER AGAIN BETWEEN

23   THE PARTIES ABOUT WHETHER TO ENTER INTO NEGOTIATIONS.  MOST OF

24   THE TIME IT WAS ACTUALLY PHARMASSET WHO CAME TO MERCK AND SAID

25   LET'S HAVE CONVERSATIONS ABOUT DOING A DEAL TOGETHER.

1          PAM DEMAIN TESTIFIED, AND THERE'S NO CONTRADICTION TO

2     THIS, THAT NOBODY EVER SAID TO MERCK, YOU KNOW WHAT, WE THINK

3     YOU'VE REACHED THE FIREWALL OR BREACHED THE CONFIDENTIALITY

4     AGREEMENT OR YOU'VE DONE SOMETHING WRONG FOR YEARS AND YEARS

5     AND YEARS UNTIL THIS LITIGATION STARTED.

6          AND SO I UNDERSTAND THAT THERE MAY NOT BE PERFECTION IN

7     THIS DOCUMENT AND HOW TO UNDERSTAND IT, I'M NOT GOING TO

8     PRETEND LIKE THERE IS, BUT I THINK WHAT YOU SEE FROM THIS

9     DOCUMENT IS THAT THERE'S A FEW THINGS THAT I THINK ARE

10    UNAMBIGUOUSLY CLEAR.  ONE IS THAT PHIL DURETTE WAS HONEST AND

11    HE SPOKE UP IMMEDIATELY.  AND THIS IS NOT CONSISTENT WITH THE

12    EGREGIOUS PATTERN OF MISBEHAVING CONDUCT THAT THE SUPREME COURT

13    HAS TALKED ABOUT IN THE SENSE OF UNCLEAN HANDS.

14         IF HE WANTED TO GO DO SOMETHING SHADY, HE WOULD HAVE KEPT

15    QUIET AND INSTEAD OF STANDING UP IMMEDIATELY AND SAYING I HAVE

16    A PROBLEM.

17         AND, MORE IMPORTANTLY, WHAT YOU SEE HERE IS THAT THEY WERE

18    ON NOTICE OF THAT BEFORE THEY HAD DISCLOSED THE COMPOUND TO

19    HIM.

20         BUT LET'S NOW TALK ABOUT THE QUESTION WHAT DID HE DO WITH

21    THAT INFORMATION?  AND THE ANSWER, OF COURSE, IS NOTHING,

22    RIGHT?

23         WE KNOW THAT WHAT HE DID WAS NOTHING BECAUSE HE WAITED

24    UNTIL AFTER THE CLARK PATENT APPLICATION PUBLISHED BEFORE DOING

25    ANYTHING TO THE PROSECUTION.  BY THE WAY, BEFORE WE GET THERE,

1    I JUST WANT TO JUMP TO ONE OTHER THING, DDX-768, PLEASE.

2         PHARMASSET REFLECTED IN THEIR NOTES A FEW MONTHS LATER

3    THEY SAID MERCK HAS POTENTIAL I.P. IN THE SAME SPACE AND THE

4    VALUE OF THEIR I.P. HAS TO BE TAKEN INTO CONSIDERATION.  THIS

5    WOULD HAVE RESULTED IN A 50 PERCENT REDUCTION FROM THE ORIGINAL

6    OFFER.

7         THEY UNDERSTOOD AT THAT POINT IN TIME EXACTLY WHAT I THINK

8    THEY UNDERSTOOD GOING INTO THE CALL WHICH IS THAT ONCE MERCK

9    SAID THAT IT HAD PATENTS COVERING THIS ESTATE, IT WAS GOING TO

10   MAKE A DIFFERENCE IN TERMS OF MERCK'S INCLINATION TO PAY AS

11   MUCH MONEY FOR A DEAL.

12        THE COURT:  AND THAT'S EXHIBIT 1921?  IS THAT --

13        MS. BERNIKER:  IT IS EXHIBIT 1921.  AND, OF COURSE,

14   THAT'S CORROBORATED BY DR. SCHINAZI'S TESTIMONY, WHAT HE SAID,

15   AND THIS IS THE TRIAL TESTIMONY AT 1151.  HE SAID WHEN THEY

16   ASKED HIM WHAT IS YOUR BASIS FOR UNDERSTANDING OF WHY MERCK

17   PASSED ON 6130.

18        HE SAID, AS I SAID, WE WERE VERY CLOSE TO THEIR ISIS

19   PATENTS.  THEY WERE CERTAINLY CONCERNED THAT WE WERE BASICALLY

20   LICENSING A COMPOUND THAT THEY HAD ALREADY IN THIS STABLE.

21        THIS ALSO GOES TO THE WAIVER POINT, YOUR HONOR.  OBVIOUSLY

22   DR. SCHINAZI UNDERSTOOD BACK TO 2004 THAT MERCK HAD INTENDED TO

23   ENFORCE ITS PATENT.

24        I WANT TO TAKE A MINUTE TO ALSO TALK ABOUT THE SECOND SET

25   OF NOTES FROM THE SECOND CALL ON THE DUE DILIGENCE ISSUE FROM

1     MARCH 29TH, 2004.  IF I COULD GET DDX-764.

2          THIS IS THE SECOND CALL.

3               THE COURT:  I HAVE THAT.

4               MS. BERNIKER:  THIS IS NOW THE SECOND CALL, AND

5     THERE'S NO DISPUTE THAT PHIL DURETTE IMMEDIATELY WITHDREW FROM

6     ANY DUE DILIGENCE CONVERSATIONS.  AND SO HE'S NOT PRESENT ON

7     THIS CALL, BUT WE DO HAVE KEN WALTON AND VAL KAMERA, ATTORNEYS

8     FOR MERCK, AND THIS WAS DISCUSSED WITH DR. ROEMER AT TRIAL AT

9     PAGE 446.

10          AND WHAT YOU SEE HERE IS IMMEDIATELY UPON LEARNING THE

11    STRUCTURE OF THE COMPOUND, MERCK PUT GILEAD OR PHARMASSET ON

12    NOTICE THAT THEY HAD A FREEDOM TO OPERATE PROBLEM.  AND SO IN

13    THE MIDDLE OF -- I'VE GOT THIS ON THE SCREEN, TOWARD THE TOP OF

14    THE DOCUMENT YOU HAVE KEN WALTON SAYING, FOCUS ON THE

15    MERCK/ISIS FREEDOM OF OPERATION ISSUES.  AND THEN WE HAVE

16    VAL KAMERA ON THE NEXT BULLET, WHO WAS A MERCK LAWYER, SAYING

17    MERCK/ISIS DISCLOSURES DON'T SPECIFICALLY DISCLOSE THIS

18    COMPOUND.  IT'S PATENTABLE, MEANING THAT PHARMASSET CAN GET A

19    SPECIFIC PATENT ON 6130 BUT FREEDOM TO OPERATE IS A DIFFERENT

20    ISSUE.  OVERLAP WITHIN THE GENUS; CORRECT.

21          AND MR. ROEMER TESTIFIED TO THE SAME UNDERSTANDING ABOUT

22    THAT THIS WAS MERCK PUTTING THEM ON NOTICE THAT THEY HAD A

23    FREEDOM TO OPERATE ISSUE NOT TWO WEEKS AFTER THEY FOUND THE

24    STRUCTURE.

25          AND THEN IF WE CAN GO TO THE REST OF THE DOCUMENT, WHAT

1    YOU HAVE IS RAY SCHINAZI JUMPING IN AND SAYING, WELL, BEFORE WE

2    JUMP TO THE CONCLUSIONS, WE HAVE TO HAVE A FACE-TO-FACE

3    MEETING, AND THEN HE SAYS COMBINING OUR ASSETS WITH YOURS WILL

4    MAKE US UNBEATABLE.

5         SO HE UNDERSTOOD THAT BOTH PARTIES HAD IMPORTANT ASSETS

6    HERE.

7         AND THEN VAL CAME IN AND SAID, WELL, WE'RE JUST ADVISING

8    YOU ABOUT PATENTABILITY AND FREEDOM TO OPERATE.  I'M JUST HERE

9    TO TELL YOU THAT YOU HAVE A FREEDOM TO OPERATE ISSUE.

10        AND THEN MR. SCHINAZI GOES RIGHT BACK TO HIS '587 PATENT

11   FROM 1999 AND ASSERTS, FALSELY, THAT IT GENERICALLY COVERS

12   6130.  STILL TRYING TO PERSUADE MERCK.

