1  BRUCE R. GENDERSON (Pro Hac Vice)
   bgenderson@wc.com
2  JESSAMYN S. BERNIKER (Pro Hac Vice)
   jberniker@wc.com
3  STANLEY E. FISHER (Pro Hac Vice)
   sfisher@wc.com
4  JESSICA BODGER RYDSTROM
   jrydstrom@wc.com
5  SANJIV P. LAUD (Pro Hac Vice)
   slaud@wc.com
6  JESSICA PALMER RYEN (Pro Hac Vice)
   jryen@wc.com
7  WILLIAMS & CONNOLLY LLP
   725 Twelfth Street, N.W.
8  Washington, D.C. 20005
   Telephone:  (202) 434-5000
9  Facsimile:  (202) 434-5029

10 STEPHEN S. RABINOWITZ
   stephen.rabinowitz@hugheshubbard.com
11 PATRICE P. JEAN (Pro Hac Vice)
   patrice.jean@hugheshubbard.com
12 MITCHELL EPNER (Pro Hac Vice)
   mitchell.epner@hugheshubbard.com
13 HUGHES HUBBARD & REED LLP
   ONE BATTERY PARK PLAZA
14 NEW YORK, NY 10004
   Telephone:     (212) 837-6000
15 Facsimile:     (212) 299-6807

16 [Counsel continued overleaf]

17 Attorneys for Defendant
   MERCK & CO., INC. and Defendants and Counterclaimants
18 MERCK SHARP & DOHME CORP. and ISIS PHARMACEUTICALS, INC.

19

20         IN THE UNITED STATES DISTRICT COURT

21         FOR THE NORTHERN DISTRICT OF CALIFORNIA

22                  SAN JOSE DIVISION

23 GILEAD SCIENCES, INC.,                          Case No. 5:13-cv-04057-BLF

24         Plaintiff and Counterdefendant,         **DEFENDANTS' POST TRIAL BRIEF ON
                                                    EQUITABLE DEFENSES**
25         v.

26 MERCK & CO., INC. (Defendant only), MERCK
   SHARP & DOHME CORP., and ISIS
27 PHARMACEUTICALS, INC.

28         Defendants and Counterclaimants.

JOSHUA H. LERNER (SBN 220755)
jlerner@durietangri.com
LAURA E. MILLER (SBN 271713)
lmiller@durietangri.com
Durie Tangri LLP
217 Leidesdorff Street
San Francisco, CA 94111
Telephone:    (415) 362-6666
Facsimile:    (415) 236-6300

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

I.      INTRODUCTION AND FACTUAL BACKGROUND ................................................ 1

II.     ARGUMENT ................................................................................................................ 5

    A.      Gilead Cannot Prevail on Its Unclean Hands Defense Because the
        Theory It Disclosed Is Foreclosed by the Jury Verdict. ................................... 5

    B.      The Court Should Not Find Unclean Hands Here for the Independent
        Reason That It Would Be Unprecedented and Inequitable. ............................... 6

        1. The Alleged Misconduct Is Not "Egregious Misconduct." .......................... 7

        2.  Dr. Durette's Deposition Testimony Cannot Be Imputed
           to Merck, and There Is No Evidence That Merck
           Itself Engaged in Any Improper Conduct .................................................. 10

        3.  Gilead Suffered No Prejudice Regarding the Subject of
           This Litigation. ......................................................................................... 11

        4.  It Would Be Inequitable To Set Aside the Jury's Verdict. .......................... 13

    C.      Gilead's Unclean Hands Defense Is Inapplicable to the '712 Patent. ............. 14

    D.      *Rembrandt Vision Technologies* Does Not Provide a Basis for a New
        Trial Here. ....................................................................................................... 14

    E.      Gilead Cannot Prove Its Waiver Defense by Clear and Convincing
        Evidence. ......................................................................................................... 15

III.    CONCLUSION .......................................................................................................... 15

1

## TABLE OF AUTHORITIES

2

### FEDERAL CASES

3

*Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341 (Fed. Cir. 2008) ........................................ 11

4

*Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.*, 2006 WL 3342655 (S.D.N.Y.

5

    Nov. 16, 2006) ....................................................................................................... 14

6

*Aeroplate Corp. v. United States*, 71 Fed. Cl. 568 (2006) ............................................. 11

7

*Apotex, Inc. v. UCB, Inc.*, 970 F. Supp. 2d 1297 (S.D. Fla. 2013) .................................... 9

8

*Aptix Corp. v. Quickturn Design Sys., Inc.*, 269 F.3d 1369 (Fed. Cir. 2001) ...................... 8

9

*BASF Corp. v. Aristo, Inc.*, 872 F. Supp. 2d 758 (N.D. Ind. 2012) ................................. 11

10

*Big Lots Stores v. Jaredco*, 182 F. Supp. 2d 644 (S.D. Ohio 2002) ................................. 10

11

*Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223 (Fed. Cir. 1994) ..................... 6

12

*Cabinet Vision v. Cabnetware*, 129 F.3d 595 (Fed. Cir. 1997) ........................................ 6

13

*CFM Commc'ns, LLC v. Mitts Telecasting Co.*, 424 F. Supp. 2d 1229 (E.D. Cal. 2005) ....... 12

14

*Dairy Queen, Inc. v. Wood*, 369 U.S. 469 (1962) .......................................................... 6

15

*Denen v. Buss*, 801 F.2d 385 (Fed. Cir. 1986) ............................................................. 6

16

*Dream Games of Ariz., Inc. v. PC Onsite*, 561 F.3d 983 (9th Cir. 2009) ........................ 12

17

*Eastman Kodak Co. v. Agfa-Gevaert N.V.*, 560 F. Supp. 2d 227 (W.D.N.Y. 2008) ............ 11

18

*Excelled Sheepskin & Leather Coat v. Oregon Brewing*, 2014 WL 3874193 (S.D.N.Y.