13        NOW, OUR VIEW WITH RESPECT TO THIS CALL, YOUR HONOR, IS

14   THAT IT SHOWS AT LEAST AS MUCH MISCONDUCT ON BEHALF OF

15   PHARMASSET AS IT DOES ON BEHALF OF MERCK WHERE DR. DURETTE IS

16   THE PERSON STANDING UP AND SAYING I HAVE A PROBLEM AND

17   DR. SCHINAZI IS THE PERSON CONTINUALLY WITHHOLDING INFORMATION

18   FROM MERCK ON THE BASIS OF THESE CALLS.

19        AND THERE'S ABUNDANT AUTHORITY THAT STANDS FOR THE

20   PROPOSITION THAT WHERE THERE'S MUTUAL FAULT, YOU CANNOT FIND

21   UNCLEAN HANDS.

22        WE WOULD SUBMIT THE FAULT IS ALL ON PHARMASSET.  I'M SURE

23   THEY DISAGREE WITH THAT.

24        BUT THE POINT IS THAT I THINK IT WAS BEST PUT BY THE CASE

25   I PUT UP ON THE SCREEN AT THE END WHERE THE PHRASE WAS IN

1     HOMELY PHRASE, THE POT CANNOT CALL THE KETTLE BLACK.

2          WE SUGGEST THAT YOUR HONOR SHOULD TAKE INTO CONSIDERATION

3     THE INFORMATION THAT WAS MISREPRESENTED BY DR. SCHINAZI ON THAT

4     CALL.

5          BUT LET'S TALK FOR A MINUTE --

6               THE COURT:  YOU HAVE TO DISCLOSE SOMETHING THAT

7     YOU -- BUT RIGHT HERE YOU JUST TOLD ME THAT MERCK ALREADY IS

8     PUTTING PHARMASSET ON NOTICE OF THE FREEDOM TO OPERATE, SO WHAT

9     DOES PHARMASSET HAVE TO DISCLOSE IF MERCK ALREADY KNOWS IT?

10              MS. BERNIKER:  IN THE SECOND CALL.

11              THE COURT:  I'M LOOKING AT THE SECOND CALL.

12              MS. BERNIKER:  RIGHT.  RIGHT.  BUT IN THE FIRST CALL

13    WHAT WE SEE IS THAT THEY AREN'T -- THAT PHIL DURETTE KEEPS

14    ASKING ARE THERE OTHER PEOPLE THAT HAVE PATENTS COVERING THIS

15    COMPOUND.  WE WANT TO UNDERSTAND THE 6130 PATENT PROTECTION.

16    AND NOT ONCE DOES PHARMASSET SAY YOU DO, RIGHT?  NOT ONCE.  HE

17    KEEPS ASKING OVER AND OVER AGAIN, WHAT IS THERE?  AND THEY

18    SAID, WELL, YOU SHOULD LOOK AT OUR 1999 PATENT THAT DOESN'T

19    COVER IT, ACTING LIKE IT DOES, AND THEY ASSERTED IN THAT

20    CONVERSATION THAT THE 1999 PATENT SOMEHOW PREDATES EVERYTHING

21    ELSE.  I THINK THE WORDS HE SAID WERE BEATS EVERYTHING ELSE

22    WHICH IS ALSO NOT TRUE AND NEVER SAID ACTUALLY THAT YOU HAVE A

23    PATENT THAT COVERS IT.

24         I THINK -- MY VIEW IS THAT THEY WERE TRYING TO KEEP MERCK

25    FROM FIGURING THAT OUT.

1       NOW, I WANT TO TALK ABOUT DR. DURETTE.  HOW COULD HE HAVE

2    POSSIBLY HAVE TESTIFIED AT HIS DEPOSITION THAT HE WASN'T ON THE

3    CALL EVEN THOUGH IT TURNS OUT THAT HE WAS ON THE CALL?

4       AND GILEAD SAYS, WELL, THE MOST REASONABLE EXPLANATION OF

5    THIS IS THAT HE WASN'T BEING TRUTHFUL, AND IT WAS ALL PART OF A

6    GRAND SCHEME TO DEFRAUD THE COURT AND EVERYONE ELSE.

7       AND I THINK THE MOST REASONABLE EXPLANATION OF IT IS THAT

8    HE FORGOT, JUST LIKE PEOPLE FORGET AFTER YEARS AND YEARS AND

9    YEARS.

10      IF WE CAN GET DDX-743, PLEASE.

11          THE COURT:  HE HAD FORGOTTEN, AND HE HAD ALL KINDS

12   OF STRONG ARGUMENTS OF WHY HE WOULDN'T HAVE BEEN THERE.  IT'S

13   NOT CONSISTENT.  REALLY?  I'M SORRY, I STRUGGLE WITH THAT.

14      IF HE HAD SIMPLY MADE A MISTAKE, HE WOULD NOT HAVE ALSO

15   HAD A LIST AS LONG AS HIS ARM OF REASONS WHY HE COULD NOT HAVE

16   BEEN ON THE CALL.

17          MS. BERNIKER:  SO WHAT I THINK IS INTERESTING ABOUT

18   THAT, YOUR HONOR, IS WHAT HE SAID ABOUT WHY HE WASN'T ON THE

19   CALL WAS THAT HE THOUGHT IT WOULD HAVE BEEN A CONFLICT OR A

20   POTENTIAL CONFLICT.

21      I DON'T SEE HOW YOU WOULD POSSIBLY COME UP WITH THAT AS

22   THE LIE IF YOU WERE TRYING TO LIE ABOUT THIS.

23      IT SEEMS LIKE THE WAY TO SAY IS IT THAT I'M NOT ON THE

24   CALL --

25          THE COURT:  SO PEOPLE WHO ARE REALLY GOOD AT LIES WE

1    NEVER KNOW.  THINK OF IT THAT WAY.  AND OUR PEOPLE ARE FILLED

2    WITH JAILS OF BAD LIARS, AND THE GOOD LIARS ARE OUT THERE IN

3    THE COMMUNITY ENJOYING THEMSELVES.

4              MS. BERNIKER:  ALL RIGHT.  WELL, OBVIOUSLY IT IS

5    WHAT IT IS, YOUR HONOR.  BUT I THINK THE EVIDENCE -- I THINK

6    THERE'S AT LEAST ENOUGH EVIDENCE TO CONCLUDE THAT HE FORGOT

7    THAT'S WHAT HE SAID HAD HAPPENED, AND ACTUALLY THAT'S THE SAME

8    THING THAT HAPPENED WITH DR. PANKIEWICZ AND HE HAD THE SAME

9    ISSUE COME UP IN HIS DEPOSITION WHERE THERE WAS A QUESTION FOR

10   HIM ABOUT A DOCUMENT THAT HE DIDN'T REMEMBER AND WHAT HE SAID

11   WAS, OH, YEAH, I FORGOT ABOUT THAT.  NOW I REMEMBER AFTER

12   LOOKING AT THE DOCUMENT.

13             THE COURT:  RIGHT.  AND SO AS MR. SINGER POINTED OUT

14   AT THE DEPOSITION OF DR. DURETTE, MR. FARRELL SHOWED HIM HIS

15   OWN E-MAIL ADDRESS ON THE E-MAIL THAT WOULD HAVE PLACED HIM AT

16   THE MEETING.

17        SO WHERE DR. PANKIEWICZ LOOKED AT SOMETHING AND SAID, OH,

18   YEAH, I GUESS I WAS OR THAT WOULD INDICATE THAT I WAS THERE BUT

19   I STILL HAVE NO MEMORY OF THAT.

20        THAT'S WHAT WE EXPECT, AND THAT'S COMMON WHEN YOU HAVE A

21   MERE FAILURE TO RECALL.  AND YOU'RE RIGHT, 11 YEARS IS A LONG

22   TIME AND NOT ONLY 11 YEARS BUT FOR SOMEONE WHO HAS LEFT THE

23   COMPANY 5 YEARS AGO.  THERE ARE ALL KINDS OF REASONS WHY A

24   FAILURE TO RECALL WOULD BE VERY CREDIBLE.

25        BUT THAT'S ACTUALLY NOT WHAT WE HAD.

1              MS. BERNIKER:  UNDERSTOOD, YOUR HONOR.  I JUST

2     WANTED TO POINT OUT THAT THE E-MAIL DID NOT ACTUALLY SAY HE WAS

3     ON THE CALL.  IT JUST INVITED HIM TO THE CALL, BUT I

4     UNDERSTAND.

5              THE COURT:  YES.

6              MS. BERNIKER:  NOW, I WANT TO TALK FOR A MINUTE

7     ABOUT WHAT HE ACTUALLY DID AFTER THE 2004 CALL BECAUSE I THINK

8     THAT'S A CRITICAL DEFECT IN THE UNCLEAN HANDS ARGUMENT.

9          AND WHAT HE DID WAS NOTHING.  HE DIDN'T DO ANYTHING DURING

10    PROSECUTION UNTIL THE CLARK APPLICATION PUBLISHED.

11         AND WHEN IT PUBLISHED AND ONLY AFTER IT PUBLISHED HE MADE

12    AMENDMENTS TO HIS CLAIMS TO NARROW THEM.  AND I WANT TO GO BACK

13    TO THE NONDISCLOSURE AGREEMENT AND THE TERMS OF THAT WHICH TO

14    THIS DAY GILEAD DOES NOT SAY THAT HE VIOLATED.

15         IF WE CAN GO TO DDX-772, PLEASE.  AND THIS IS

16    EXHIBIT 2298.  AND WE TALKED ABOUT THIS A LITTLE BIT THIS

17    MORNING, YOUR HONOR, BUT, AGAIN, THIS AGREEMENT ONLY DEFINES AS

18    CONFIDENTIAL INFORMATION, INFORMATION THAT WAS NOT LAWFULLY IN

19    THE POSSESSION --

20              THE COURT:  SO THE ARGUMENT THAT MR. SINGER MADE

21    THAT I THOUGHT WAS WORTH CONSIDERING IS THAT THE PUBLICATION OF

22    CLARK BY ITSELF WAS NOT ENOUGH TO ALERT DR. DURETTE TO THIS

23    BEING THE CROWN JEWELS.  I THINK THAT'S HOW HE SAID IT.

24         THAT PHARMASSET AND LOTS OF COMPANIES PUT OUT LOTS OF

25    PATENTS ON THINGS THAT ARE -- THAT NEVER MAKE IT TO ANYTHING.

1    I MEAN, FRANKLY, MOST PATENTS DON'T EVER BECOME BLOCKBUSTERS OR

2    EVEN MARGINALLY PROFITABLE.  SO THAT WAS AN ARGUMENT THAT I

3    THOUGHT WAS REALLY WORTH CONSIDERING AND COUPLED WITH, AS

4    MR. SINGER ARGUED, DR. DURETTE'S OWN ACKNOWLEDGEMENT OF THE

5    TAINT THAT WOULD BE THERE IS THAT YOU COULDN'T HELP BUT SAY,

6    OH, THAT'S IT, EUREKA.

7         WHEREAS OTHERWISE IT WOULD HAVE BEEN, WELL, THERE'S

8    ANOTHER ONE, LET'S MOVE ON.

9              MS. BERNIKER:  UNDERSTOOD.  WELL, I THINK THE

10   EVIDENCE WITH RESPECT TO THIS SPACE AT THAT TIME IS A DIFFERENT

11   PICTURE THAN WHAT WE MIGHT HAVE IN A HYPOTHETICAL UNIVERSE.

12   YOU'LL REMEMBER THAT THERE WAS ABUNDANT EVIDENCE ABOUT IN THIS

13   SPACE THERE REALLY WEREN'T THAT MANY PEOPLE PUBLISHING ON

14   ACTIVE COMPOUNDS, AND DR. DURETTE HIMSELF SPECIFICALLY

15   TESTIFIED, AND I DON'T THINK THAT THIS IS CHALLENGED IN ANY

16   WAY, THAT HE WAS REVIEWING THE LITERATURE AND THAT'S ACTUALLY

17   HOW HE FOUND THE CLARK PATENT HAD PUBLISHED IN THE FIRST PLACE.

18   HE FOUND THAT OF HIS OWN ACCORD.  THERE'S NO BASIS TO THINK

19   THAT HE WAS LOOKING FOR IT, AND DR. OTTO SAID HE WAS DOING THE

20   SAME THING AT PHARMASSET.

21        SO I THINK THE NOTION THAT DR. DURETTE WOULDN'T HAVE

22   SOMEHOW BEEN ON NOTICE OF THE CLARK PUBLICATION AND PAID

23   ATTENTION TO IT, IS INCONSISTENT WITH --

24              THE COURT:  I DON'T THINK THAT WAS MR. SINGER'S

25   POINT THAT HE WOULDN'T HAVE SEEN IT, BUT HE WOULDN'T HAVE

1    UNDERSTOOD ITS VALUE.

2         MS. BERNIKER:  AND TO THAT I THINK WE SHOULD TALK

3    ABOUT WHAT IT ACTUALLY DISCLOSED.

4         IF WE CAN GO TO DDX-776, PLEASE.  THIS IS A CALL OUT FROM

5    THE CLARK PATENT PUBLICATION WHICH IS 825.  AND IN THE CLARK

6    PUBLICATION, THERE ARE ONLY SIX COMPOUNDS IDENTIFIED AND ONLY

7    ONE HAS ACTIVE INFORMATION ABOUT IT AND THAT'S 6130.

8         THE COURT:  THAT'S ALL WE NEEDED.

9         MS. BERNIKER:  RIGHT.  AND SO IT WASN'T HIDDEN IN

10   THERE.  IT WAS FRONT AND CENTER IN THE PUBLICATION.

11        AND DR. DURETTE TESTIFIED THAT HE SAW THAT WHEN HE READ

12   THE PATENT PUBLICATION.  SO I DON'T THINK THAT THERE'S ANY

13   LEGITIMATE ARGUMENT -- SO LET ME PUT IT THIS WAY, I DON'T THINK

14   GILEAD HAS COME ANYWHERE CLOSE TO PROVING THAT DR. DURETTE

15   WOULDN'T HAVE NARROWED HIS CLAIMS TO FOCUS ON THAT COMPOUND,

16   EVEN IF HE HAD NEVER PARTICIPATED ON ANY CONVERSATIONS WITH

17   PHARMASSET.

18        AND, OF COURSE, I'LL REITERATE WHAT YOUR HONOR KNOWS WHICH

19   IS THAT IF DR. DURETTE HAD NEVER NARROWED HIS CLAIMS AT ALL,

20   THEY WOULD HAVE ISSUED HIS CLAIMS STILL COVERING 6130.  AND BY

21   THE WAY, HIS TESTIMONY THAT HE WAS ALWAYS MONITORING PATENT

22   PUBLICATIONS IS FOUND AT THE TRANSCRIPT AT 385 TO 391.  HE

23   TALKS ABOUT IT TWICE.

24        I'M GOING TO TRY TO SKIP AHEAD IN THE INTEREST OF TIME.

25             THE COURT:  I THINK WE'RE GETTING TO THE HOUR, AND I

1    HAVE A LOT MORE TO DO SO IF YOU CAN WRAP UP.

2         MS. BERNIKER:  LET ME WRAP UP.  WITH RESPECT TO THE

3    '712 PATENT, I THINK YOUR HONOR IS ALREADY APPRISED OF THIS,

4    BUT THERE'S NO WAY TO CONNECT ANY OF THE ALLEGED MISCONDUCT

5    FROM DR. DURETTE'S 2004 CALL TO THE '712 PATENT.

6         MR. BERGMAN WASN'T THERE AT THE TIME AND WASN'T

7    PROSECUTING AT THE TIME, AND THERE'S NO COMMUNICATIONS BETWEEN

8    THE TWO THAT WOULD LEAD TO ANY SORT OF SUGGESTION THAT ANY OF

9    THIS WOULD PERTAIN TO THE '712 PATENT.  SO WE THINK IT'S

10   ENTIRELY INAPPROPRIATE TO SOMEHOW TAKE WHAT HAPPENED IN 2004

11   WITH DR. DURETTE AND SOMEHOW INFUSE IT INTO THE '712 PATENT.

12        AND I ALSO BELIEVE THAT GILEAD HAS NOT CITED ANY LEGAL

13   AUTHORITY THAT WOULD SUPPORT THAT SORT OF EXTENSION OF UNCLEAN

14   HANDS INTO A DIFFERENT PATENT.

15        THE COURT:  WELL, BECAUSE THEN THIS WHOLE ARGUMENT

16   THEY CAN WIN THE BATTLE AND LOSE THE WAR, AND THAT'S WHY I

17   RAISE THE QUESTION.

18        MS. BERNIKER:  RIGHT.

19        THE COURT:  SO IT IS SOMETHING THAT I AM CONCERNED

20   ABOUT BECAUSE FROM LISTENING TODAY, AND, OF COURSE, I HAVE MORE

21   TO CONSIDER, IT DOESN'T APPEAR THAT THERE'S ANY EVIDENCE ON THE

22   '712.