19

    Aug. 5, 2014) .................................................................................................. 9, 11

20

*FDIC v. O'Melveny & Myers*, 61 F.3d 17 (9th Cir. 1995) (per curiam) ........................... 11

21

*Frazer v. Schlegel*, 498 F.3d 1283 (Fed. Cir. 2007) ...................................................... 5

22

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944) ............................... 8

23

*Hedgewick v. Akers*, 497 F.2d 905 (CCPA 1974) ......................................................... 5

24

*Helene Curtis v. Sales Affiliates*, 121 F. Supp. 490 (S.D.N.Y. 1954), *aff'd*, 233 F.2d 148

25

    (2d Cir. 1956) ................................................................................................... 9

26

*Hoffman-La Roche, Inc. v. Promega Corp.*, 319 F. Supp. 2d 1011 (N.D. Cal. 2004) ......... 14

27

*Human Genome Scis., Inc. v. Genentech, Inc.*, 2011 WL 7461786 (C.D. Cal. Dec. 9, 2011) ........ 7, 10

28

*Hyatt v. Boone*, 146 F.3d 1348 (Fed. Cir. 1998) ..................................................................... 5

*Hynix Semicond. Inc. v. Rambus, Inc.*, 645 F.3d 1336 (Fed. Cir. 2011) ................................... 15

*Hynix Semicond. Inc. v. Rambus Inc.*, 897 F. Supp. 2d 939 (N.D. Cal. 2012) ........................... 12

*In re Gabapentin Patent Litig.*, 648 F. Supp. 2d 641 (D.N.J. 2009) ......................................... 14

*In re Omeprazole Patent Litig.*, 483 F.3d 1364 (Fed. Cir. 2007) ............................................... 6

*Intamin, Ltd. v. Magnetar Techs. Corp.*, affirmed, 623 F. Supp. 2d 1055 (C.D. Cal. 2009),
    *aff'd* 404 F. App'x 496 (Fed. Cir. 2010) ............................................................................ 8

*Intellect Wireless, Inc. v. HTC Corp.*, 732 F.3d 1339 (Fed. Cir. 2013) ...................................... 9

*Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240 (1933) ................................ 7, 8, 12, 14

*Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867 (Fed. Cir. 1988) ................. 12

*Laitram Corp. v. Morehouse Indus., Inc.*, 1997 WL 33320572 (E.D. Cal. Apr. 24, 1997) ....... 12

*Larson Mfg. Co. of S.D. v. Aluminart Prods. Ltd.*, 559 F.3d 1317 (Fed. Cir. 2009) .................. 11

*Lenz v. Univ. Music*, 2010 U.S. Dist. LEXIS 16899 (N.D. Cal. Feb. 25, 2010) ..................... 9, 11

*Leviton Mfg. Co. v. Universal Security Instr., Inc.*, 606 F.3d 1353 (Fed. Cir. 2010) ................... 6

*Mas v. Coca-Cola*, 163 F.2d 505 (4th Cir. 1947) ....................................................................... 8

*McHale v. Silicon Valley Law Grp.*, 2011 WL 6990187 (N.D. Cal. Dec. 14, 2011) ................. 11

*Mead v. McKirnan*, 585 F.2d 505 (CCPA 1978) ........................................................................ 5

*MedPointe Healthcare Inc. v. Hi-Tech Pharmacal Co.*, 380 F. Supp. 2d 457 (D.N.J. 2005) ..... 14

*Network Signatures, Inc. v. State Farm Mut. Auto. Ins. Co.*, 2012 WL 2357307 (C.D. Cal.
    June 13, 2012), *rev'd on other grds*, 731 F.3d 1239 (Fed. Cir. 2013) ................................ 9

*Northbay Wellness Grp., v. Beyries*, 789 F.3d 956 (9th Cir. 2015) .......................................... 13

*Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333 (Fed. Cir. 2013) ................................... 9

*Oracle Am., Inc. v. Google Inc.*, 2012 WL 1965778 (N.D. Cal. May 31, 2012) ....................... 15

*Ormco Corp. v. Align Tech., Inc.*, 647 F. Supp. 2d 1200 (C.D. Cal. 2009) ............................... 12

*Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 695 F.3d 1285 (Fed. Cir. 2012) ...... 11

*Perfumebay.com Inc. v. eBay, Inc.*, 506 F.3d 1165 (9th Cir. 2007) ......................................... 10

*Precision Instr. Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806 (1945) ................................ 8

*Qualcomm Inc. v. Broadcom Corp.*, 2007 WL 1031373 (S.D. Cal. Mar. 21, 2007), *aff'd*
    548 F.3d 1004 (Fed. Cir. 2008) ........................................................................... 15

*Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care*, 2016 WL 1376363
    (Fed. Cir. Apr. 7, 2016) ....................................................................................... 14

*Rep. Molding v. BW Photo Util.*, 319 F.2d 347 (9th Cir. 1963) ........................... 12, 13

*Smith & Nephew, Inc. v. Interlace Med., Inc.*, 955 F. Supp. 2d 69 (D. Mass. 2013) ..... 9

*Therasense, Inc., v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011) (*en banc*)......... 7, 9, 11, 13

*Top Grade Constr. v. Fluoresco Lighting-Sign Maint.*, 2012 WL 1122599 (N.D. Cal. Apr.
    3, 2012)................................................................................................................. 8, 9

*Wash. Capitols Basketball Club, Inc. v. Barry*, 304 F. Supp. 1193 (N.D. Cal. 1969) ........ 11

## STATUTES AND RULES

35 U.S.C. § 112 ¶ 1 .................................................................................................. 5

35 U.S.C. § 271(e) ................................................................................................. 15

Fed. R. Civ. P. 30(b)(6) ...................................................................................... 3, 10

DEFENDANTS' POST TRIAL BRIEF ON EQUITABLE DEFENSES
CASE NO. 5:13-CV-04057-BLF

# I.   INTRODUCTION AND FACTUAL BACKGROUND

As a matter of fact and law, Gilead did not meet its burden to prove unclean hands and implied waiver by clear and convincing evidence. In the joint pretrial order, the parties defined "unclean hands" as requiring "that one coming for relief have committed some unconscionable act immediately and necessarily related to the equity that he seeks in respect of the matter in litigation." Merck's Proposed Findings of Fact & Conclusions of Law ("FOF" or "COL") FOF ¶ 22. The only unclean hands theory Gilead identified before trial was that Merck and its partner Isis (now Ionis; collectively "Merck") had derived their invention in 2004 from Pharmasset employee Jeremy Clark. *See* FOF ¶ 23. The jury, however, found that the asserted claims of the '499 and '712 patents were described and enabled as of the filing of Merck's patent applications ***in January 2002***, months before Mr. Clark conceived of PSI-6130, and the Seventh Amendment precludes this Court from making contrary findings. FOF ¶¶ 17, 18; COL ¶¶ 3, 80. In fact, the undisputed record is that Mr. Clark arrived at the predecessor compound, PSI-6130, after studying Merck's patent publication—not the other way around. FOF ¶¶ 63-68, 72. It would be especially inequitable to allow Gilead to freely infringe patents that played a vital role in the development of Gilead's product.