23        BUT AS WE KNEW FROM THE JURY'S VERDICT, EVEN ONE CLAIM

24   THAT WAS FOUND TO BE VALID -- TO BE INVALID, RATHER, WOULD HAVE

25   MADE A DIFFERENCE HERE.  AND SO -- OR I'M SORRY, WITH ANY

1     SINGLE CLAIM REMAINING UNTOUCHED BY THE ARGUMENTS WOULD HAVE

2     SENT THE JURY TO THE DAMAGES CONSTRUCTION AND HERE I, I --

3     YOU'RE RIGHT, THERE'S NO -- I DON'T HAVE ANY CASE LAW THAT

4     EXTENDS THE REMEDY.  HOWEVER, IT'S A -- IT SEEMS UNLIKELY THAT

5     THE LAW WOULD SAY THAT THE FACT THAT MORE THAN ONE PATENT IS A

6     PATENT-IN-SUIT WOULD SHIELD A WRONGDOER FROM A PENALTY IF I

7     WERE TO FIND UNCLEAN HANDS.

8          YOU KNOW, I HAVE TAKEN OFFENSE BY WHAT I THINK IS

9     UNTRUTHFUL STATEMENTS BY AN ATTORNEY.  IT DOESN'T MEAN IT

10    EQUALS UNCLEAN HANDS, SO I WANT TO BE CLEAR ON THAT.  AND TO

11    FIND UNTRUTH IS NOT THE DEATH NAIL OF THE ARGUMENT.  I HAVE A

12    LONG WAY TO GO ON IT, AND I UNDERSTAND THAT.

13         AND SO WE'VE BEEN THROUGH ALL OF THOSE ISSUES AND HOW THEY

14    CONNECT AND WHAT THESE THINGS MEAN.  I -- YOU KNOW, I -- THAT'S

15    REALLY WHAT I WANT TO MAKE SURE THAT YOU UNDERSTAND THAT YOU DO

16    HAVE SOME -- YOU HAVE SOME BAD FACTS, BUT IT DOESN'T MEAN I'VE

17    DECIDED THAT YOU LOSE ON THIS ISSUE.

18              MS. BERNIKER:  WE UNDERSTAND.  AND JUST ON THE '712

19    PATENT, YOUR HONOR, I WANT TO REMIND YOU THAT FOR UNCLEAN HANDS

20    THERE STILL MUST BE PROOF OF THE IMMEDIATE AND NECESSARY

21    RELATION TO THE EQUITY THAT IS SOUGHT HERE, AND SO I THINK THAT

22    IS SOMETHING THAT NEEDS TO BE CONSIDERED UNDER THE QUESTION OF

23    WHETHER OR NOT YOU WOULD BE PERMITTED.

24              THE COURT:  WELL, BUT, AGAIN, THE REMEDY IS TO NOT

25    ALLOW THIS SUIT AS OPPOSED TO INVALIDATING TWO PATENTS.  THAT'S

1    A BIG DIFFERENCE.  THAT'S A BIG DIFFERENCE.

2        AND SO A REMEDY THAT DOESN'T ALLOW THIS SUIT IS -- DOES

3    GIVE ME THE CONFINE TO CONSIDER.  I MAY BE WRONG AND MAYBE I

4    DON'T HAVE THAT AUTHORITY.

5            MS. BERNIKER:  BUT IN MY EXPERIENCE THE FEDERAL

6    CIRCUIT HAS BEEN VERY RELUCTANT, AT LEAST IN THE CONTEXT OF

7    INEQUITABLE CONDUCT, TO EXTEND MISCONDUCT FROM ONE PATENT TO

8    ANOTHER EVEN IN THE SAME FAMILY.

9            THE COURT:  BUT BECAUSE YOU'RE DEALING WITH

10   EXTINGUISHING A PROPERTY RIGHT.

11           MS. BERNIKER:  I UNDERSTAND.

12           THE COURT:  AND I CERTAINLY WOULD UNDERSTAND THE

13   WISDOM AND PROPRIETY OF THAT CONCERN.

14       I DID NOTE THAT IN THE UNCLEAN HANDS CASES, BY AND LARGE

15   THE SUPREME COURT WAS THE ONE TAKING UMBRAGE OF THE CONDUCT

16   WHERE LOWER COURTS MIGHT HAVE BEEN MORE WILLING TO ACCEPT IT.

17       SO, YOU KNOW, THAT'S NOT LOST ON ME EITHER.

18           MS. BERNIKER:  CERTAINLY.  MAY I HAVE FIVE MINUTES

19   ON WAIVER?

20           THE COURT:  YES, BUT --

21           MS. BERNIKER:  I UNDERSTAND.  I WILL BE BRIEF.  A

22   FEW HIGH-LEVEL POINTS AND I WILL SIT DOWN.  THE FIRST ONE IS

23   THERE'S NO DISPUTE THAT MERCK DID NOT HAVE AN INFRINGEMENT

24   CLAIM THAT WAS RIPE AGAINST GILEAD UNTIL DECEMBER 2013.

25           THERE WAS NO CLAIM TO WAIVE, AND THERE IS NOTHING THAT WE

1    NEEDED TO DO IN THE PERIOD BETWEEN 2007 THROUGH THE PERIOD OF

2    2013 THAT WE DIDN'T DO.