Gilead now argues that even if Merck did not derive its invention from Pharmasset and is entitled to its patents, Merck has unclean hands because of the conduct of Merck patent attorney Philippe Durette. The defense is based on three facts. First, on March 17, 2004, Dr. Durette participated in a due diligence call with Pharmasset in which, according to Merck policy, he should not have participated. During that call, Pharmasset disclosed the structure of PSI-6130 to Merck. Second, a year later, and after the Clark application published disclosing the same information and more, Dr. Durette amended the claims, which always covered PSI-6130, to remove some less important subject matter. Third, on May 8, 2015, eleven years later, Dr. Durette inaccurately testified at his deposition that he had not participated in the March 17, 2004 call. Based on these three facts, Gilead now asks the Court to do what the jury—in a verdict that followed eight days of trial and unanimously upheld the validity of each asserted claim—refused to do: allow Gilead to infringe Merck's patents with impunity. Under the circumstances of this case, it would be unprecedented and improper for this Court to absolve Gilead from liability.

Merck's Invention. Merck had focused on compounds with 2'methyl up, 2'fluoro down long

1

before the 2004 call, as reflected in the testimony of Dr. Olsen and corroborated by the 2001 provisional application, the January 2002 non-provisional application, the claims of the '395 patent (allowed in September 2003, before the Pharmasset call), and the documents of Drs. Prakash and Song from 2001. FOF ¶¶ 26-59. Merck's pending application already included these compounds in the claims *before* the 2004 call. FOF ¶¶ 52-55. There is no evidence, much less clear and convincing evidence, that but for the 2004 call Dr. Durette would have *removed* these compounds from the pending claims. FOF ¶¶ 113-16.

PSI-6130. Before Merck's patent applications published in July 2002, Pharmasset had yet to make a single new anti-HCV compound. FOF ¶ 61. Within four days of the publication, Pharmasset obtained copies of the applications, which were distributed to Pharmasset chemists who studied them throughout the fall of 2002. FOF ¶¶ 63-66. In November 2002, after reviewing the Merck patent application, Mr. Clark approached Pharmasset's Chief Scientific Officer with a copy of the Merck application in one hand and a drawing of PSI-6130 in the other. FOF ¶ 68.

The 2004 Patent Due Diligence Call. It is undisputed that for nearly a year prior to the March 17, 2004 patent due diligence call, Pharmasset knew that Merck's patents covered PSI-6130. FOF ¶¶ 74-76. Pharmasset never disclosed that fact, even though the purpose of the call was to discuss the IP around PSI-6130 so that Merck could evaluate a potential collaboration. FOF ¶¶ 94-96. Instead, Pharmasset tried to mislead Merck by stating that PSI-6130 was covered only by Dr. Schinazi's earlier-filed 1999 patent. FOF ¶ 95. Whatever happened in the discussion on the 2004 call—and the record is anything but clear on that point, *see* FOF ¶ 100—Pharmasset's own notes make it plain that Dr. Durette, entirely of his own accord, announced his potential conflict *before* Pharmasset disclosed the structure of PSI-6130. FOF ¶¶ 98-100. Dr. Durette made no attempt to hide the conflict from Pharmasset, and Pharmasset persisted— even after Dr. Durette's red flag—in disclosing the structure of PSI-6130 on the call. FOF ¶ 99.

Merck immediately thereafter told Pharmasset that Merck's patents covered PSI-6130, identifying for Pharmasset five of Merck's pending applications and telling Pharmasset on a March 29, 2004 follow-up diligence call—as soon as Merck knew the structure—that they posed freedom to operate issues for Pharmasset. FOF ¶¶ 117-18. Merck certainly did not lie in wait. And in the ten years following those calls, Pharmasset never asserted any breach of the Merck-Pharmasset non-disclosure agreement (as there was none), never suggested that Dr. Durette or Merck did anything improper—including on the March 29

2

1    follow-up call—and instead repeatedly sought out Merck as a collaboration partner. FOF ¶¶ 118, 121.

2           After the call, Dr. Durette withdrew from further due diligence and did nothing with respect to the

3    prosecution of the '499 patent until after the Clark patent application was published. FOF ¶¶ 102-04.

4    Merck learned of that publication in the course of its routine monitoring of competitor publications

5    (something everyone in the industry did). FOF ¶ 105. Of the three compounds exemplified in

6    Pharmasset's patent publication, biological data was only reported for PSI-6130 (and a few controls), and

7    PSI-6130 had very impressive 2μM potency at a time when anything below 100μM was noteworthy.

8    FOF ¶¶ 105-06. In light of the inventors' focus on 2' methyl/fluoro and the Clark publication, there can

9    be no doubt that Merck would have continued to claim this compound even if the 2004 conversation had

10   not occurred. FOF ¶¶ 113-16. Under the terms of the Merck-Pharmasset non-disclosure agreement, the

11   Clark publication removed any confidentiality obligation that could have attached to the compound's

12   structure. FOF ¶¶ 108-10. In any event, Dr. Durette's only act afterwards was to focus the claims more

13   specifically on compounds with a fluoro substituent (which were already claimed), as expressly

14   permitted under the precedent of *Kingsdown*.

15          Dr. Durette's May 2015 Deposition. Dr. Durette was deposed more than a decade after the 2004

16   call. FOF ¶ 122. Although Merck named Dr. Durette as a Rule 30(b)(6) representative for the prosecution

17   of the '499 patent, he was not a Rule 30(b)(6) representative with respect to Merck's due diligence of

18   Pharmasset. FOF ¶ 122. At his deposition, Dr. Durette inaccurately testified that he had not participated

19   in the due diligence call eleven years earlier and that he did not learn the structure of PSI-6130 during

20   that call. FOF ¶¶ 122-23. He also stated that because he was prosecuting patents with related subject

21   matter, Merck policy would have precluded him from participating in the due diligence. *See* FOF ¶ 125.

22          It is undisputed that Dr. Durette's deposition testimony that he did not participate in the March

23   17, 2004 phone call was wrong. FOF ¶ 127. It is also undisputed, however, that Dr. Durette interrupted

24   the March 2004 conversation and disclosed a potential personal conflict. FOF ¶ 98. After that disclosure,

25   Pharmasset nonetheless disclosed the structure of PSI-6130. FOF ¶ 99. Dr. Durette's faulty memory is

26   not only plausible, it is the most plausible explanation for Dr. Durette's deposition testimony. Dr. Durette

27   did not try to hide the conflict in 2004, and there was no reason to do so at his deposition. On this point,

28   his deposition testimony identifying the potential conflict that he thought would have precluded his

1  participation in the call is entirely in line with the conflict he actually disclosed to Pharmasset on that

2  call. FOF ¶ 125. Dr. Durette believed his testimony was correct. FOF ¶ 123.