3         THERE WAS NOTHING THAT WE COULD DO --

4              THE COURT:  THAT GOES TO A LACHES DEFENSE WHICH WE

5    DON'T HAVE.

6              MS. BERNIKER:  I'M NOT SURE THAT THAT'S RIGHT, YOUR

7    HONOR.  I THINK WE WERE JUST ACCUSED OF SITTING ON OUR HANDS

8    FOR THE PERIODS 2010 TO 2013 AFTER WE HAD CLEARLY MR. PRICE ON

9    ON NOTICE OF THE FACT THAT WE BELIEVED WE HAD PATENT RIGHTS TO

10   ENFORCE AGAINST HIM AND AFTER HE TESTIFIED THAT I'LL MET YOU AT

11   THE COURTHOUSE.  HE BELIEVED AT THAT POINT IN TIME THAT MERCK

12   HAD PATENT RIGHTS THAT IT INTENDED TO ASSERT.  AND, OF COURSE,

13   THERE'S NOTHING THAT WE COULD HAVE DONE TO ASSERT THEM DURING

14   THAT PERIOD.  SO I DO THINK THAT'S RELEVANT.

15        YOUR HONOR HAS ALSO SEEN THE EVIDENCE --

16             THE COURT:  I DON'T THINK THAT THEY'RE SAYING --

17             MS. BERNIKER:  YOUR HONOR --

18             THE COURT:  I DON'T THINK THAT'S WHAT MR. SINGER OR

19   MR. BOOKER WAS ARGUING.  IT WAS THAT YOU HAD A DUTY TO ASSERT

20   YOUR RIGHT TO ROYALTY OR A LICENSE.

21             MS. BERNIKER:  WELL, FIRST OF ALL, THERE'S A FIRST

22   FEW THINGS TO RESPOND ON THAT.  AND THE FIRST ONE IS THAT WE

23   HAD CONVERSATIONS WITH ROCHE THAT PHARMASSET WAS PART OF IN

24   2011 WHERE WE WERE ASSERTING OUR RIGHTS AND PHARMASSET

25   CONSENTED TO THAT.

1       THEY UNDERSTOOD AT THAT TIME THAT WE INTENDED TO ENFORCE

2   OUR RIGHTS, OTHERWISE THEY WOULD HAVE TOLD ROCHE, DON'T WORRY

3   ABOUT IT, YOU DON'T NEED TO GET A LICENSE.

4       BUT THEY NEVER DID THAT.  SO THAT'S ONE THING.

5       AND THE SECOND THING THAT I THINK IS IMPORTANT, AND YOU'VE

6   SEEN VARIOUS BACK AND FORTHS BETWEEN THE PARTIES, INCLUDING

7   VARIOUS LICENSE PROVISIONS.  I WANT TO CALL YOUR ATTENTION TO

8   ONE OF THEM, EXHIBIT 1625, WHERE WE SPECIFICALLY -- PHARMASSET

9   SPECIFICALLY DID SUGGEST PAYING MERCK A ROYALTY.

10      BUT, OF COURSE, IN ANY EVENT, IN ALL OF THOSE

11  CONVERSATIONS, AS YOU HEARD FROM PAM DEMAIN, MERCK HAD BEEN

12  INDICATING TO PHARMASSET, AND PHARMASSET HAD BEEN REQUESTING

13  FROM MERCK, A LICENSE TO THE PATENTS THAT MERCK HAD THAT

14  RELATED TO 7977 OR SOFOSBUVIR.  THERE WASN'T SILENCE FOR

15  PERIODS OF YEARS.

16      AND FINALLY, JUDGE ALSUP'S OPINION IN THE ORACLE CASE,

17  SLIDE DDX-859, WHICH SETS FORTH, ALBEIT WITH A PREPONDERANCE OF

18  THE EVIDENCE STANDARD, SETS FORTH WHAT THIS PARTICULAR COURT

19  BELIEVES IS THE APPROPRIATE LAW IN THE CONTEXT -- NOT YOU, YOUR

20  HONOR, I'M SORRY, BUT THE NORTHERN DISTRICT OF CALIFORNIA HAS

21  STATED IS THE LAW ON WAIVER.  THAT WAIVER OF A KNOWN RIGHT MUST

22  BE MANIFESTED BY SOME OVERT ACT INDICATING AN INTENTION TO

23  ABANDON THAT RIGHT.

24          THE COURT:  YOU KNOW, I LOOKED VERY QUICKLY AT THE

25  CASES THAT WERE CITED.  I DON'T THINK THAT THEY GO AS FAR AS

1    MR. BOOKER WOULD SUGGEST, BUT I'LL LOOK AT THEM.

2              MS. BERNIKER:  I AGREE WITH YOU.  I DID THE SAME

3    THING, AND I AGREE WITH THAT, YOUR HONOR.

4         I THINK THE IMPORTANT POINT HERE IS THAT, FIRST OF ALL,

5    MERCK NEVER MADE SOME SORT OF OVERT ACT INDICATING AN INTENTION

6    TO ABANDON A RIGHT BUT EVEN IF YOU CAN ARGUE WRONGLY APPLIED

7    IMPLIED WAIVER TO THIS CASE, PHARMASSET NEVER REASONABLY

8    BELIEVED THAT MERCK WASN'T GOING TO ASSERT ITS PATENTS,

9    ESPECIALLY WHEN IT SAID I'LL MEET YOU AT THE COURTHOUSE.

10             THANK YOU, YOUR HONOR.

11             THE COURT:  THANK YOU.  MR. SINGER.

12             MR. SINGER:  I THINK I CAN DO THIS IN SIX OR SEVEN

13   MINUTES, I THINK.  WE TOOK 45; THEY TOOK 58.  IF I COULD HAVE

14   JUST A LITTLE REBUTTAL.

15             THE COURT:  YES.

16        **(PLAINTIFF'S GAVE THEIR REBUTTAL ARGUMENT.)**

17             MR. SINGER:  THANK YOU.  YOUR HONOR, I DON'T WANT TO

18   BELABOR THE FACTS.  I KNOW WE'RE GOING TO BE FILING NEW REVISED

19   FINDINGS, BUT I JUST WANT TO RESPOND TO A FEW POINTS ON THE

20   FACTS AND THEN RESPOND ON THE LAW JUST SO THAT WE'RE -- I HAVE

21   A FEELING THAT WE'RE GOING TO BE DOING MORE BRIEFING ON THE LAW

22   AS WELL.

23        BUT IN ANY EVENT, IF WE CAN HAVE PDX-1520.  JUST THE --

24   AND THIS IS JUST THE POLICY AS ARTICULATED BY THE SUPREME

25   COURT -- I'M LOSING MY VOICE.  I APOLOGIZE.  IT'S BEEN A LONG

1      FEW WEEKS, YOUR HONOR -- WITH RESPECT TO THE UNCLEAN HANDS.

2          AND IT'S IMPORTANT TO KEEP THIS IN MIND BECAUSE AT THE

3      END OF THE DAY THE PERSON AT THIS LEVEL GUARDING THE DOOR OF

4      THE COURTHOUSE IS YOUR HONOR, AND THE POLICY BEHIND IT IS A

5      SELF-IMPOSED ORDINANCE THAT CLOSES THE DOORS OF THE COURT'S

6      EQUITY TO ONE TAINTED WITH INEQUITABLENESS OR BAD FAITH

7      RELATIVE TO THE MATTER IN WHICH HE SEEKS RELIEF, HOWEVER

8      IMPROPER, MAY HAVE BEEN THE BEHAVIOR OF THE DEFENDANT.

9          AND MS. BERNIKER, YOU KNOW, OR COUNSEL USED A CLICHE --

10     CLICHE IS PROBABLY NOT THE RIGHT TERM -- WITTICISM, THE POT

11     CALLING THE KETTLE BLACK.

12         A LOT THE OF THE ARGUMENT I HEARD UNFORTUNATELY -- I

13     CHOOSE A DIFFERENT ONE -- IT IS BLAMING THE VICTIM FOR THE

14     CRIME.  AND I DON'T MEAN TO BELITTLE THE REAL SITUATION THAT

15     OCCURS, BUT PHARMASSET RELIED ON WHAT MERCK SAID TO THEM,

16     RIGHT?  MERCK SET UP THE FIREWALL AND SUGGESTED THAT TO

17     PHARMASSET AND RELIED ON THE FIREWALL.

18         DR. DURETTE TESTIFIED THAT HE SAID HE WAS AT THE FIREWALL

19     BEFORE THE CONVERSATION, AND HE TESTIFIED AGAIN THAT HE GAVE

20     THE FIREWALL AFTER THE CONVERSATION.

21         MR. ROEMER TESTIFIED IN THIS COURT THAT ACTUALLY THE

22     STRUCTURE WAS GIVEN BEFORE MR. DURETTE OR DR. DURETTE SAID HE

23     HAD THE CONFLICT.  WHEN WE LOOK AT THE TESTIMONY WE'LL BE ABLE

24     TO PROVIDE IT FOR YOU.

25              THE COURT:  I'M SORRY, I DON'T THINK THAT'S THE

1     ORDER OF THE TESTIMONY.  THE ROEMER NOTES DON'T BEAR OUT THAT

2     THE STRUCTURE WAS REVEALED BEFORE --

3               MR. SINGER:  I BELIEVE WHEN YOU LOOK AT MR. ROEMER'S

4     TESTIMONY, HE SAYS THAT THEY'RE TALKING ABOUT THE STRUCTURE OF,

5     THEY'RE GIVING STRUCTURAL INFORMATION TO DR. DURETTE ABOUT 6130

6     AND THEN HE RAISES A --

7               THE COURT:  WELL, HE CERTAINLY HAD ENOUGH

8     INFORMATION TO BE ABLE TO STATE, AND I THINK THIS IS IN THE

9     SAME SPACE OF WHAT I'M WORKING ON.

10              MR. SINGER:  THAT'S RIGHT.

11              THE COURT:  CLEARLY.

12              MR. SINGER:  AND, AGAIN, THIS IS IMPORTANT BECAUSE

13    PHARMASSET IS A SMALL COMPANY, AND IT'S RELYING ON WHAT MERCK

14    HAS REPRESENTED TO IT ABOUT IT.

15         AND IF YOU LOOK, AGAIN, YOU'LL SEE, I THINK IF WE GO TO

16    PDX-1508, YOU CAN SEE IT'S VERY IMPORTANT THAT -- WHOOPS.  YOU

17    HAD IT.  YOU ZOOMED BY IT.  IT WAS 1508, AND THERE YOU GO.

18         THIS IS DR. SCHINAZI SAYING YOU CAN RESPOND TO QUESTIONS.

19    YOU'RE AUTHORIZED TO SEND TO THE FIREWALLED PERSON.  THIS WAS

20    IMPORTANT FOR THEM, RIGHT?  THE FIREWALL.  THE FIREWALL

21    SEPARATE FROM THE HCV PROGRAM.

22              THE COURT:  I THINK THE REAL QUESTION, AND OBVIOUSLY

23    FROM MY COMMENTS I THINK YOU UNDERSTAND THAT I HAVE -- I'M

24    FINDING PERSUASIVE YOUR ARGUMENT ON DR. DURETTE'S CONDUCT.

25         AND THE REAL ISSUE IS HOW DOES THIS APPLY WITH THE JURY'S

1    VERDICT?  AND THAT'S REALLY THE KEY BECAUSE I AM AFRAID THAT AS

2    I GO THROUGH THIS, THAT I WILL HAVE NO REMEDY FOR YOU BECAUSE

3    OF THAT VERDICT.

4            MR. SINGER:  VERY WELL.  LET ME JUST ADDRESS THAT,

5    YOUR HONOR.  I'LL LEAVE THE EVIDENCE FOR OUR REVISED FINDINGS

6    BECAUSE I THINK WE WILL HAVE SOME THAT ADDRESS SOME OF THE

7    ARGUMENTS OF COUNSEL.

8        AND I WANT TO GO BACK TO THE LEVITON CASE BECAUSE I

9    ACTUALLY THINK FACTUALLY IT'S NOT DISTINGUISHABLE TO THE EXTENT

10   THAT ALL CASES HAVE DISTINGUISHABLE FACTS, YOUR HONOR.

11       THERE ISN'T A CASE, RIGHT, WHERE WE HAVE WHAT ACTUALLY

12   HAPPENED HERE AND WAS DECIDED BY THE FEDERAL CIRCUIT BECAUSE

13   THEN WE WOULDN'T BE SEARCHING FOR ANSWERS IN THE CASE LAW.

14       AND I THINK IT'S IMPORTANT TO SEE IN THE CASE, 606 F.3D,

15   1353, WHAT THEY'RE TALKING ABOUT, WHAT THEY'RE REALLY TALKING

16   ABOUT, AND THIS IS THE ISSUE, IS THAT PRIORITY, WHEN THE COURT

17   GOES INTO THESE AUTHORITIES, YOU WILL SEE PRIORITY, WRITTEN

18   DESCRIPTION PLUS ENABLEMENT, THAT'S WHAT ESTABLISHES PRIORITY,

19   AND INVENTION.  THOSE ARE TWO DISTINCT CONCEPTS.  THEY HAVE

20   THINGS THAT INTERMIX AT TIMES, BUT THOSE TWO THINGS ARE

21   DISTINCT IN THE PATENT LAW.  AND IT MAY BE COUNTERINTUITIVE,

22   BUT THAT'S WHAT THE LAW IS.

23       AND I THINK LEVITON DOES A GOOD JOB OF EXPLAINING IT,

24   RIGHT?

25       AND THEY'RE TALKING ABOUT THESE SITUATIONS WHERE THERE ARE

1    TWO APPLICATIONS AND SOMEONE IS TRYING TO PROSECUTE THE EARLIER

2    ONE, AND THE QUESTION IS WHETHER OR NOT THEY ACTUALLY INVENTED

3    WHAT WAS IN THE EARLIER ONE, EVEN IF THAT HAS PRIORITY.

4            THE COURT:  AND I THINK, UNFORTUNATELY, THAT

5    ARGUMENT IS GOING TO HAVE TO BE MADE ON JMOL.  AND, OF COURSE,

6    I'LL GIVE YOU AS MUCH CONSIDERATION ON THIS AS POSSIBLE, BUT I