3       No Evidence of Impact or Systemic Misconduct with Regard to '499 Patent. Gilead has not

4  introduced any evidence that Dr. Durette's conduct had any impact on Merck obtaining the patent claims

5  involved in this litigation. There is no evidence of the kind of systematic, deliberate misconduct required

6  to support a finding of unclean hands. Even if the Court were to conclude that Dr. Durette's statement at

7  his deposition was intentionally false, it would at most be an isolated statement by a former employee

8  immaterial to the validity of the asserted claims. There is no evidence—as required by the Federal

9  Circuit—of the kind of pattern of egregious, fraudulent misconduct perpetrated in the Supreme Court's

10 patent cases applying unclean hands, all of which involved deliberate falsification, fabrication, or

11 suppression of evidence material to the patents and, in addition, affirmative acts designed to sustain the

12 deception before the PTO and the courts. Merck never relied on Dr. Durette's deposition testimony.

13 Evidence about the events of 2004 and the testimony of Dr. Durette about those events were *introduced*

14 *by Gilead over Merck's objection*. Merck maintained that events after January 2002 were irrelevant to

15 Gilead's section 112 defenses and that the patents would be invalid, one way or another, if Gilead

16 prevailed on those section 112 defenses. FOF ¶ 16, 130. It cannot possibly be part of a systemic pattern

17 of fraud perpetrated by Merck to gain advantage in this litigation.

18      Prosecution of the '712 Patent. As to the '712 patent, Gilead's unclean hands argument is entirely

19 untenable. Jeffrey Bergman, not Dr. Durette, was responsible for the issued claims of that patent, and his

20 involvement only began many years after the 2004 phone call. FOF ¶ 148. Long before Mr. Bergman

21 framed those claims, Pharmasset had publicly disclosed the structure of sofosbuvir. FOF ¶ 147. Framing

22 claims to cover a competitor's product is perfectly permissible under *Kingsdown*, and Mr. Bergman's

23 conduct confirms that Merck would have had claims covering Gilead's product independent of the 2004

24 call. Gilead has not and cannot point to any misconduct by Mr. Bergman or Merck with respect to the

25 '712 patent; thus unclean hands cannot bar its enforcement.

26      Gilead's Claim of Waiver. There is no evidence that Merck represented or otherwise suggested

27 through conduct that it would not assert its patent rights against Pharmasset. To the contrary, many

28 documents from 2004 through 2011 corroborate Pamela Demain's testimony that Merck repeatedly

1   informed Pharmasset that it needed to license Merck's patents to bring its product to market. FOF ¶¶ 159,

2   164-73. Pharmasset's own documents, the testimony of Dr. De la Rosa, and the testimony of CEO

3   Schaefer Price (wishing Merck's attorney "better luck finding the courthouse") eliminate any possible

4   doubt that Pharmasset understood at all times that Merck had not waived its rights. FOF ¶ 174.

5   **II.   ARGUMENT**

6           **A.   Gilead Cannot Prevail on Its Unclean Hands Defense Because the Theory It Disclosed Is Foreclosed by the Jury Verdict.**

7           In response to Merck's interrogatory asking for the basis of Gilead's unclean hands defense, the

8   only theory Gilead identified was that Merck "obtain[ed] its patent rights by deriving the invention from

9   Pharmasset's confidential disclosures, which renders it inequitable for Merck to now assert the patents

10  against Gilead, Pharmasset's successor." ECF 218-2 at 3-5 (Gilead's Interrog. Resp.). This theory fails.

11          Derivation requires proof of "prior, complete conception of the claimed subject matter and

12  communication of the complete conception to the party charged with derivation." *Hedgewick v. Akers*,

13  497 F.2d 905, 908 (CCPA 1974). To prove "prior" conception, Gilead must show that Jeremy Clark

14  conceived the invention of the asserted claims prior to Merck. Yet it is undisputed that this did not occur.

15  *See* Tr. 2548:20-25. This is fatal to Gilead's position. There can be no derivation without proof of

16  conception before the priority date of the challenged claims. *See Mead v. McKirnan*, 585 F.2d 505, 507

17  (CCPA 1978); *see also* COL ¶¶ 7-11, 21 (discussing cases).

18          Gilead argues that Merck derived the invention from Pharmasset's confidential disclosures *after*

19  the filing of its patent applications on January 18, 2002. That cannot be. "The filing of a patent

20  application serves as conception and constructive reduction to practice of the subject matter described in

21  the application." *Hyatt v. Boone*, 146 F.3d 1348, 1352 (Fed. Cir. 1998). Put differently, "when reliance is

22  on a patent document already filed, the question is whether the document discloses the invention [at

23  issue] by meeting the written description and enablement requirements of 35 U.S.C. § 112 ¶ 1." *Frazer v.

24  Schlegel*, 498 F.3d 1283, 1287 (Fed. Cir. 2007); *see also* COL ¶¶ 7-11 (discussing cases).

25          Here the jury rejected Gilead's contention that the asserted claims lack written description or

26  enablement in the January 2002 application. "[P]rior possession by [Merck] vitiates argument that the

27  invention was derived from [Gilead]." *Denen v. Buss*, 801 F.2d 385, 386 (Fed. Cir. 1986). These jury

28

1   findings are binding with respect to this Court's ruling on Gilead's equitable defenses. *Cabinet Vision v.*

2   *Cabnetware*, 129 F.3d 595, 600 (Fed. Cir. 1997); *see Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 472-73

3   (1962). This Court thus must conclude that Merck conceived the claimed subject matter no later than

4   January 18, 2002 and that Merck could not have derived its invention from Pharmasset's confidential

5   disclosures over two years later. In any event, Merck presented abundant evidence at trial to establish a

6   date of conception years before Jeremy Clark's work. *See* FOF ¶¶ 37-56.