7    THINK BASED UPON MY DETERMINATION THAT FORM THE JURY

8    INSTRUCTIONS AND THE VERDICT FORM, AND THEN THE VERDICT OF THE

9    JURY, THAT THIS IS THE -- THIS IS WHERE THE CASE STANDS AT THIS

10   JUNCTURE.

11           MR. SINGER:  AND I UNDERSTAND THAT, YOUR HONOR.  I

12   GET THAT POINT.  WE WILL MAKE THAT ARGUMENT ON JMOL.

13       ALL I'M TRYING TO GET AT, YOUR HONOR, IN TERMS OF THE

14   UNCLEAN HANDS, IS THAT IT IS A SEPARATE ARGUMENT BUT THERE'S,

15   THERE'S MULTIPLE ARGUMENTS ON UNCLEAN HANDS.

16       ONE IS THE DERIVATION POINT, AND I JUST WANTED TO DRAW THE

17   COURT'S ATTENTION THAT THAT'S WHAT THE CASES SAY ON THE

18   SPECIFIC DERIVATION POINT.

19       AND ALL OF THE OTHER CONDUCT, THE UNTRUTHFULNESS BEFORE

20   THIS TRIBUNAL AND THE DEPOSITION CONDUCT AND THE UNTRUTHFULNESS

21   WITH PHARMASSET, FIRST OFF, ON THE UNTRUTHFULNESS AT HIS

22   DEPOSITION, HOW ARE WE SUPPOSED TO KNOW WHAT THIS INDIVIDUAL IS

23   GOING TO TESTIFY HERE IN THIS COURTROOM VERSUS WHAT HE IS GOING

24   TO SAY AT HIS DEPOSITION?

25           AS TO THE UNTRUTHFULNESS TO PHARMASSET, THAT WAS PATENT

1    AND THAT WAS PART OF THE ALLEGATION OF DERIVATION WHEN YOU LOOK

2    THROUGH OUR INTERROGATORY RESPONSE AND THERE ARE SEVEN MORE

3    PAGES.  SO THAT IS A SEPARATE GROUNDS OF UNCLEAN HANDS THAT

4    COULD BE FOUND BY THE COURT, LITIGATION MISCONDUCT, THAT'S ALL

5    I'M SAYING THERE.

6         AS TO THE DERIVATION POINT, I JUST WANT TO ALERT THE COURT

7    TO THAT CASE.

8              THE COURT:  SO IF I WERE TO DENY YOUR MOTION FOR

9    JMOL, OR I DON'T NEED TO SAY IT THAT WAY BECAUSE I'M NOT

10   CONSIDERING THAT, TAKING THE JURY VERDICT AND THE INSTRUCTIONS

11   THAT I HAVE GIVEN IN THE CASE, SO WHAT IS THE LAW OF THE CASE

12   AS WE STAND HERE TODAY, IS THERE A PATH FOR YOU TO WIN ON THIS

13   ARGUMENT?

14             MR. SINGER:  TAKING THE JURY INSTRUCTION WHICH SAYS

15   THAT IF YOU FIND WRITTEN DESCRIPTION, THERE CANNOT BE

16   DERIVATION?

17             THE COURT:  YES.

18             MR. SINGER:  WELL, YOUR HONOR, I CAN'T SAY SEPARATE

19   AND APART FROM DR. DURETTE'S CONDUCT, OKAY, THAT ON THE

20   DERIVATION POINT, I THINK YOU HAVE TO STICK WITH THAT POINT.

21        BUT ON UNCLEAN HANDS, THAT DOESN'T ANSWER THE QUESTION OF

22   WHETHER OR NOT, RIGHT, WHETHER OR NOT THESE PATENTS WOULD HAVE

23   EXISTED BUT FOR THE UNCLEAN HANDS.  AND THE WHOLE LIE IN WAIT

24   POINT THAT YOU AND I HAVE DISCUSSED ON MY OPENING ARGUMENT, I

25   THINK THE FACTS ESTABLISH THAT.  WE BELIEVE BASED ON THE FACTS

1    UNCONSCIONABLE BEHAVIOR THAT DOES NOT SHOW EQUITY IN DEALING

2    WITH PHARMASSET AND IN DEALING WITH THE DEPOSITION AND THE

3    TRIBUNAL AND THIS COURT.

4          THE COURT:  AND THAT'S WHY I'M STRUGGLING AT THIS

5    PHASE.  I KNOW WHAT EGREGIOUS CONDUCT THE SUPREME COURT HAS

6    DESCRIBED AS QUALIFYING AS UNCLEAN HANDS, AND THIS CASE DOES

7    NOT EQUAL ANY OF THE FACTS IN KEYSTONE OR HAZEL-ATLAS OR

8    PRECISION.  THEY ARE NOT THE FLOOR FOR UNCLEAN HANDS.  IT'S NOT

9    THE MINIMUM IN THOSE CASES.  SO THAT IS MY STRUGGLE.

10         MR. SINGER:  THAT IS YOUR STRUGGLE BECAUSE THE IRONY

11   OF ALL OF THIS, RIGHT, IS THAT THOSE CASES HAVE EGREGIOUS

12   FACTS, I THINK WE CAN ALL AGREE.

13         BUT INEQUITABLE CONDUCT, AND WE'RE NOT ALLEGING

14   INEQUITABLE CONDUCT, RIGHT, GREW OUT OF THOSE CASES WHERE THE

15   FACTS ARE OFTEN, THEY'RE FAR LESS, RIGHT?  A FAILURE TO

16   DISCLOSE A REFERENCE THAT YOU KNEW ABOUT, RIGHT, WITH AN INTENT

17   TO DECEIVE.

18         WE SURE HAVE AN INTENT TO DECEIVE HERE, RIGHT, AND WE HAVE

19   A FAILURE TO BE TRUTHFUL AND JUST AS A GENERAL MATTER AN INTENT

20   TO DECEIVE PHARMASSET WE THINK IS ESTABLISHED BY THE

21   REPRESENTATIONS THAT HE'S WITHIN THE FIREWALL TWICE ON THAT

22   PHONE CALL AND ALSO WITH RESPECT TO HIS FALSE TESTIMONY.

23         AND, YOU KNOW, SO WE'RE AT THAT LEVEL OF CONDUCT, IF YOU

24   WILL, THAT HAS GROWN OUT OF THE UNCLEAN HANDS JURISPRUDENCE.

25         THE COURT:  OR IS IT MORE UNLIKELY THAT THE

1    INEQUITABLE CONDUCT DOCTRINE GREW BECAUSE THERE WERE

2    CIRCUMSTANCES WHERE THIS IMPROPER CONDUCT, UNETHICAL CONDUCT

3    EXISTED BUT DIDN'T RISE TO LEVEL OF UNCLEAN HANDS AND SO A

4    HIGHER BURDEN OF PROOF, NOT A BURDEN OF PROOF, BUT A HIGHER SET

5    OF ELEMENTS, THIS MATERIALITY, THIS BUT FOR REQUIREMENT HAS

6    GROWN TO -- SO THAT IT CAN ENCOMPASS THIS BROADER SET OF BAD

7    ACTS.

8         AND SO THIS CONDUCT THAT YOU HAVE PRESENTED TO THE COURT

9    MAY SIMPLY NOT FALL WITHIN THIS NARROWED AMBIT OF UNCLEAN

10   HANDS.

11           MR. SINGER:  AND THAT, YOUR HONOR, IS WHERE -- THE

12   COURT WOULD BE WELL ADVISED TO TURN TO THE OTHER CASES THAT ARE

13   NOT IN THE PATENT CONTEXT TO SEE WHAT IS UNCLEAN HANDS JUST AS

14   A GENERAL MATTER.

15           THE COURT:  I'M GOING TO LET YOU HELP ME OUT ON

16   THAT.  WE STARTED THIS MORNING, AND I AM GOING TO HAVE YOU

17   BRIEF THAT BECAUSE I DON'T KNOW THE BOUNDARIES.

18        SO UNTIL I KNOW THE BOUNDARIES, I DON'T KNOW IF IT FALLS

19   WITHIN.  IT'S A LITTLE BIT LIKE THAT DRAWING THAT WE LOOKED AT

20   WITH THE LITTLE DOTS ON IT, AND I DON'T KNOW IF WE'RE IN IT OR

21   OUT OF IT RIGHT NOW.  I DON'T KNOW.  AND WHENEVER YOU ALLEGE

22   THAT AN ATTORNEY HAS LIED UNDER OATH, THAT'S A SERIOUS

23   ALLEGATION.

24           MR. SINGER:  OKAY.  WELL, I HOPE WE HAVE GIVEN YOU

25   SOMETHING TO THINK ABOUT.  THANK YOU FOR YOUR TIME.

1          THE COURT:  JUST TO BE CLEAR, THE PARTIES MAY AMEND

2    YOUR PROPOSED FINDINGS OF FACT, AND THAT WILL BE MY ROAD MAP OF

3    THE EVIDENCE THAT I AM TO CONSIDER WHEN I LOOK AT THESE ISSUES.

4    SO I'M GOING TO LET YOU DO THAT.

5          I WOULD LIKE THE FURTHER BRIEFING ON UNCLEAN HANDS AS TO

6    WHAT ITS BOUNDARIES MIGHT BE OR THE SCOPE OF IT.  AND THEN, OF

7    COURSE, ON THE WAIVER ISSUE I SUPPOSE WE'RE STILL GRAPPLING

8    WITH THE BURDEN OF PROOF THERE BECAUSE -- BECAUSE I CERTAINLY

9    THINK THAT I CERTAINLY NEED A LITTLE BIT MORE THERE.  I DON'T

10   THINK THAT WE'VE COME UP WITH ENOUGH.  MAYBE THERE WON'T BE

11   MUCH, BUT I WOULD LIKE THAT.

12         NOW, WE HAVE A NUMBER OF OTHER ISSUES TO COVER JUST SO I

13   DON'T FORGET IT.

14         ON THIS BRIEFING, I DON'T -- I'M -- AS I SAID, I'M GOING

15   INTO SOME OTHER CASES AND SO I DON'T NEED TO HAVE YOU PRESENT

16   THIS TO ME IMMEDIATELY FOR IT JUST TO SIT ON MY SHELF.

17         SO HOW MUCH TIME WOULD YOU LIKE?

18         MR. SINGER:  I'M THINKING TO MYSELF.  I'M LOSING

19   SOME OF MY TEAM TO VACATION.

20         MR. GENDERSON:  THEY'RE ASKING FOR 60 DAYS.

21         THE COURT:  THAT'S WAY TOO MUCH.

22         MR. GENDERSON:  I'D LIKE TO DO IT A LITTLE SOONER

23   THAN THAT.

24         THE COURT:  SO HERE'S MY PROBLEM.  I REMEMBER THE

25   CASE NOW.  AND AS OTHERS COME, YOU JUST DON'T WANT ME LOSING --

1    THAT WOULD BE WAY TOO LONG.

2              MR. GENDERSON:  HOW ABOUT THREE WEEKS, YOUR HONOR?

3              THE COURT:  THREE WEEKS WOULD BE GREAT.  AND THAT

4    WOULD GET US TO APRIL 22ND.  DOES THAT WORK?  THAT'S A FRIDAY

5    SO THAT MAKES IT A LITTLE EASIER.

6              MR. GENDERSON:  YEAH, BETTER THAN A MONDAY.

7              THE COURT:  YES, IT IS.

8              MR. SINGER:  AND, YOUR HONOR, ONE FINAL THING.  I'M

9    GOING TO GET IN TROUBLE IF I DON'T PRESERVE A 52(C) MOTION FOR

10   MS. FLANAGAN AND WHICH MAY EVEN BE WORSE THAN THE APPELLATE

11   COURT.

12        COULD I HAND UP -- WE UNDERSTAND THE COURT WOULD RESERVE.

13             THE COURT:  YES, I WILL RESERVE AND YOU CERTAINLY

14   MAY, YES, YES.

15             MR. SINGER:  THANK YOU VERY MUCH.  THAT WAS ALL I

16   HAD TO REMEMBER TO DO.  THANK YOU.

17             MR. GENDERSON:  YOUR HONOR, PAGE LIMITS ON THE

18   BRIEFING?

19             THE COURT:  YOU KNOW, THESE ARE PRETTY NARROW

20   THINGS, AND I REALLY THINK ON EVERYTHING THAT I WOULD ASK FOR

21   THE TEN PAGES.  IT SHOULD BE AMPLE.

22             MR. SINGER:  I THINK 20.  NO?  TOO MUCH?

23             THE COURT:  THE ENTIRE SUMMARY JUDGMENT MOTION IS

24   25 PAGES SO --

25             MR. GENDERSON:  ARE WE TALKING ABOUT THE FINDINGS OF

1  FACT, TOO?

2          THE COURT:  THAT'S COMPLETELY SEPARATE.  I DIDN'T

3  LIMIT YOU ON THE FINDINGS OF FACT.

4          MR. GENDERSON:  COULD WE HAVE 15?

5          THE COURT:  SURE.

6          MR. GENDERSON:  AND ON THE --

7          THE COURT:  AND CAN I TELL YOU THAT I DON'T LIKE

8  FOOTNOTES AND THERE SHOULDN'T BE MANY.

9          MR. GENDERSON:  YES.  AND ON THE FINDINGS OF FACT

10  WE'RE SUBSTITUTING FOR WHAT WE HAVE NOW.

11          THE COURT:  I'D LIKE YOU TO HAVE A COMPLETE

12  SUBSTITUTION AND SO THAT GIVES YOU A CHANCE TO GO BACK THROUGH

13  IT NOW, AND YOU'VE SEEN THE EVIDENCE, AND YOU'VE SEEN HOW IT'S

14  PLAYED OUT.  AND THEN I HAD ASKED YOU TO IDENTIFY ALL OF THE

15  EVIDENCE IN THE ENTIRE RECORD THAT YOU THINK RELATES TO THE

16  FINDINGS THAT YOU'RE ASKING ME TO MAKE AND THAT WILL BECOME MY

17  ROAD MAP OF THE EVIDENCE TO REVIEW.

18          MR. RABINOWITZ:  YOUR HONOR, TWO SUPPLEMENTAL

19  THINGS.  COULD WE PERHAPS ASK FOR A DEADLINE OF THE 21ST?  THE

20  22ND IS THE EVE OF PASSOVER.