7   Gilead cites *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223 (Fed. Cir. 1994), which

8   actually supports Merck's position. The majority opinion rejected the contention that the invention was

9   not fully conceived by the time the draft application was complete. Gilead relies on a statement in Judge

10  Lourie's concurring-in-part and dissenting-in-part opinion, but that statement is ambiguous, unsupported,

11  and not controlling authority. COL ¶ 12-13. The other case Gilead cites, *Leviton Mfg. Co. v. Universal*

12  *Security Instr., Inc.*, 606 F.3d 1353 (Fed. Cir. 2010), did not decide an issue of derivation. Instead, this

13  case involved two irreconcilable applications filed by the same company and claiming the same

14  invention but naming different sets of inventors. The court held that the company should have disclosed

15  the co-pending applications to the PTO, noting that "[n]either an inventor nor his counsel may graft

16  claims onto an earlier specification if those claims do not reflect what the inventor actually invented at

17  the time of the earlier application." *Id.* at 1360. Leviton argued that the earlier application supported the

18  claims, but (1) it was possible that the other inventors conceived *before* the filing date of the earliest

19  application and (2) there was no proceeding to confirm that the earliest application supported the claims.

20  Here, in contrast, there is no possibility of a prior conception by Clark before the filing date and the jury

21  has confirmed that the specification supports the claims at issue. COL ¶¶ 14-18. *Leviton* does not purport

22  to overrule *Hyatt v. Boone* and its progeny, nor could it.

23  The jury verdict forecloses the only disclosed basis for Gilead's unclean hands defense. *See* FOF

24  ¶¶ 23; COL ¶¶ 21-25. Accordingly, the Court should reject that defense.

25  **B.    The Court Should Not Find Unclean Hands Here for the Independent Reason That It**
         **Would Be Unprecedented and Inequitable.**

26  A party asserting unclean hands must prove it by clear and convincing evidence. *In re*

27  *Omeprazole Patent Litig.*, 483 F.3d 1364, 1374 (Fed. Cir. 2007). The doctrine applies "only where some

28

unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation" and "only for such violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication." *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933). The type of "unconscionable" conduct that supports a finding of unclean hands is exemplified in three Supreme Court cases, "all [of which] involved 'deliberately planned and carefully executed scheme[s] to defraud' not only the PTO but also the courts." *Therasense, Inc., v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1285-87 (Fed. Cir. 2011) (*en banc*). While unclean hands is not available in the majority of cases involving alleged misconduct by a patentee, it "remains available to supply a remedy for egregious misconduct *like that in the Supreme Court cases.*" *Id.* (emphasis added); *see also Human Genome Scis., Inc. v. Genentech, Inc.*, 2011 WL 7461786, at *8 (C.D. Cal. Dec. 9, 2011) ("*HGS*"). *See* COL I.C.

Gilead's unclean hands defense fails on multiple independent grounds. First, the alleged misconduct does not come close to the "egregious misconduct like that in the Supreme Court cases," *see Therasense*, 649 F.3d at 1287, which is the floor for a finding of unclean hands. Second, there is no clear and convincing evidence of any intent to deceive on the part of the litigant, Merck. Third, the alleged misconduct did not "affect the equitable relations between the parties." *Keystone*, 290 U.S. at 245. Finally, unclean hands is an equitable doctrine, and the equities do not support its application here. It would be unprecedented to set aside the jury's verdicts on validity and damages because a former employee gave inaccurate testimony, subsequently corrected, about events that are not relevant to the validity of the claims—particularly where, as here, Dr. Durette was not under Merck's control at the time of his deposition and his testimony was more damaging to Merck than to Gilead. It would be doubly inequitable to set the verdicts aside where the record shows that Gilead profited, to the tune of many billions of dollars, from capitalizing on the very patents it knew from the beginning it would infringe.

### 1. The Alleged Misconduct Is Not "Egregious Misconduct."

The degree of unconscionable conduct required for a finding of unclean hands is "egregious misconduct." *Therasense*, 649 F.3d at 1287. *See* COL I.C.i. That standard is exemplified by three Supreme Court cases involving unconscionable, shocking conduct by litigant-patentees. *See id.*; *Keystone,* 290 U.S. at 243; *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944);

1    *Precision Instr. Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806 (1945). The *Keystone* inventor bribed

2    a witness to falsify an affidavit and suppressed the evidence. *See* 290 U.S. at 243. The *Hazel-Atlas*

3    plaintiff published a fraudulent article, used it to secure the issuance of a patent, induced the court to rely

4    on it in holding the patent not invalid, and took affirmative steps to conceal the scheme. *See* 322 U.S. at

5    240. And, in *Precision*, the plaintiff learned that an inventor had given extensive false testimony to the

6    Patent Office ("PTO"), coerced the inventor's company to sign over the patent, secured issuance of the

7    patent based on the false testimony, and tried to enforce the patent, all while concealing the deception

8    from the PTO and the courts. *See* 324 U.S. at 809-10, 818. As the Court has already noted, the conduct

9    cited by Gilead in this case is not comparable to the bribery, forgery, and manufacture of evidence in the

10   Supreme Court cases exemplifying "egregious misconduct." *See* Tr. 2619:4-9.

11       Consistent with the Supreme Court cases, more recent decisions sustain an infringer's unclean

12   hands defense only where misconduct is truly egregious. Only one Federal Circuit opinion has affirmed

13   the dismissal of infringement claims based on an unclean hands defense absent a finding of inequitable

14   conduct (and absent a patent misuse issue that is not present here). In that case, *Aptix Corp. v. Quickturn*

15   *Design Sys., Inc.*, the patentee falsified engineering notebooks to support its position on patent validity,

16   knowingly submitted the false notebooks to the court, and staged a theft to cover up the deception. 269

17   F.3d 1369, 1371, 1373 (Fed. Cir. 2001). In *Intamin, Ltd. v. Magnetar Techs. Corp.*, affirmed without

18   opinion, the plaintiff repeatedly submitted an "obviously falsified patent assignment" to the PTO, "began

19   threatening its competitors with . . . property rights it did not own," and "committed misconduct related

20   to the litigation . . . by forging the chain of title and failing to disclose the fraudulent assignments in

21   discovery." 623 F. Supp. 2d 1055, 1073, 1077 (C.D. Cal. 2009), *aff'd* 404 F. App'x 496 (Fed. Cir. 2010).

22   And in *Mas v. Coca-Cola*, 163 F.2d 505, 507 (4th Cir. 1947), cited by Gilead, the plaintiff "used forged

23   documents and perjured testimony in his attempts to establish priority of invention in the Patent Office"

24   and was subsequently indicted and convicted based on that conduct.