21          THE COURT:  THEN JUST HAVE IT DONE EARLIER.  YOU'LL

22  BE FILING THESE AT THE SAME TIME.  I MEAN, I KNOW IT IS.  I

23  RECOGNIZE THAT.

24      IS THERE ANYTHING PREVENTING YOU FROM --

25          MR. RABINOWITZ:  WELL, EACH SIDE WOULD WANT TO WAIT

1    UNTIL THE OTHER SIDE IS FILING SIMULTANEOUSLY.

2              MR. GENDERSON:  WE CAN STILL FILE IT.  WE'LL TAKE

3    CARE OF THE FILING.

4              MR. SINGER:  STEPHEN AND I WILL BE INDISPOSED.

5              MR. GENDERSON:  AS WILL I, BUT THERE WILL BE PEOPLE

6    WHO COULD FILE.

7              THE COURT:  BUT IF YOU WANT THE 21ST, THAT'S THE

8    THREE WEEKS.

9              MR. SINGER:  THERE ARE PLENTY OF MEMBERS OF MY TEAM

10   WHO CAN HANDLE THE FILING OF THE 22ND.

11             THE COURT:  YOU JUST HAVE TO WORK AHEAD AND NOT WORK

12   TO THE DEADLINE, MR. RABINOWITZ.

13             MR. RABINOWITZ:  AND, YOUR HONOR, THE OTHER THING IS

14   IF WE'RE GOING TO FILE ADDITIONAL BRIEFING, CAN WE UPDATE OUR

15   CONCLUSIONS OF LAW TO ACCOUNT FOR IT TO --

16             THE COURT:  WELL, CLEARLY THAT WILL HELP ME IF

17   THERE'S NOT A DISCONNECT.  SO, YES, YOU MAY IF YOU WISH.

18        ALL RIGHT.

19             MR. SINGER:  THANK YOU, YOUR HONOR.

20             THE COURT:  LET ME MOVE ONTO PERHAPS THE EASIER

21   ISSUE, THEN, WILL BE THE BRIEFING ON THE ONGOING ROYALTY.

22        IT APPEARS THAT BOTH PARTIES AGREE THAT I SHOULD SEVER THE

23   ISSUE AND CREATE A NEW CASE.

24        THE OBJECTION APPEARS TO BE ON WHETHER THERE WOULD BE

25   ADDITIONAL DISCOVERY AND AN EVIDENTIARY HEARING.

1          MR. FISHER?

2              MR. FISHER:  YOUR HONOR, A LITTLE CLARIFICATION ON

3      THAT, YOUR HONOR.  MERCK AND IONIS ARE AGREEABLE TO SEVERING IF

4      YOU BELIEVE THAT WE NEED TO HAVE A NEW EVIDENTIARY HEARING.

5      AND IF WE WANT TO DO THAT, THERE'S DISCOVERY THAT IS NEEDED TO

6      UNDERSTAND WHAT WITNESSES ARE GOING TO BE SAYING IN THIS NEW

7      WORLD.  AND IN THAT WORLD, YES, WE BELIEVE THAT SEVERING WOULD

8      BE APPROPRIATE.

9          NOW, UNDER YOUR HONOR'S INSTRUCTION, WE WENT BACK AND

10     LOOKED AT THE LAW AND YOU HAVE OUR BRIEFING ON THAT.

11             THE COURT:  YES.

12             MR. FISHER:  IT'S NOT CLEAR TO ME THAT WE NEED TO

13     HAVE A NEW EVIDENTIARY HEARING.  IT'S CERTAINLY WITHIN YOUR

14     HONOR'S DISCRETION.  IF YOU THINK IT'S HELPFUL IN ORDER TO

15     PREPARE FINDINGS ON WHAT AN ONGOING ROYALTY RATE SHOULD BE, IT

16     CAN BE DONE, BUT IT'S ALSO DONE WITHOUT SUCH A HEARING.

17         SO IT'S REALLY A DISCRETIONARY SITUATION.

18             THE COURT:  YOU KNOW, IT IS, AND WE HAVE AN

19     INTERESTING STATE OF THE RECORD WHERE I KNOW MS. BROOKS HAS

20     COMMENTED BEFORE THAT MERCK HAS NO EXPERT REPORT ON AN ONGOING

21     ROYALTY, SO I'LL JUST HAVE ATTORNEY ARGUMENT?

22             MR. FISHER:  YOUR HONOR, IT'S OFTEN --

23             THE COURT:  WHICH IS FINE.

24             MR. FISHER:  FRANKLY, YOUR HONOR, IT'S OFTEN DONE ON

25     THE TRIAL RECORD BEFORE THE JURY TRIAL, AND THERE'S BRIEFING

1    AND ARGUMENT.

2        THE COURT: AND SO YOU CERTAINLY COULD DO THAT AND

3    MS. BROOKS HAS ASKED FOR AN EVIDENTIARY HEARING. SO THE

4    QUESTION IS NOT CAN I ALLOW AN EVIDENTIARY HEARING, CAN I

5    PREVENT ONE? CAN I PRECLUDE THE PLAINTIFF FROM PUTTING ON

6    ADDITIONAL EVIDENCE? AND THAT'S A DIFFERENT ISSUE. I DON'T

7    KNOW HOW MUCH -- YOU KNOW, YOU SAY I HAVE DISCRETION, BUT I

8    HAVE SOME CONCERN.

9        MS. BROOKS: I'M SORRY. I DIDN'T MEAN TO INTERRUPT.

10    NO, PLEASE.

11        MR. FISHER: SO I THINK OUR VIEW ON THAT, YOUR

12    HONOR, AND THEN, OF COURSE, MS. BROOKS CAN RESPOND, IS THAT THE

13    ISSUES -- AND MR. EPNER CAN ADDRESS PRECLUSION OF RAISING NEW

14    ISSUES AT THIS POINT GIVEN THE STATE OF THE DISCOVERY RECORD

15    FROM THE BEGINNING OF THE CASE.

16    BUT THE THINGS THAT I UNDERSTAND THAT GILEAD WANTS TO

17    RAISE, THINGS LIKE NEW SALES PROJECTIONS, THERE'S A BUCKET OF

18    INFORMATION THAT WE ASKED FOR IN DISCOVERY, AND IT WASN'T

19    PROVIDED. AND, AGAIN, I'LL LET MR. EPNER ADDRESS THAT

20    PRECLUSION ASPECT.

21    BUT SOME OTHER ISSUES ALSO FALL INTO THE BUCKET OF THINGS

22    THAT CERTAINLY COULD HAVE BEEN RAISED DURING THE EXPERT PHASE,

23    ARGUMENTS LIKE STACKING AND THE FACT THAT OTHER CASES --

24        THE COURT: SO I WOULD NOT HAVE LET THE JURY HEAR

25    ANY OF THAT BECAUSE, IN FACT, AS I SIT HERE TODAY, IT'S -- TO

1    MY KNOWLEDGE, GILEAD IS NOT PAYING A LICENSE TO ANYONE ELSE AND

2    THE -- IT APPEARS THAT THE LANDSCAPE IS CHANGING.

3         AND SO I'M JUST, I'M JUST -- YOU KNOW, I'M NOT SURE THAT

4    YOU'LL HAVE ANY EVIDENCE ON STACKING, BUT CERTAINLY WHILE YOU

5    WERE DOING DISCOVERY YOU DIDN'T AND THINGS DO CHANGE.  AND

6    BASED ON YOUR BRIEFING, BOTH OF YOUR BRIEFING, CLEARLY WHETHER

7    I APPLY GEORGIA-PACIFIC FACTORS OR NOT OR SOME MODIFIED

8    CURTAILED VERSION OF IT, I AM GOING TO BE STANDING AT THE TABLE

9    IN -- AT THE DATE OF THIS NEXT HEARING, NOT BACK IN 2013.

10        SO I THINK BOTH OF YOU HAVE INDICATED THAT.

11             MR. FISHER:  I THINK THAT THAT'S FAIR ENOUGH.  I

12   MEAN, STACKING IS A GOOD EXAMPLE WHERE NOTHING HAS REALLY

13   CHANGED AS FAR AS I'M AWARE FROM BACK IN 2013 WHEN THE

14   HYPOTHETICAL NEGOTIATION WAS GOING ON UNTIL TODAY.

15        I MEAN, THE CASES THAT GILEAD HAS ALLUDED TO WHERE THERE

16   MIGHT BE A STACKING SITUATION IN THE FUTURE HAVE BEEN GOING ON

17   FOR A NUMBER OF YEARS AND, YOU KNOW, IF AN ARGUMENT WAS GOING

18   TO BE MADE, IT COULD HAVE BEEN MADE IN THE PAST.  WE DON'T SEE

19   WHY NOW SUDDENLY THERE HAS TO BE A NEW EVIDENTIARY HEARING.

20             THE COURT:  ALL RIGHT.  SO, MS. BROOKS, YOU KNOW,

21   I -- IT WAS CLEAR THAT I WAS CAUGHT OFF GUARD AT THE END OF THE

22   TRIAL.  I THOUGHT I HAD BEEN SO CLEAR TO SAY THAT THIS IS GOING

23   TO BE THE WHOLE TRIAL AND ALL OF THE BENCH ISSUES AND THIS IS A

24   BENCH ISSUE.

25        I'M NOT GOING TO TAKE A HARD POSITION AND JUST SAY, YOU

1    KNOW, YOU MISCONSTRUED WHAT WAS CLEAR.  SO I AM WILLING TO

2    PROVIDE A LIMITED AMOUNT OF TIME FOR ADDITIONAL EVIDENCE.

3        I DON'T SEE THIS BEING A COMPLETE REOPENING OF DISCOVERY.

4    SO LET ME JUST HEAR YOUR THOUGHTS ON THAT.

5            MS. BROOKS:  IF I COULD, YOUR HONOR, BECAUSE I THINK

6    IT'S VERY IMPORTANT TO MAKE THE RECORD CLEAR HERE BECAUSE WHAT

7    I HEARD TODAY WAS VERY DISHEARTENING AS TO HOW WE GOT SO OFF ON

8    THIS LAW OF DERIVATION AND HOW ONE SIDE SAYS IF IT'S SUPPORTED

9    BY WRITTEN DESCRIPTION AND ENABLEMENT, YOU CAN'T HAVE

10   DERIVATION.  AND WE ARE GOING TO SHOW YOUR HONOR CASE LAW THAT

11   SAYS JUST THE OPPOSITE.

12       AND SO WHAT I'M CONCERNED ABOUT IS THAT WE'RE ABOUT TO GO

13   DOWN THAT SAME ROAD AGAIN ON THIS ISSUE.

14       MERCK SAID IN THEIR MOVING PAPERS, AND THIS IS DOCKET

15   ENTRY NUMBER 395, IT'S DEFENDANTS BRIEF ON ISSUES RELATING TO

16   ONGOING ROYALTIES, THEY AGREE THAT IF YOUR HONOR IS GOING TO

17   ALLOW ADDITIONAL EVIDENCE AND TO HAVE AN EVIDENTIARY HEARING,

18   THEN YOUR HONOR SHOULD SEVER AND PUT THAT ASIDE TO EVEN

19   POST-APPEAL IF YOUR HONOR WISHES.

20       BUT THEY THEN ARGUE THAT YOUR HONOR DOES NOT HAVE TO TAKE

21   ADDITIONAL EVIDENCE OR HOLD AN EVIDENTIARY HEARING.  AND ON

22   PAGE 4 OF THEIR BRIEF THEY SAY AS FOLLOWS, OTHER COURTS,

23   HOWEVER, HAVE HEEDED THE FEDERAL CIRCUIT'S GUIDANCE AND NOT

24   ADMITTED ADDITIONAL EVIDENCE.

25       THEY THEN CITE FIVE CASES.

```
1              THE COURT:  UH-HUH.

2              MS. BROOKS:  THEY THEN CHARACTERIZE THOSE CASES AS

3    FOLLOWS:  AS THESE CASES RECOGNIZE, THERE IS NO REQUIREMENT TO

4    CONDUCT AN ADDITIONAL HEARING AND CERTAINLY NO REQUIREMENT TO

5    PERMIT THE PARTIES TO INTRODUCE NEW EVIDENCE, INCLUDING NEW

6    EXPERT OPINIONS.

7              NOW, I'D LIKE TO TAKE YOUR HONOR BRIEFLY THROUGH THOSE

8    FIVE CASES THAT THEY HAVE REPRESENTED TO YOUR HONOR --

9              THE COURT:  OF COURSE YOU MISS THEIR LAST SENTENCE,

10   WHICH IS PROBABLY THE MOST BENEFICIAL TO YOU, WHERE IT IS CLEAR

11   WHAT THE JURY DID AND WHY THEY DID IT.

12             AND I WOULD SAY THERE IS ANYTHING BUT CLARITY.

13             MS. BROOKS:  THANK YOU, YOUR HONOR.  BUT WHAT IS

14   MORE DISTURBING TO ME IS THAT THOSE FIVE CASES DON'T SAY WHAT

15   THEY SAY THEY SAY.

16             SO THE FIRST CASE THEY CITE IS I/P ENGINE INC. FOR THE

17   PROPOSITION THAT THESE CASES REQUIRE THAT THERE IS NO

18   REQUIREMENT TO CONDUCT AN ADDITIONAL HEARING AND CERTAINLY NO

19   REQUIREMENT TO PERMIT THE PARTIES TO INTRODUCE NEW EVIDENCE.

20             IN THE I/P ENGINE CASE, THIS IS WHAT THE COURT SAID ABOUT

21   AN ONGOING ROYALTY, "ASCERTAINING THE APPROPRIATE RATE AFTER A

22   VERDICT OF INFRINGEMENT REQUIRES THE CONSIDERATION OF

23   ADDITIONAL FACTORS AND EVIDENCE."

24             THIS CASE LITERALLY SAYS THE OPPOSITE OF WHAT WAS

25   REPRESENTED IN THE PAPERS.
```