25       Courts reject assertions of unclean hands where the alleged misconduct does not rise to the

26   required level. In *Top Grade Constr. v. Fluoresco Lighting-Sign Maint.*, for example, the court held that

27   inconsistent facts provided in interrogatory responses and a declaration were insufficient to prove

28   unclean hands as a matter of law. 2012 WL 1122599, at *10 (N.D. Cal. Apr. 3, 2012); *see also, e.g.*,

8

*Excelled Sheepskin & Leather Coat v. Oregon Brewing*, 2014 WL 3874193, at *10 (S.D.N.Y. Aug. 5, 2014); *Lenz v. Univ. Music*, 2010 U.S. Dist. LEXIS 16899, at *16-17 (N.D. Cal. Feb. 25, 2010); *Helene Curtis v. Sales Affiliates*, 121 F. Supp. 490, 512 (S.D.N.Y. 1954), *aff'd*, 233 F.2d 148 (2d Cir. 1956); COL ¶ 43 (discussing cases).

Post-*Therasense* inequitable conduct cases invoking the "egregious misconduct" materiality exception are also informative with respect to the "floor" for unconscionable behavior. As explained in *Therasense*, the Supreme Court unclean hands cases gave rise to a related doctrine, inequitable conduct, applicable to misrepresentations or omissions before the PTO. *See Therasense*, 649 F.3d at 1285-87. Over time, inequitable conduct "came to embrace a broader scope of misconduct" than unclean hands. *Id.* *Therasense* tightened the materiality requirement for inequitable conduct cases generally, but expressly exempted those cases involving "egregious misconduct" before the PTO. *Id.* at 1292. Thus, post-*Therasense* inequitable conduct decisions applying this exception also look to the Supreme Court cases and require similarly outrageous misconduct. *See, e.g.*, *Apotex, Inc. v. UCB, Inc.*, 970 F. Supp. 2d 1297, 1328 (S.D. Fla. 2013) (multiple misrepresentations to the PTO and submission of misleading expert report); *see also Intellect Wireless, Inc. v. HTC Corp.*, 732 F.3d 1339, 1342, 1343-44 (Fed. Cir. 2013).

Lesser transgressions are not sufficient. In *Smith & Nephew, Inc. v. Interlace Med., Inc.*, an inventor's "misleading statements in the patent application" did not "present the 'extraordinary circumstances' of affirmative egregious misconduct." 955 F. Supp. 2d 69, 73 (D. Mass. 2013); *see also Network Signatures, Inc. v. State Farm Mut. Auto. Ins. Co.*, 2012 WL 2357307, at *7 (C.D. Cal. June 13, 2012) (refusing to apply the exception where "[t]here is insufficient evidence of subsequent steps taken to continue deceiving the PTO or activities rising to the level of paying witnesses to lie or creating false articles with deceptive attribution"), *rev'd on other grds*, 731 F.3d 1239 (Fed. Cir. 2013); *Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1339 (Fed. Cir. 2013) (permitting inequitable conduct defense where misrepresentations were extensive, but "[i]f [the plaintiff] had simply withheld a single piece of information or made a single misrepresentation, this would be a different case").

Taken together, these cases confirm that none of the alleged misconduct here suffices to support a finding of unclean hands. First, the alleged misconduct is isolated to a single witness about a single point: his participation in a phone call in 2004. It is undisputed that when Dr. Durette realized on that call that

he had a potential conflict, he disclosed it. FOF ¶ 98. Gilead argues that during his deposition, Dr. Durette tried to conceal his participation on the call. But the inaccurate deposition testimony does not change anything about the events of 2004 and what happened thereafter.

Second, Merck did not rely on Dr. Durette's inaccurate deposition account of the 2004 call. To the contrary, Merck consistently maintained that the asserted claims rise and fall with the disclosure in the 2002 applications, irrespective of subsequent events. FOF ¶¶ 16, 130. Unlike the unclean hands cases, there is no evidence of any scheme by Merck to conceal crucial evidence or to rely on that deception in court. Like Gilead, Merck produced documents during discovery suggesting that he was on the call, and Merck acknowledged in its opening statement that he was on the call. FOF ¶ 127. Dr. Durette was not Merck's Rule 30(b)(6) representative with respect to the due diligence of Pharmasset, FOF ¶ 122, and was not Merck's witness on these events at trial, FOF ¶ 128.

Third, unlike the unclean hands cases, the alleged impropriety here is readily susceptible to an alternative explanation: Dr. Durette was on the call, and Pharmasset's notes show that when he realized he had a potential conflict, he immediately disclosed it. After determining that Merck's claims already covered PSI-6130, he took no action until after the Clark application published in 2005, at which point the issue was fully resolved in his mind and later forgotten. These facts are consistent with a failure of memory, poorly expressed in the deposition. *See* FOF ¶ 124.  This is the most plausible explanation, given the affirmative evidence of Dr. Durette's good faith in immediately disclosing the potential conflict. FOF ¶ 98; *see Big Lots Stores v. Jaredco*, 182 F. Supp. 2d 644, 652 (S.D. Ohio 2002) (no unclean hands where "susceptible to more innocuous explanations"). Throughout its continuous dealings with Merck, Pharmasset never complained about Dr. Durette and that speaks volumes; Merck's claims always covered PSI-6130 and Pharmasset knew it. FOF ¶¶ 120-21.

## 2. Dr. Durette's Deposition Testimony Cannot Be Imputed to Merck, and There Is No Evidence That Merck Itself Engaged in Any Improper Conduct.

Gilead's unclean hands defense also fails because there is no evidence that ***Merck*** had an intent to deceive anybody. "Bad intent is the essence of the defense of unclean hands." *Perfumebay.com Inc. v. eBay, Inc.*, 506 F.3d 1165, 1177 (9th Cir. 2007); *HGS*, 2011 WL 7461786, at \*8. This bar is high: "to meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single most

reasonable inference able to be drawn from the evidence.'" *Therasense*, 649 F.3d at 1290. *See* COL I.C.iv.

Gilead's only evidence of deceptive intent is Dr. Durette's erroneous deposition testimony. But courts have consistently refused to infer deceptive intent from the mere fact of a misrepresentation. *See, e.g.*, *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1354 (Fed. Cir. 2008); *Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 695 F.3d 1285, 1294-95 (Fed. Cir. 2012); *Excelled Sheepskin*, 2014 WL 3874193, at *10. Courts have likewise refused to infer deceptive intent from memory lapses. *See Eastman Kodak Co. v. Agfa-Gevaert N.V.,* 560 F. Supp. 2d 227, 301 (W.D.N.Y. 2008); *Lenz*, 2010 U.S. Dist. LEXIS 16899, at *13-15; *BASF Corp. v. Aristo, Inc.*, 872 F. Supp. 2d 758, 779 (N.D. Ind. 2012).