1    IN ADDITION, THAT ADDITIONAL EVIDENCE THAT THE COURT TOOK

2    INTO CONSIDERATION IN I/P ENGINE WAS AN EXPERT DECLARATION AS

3    TO THE CHANGED CIRCUMSTANCES.

4    THE NEXT CASE THEY CITE FOR THAT PROPOSITION, YOUR HONOR,

5    MORPHO DETECTION.  IN THAT CASE THE COURT, IN FACT, DID ALLOW

6    ADDITIONAL EVIDENCE ON FOUR FACTORS THAT THE DEFENDANT ARGUED

7    COUNSEL TOWARD A LOWER GOING FORWARD ROYALTY RATE.

8    AND WHAT THE COURT FOUND WAS THAT THE EVIDENCE PRESENTED

9    BY THE DEFENDANT AS TO ONE OF THE FACTORS, THE DESIGN AROUND

10   AND WHEN IT WOULD BE COMPLETE, WAS SPECULATION.

11   AND AS TO ANOTHER, THAT THE DEFENDANT HAD FAILED TO

12   INTRODUCE ANY EVIDENCE QUANTIFYING THE IMPACT OF THE ENTRY INTO

13   THE MARKET OF AN ADDITIONAL COMPETITOR.

14   SO THE COURT ACTUALLY TOOK EVIDENCE AND JUST SAID THAT THE

15   DEFENDANT FAILED TO MEET IT.

16   IN THE MONDIS TECHNOLOGY CASE, THAT'S THE THIRD CASE THAT

17   THEY CITE FOR THE PROPOSITION, IT SAYS THAT BECAUSE THE COURT

18   IS USING THE JURY'S DETERMINATION OF A .5 PERCENT ROYALTY RATE

19   FOR MONITORS AS A STARTING POINT, THE COURT FOCUSES ON ANY NEW

20   EVIDENCE THAT WAS NOT BEFORE THE JURY AND ADDITIONALLY ANY

21   CHANGED CIRCUMSTANCES BETWEEN A HYPOTHETICAL NEGOTIATION IN '05

22   AND THE ONE IN 2011.

23   THEN THE COURT WENT ON TO SAY THAT THE PARTIES HAD NOT

24   PRESENTED ANY NEW EVIDENCE, NOT THAT THEY WERE NOT ALLOWED TO.

25   AFFINITY LABS, THE FOURTH CASE THAT THEY CITE FOR THE

1    PROPOSITION SAYS THAT PREJUDGMENT DAMAGES AND POST-JUDGMENT

2    DAMAGES ARE DISTINCT AND MAY WARRANT DIFFERENT ROYALTY RATES

3    GIVEN THE CHANGE IN THE PARTIES' LEGAL RELATIONSHIP AND OTHER

4    FACTORS.

5        AND THE COURT MUST KEEP IN MIND THE IMPORTANCE OF

6    PROVIDING, QUOTE, "A CONCISE BUT CLEAR EXPLANATION OF ITS

7    REASONS FOR THE FEE AWARD," UNQUOTE, CITING THE AMADO CASE.

8        IN FOOTNOTE CASE, THE AFFINITY LABS CASE SAID TO THE

9    EXTENT THAT SOME NEW FACT OR CHANGE WAS NOT CONSIDERED UNDER

10   THE BOOK OF WISDOM EVIDENCE THAT THE JURY WOULD HAVE HEARD

11   ABOUT, SUCH CHANGES CAN BE PRESENTED POST-TRIAL.

12       CASE NUMBER FIVE, THE CREATIVE INTERNET ADVERTISING

13   CORPORATION CASE WHERE MERCK REPRESENTED IN THEIR PAPERS, THE

14   COURT DECLINED TO ADMIT NEW EVIDENCE AND DECLINED TO HOLD AN

15   EVIDENTIARY HEARING, HERE IS HOW THAT OPINION BEGINS, ON

16   JULY 14TH, 2009, THE PARTIES -- THE COURT ORDERED THE PARTIES

17   TO SUBMIT BRIEFING AND ADDITIONAL EVIDENCE TO DETERMINE AN

18   APPROPRIATE ONGOING ROYALTY.  ON SEPTEMBER 30TH, 2009, THE

19   COURT HELD AN EVIDENTIARY HEARING ON A REASONABLE ONGOING

20   ROYALTY.

21       THEY ARE ZERO FOR FIVE ON THESE CASES REPRESENTING THAT

22   THE COURT SHOULD NOT TAKE NEW EVIDENCE AND SHOULD NOT HOLD AN

23   EVIDENTIARY HEARING.

24           MR. FISHER:  YOUR HONOR, WE DID NOT SAY THAT THE

25   COURT COULD NOT DO IT.  I THINK WE WERE VERY CLEAR THAT IT'S

1    WITHIN YOUR DISCRETION AS TO WHETHER OR NOT YOU'RE GOING TO

2    CONDUCT AN EVIDENTIARY HEARING.

3            THE COURT:  ALL RIGHT.  WELL, I AM GOING TO CONDUCT

4    AN EVIDENTIARY HEARING.  I AM GOING TO, THEREFORE, SEVER THE

5    CASE, BUT I WANT TO BE CLEAR THAT IT'S NOT OPEN SEASON AS IF

6    IT'S A BRAND NEW CASE.  AND I WILL REQUIRE A DISCOVERY PLAN

7    THAT -- WITH A THOROUGH MEET AND CONFER.

8        CLEARLY IF YOU DON'T OBJECT TO THE SCOPE OF DISCOVERY, YOU

9    NEVER NEED TO SEE ME, BUT I DO NOT WANT THIS TO BE A RUNAWAY.

10    I DON'T THINK YOUR CLIENTS WANT THIS TO BE A RUNAWAY.  THE

11    ISSUES ARE NARROW.  YOUR EXPERTS NEED TO BEGIN THEIR WORK, AND,

12    FRANKLY, ALTHOUGH I DON'T KNOW WHEN I WOULD DO THIS, WE'LL TALK

13    FROM TIME TO TIME.

14        MY FIRST INTEREST IS IN GETTING A JUDGMENT, AND MY NEXT

15    INTEREST IS IN FINISHING JMOL.  SO WE'RE NOT GOING TO BE DOING

16    THAT, PERIOD.  AND UNFORTUNATELY THAT PERIOD IS GOING TO BE A

17    MINIMUM OF SIX MONTHS AND I WISH IT WEREN'T, BUT I THINK YOU

18    ALL KNOW THAT.

19        BUT I'M NOT SUGGESTING THIS DISCOVERY SHOULD BEGIN

20    IMMEDIATELY.  THAT WILL BE YOUR CHOICE, BUT I WANT TO BE CLEAR

21    ON THE RESTRICTIONS.

22        AND IT WILL BE -- IT'S PROBABLY WISE TO WAIT UNTIL THE

23    CASE IS FINAL.  IT GIVES THE PARTIES AMPLE TIME THROUGHOUT THE

24    REMAINDER OF THE PROCEEDINGS TO COME BACK TO A SETTLEMENT TABLE

25    TO CONTINUE TO TALK TO SEE HOW EVENTS TURN OUT AND PERHAPS WORK

1   THIS OUT YOURSELVES.

2       BUT UNTIL THE CASE IS FINAL, WHETHER AN APPEAL IS TAKEN OR

3   NOT, WHAT THE RESULTS OF AN APPEAL WOULD BE, I THINK IT'S WISE

4   TO WAIT.

5       SO I WILL SEVER THIS AND GIVE IT A CASE NAME IDENTICAL TO

6   WHAT WE HAVE BUT A NEW CASE NUMBER AND THAT WAY THAT WILL

7   PRESERVE IT.

8       I THINK THAT'S THE ONLY THING I NEED TO DEAL WITH ON

9   ONGOING ROYALTIES.

10          MR. EPNER:  YOUR HONOR, CAN I BE HEARD FOR ONE

11  MOMENT BEFORE MS. BROOKS SITS DOWN?

12          THE COURT:  YES.

13          MR. EPNER:  WITH REGARD TO THE AMBIT OF THIS

14  ADDITIONAL DISCOVERY, BECAUSE THE DEVIL IS IN THE DETAILS, WHEN

15  MS. BROOKS ROSE TO SPEAK TO THE ISSUES THAT SHE THOUGHT WOULD

16  BE APPROPRIATE, AND WE HIGHLIGHTED THESE AT DOCUMENT 395 AT

17  PAGE 6, THE THREE ISSUES AS WE'VE CHARACTERIZED THEM, I DIDN'T

18  GIVE A DIRECT -- WE DIDN'T GIVE A DIRECT QUOTE IN THIS SECTION,

19  WERE, NUMBER ONE, GILEAD'S INABILITY -- PUNITIVE INABILITY TO

20  AFFORD ONGOING ROYALTIES; NUMBER TWO, THE FACT THAT ONGOING

21  ROYALTIES WOULD SUPPLANT EXPENDITURES ON FURTHER RESEARCH; AND,

22  NUMBER THREE, THAT ROYALTIES WOULD PRESENT A STACKING ISSUE.

23      WITH REGARD TO ISSUES NUMBER ONE AND NUMBER TWO, YOU'VE

24  GIVEN US VERY FIRM GUIDANCE ABOUT MERCK'S ABILITY TO BRING INTO

25  THIS CASE QUESTIONS ABOUT GILEAD'S PRICING POLICIES, WHAT

1    EFFECTS THOSE PRICING POLICIES HAVE HAD ON ACCESS TO CARE.

2        YOUR HONOR, THIS IS THE OTHER SIDE OF THAT COIN.  IF

3    THEY'RE ALLOWED TO BRING IN EVIDENCE, AND WE'RE GOING TO START

4    TAKING DISCOVERY ABOUT THEIR DECISION MAKING ABOUT WHAT THEY

5    CAN SPEND ON RESEARCH AND HOW MUCH PROFIT THEY NEED TO MAKE

6    BEFORE THEY CAN NO LONGER CONTINUE IN THIS --

7        THE COURT:  SO, MR. EPNER, YOU KNOW, I THINK IT'S

8    PREMATURE FOR ME TO CONSIDER ANY OF THOSE ARGUMENTS.  I

9    APPRECIATE WHAT YOU'RE SAYING.  AND I'LL GIVE YOU AMPLE

10   OPPORTUNITY, WHETHER IT'S IN DISCOVERY CONFERENCES, TO ATTEMPT

11   TO LIMIT THE DISCOVERY, WHICH IS HARD TO DO BUT CERTAINLY AT

12   THE NEXT PHASE OF A TRIAL, WHICH COULD BE A FEW YEARS DOWN THE

13   ROAD, TO ADDRESS THIS.

14       SO I THINK I'M NOT GOING TO LIMIT IT AT THIS POINT.

15   THAT'S THE WHOLE PURPOSE OF MY KEEPING A CLOSE REIGN ON THE

16   DISCOVERY SO THAT IT DOESN'T GO INTO THE STRATOSPHERE HERE.

17       AND, YOU KNOW, I DON'T GET TO SEE WHAT YOUR ACTUAL

18   RELATIONSHIP IS.  I ONLY SEE WHAT YOUR COURT FACE IS.  I LIKE

19   WHAT I SEE HERE, AND I CAN ONLY HOPE THAT IT SPREADS OUTSIDE OF

20   THE COURTROOM BUT PROBABLY NOT QUITE AS GOOD AS WHAT I SEE

21   HERE.

22       MR. EPNER:  YOUR HONOR, MAY I MAKE A VERY LOGISTICAL

23   SUGGESTION?

24       THE COURT:  SURE.

25       MR. EPNER:  BECAUSE I BELIEVE IN THIS SITUATION THE

1    ISSUE IS NOT GOING TO BE THAT WE REQUEST INFORMATION AND THAT

2    THEY RESIST IT ON CERTAIN ISSUES THAT MS. BROOKS HAS RAISED.

3    IT'S THAT THEY ARE GOING TO PRODUCE DOCUMENTS THAT WE THINK ARE

4    NOT PROPERLY IN THE CASE.

5            THE COURT:  THOSE ARE IN LIMINE MOTIONS.  I CAN'T

6    RESTRICT GILEAD FROM PLANNING THEIR PRESENTATION.  IT'S ONLY AT

7    TRIAL WHEN THEY REVEAL WHAT THEY WANT TO PUT FORWARD THAT YOU

8    CAN PROPERLY LIMIT IT.

9         I DON'T KNOW WHAT ELSE TO SAY TO YOU.

10           MR. EPNER:  YOUR HONOR, MY SUGGESTION IS THAT WHEN

11   WE GET TO THE END OF THIS CASE, BEFORE WE, BEFORE WE START

12   THROUGH NEW DISCOVERY, THAT WE GO -- AND MY SUGGESTION IS THAT

13   WE EITHER GO BEFORE YOU OR WE GO BEFORE MAGISTRATE JUDGE GREWAL

14   IN THE CONTEXT OF A DISCOVERY -- CREATING A DISCOVERY PLAN.

15           THE COURT:  THAT'S MY EXACT POINT.  I AGREE WITH YOU

16   COMPLETELY.  AND IF YOU'RE GOING TO COME BACK TO JUDGE GREWAL

17   ON SETTLEMENT, I MEAN, I HOPE YOU'LL ALSO VISIT HIM ON

18   DISCOVERY ISSUES, BUT THAT -- I KNOW SOMETIMES THAT CAN BE A

19   LITTLE BIT DIFFICULT, BUT I THINK I ACTUALLY AGREE WITH YOU IN

20   THE SENSE OF THE COURT WILL CONTROL --

21           MR. EPNER:  THANK YOU, YOUR HONOR.

22           THE COURT:  -- THE ALLOWED DISCOVERY BASED ON YOUR

23   GOOD FAITH MEET AND CONFER.

24        BUT SOME OF THESE ISSUES THAT YOU SUGGEST WHERE GILEAD MAY

25   BE AMASSING ITS OWN EVIDENCE IS NOT SOMETHING THAT I CAN

1    NECESSARILY CONTROL.  SO WE'LL SEE HOW THAT DEVELOPS.

2              MR. EPNER:  THANK YOU, YOUR HONOR.

3              THE COURT:  AND, MS. BROOKS, ARE YOU COMFORTABLE

4    WITH ALL OF THIS?

5              MS. BROOKS:  ABSOLUTELY, YOUR HONOR.

6              THE COURT:  ALL RIGHT.  GOOD.  AND THEN I WANT TO GO

7    ON TO THERE IS A MOTION AND REQUEST FOR THE COURT TO AWARD

8    PREJUDGMENT INTEREST AND SUPPLEMENTAL DAMAGES.

9         NOW, THERE'S ALSO THE SUGGESTION HERE THAT IT'S PREMATURE

10   TO BE DOING THIS AS WELL.

11        I WILL SAY THAT PREJUDGMENT INTEREST ON THE JURY VERDICT

12   IS NOT ROCKET SCIENCE, AND I HAVE TO PICK ONE OF TWO SUGGESTED

13   RATES AND THEN THERE JUST NEEDS TO BE -- YOU ALL DO THE MATH ON

14   IT.  I DON'T.

15        AND, I MEAN, I DON'T KNOW IF YOU NEED TO SUBMIT ANYTHING

16   MORE.  I HEARD MS. DEMAIN'S TESTIMONY.  I DON'T KNOW WHAT ELSE

17   YOU WOULD HAVE.  THE REAL ISSUE, THOUGH, IS ON THE SUPPLEMENTAL

18   DAMAGES, AND THERE THE JURY HANDED US A VERDICT THAT IS -- CAN

19   BE INTERPRETED IN MORE THAN ONE WAY, AND I KNOW THAT BECAUSE

20   YOU HAVE OFFERED THOSE INTERPRETATIONS.

21        AND THEY MAY ALL BE PLAUSIBLE, AND WE'RE NOT ENTITLED TO

22   KNOW WHAT THE JURY'S INTERNAL WORKINGS ARE SO IT IS JUST AS

23   REASONABLE TO TAKE THE $5 BILLION TOTAL SALES AND ASSUME THAT

24   THEY HAVE TAKEN OUT THE ONE-TIME $15 BILLION INVESTMENT AND

25   ONGOING WILL BE FULL BOAT TOTAL SALES, THAT'S WHAT YOU ARGUE,

1    MR. FISHER.

2         BUT WHAT GILEAD OFFERED IS NOT IMPLAUSIBLE AT ALL IS THAT

3    THE JURY, RIGHTLY OR WRONGLY, MAYBE THEY DIDN'T HAVE THE

4    AUTHORITY TO DO THAT, WE'LL VISIT THAT ON JMOL, ACTUALLY

5    DETERMINED THAT ONLY ROUGHLY 25 PERCENT OF SALES SHOULD BE

6    ATTRIBUTED TO THE ROYALTY PAYMENT.

7         AND BECAUSE IT WAS A NUMBER THAT I WASN'T EXPECTING, I

8    DON'T HAVE A PATH THAT LEADS ME TO THAT NUMBER.  SO I THINK

9    IT'S PREMATURE UNTIL WE HAVE A REAL VERDICT, A FINAL VERDICT, I

10   SHOULD SAY, IT IS REAL NOW, BUT A FINAL VERDICT ON DAMAGES TO

11   CONSIDER SUPPLEMENTAL.

12        AND I THINK, MS. BROOKS, THAT'S ESSENTIALLY WHAT YOU'RE

13   ARGUING.

14        SO, MR. FISHER, YOUR COMMENT.

15            MR. FISHER:  YOUR HONOR, I MEAN, I THINK CERTAINLY

16   YOU COULD WAIT.  I THINK THAT QUITE HONESTLY, I DON'T THINK

17   THAT THERE'S THE AMBIGUITY THAT MS. BROOKS HAS SUGGESTED.

18        IN TERMS OF PLUCKING 25 PERCENT IN TERMS OF APPORTIONMENT,

19   I MEAN, IT REALLY IS OUT OF THIN AIR.  IF YOU LOOK AT THE

20   CLOSING ARGUMENT, THE RECORD IS SIMPLY CRYSTAL CLEAR ON THE 15

21   BILLION APPEARING THREE TIMES.

22            THE COURT:  YOU ALL SAID LOTS OF THINGS, THOUGH,

23   THAT THE JURY DIDN'T PICK UP ON SO WHY WOULD I THINK THAT THEY

24   PICKED UP ON THE DEDUCTION.

25            MR. FISHER:  WELL, THERE'S A SLIDE THAT, YOU KNOW, I

1      THINK MAKES IT VERY, VERY CLEAR.

2              THE COURT:  BUT GILEAD GIVES ME ANOTHER SLIDE THAT

3      MAKES IT THEIR ARGUMENT HERE.

4              MR. FISHER:  CERTAINLY THEY DIDN'T PICK 1 PERCENT OF

5      20 BILLION, WE KNOW THAT.