In this case, where over ten years had passed, a memory lapse is the most plausible explanation for the error at Dr. Durette's deposition, as explained above. Dr. Durette believed he was telling the truth in the deposition. There is, moreover, affirmative reason to doubt that Dr. Durette intended to deceive at his deposition, because he voluntarily disclosed his potential conflict to Pharmasset as soon as he realized it in 2004. FOF ¶ 98; *see Larson Mfg. Co. of S.D. v. Aluminart Prods. Ltd.*, 559 F.3d 1317, 1341 (Fed. Cir. 2009) (court should "take into account any evidence of good faith, which militates against a finding of deceptive intent," like disclosure of information allegedly sought to be concealed).

In any event, it is *Merck's* behavior, not that of its former employee, that is relevant to unclean hands. A non-litigant's misconduct is insufficient to support unclean hands unless it is attributable to the litigant. *See Wash. Capitols Basketball Club, Inc. v. Barry*, 304 F. Supp. 1193, 1199 (N.D. Cal. 1969) (rejecting unclean hands defense based on acts by plaintiff's predecessor-in-interest); *see also McHale v. Silicon Valley Law Grp.*, 2011 WL 6990187, at *5-8 (N.D. Cal. Dec. 14, 2011) (denying motion for summary judgment on unclean hands, despite undisputed misconduct of corporate officer, where there was a triable issue as to whether the officer's misconduct should be imputed to the plaintiff); *Aeroplane Corp. v. United States*, 71 Fed. Cl. 568, 569 (2006); *FDIC v. O'Melveny & Myers*, 61 F.3d 17, 19 (9th Cir. 1995) (per curiam). The record here is unmistakable: as explained *supra*, Merck was not the party that sought or obtained an advantage from Dr. Durette's erroneous testimony regarding the 2004 call. Dr. Durette's testimony was not part of any fraudulent scheme intentionally crafted by Merck.

**3. Gilead Suffered No Prejudice Regarding the Subject of This Litigation.**

1    Gilead's unclean hands defense also fails because Gilead suffered no prejudice from the alleged

2    misconduct. The doctrine of unclean hands applies only where the alleged misconduct "has immediate

3    and necessary relation" to the matter at issue in the litigation such that it "affects the equitable relations

4    between the parties in respect of something brought before the court for adjudication." *Keystone*, 290

5    U.S. at 245. In other words, the "bad faith or inequitable conduct must relate directly to the subject

6    matter of the claim, and the party asserting the defense must have been prejudiced by the bad faith

7    conduct." *Hynix Semicond. Inc. v. Rambus Inc.*, 897 F. Supp. 2d 939, 978 (N.D. Cal. 2012); *see also*

8    *Dream Games of Ariz., Inc. v. PC Onsite*, 561 F.3d 983, 990-91 (9th Cir. 2009); *CFM Commc'ns, LLC v.*

9    *Mitts Telecasting Co.*, 424 F. Supp. 2d 1229, 1238 (E.D. Cal. 2005). "[M]isconduct in the abstract,

10    unrelated to the claim to which it is asserted as a defense, does not constitute unclean hands." *Rep.*

11    *Molding v. BW Photo Util.*, 319 F.2d 347, 349 (9th Cir. 1963).

12    Gilead must show that the alleged misconduct was (1) directly related to the claims Merck asserts

13    in the present suit, *and* (2) as a result, Gilead suffered injury. *Hynix*, 897 F. Supp. 2d at 978. *See* COL

14    I.C.v. Gilead has shown neither. As already discussed, the jury verdict and undisputed evidence foreclose

15    any conclusion that Merck's claims are invalid as derived from Pharmasset. *Supra* I.A. There is no other

16    cognizable harm to Gilead. Gilead suggests that it could meet its burden by demonstrating that had it not

17    been for Dr. Durette's participation in the 2004 call, Merck would have inexplicably given up its existing

18    claims covering PSI-6130. But all the evidence points the other way: Merck's interest in these

19    compounds was well documented going back to 2001, and Merck had many reasons to retain this subject

20    matter, including the disclosure in the Clark publication, and no reason to drop it. FOF ¶¶ 113-16.

21    Gilead was not injured by the amended claims filed after the Clark patent application was

22    published. As this Court recognized in its jury instructions, as long as the original application supports

23    the claims—a requirement the jury found to be satisfied here—filing claims for the purpose of covering a

24    competitor's product is not "in any manner improper," *Kingsdown Med. Consultants, Ltd. v. Hollister*

25    *Inc.*, 863 F.2d 867, 874 (Fed. Cir. 1988), and does not support a finding of unclean hands, *Ormco Corp.*

26    *v. Align Tech., Inc.*, 647 F. Supp. 2d 1200, 1207 (C.D. Cal. 2009); *see also Laitram Corp. v. Morehouse*

27    *Indus., Inc.*, 1997 WL 33320572, at *13 (E.D. Cal. Apr. 24, 1997). That is especially true here, where Dr.

28    Durette voluntarily disclosed the potential conflict to Pharmasset, refrained from further amending the

1  '499 patent's claims until after the publication of the Clark application, and even then did not add

2  anything new to the claims. *See* FOF ¶ 116; COL ¶ 57.

3      Nor was Gilead injured by Dr. Durette's misstatement at his deposition. Gilead was aware of Mr.

4  Roemer's notes at the time of Dr. Durette's deposition and knew that his testimony was incorrect. Nor

5  was there anything surprising about Dr. Durette's trial testimony, which merely explained what was

6  evident from the public file history: that the initial claims already covered PSI-6130 and that Dr. Durette

7  did not amend the claims of the '499 patent until after the Clark application had published. FOF ¶¶ 103-

8  04. The fact that Gilead—not Merck—sought to introduce Dr. Durette's testimony and highlight it

9  repeatedly establishes that Gilead saw it as advantageous to its case, not prejudicial; indeed, Merck

10  moved to exclude this evidence as irrelevant and *highly prejudicial to Merck*. FOF ¶¶ 16, 130. Having

11  opposed that motion and insisted on the introduction of this evidence, but having failed to persuade the

12  jury that Merck did not invent the claimed compounds, Gilead cannot now be heard to complain.

13  **4.  It Would Be Inequitable To Set Aside the Jury's Verdict.**

14      Assessing whether unclean hands "precludes relief requires balancing the alleged wrongdoing of

15  the plaintiff against that of the defendant, and 'weigh[ing] the substance of the right asserted by [the]

16  plaintiff against the transgression which, it is contended, serves to foreclose that right.'" *Northbay*

17  *Wellness Grp., v. Beyries*, 789 F.3d 956, 960 (9th Cir. 2015) (quoting *Rep. Molding*, 319 F.2d at 350).