6              THE COURT:  THEY DIDN'T DO THAT.

7              MR. FISHER:  AND I THINK EVEN ONLOOKERS ON THE CASE

8      RECOGNIZED THAT THEY BACKED OUT THE PHARMASSET PURCHASE PRICE

9      AND THE SEVERAL BILLION DOLLARS AND I THINK IT'S CLEAR.

10             THE COURT:  YOU KNOW, YOU CAN BE CLEAR IN YOUR

11     CONVICTION THAT THAT'S WHAT THEY DID, AND YOU MIGHT HAVE EVEN

12     HEARD THINGS IN THE HALLWAY, AND I READ SOME OF THE PRESS ON IT

13     SO THERE MIGHT HAVE BEEN, BUT THAT'S IRRELEVANT TO ME.

14             MR. FISHER:  ULTIMATELY, YOUR HONOR, WE'LL NEED TO

15     ASSESS SUPPLEMENTAL DAMAGES.

16             THE COURT:  YES.  SO HERE'S MY SUGGESTION BECAUSE,

17     AGAIN, I THINK IT'S WITHIN MY DISCRETION TO MANAGE THE CASE

18     EFFICIENTLY, I WANT THERE TO BE A JUDGMENT SO THAT THIS CASE

19     CAN MOVE ON.

20         AND THE ONLY THING THAT I WONDERED WAS WHETHER I COULD

21     MAKE A DETERMINATION THAT MERCK IS ENTITLED TO PREJUDGMENT

22     INTEREST AND TO SUPPLEMENTAL DAMAGES AND TO RESERVE THE

23     TERMINATION OF THE AMOUNTS.

24         AND WHAT I'M HOPING, AND YOU HAVE TO HELP ME WITH THIS

25     BECAUSE YOU HAVE THE EXPERIENCE AT THE FEDERAL CIRCUIT AND I

1    DON'T, I WANT TO MAKE SURE THAT THEY RECOGNIZE THIS AS A FINAL

2    JUDGMENT, AND I THINK THAT WAS IN SOME OF THE BRIEFING.

3         BUT IT SEEMS TO ME THAT IF I MAKE THE LEGAL DETERMINATION

4    OF THE ENTITLEMENT TO BOTH, THAT THE ACTUAL CALCULATION IS

5    SOMETHING THAT I CAN RESERVE JURISDICTION ON.

6              MR. FISHER:  YEAH, I THINK THAT IS AN ACCOUNTING,

7    AND I THINK MS. BROOKS PROBABLY AGREES.

8              MS. BROOKS:  WE DO.

9              THE COURT:  SO THAT TAKES CARE OF THE SUPPLEMENTAL

10   AND THAT'S ACTUALLY ULTIMATELY PRETTY EASY AND, IN FACT, YOU

11   PROBABLY EVEN WON'T NEED TO COME BACK TO ME ON THAT.

12        BUT ON THE PREJUDGMENT INTEREST, I DON'T KNOW THAT THERE

13   WAS ANY MORE ARGUMENT OR EVIDENCE FOR YOU TO GIVE ME.  I'VE GOT

14   THE T BILL RATE, AND I THINK I HAVE EVIDENCE ON WHAT THE T BILL

15   ARGUMENTS ARE.

16             MS. BROOKS:  WE NEED TO GIVE YOU A SPREADSHEET ON

17   THAT.  IT RANGED FROM -- JUST AS THE PRIME VARIED, IT RANGED

18   DURING THE PERTINENT TIME PERIOD FROM .13 TO .63 WITH AN

19   AVERAGE OF .25, BUT WE CAN GIVE YOUR HONOR A SPREADSHEET IF YOU

20   WOULD LIKE WHICH WE WOULD OBVIOUSLY GIVE TO THE OTHER SIDE.

21   AND WE HAVE VERIFIED THAT THE PRIME RATE THAT I THINK HAS BEEN

22   REPRESENTED WAS ACCURATE, AND WE GOT THE T BILL RATE FROM THE

23   SAME SOURCE.

24             THE COURT:  SO THIS PARTICULAR CONSIDERATION ON

25   WHICH MEASURE OF PREJUDGMENT INTEREST IS SOMETHING THAT I CAN

1      DO AS EASILY NOW AS LATER.

2             MR. FISHER:  YOUR HONOR, THE ONLY THING AND TWIST IN

3      THIS IN A CASE FULL OF TWISTS IS THAT THE WAY THAT WE OFFERED

4      TO DEAL WITH THE PREJUDGMENT INTEREST ISSUE WAS TO APPLY IT TO

5      THE LAST 15 BILLION, OR EXCUSE ME, THE LAST 5 BILLION IN SALES

6      OF THESE PRODUCTS IN THE DOOR ON THE ASSUMPTION THAT WE WERE

7      TRYING TO BE CONSISTENT WITH HOW WE VIEWED THE JURY VERDICT AND

8      HOW WE VIEWED SUPPLEMENTAL DAMAGES.

9          IF YOUR HONOR DISAGREED WITH THAT AND WE NEED TO GO BACK

10     TO SPREADING IT OUT OVER TIME AND POTENTIALLY COMPOUNDING IT

11     FROM THE FIRST DOLLAR IN, THAT MAY FIGURE IN THE CALCULUS

12     BUT --

13            THE COURT:  SO I'M NOT TALKING ABOUT THE ARITHMETIC

14     OF CALCULATING IT.  IT'S WHICH MEASURE I SELECT, PRIME OR T

15     BILL.  IS THAT SOMETHING THAT I SHOULD RESERVE ON OR DECIDE?

16            MR. FISHER:  I THINK YOU CAN DECIDE IT.

17            THE COURT:  IS THERE ANY REASON NOT TO?  DO I HAVE

18     ALL OF THE EVIDENCE I NEED?

19            MS. BROOKS:  YOU DO, AND YOU HAVE THE CASE LAW.  AND

20     WE CITED SUPPORT FOR THE T BILL, AND I BELIEVE THEY'VE CITED

21     SUPPORT FOR THE PRIME.  AND WE ALSO CITED THAT YOUR HONOR

22     DOESN'T HAVE TO HAVE IT COMPOUNDED.  IT CAN BE SIMPLE.

23            MR. FISHER:  IT'S DISCRETIONARY.

24            MS. BROOKS:  YES, IT'S COMPLETELY DISCRETIONARY.  I

25     THINK IF YOUR HONOR FEELS LIKE LOOKING AT OUR PAPERS YOU WANT

1    MORE INFORMATION, WE CAN CERTAINLY PROVIDE THAT.

2         THE COURT:  YES, I APPRECIATE THAT.  AND I GUESS I

3    WANT TO MAKE SURE THAT I ACTUALLY HAVE THE EVIDENCE OF WHAT

4    THESE -- WELL, MAYBE I DON'T NEED TO KNOW THAT.  I CAN IN MY

5    ORDER JUST SELECT THE PRIME RATE OR THE T BILL RATE AND --

6         MR. FISHER:  IF YOU TELL US HOW YOU WOULD LIKE TO

7    HAVE IT CALCULATED, WE CAN WORK IT OUT.

8         THE COURT:  BECAUSE THOSE ARE PUBLISHED NUMBERS.

9         MS. BROOKS:  CORRECT.

10        THE COURT:  SO I DON'T NEED TO KNOW WHAT THE

11   PUBLISHED NUMBERS ARE IS REALLY MY POINT.

12        MS. BROOKS:  YES, YOUR HONOR, THAT'S CORRECT.

13        THE COURT:  WHY DON'T I, THEN, DETERMINE WHETHER OR

14   NOT THERE WILL BE PREJUDGMENT INTEREST AND WHAT THE AMOUNT WILL

15   BE, THE RATE WILL BE, AND WHETHER OR NOT IT WILL BE COMPOUNDED

16   AND THEN JUST RESERVE JURISDICTION OVER THE ACCOUNTING OF IT TO

17   TAKE PLACE AFTER THE CASE IS FINAL.

18        IS THAT REASONABLE?

19        MS. BROOKS:  ABSOLUTELY, YOUR HONOR, AND VERY

20   EFFICIENT.

21        THE COURT:  WELL, SOMETHING HAS TO BE EFFICIENT

22   HERE.

23        I BELIEVE THAT THAT COVERS EVERYTHING THAT YOU PRESENTED.

24        MS. BROOKS:  INDEED.

25        THE COURT:  ALL RIGHT.  WELL, I KNOW YOU STILL HAVE

1    SOME MORE HOMEWORK ON THIS.  I HAVE A LOT OF HOMEWORK ON THIS,

2    AND I CAN'T THINK OF ANYTHING ELSE I NEED ON IT.  AND THE EXTRA

3    BRIEFING WILL BE OF GREAT ASSISTANCE TO THE COURT AND SO I

4    THANK YOU FOR THAT.

5         WELL, I GUESS AT THIS POINT I DON'T EXPECT TO SEE YOU

6    UNTIL AND UNLESS THERE'S A JMOL HEARING; IS THAT RIGHT?

7              MS. BROOKS:  I BELIEVE SO, YOUR HONOR.

8              MR. GENDERSON:  ONE OTHER HOUSEKEEPING MATTER.  CAN

9    THESE BE COURT DEMONSTRATIVES, THE DRAWINGS THAT ARE UP THERE?

10   WE HAVE PHOTOGRAPHS OF THEM ALL WHICH WE CAN SUBMIT.

11             THE COURT:  SO DO YOU WANT THOSE TO BE PART OF THE

12   RECORD?

13             MR. GENDERSON:  YEAH, JUST AS THE OTHER

14   DEMONSTRATIVES THAT HAVE BEEN USED.

15        WE HAVE PHOTOGRAPHS, AND WE CAN SUBMIT THOSE PHOTOGRAPHS.

16             THE COURT:  SO DID YOU SPIT ALL OF YOUR SCREEN

17   DEMONSTRATIVES TO THE RECORD?

18             MR. GENDERSON:  HAVE YOU GOTTEN THEM YET.

19             THE CLERK:  I HAVE COPIES OF THEM, BUT THEY WERE NOT

20   MARKED PART OF THE RECORD.

21             MR. RABINOWITZ:  WE SUBMITTED AS EXHIBITS FOR

22   INFORMATION THE DEMONSTRATIVES BUT NOT THE SCREEN SHOTS.  WE

23   COULDN'T REACH AGREEMENT WITH THE OTHER SIDE THAT THOSE SHOULD

24   BE SUBMITTED.

25        I THINK WE WILL SIMPLY HAVE TO SUBMIT THEM IN THE CONTEXT

1    OF THE JMOL BRIEFING SO THEY WILL BE PART OF THE RECORD.

2           THE COURT:  SO I DON'T KNOW THAT -- WHY THE

3    DEMONSTRATIVES NEED -- YOU WANT THOSE TO BE PART OF THE RECORD

4    WHEN THEY WEREN'T EVIDENCE?

5           MR. RABINOWITZ:  PART OF THE APPELLATE RECORD

6    BECAUSE THEY CLARIFY IF THE WITNESS IS REFERRING TO THE

7    DEMONSTRATIVE, IT'S FOR THE COURT OF APPEALS TO BE ABLE TO SEE

8    WHAT WAS BEING SAID.

9        AND THE SAME GOES FOR MANY OF THE SCREEN SHOTS.  IT

10   CLARIFIES THE INTERPRETATION OF THE TESTIMONY.

11          THE COURT:  WELL, I'LL LEAVE IT TO YOU TO SUBMIT

12   THOSE FOR THE RECORD.

13       I WANTED YOUR -- WHAT YOU SHOWED ME ON THE SCREEN TODAY, I

14   WANTED A HARD COPY OF THOSE, AND IF YOU COULD MAKE AND SEND

15   THOSE TO ME, I'D APPRECIATE IT.  YOU MAY ALREADY HAVE IT.

16   THANK YOU.

17          MR. RABINOWITZ:  AND, YOUR HONOR, WE WILL ASK THAT

18   THE PARTIES EXCHANGE THEM AS WELL.

19          MS. BROOKS:  YES, YOUR HONOR, UNFORTUNATELY WE DON'T

20   HAVE HARD COPIES BECAUSE -- BUT WE'LL HAVE THEM FOR YOU FIRST

21   THING TOMORROW.

22          THE COURT:  OH, PLEASE, YOU KNOW, I'M NOT IN THAT

23   MUCH OF A HURRY.  MR. GENDERSON HAS ALREADY MADE A BOOK FOR ME,

24   AND I APPRECIATE IT.  BUT I WILL -- THAT'S GREAT BECAUSE,

25   FRANKLY, YOU HAD VERY MUCH HELPFUL INFORMATION IN THESE TODAY,

1    AND I APPRECIATE THE WORK YOU PUT INTO IT.

2              MS. BERNIKER:  DO YOU JUST NEED THE ONE COPY?

3              THE COURT:  I JUST NEED THE ONE COPY.  THANK YOU.

4              MR. GENDERSON:  SO WE'LL SUBMIT AS WE DID FOR THE

5    DEMONSTRATIVES PHOTOGRAPHS OF THESE.

6              THE COURT:  AND DO YOU NEED TO TAKE THOSE?

7              MR. GENDERSON:  I THINK WE ALREADY HAVE.  WE HAVE

8    PHOTOGRAPHS, AND WE'LL NUMBER THEM AND SUBMIT THEM.

9              THE COURT:  AND THESE ARE NOW FOR US TO KEEP.

10              MR. GENDERSON:  YES.

11              THE COURT:  THAT'S FINE.

12              MS. BROOKS:  AND, YOUR HONOR, APPARENTLY WE HAVE AN

13    EXHIBIT BINDER FOR THE EXHIBITS THAT WERE ADMITTED DURING THE

14    BENCH TRIAL.

15              THE COURT:  OTHER THAN THE ONES FOR THE WITNESSES

16    TODAY?

17              MS. BROOKS:  I BELIEVE --

18              MS. FLANAGAN:  THE STIPULATION AND THEN THE TWO THAT

19    WERE WITH THE DEPOSITIONS.

20              THE COURT:  THANK YOU, MS. FLANAGAN, THAT'S GREAT.

21    SO THAT'S ONE COPY.

22              MS. FLANAGAN:  I HAVE THREE COPIES TOTAL TODAY.

23              THE COURT:  THAT'S GREAT BECAUSE ONE IS FOR THE

24    COURT AND ONE IS FOR ME.

25              MR. GENDERSON:  AND THAT'S EVERYTHING IN THE

1    STIPULATION --

2              THE COURT:  ANYTHING YOU CAN DO TO LIGHTEN YOUR TRIP

3    HOME.

4              MS. BROOKS:  THANK YOU, YOUR HONOR.

5              THE COURT:  I KEEP SAYING IS THAT EVERYTHING AND

6    THERE'S SOMETHING MORE.

7          ALL RIGHT.  THANK YOU ALL.  THANK YOU FOR COMING BACK THIS

8    WEEK.  I'M SURE THIS FELT LIKE IT WAS TAKEN OUT OF YOUR HIDES

9    BECAUSE THE LET DOWN AFTER A JURY VERDICT IS PRETTY REMARKABLE,

10   BUT HOPEFULLY YOU'RE NOT ON TO THE NEXT TRIAL TOO SOON AND I

11   KNOW YOU PROBABLY ARE.  BUT THANK YOU ALL.

12             MS. BROOKS:  THANK YOU, YOUR HONOR.

13             MR. GENDERSON:  THANK YOU, YOUR HONOR.

14             THE CLERK:  THIS COURT IS ADJOURNED.

15         (COURT CONCLUDED AT 4:56 P.M.)

16

17

18

19

20

21

22

23

24

25

1

2

3                    CERTIFICATE OF REPORTER

4

5

6

7          I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8     STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9     280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10    CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16         _____
           IRENE RODRIGUEZ, CSR, RMR, CRR
           CERTIFICATE NUMBER 8074
17

18
           DATED:  MARCH 31, 2016
19

20

21

22

23

24

25