18      The equities in this case weigh heavily in Merck's favor. *See* COL I.C.vi. None of the alleged

19  misconduct was "egregious"; there is no evidence that Merck intended to deceive; and none of the

20  alleged misconduct harmed Gilead or benefited Merck. Meanwhile, Merck's rights are substantial.

21  Merck's patents are property rights duly issued by the PTO and adjudged not invalid by the jury *after*

22  hearing Gilead's derivation arguments and Dr. Durette's testimony. And Pharmasset derived its

23  blockbuster product in significant part from reviewing the very patent application that led to the '499

24  patent—a patent Gilead knowingly infringes. FOF ¶ 14. A finding of unclean hands would be completely

25  disproportionate to the alleged transgression. As the Federal Circuit cautioned in *Therasense*, it is

26  "inequitable to strike down an entire patent where the patentee committed only minor missteps or acted

27  with minimal culpability." 649 F.3d at 1292. Merck is not aware of any case where a court concluded

28  that the equities required such an imbalanced outcome, and respectfully asks the Court not to make this

the first.

###### C. Gilead's Unclean Hands Defense Is Inapplicable to the '712 Patent.

This Court should reject Gilead's unclean hands defense with respect to the '712 patent. As already explained, the doctrine of unclean hands only bars relief if the alleged misconduct has an immediate and necessary relationship to the asserted claims, i.e., the claims of the '712 patent. "[W]hen the alleged misconduct does not directly relate to the particular patent that is the subject of the litigation, even if it involves other patents, courts have rejected claims of unclean hands." *In re Gabapentin Patent Litig.*, 648 F. Supp. 2d 641, 650 (D.N.J. 2009). In *Hoffman-La Roche, Inc. v. Promega Corp.*, 319 F. Supp. 2d 1011, 1026 (N.D. Cal. 2004), the court rejected an unclean hands defense where inequitable conduct in procuring one patent was insufficiently related to two other asserted patents, even though all three patents had "a close technological relation." *See also Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.*, 2006 WL 3342655, at *1-2 (S.D.N.Y. Nov. 16, 2006); *MedPointe Healthcare Inc. v. Hi-Tech Pharmacal Co.*, 380 F. Supp. 2d 457, 466 (D.N.J. 2005). *See* COL I.D.

None of the misconduct Gilead cites concerns the '712 patent. There is no evidence or allegation that in prosecuting the '712 patent years later, Jeffrey Bergman ever received any of the information Pharmasset provided to Dr. Durette on the call or ever spoke to Dr. Durette about these applications. Indeed, by the time that Mr. Bergman filed the claims that issued in the '712 patent, Pharmasset had published both the structure of PSI-7977 (sofosbuvir) and the fact that it was a development compound in human clinical trials. There is no evidence that any of Dr. Durette's alleged misconduct affected the prosecution or enforcement of the '712 patent in any way, much less bore an "immediate and necessary" relationship to the patent. *Keystone*, 290 U.S. at 245. *See* FOF ¶¶ 147-52.

###### D. *Rembrandt Vision Technologies* Does Not Provide a Basis for a New Trial Here.

Gilead seeks a new trial based on *Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care*, 2016 WL 1376363 (Fed. Cir. Apr. 7, 2016), but that case is completely inapposite. *Rembrandt* concerned false trial testimony and suppression of evidence uncovered by the losing party *after trial*. *Id.* at *1-2. The Federal Circuit ordered a new trial because the losing party had been deprived of "a full and fair trial" on the affected issue. *Id.* at *6. There are no new facts here, only testimony and documents Gilead had before trial and either used or decided not to. Gilead had every chance to address Dr.

14

1   Durette's testimony at trial. And it took those chances—it made him a centerpiece of its case. In any

2   event, Dr. Durette's testimony was irrelevant to written description and enablement, the issues on which

3   Gilead seeks a new trial, and especially irrelevant to those issues with regard to the '712 patent, which

4   undisputedly was not affected by Dr. Durette's learning the structure of PSI-6130 in 2004. The notion

5   that Gilead was deprived of "a full and fair trial" here is meritless. *See* COL I.E.

6          **E.**    **Gilead Cannot Prove Its Waiver Defense by Clear and Convincing Evidence.**

7        Gilead has never contended that Merck expressly waived its patent rights; it contends only that

8   Merck's conduct over a period of years amounted to an implied waiver of patent rights that had not yet

9   materialized into an infringement claim, due to the safe harbor of § 271(e). Outside the specific context

10  of standard-setting organizations, where participants may have an affirmative duty to disclose and assert

11  patent rights, Gilead has pointed to no case in which a court found a waiver of patent enforcement rights

12  on an implied basis. Accordingly, Gilead's waiver defense is not cognizable.

13       Even if Gilead's waiver defense were cognizable, it would fail. The Federal Circuit has held that

14  implied waiver must be proved by clear and convincing evidence. *Hynix Semicond. Inc. v. Rambus, Inc.*,

15  645 F.3d 1336, 1348 (Fed. Cir. 2011); *see also Qualcomm Inc. v. Broadcom Corp.*, 2007 WL 1031373,

16  at *8-9 (S.D. Cal. Mar. 21, 2007), *aff'd* 548 F.3d 1004 (Fed. Cir. 2008). *See* COL II. In *Oracle Am., Inc.*

17  *v. Google Inc.*, 2012 WL 1965778, at *2 (N.D. Cal. May 31, 2012), the only case cited by Gilead that

18  used a preponderance standard, the alleged waiver was *express*, not implied, and the parties "agree[d]

19  that inaction alone is insufficient to show waiver." *Id.*

20       In any event, Gilead cannot prove implied waiver under any standard. Gilead must demonstrate

21  that it held a reasonable belief that Merck would not assert its patents against it. COL ¶ 127. There is not

22  a single bit of evidence to that effect. Rather, Merck repeatedly raised its patent rights to Pharmasset

23  including as far back as 2004, FOF ¶ 118, and Pharmasset knew that Merck had no intention of

24  relinquishing them, even inviting Merck to meet them at the courthouse, FOF ¶ 174.

25  **III.**    **CONCLUSION**

26       The Court should find that Gilead has failed to prove its defenses of unclean hands and waiver.

27  Dated:  April 22, 2016           By:  _____*/s/ Bruce Genderson*_____

                                      BRUCE GENDERSON

28

1

## CERTIFICATE OF SERVICE

2

I certify that all counsel of record are being served on April 22, 2016 with a copy of this

3

document via the Court's CM/ECF system.

4

_____
*/s/ Bruce Genderson*
BRUCE GENDERSON

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28